# Exhibit C

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

OF

BAYOU STEEL BD HOLDINGS, L.L.C.

A Delaware Limited Liability Company

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of Bayou Steel BD Holdings, L.L.C., a Delaware limited liability company (the "Company"), which amends and restates the Limited Liability Company Agreement of the Company dated December 22, 2015 (the "Original Agreement"), is dated and effective as of May 25, 2016 (the "Effective Date"), and is adopted, executed, and agreed to by and among the Company and Bayou Steel BD Holdings II, L.L.C., as the Company's sole member on the Effective Date (the "Initial Member"), and each other Person who at any time after the Effective Date becomes a Member in accordance with the terms of this Agreement and the Act. Any reference in this Agreement to any Member shall include such Member's Successors in Interest to the extent such Successors in Interest have become Substitute Members in accordance with the provisions of this Agreement.

WITNESSETH:

WHEREAS, the Company was formed as BD Long Products, LLC, a Delaware limited liability company, in accordance with the Act upon the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on December 22, 2015 (as amended from time to time, the "Certificate"), and the Company, Black Diamond Capital Management, L.L.C., as the sole manager of the Company (the "Initial Manager"), and the Initial Member entered into the Original Agreement effective as of the same date;

WHEREAS, on April 6, 2016, the Company changed its name from BD Long Products, LLC to Bayou Steel BD Holdings, L.L.C.;

WHEREAS, the Company, the Initial Manager, and the Initial Member have agreed to amend and restate the Original Agreement in order to, among other things, provide for two classes of membership interests, including non-voting equity incentive units that may be issued as compensation to certain employees and other service providers;

WHEREAS, the Original Agreement, pursuant to Section VIII(D), may only be amended by the unanimous written consent of the then-current Members and Manager;

WHEREAS, by joint written consent on April 21, 2016, the Initial Manager and the sole member of the Company approved the execution and delivery of this Agreement; and

WHEREAS, by its execution hereof, the Initial Member in its capacity as the Company's sole member authorizes and approves the Agreement.

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein, the parties hereto, each intending to be legally bound, agree as follows:

ARTICLE I.
GENERAL PROVISIONS

SECTION 1.1.    Definitions.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings set forth on Exhibit B.

SECTION 1.2.    Terms Generally.    The words "hereby," "herein," "hereof," "hereunder" and words of similar import refer to this Agreement as a whole (including any Exhibits hereto) and not merely to the specific section, paragraph or clause in which such word appears.  All references herein to Sections, Articles and Exhibits shall be deemed references to Sections and Articles of, and Exhibits to, this Agreement unless the context shall otherwise require.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The definitions given for terms in Exhibit B and elsewhere in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  Except as otherwise expressly provided herein, all references to "dollars" or "$" shall be deemed references to the lawful money of the United States of America. The use of "or" is not intended to be exclusive unless expressly indicated otherwise.  All terms herein that relate to accounting matters shall be interpreted in accordance with GAAP.

SECTION 1.3.    Formation.  The Company has been organized as a Delaware limited liability company by the execution and filing of the Certificate by an authorized Person under and pursuant to the Act.  The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Act and this Agreement.  To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

SECTION 1.4.    Name.  The name of the Company is Bayou Steel BD Holdings, L.L.C.; provided, however, that the name of the Company may be changed by amendment to the Certificate in accordance with the Act and this Agreement.  All Company business shall be conducted in that name or in such other names that comply with applicable law as the Board may select from time to time.

SECTION 1.5.    Term.  The term of the Company shall be perpetual unless and until the Company is dissolved by the Board or as set forth herein.  The existence of the Company as a separate legal entity shall continue until the cancellation of the Certificate in the manner required by the Act.

SECTION 1.6.    Purpose; Powers.

(a)    General Powers.  The nature of the business or purposes to be conducted or promoted by the Company is to engage in any lawful act or activity for which limited liability companies may be organized under the Act.  The Company may engage in any and all activities necessary, desirable or incidental to the accomplishment of the foregoing.  Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the

Company to possess any purpose or power, or to do any act or thing, forbidden by applicable law to a limited liability company organized under the laws of the State of Delaware.

(b)     Company Action. Except as otherwise set forth in this Agreement and except as prohibited by applicable law, (i) the Company may, with the approval of the Class A Members holding at least a majority of the outstanding Class A Units, the Board (or a duly authorized committee thereof) or a duly authorized Officer, enter into and perform any and all documents, agreements and instruments contemplated by such approval, all without any further act, vote or approval of any Member, and (ii) the Class A Members holding at least a majority of the outstanding Class A Units or the Board (or a duly authorized committee thereof) may authorize any Person (including any Member, Director or Officer) to enter into and perform any document on behalf of the Company.

SECTION 1.7.     Foreign Qualification. The Board shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in any jurisdiction in which the location of its assets and properties or the conduct of its business requires such qualification unless the Board shall determine that the failure to so qualify would not adversely affect the Company.

SECTION 1.8.     Registered Office; Registered Agent; Offices. The Registered Office and Registered Agent of the Company for service of process is The Corporation Trust Company, whose address is 1209 Orange Street, Wilmington, Delaware, 19801. The Board may change the registered agent and appoint successor registered agents at any time. The principal place of business of the Company shall be 138 Highway 3217, LaPlace, Louisiana 70068, or at such other location as may be designated by the Board from time to time. The Company may have such other offices as the Board may designate from time to time.

SECTION 1.9.     Partnership Status. The Members intend that the Company shall be treated as a partnership for federal, state and local income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment, except to the extent otherwise required by applicable law. The Members intend that the Company shall not be treated as a partnership or joint venture for any other purpose, and neither this Agreement nor any other document executed by the Company or the Members relating to the subject matter hereof shall be construed to suggest otherwise.

SECTION 1.10.     Limited Liability Company Agreement. Effective as of the Effective Date, the Initial Member and the Company hereby execute and deliver this Agreement, which amends, restates, and supersedes the Original Agreement in its entirety, for the purpose of governing and regulating the affairs of the Company and the conduct of its business in accordance with the provisions of the Act. The parties hereto acknowledge that the Initial Member constitutes the sole Member of the Company as of the Effective Date.

ARTICLE II.
MEMBERSHIP INTERESTS

SECTION 2.1.    Capital Structure; Rights and Privileges of Units. Effective as of the Effective Date, the Membership Interests of the Members shall be represented by Class A Units and Class B Units, each of which shall carry the rights, preferences, privileges, restrictions and limitations set forth in this Agreement.

(a)    Class A Units.

(i)    Authorized Units. Initially, a total of **9,175** Class A Units shall be authorized, all of which are issued to the Initial Member as set forth on Exhibit A.

(ii)    Voting. Except as otherwise provided by applicable law, the Class A Members shall have the right to vote on all matters presented to the Members of the Company entitled to vote. Each Class A Unit shall be entitled to one (1) vote on all such matters. Notwithstanding anything else contained herein to the contrary, the Class A Members holding at least a majority of the outstanding Class A Units shall have the power to act for, sign for and do any act on behalf of the Company, and to make any expenditures and incur any obligations on behalf of the Company or authorize any of the foregoing.

(b)    Class B Units.

(i)    Authorized Units. Initially, a total of **825** Class B Units shall be authorized, none of which are issued as of the Effective Date.

(ii)    Voting and Other Rights. The Class B Units shall be non-voting Units and shall not have any right to vote on any matters involving the Company, including any matter with respect to which the Act provides for the consent or approval of the members of a limited liability company organized under the Act. The only right to which a Class B Member shall be entitled shall be the right to receive distributions with respect to the Class B Units held by such Class B Member in accordance with Section 5.4(b) or (c).

(iii)    Vesting. Any Class B Units shall vest in accordance with the terms set forth in the Equity Incentive Plan and the applicable Award Agreement under which such Class B Units are granted and shall be subject to forfeiture and repurchase by the Company and other terms as set forth therein.

(c)    Profits Interests. The Class B Units are intended to constitute "profits interests" within the meaning of Rev. Proc. 93-27, 1993-2 CB 343, when issued, and all provisions of this Agreement shall be interpreted consistent with this intention. Immediately prior to the issuance of a Class B Unit, the Gross Asset Value of all Company assets shall be adjusted to equal their respective Gross Asset Values and the Capital Accounts of the Members shall be adjusted pursuant to this Agreement. Each Class B Unit shall entitle its record owner to share in the appreciation in the fair market value of the Company from the date of issuance and not in any fair market value of the Company accrued prior to the issuance of such Unit. Holders of Class B Units shall not be entitled to any retroactive allocation of the Company's income, gains, losses, deductions, credits or other items. To implement this limitation, in connection with the issuance

of each Class B Unit, the Board shall amend Section 5.4 through amendment of Exhibit A providing for a subsection corresponding to each Class B Unit and establishing the Threshold Amount for each such Class B Unit as the minimum aggregate amount that must be distributed pursuant to Section 5.4 with respect to all Units outstanding (such Units, the "Participating Units") as of the date of the issuance of such Class B Unit before such Class B Unit shall share in its respective portion (as determined under Section 5.4) of distributions.

(i)     To the extent provided for in Regulations, revenue rulings, revenue procedures and/or other Internal Revenue Service guidance issued after the date hereof, the Company is hereby authorized to, and at the direction of the Board shall, elect a safe harbor under which the fair market value of any Class B Units issued after the effective date of such Regulations (or other guidance) will be treated as equal to the liquidation value of such Class B Units (i.e., a value equal to the total amount that would be distributed with respect to such Class B Units if the Company sold all of its assets for their fair market values immediately after the issuance of such Units, satisfied its liabilities (excluding any non-recourse liabilities to the extent the balance of such liabilities exceeds the fair market value of the assets that secure them) and distributed the net proceeds to the Members under the terms of this Agreement). In the event that the Company makes a safe harbor election as described in the preceding sentence, each Member hereby agrees to comply with all safe harbor requirements with respect to transfers of such Class B Units while the safe harbor election remains effective. The Board shall be authorized to (and shall) prepare, execute, and file any such safe harbor election.

(ii)     If Rev. Proc. 93-27 is replaced or withdrawn, but not with the safe harbor regulations set forth in Proposed Treasury Regulations Section 1.83-3(l), issued on May 19, 2005 in materially the current form, the Company, the Board and the Members shall, to the extent possible, endeavor to treat the Class B Units issued in connection with the performance of services in the same manner as provided in this Section 2.1(c), including determining the fair market value of the Class B Units issued in connection with the performance of services as being equal to the liquidation value of such Class B Units on the date that the Class B Units are Transferable or not subject to (or deemed not subject to) a substantial risk of forfeiture within the meaning of Code Section 83 (including by reason of filing an election under Code Section 83(b)), whichever occurs earlier. The Company, the Board and the Members (including any Person to whom Class B Units are issued or Transferred in connection with the performance of services) shall execute and file any tax election or statement necessary to effectuate the treatment of Class B Units as provided in this Section 2.1(c)(ii) and shall not take any position on their tax returns that is inconsistent with such treatment.

(iii)     Any Member who receives Class B Units for services shall make a timely and effective election under Code Section 83(b) with respect to such Class B Units, which may be restricted. Except as otherwise determined by the Board, both the Company and all Members will (A) treat such Class B Units as outstanding for tax purposes, (B) treat such Member as a partner for tax purposes with respect to such Class B Units, and (C) file all tax returns and reports consistently with the foregoing, and neither the Company nor any of its Members will deduct any amount (as wages, compensation or otherwise) for the fair market value of such Class B Units for federal income tax purposes.

(iv)    Notwithstanding the foregoing, upon a forfeiture of any unvested Class B Units by any Member, gross items of income, gain, loss or deduction shall be allocated to such Member if and to the extent required by final Regulations promulgated after the Effective Date to ensure that allocations made with respect to all unvested Class B Units are recognized under Code Section 704(b).  In the event that any Class B Units cease to continue to vest or are forfeited for any reason, then such Class B Units shall once again become available for issuance.

(v)    The intent of this Section 2.1(c) is to ensure that any Class B Unit issued as a profits interest pursuant to an applicable Award Agreement after the Effective Date qualifies as "profits interests" under Revenue Procedure 93-27, I.R.B. 1993-24, June 9, 1993 and Revenue Procedure 2001-43, I.R.B. 2001-34, August 2, 2001.

SECTION 2.2.    Ownership and Issuance of Units.

(a)    Ownership.  The ownership of outstanding Units shall be listed on Exhibit A to this Agreement, as from time to time amended or supplemented in accordance with this Agreement.  From time to time, following the admission of any Additional Members or Substitute Members, or following the issuance, Transfer or forfeiture of any Units, or the change of address of any Member, Exhibit A shall be amended by the Board to reflect such changes.

(b)    Issuance.  Subject to the terms of this Agreement, the Board is authorized in its sole and complete discretion to cause the Company to issue, on such terms and conditions as the Board shall determine, additional Units, which Units may be of a same or different class from the Units which are outstanding prior to such issuance, at any time or from time to time, to existing Members or to other Persons, and to admit any such other Persons to the Company as Additional Members pursuant to Section 6.4.  In connection with any issuance of additional Units, the Board shall have sole and complete discretion to increase the authorized number of Units of any existing Class of Units or to create new Classes, subclasses or series of Units (in addition to the then existing Classes, subclasses and series of Units), with such relative rights, preferences, privileges, restrictions and limitations as shall be fixed by the Board, and to make such revisions to the relative rights, preferences, privileges, restrictions and limitations of Units which are outstanding prior to such issuance, subject only to the express restrictions set forth in Section 13.4.  Upon the issuance of any additional Units pursuant to this Section 2.2, the Board shall amend Exhibit A hereto to reflect such issuance and, if necessary and subject to Section 13.4, the other terms and provisions of this Agreement to reflect the creation, designation, preferences and relative, participating, optional or other special rights, powers and duties of any such new Class, subclass or series of Units.

(c)    Equity Incentive Plan.  Without limiting the generality of paragraph (b) above, the Board may issue Class B Units to employees of, or other service providers to, the Company and its Subsidiaries, in accordance with and subject to the terms of the Equity Incentive Plan.  Notwithstanding anything to the contrary contained herein, in addition to any conditions or restrictions on Class B Units contained in this Agreement, any Class B Units issued pursuant to the Equity Incentive Plan may also be subject to such other conditions and restrictions (including vesting) as determined by the Board and set forth in an applicable Award Agreement.

ARTICLE III.
MANAGEMENT

SECTION 3.1.    The Board of Directors; Delegation of Authority and Duties.

(a)    Authority of the Board.  To the fullest extent permitted by Delaware law, but subject to the ultimate control and authority of the Class A Members and the terms of this Agreement (including Section 3.12), the Board shall possess full power to manage the business and affairs of the Company (and each Director shall be considered a "manager" for purposes of Section 18-402 of the Act).  In furtherance of the foregoing, each of the Members hereby consents to the exercise by the Board of all such powers and rights conferred on the Board by the Act and this Agreement with respect to the management and control of the Company.  Each Member acknowledges and agrees that, except as otherwise agreed in writing, each Class A Member shall not be bound to devote any of such Class A Member's business time to the affairs of the Company, and that each Class A Member and such Class A Member's Affiliates do and will continue to engage for such Class A Member's own account and for the account of others in other business ventures, which may be competitive with the business of the Company.

(b)    Delegation by the Board.  The Board shall have the power and authority to delegate to one or more other Persons the Board's rights and powers to manage and control the business and affairs of the Company as set forth in this Agreement and may authorize any Person (including any Member, Officer or Director) to enter into and perform under any document authorized by the Board on behalf of the Company.

SECTION 3.2.    Establishment of the Board.

(a)    Directors.  The number of Directors serving on the Board may be set from time to time by the Board by resolution.  Directors shall be elected, appointed and removed by the Class A Members in accordance with Section 4.1.  Each Director shall remain in office until his or her death, resignation or removal, and in the event of death, resignation or removal of a Director, the vacancy created shall be filled as provided in Section 4.1.  All Directors shall be individuals but need not be Members.  As of the Effective Date, the initial Directors shall be Sam Farahnak and Phil Raygorodetsky.

(b)    No Individual Authority.  No Director, in his or her capacity as a member of the Board, has the individual authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to make any expenditures or incur any obligations on behalf of the Company or authorize any of the foregoing, other than acts that are expressly authorized by the Board (or a duly authorized committee thereof).

(c)    Committees.  The Board may, from time to time, designate one or more committees.  Any such committee, to the extent provided in the enabling resolution and until dissolved by the Board, shall have and may exercise any or all of the authority of the Board.  At every meeting of any such committee, the presence of at least a majority of all the members thereof shall constitute a quorum, and the affirmative vote of a majority of the members of such committee present shall be necessary for the adoption of any resolution.  The Board may dissolve any committee at any time.

SECTION 3.3.    Board Meetings.

(a)    Quorum; Voting.  At least a majority of the total number of Directors shall constitute a quorum for the transaction of business of the Board; provided that any such majority shall at all times be required to include at least one Affiliated Director.  The act of a majority of the Directors present at a meeting of the Board at which a quorum is present shall be the act of the Board; provided that any such majority shall at all times be required to include all of those Affiliated Directors present at such meeting.  A Director who is present at a meeting of the Board at which action on any matter is taken shall be presumed to have assented to the action unless his or her dissent shall be entered in the minutes of the meeting or unless he or she shall file his or her written dissent to such action with the Person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a Director who voted in favor of such action.

(b)    Place of Meetings; Waiver of Notice.  Meetings of the Board may be held at such place or places as shall be determined from time to time by resolution of the Board or, in the case of a special meeting of the Board, by the Person(s) calling the meeting as provided herein.  At all meetings of the Board, business shall be transacted in such order as shall from time to time be determined by resolution of the Board or, in the absence of such resolution, by the Chairman.  Attendance of a Director at a meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c)    Regular Meetings.  Regular meetings of the Board shall be held at such times and places as shall be designated from time to time by resolution of the Board.  Additional notice of such meetings shall not be required.

(d)    Special Meetings.  Special meetings of the Board may be called on at least 24 hours' notice to each Director by any Director.  Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by applicable law or provided for in this Agreement.

(e)    Notice.  Without limiting the foregoing, notice of any special meeting of the Board or other committee may be given to the Directors either by email at their email addresses known to the Company or at their physical addresses known to the Company in the manner permitted by Section 13.5.  Notice to a Director of any meeting may be waived by such Director.

SECTION 3.4.    Chairman.  The Board shall elect its Chairman.  The Chairman shall preside at all meetings of the Board.  If the Chairman is absent at any meeting of the Board, at least a majority of the Directors present shall designate another Director to serve as interim chairman (an "Interim Chairman") for that meeting.  Except as authorized by the Board or this Agreement, the Chairman shall have no authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to make any expenditure or incur any obligations on behalf of the Company or authorize any of the foregoing.  In the event any action or decision on behalf of or with respect to the Company requiring the approval of the

Board results in a deadlock between the Directors, such dispute shall be resolved by the Chairman or by an Interim Chairman if the Chairman is unavailable or unwilling to resolve such dispute. As of the Effective Date, the initial Chairman shall be Phil Raygorodetsky.

SECTION 3.5.    Action by Written Consent or Telephone Conference.    Any action permitted or required by the Act, the Certificate or this Agreement to be taken at a meeting of the Board or any committee designated by the Board may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by a majority of the Directors or a majority of the members of such committee, as the case may be; provided that any such majority shall at all times include at least one Affiliated Director. Such consent shall have the same force and effect as a vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of the State of Delaware. Subject to the requirements of this Agreement for notice of meetings, the Directors, or members of any committee designated by the Board, may participate in and hold a meeting of the Board or any such other committee, as the case may be, by means of a conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

SECTION 3.6.    Officers.

(a)    Designation and Appointment.  The Board may, from time to time, employ and retain Persons as may be necessary or appropriate for the conduct of the Company's business (subject to the supervision and control of the Board), including employees, agents and other Persons (any of whom may be a Director) who may be designated as Officers of the Company, with titles including "Chief Executive Officer," "Chief Operating Officer," "President," "Vice President," "Treasurer," "Secretary," "Assistant Secretary," and "Chief Financial Officer," as and to the extent authorized by the Board. Each such Officer shall have responsibilities consistent with those set forth in this Section 3.6, subject to any employment agreement between any such Officer and the Company. Any number of offices may be held by the same Person. In its discretion, the Board may choose not to fill any office for any period as it may deem advisable. Officers need not be Members or residents of the State of Delaware. Any Officers so designated shall have such authority and perform such duties as the Board may, from time to time, delegate to them. The Board may assign titles to particular Officers. Each Officer shall hold office until his or her successor shall be duly designated and shall qualify or until his or her death or until he or she shall resign or shall have been removed in the manner hereinafter provided. The salaries or other compensation, if any, of the Officers of the Company shall be fixed from time to time by the Board.

(b)    Resignation/Removal.  Any Officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Board. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Subject to any applicable contractual rights, any Officer may be removed as such, either with or without cause, at any time by the Board. Designation of an Officer shall not of itself create any contractual or employment rights.

(c)     Duties of Certain Officers. The Officers of the Company who are full-time employees of the Company or a Subsidiary thereof, in the performance of their duties as such, shall owe to the Company duties of loyalty and due care of the type owed by the officers of a corporation to such corporation and its stockholders under the laws of the State of Delaware.

(d)     Chief Executive Officer. Subject to the powers of the Board, the Chief Executive Officer of the Company shall have general and active supervisory authority for the management of the business of the Company and shall see that all orders and resolutions of the Board are carried into effect. The Chief Executive Officer shall have the general duties, powers and responsibilities of a chief executive officer and president of a corporation and have such other powers and perform such other duties as may be prescribed by the Board.

(e)     Chief Operating Officer. Subject to the powers of the Board and the Chief Executive Officer, the Chief Operating Officer of the Company, if any, shall have general and active supervisory authority for the day-to-day operations of the Company. The Chief Operating Officer shall have such other powers and perform such other duties as may be prescribed by the Chief Executive Officer or the Board.

(f)     Chief Financial Officer. The Chief Financial Officer, if any, shall keep and maintain, or cause to be kept and maintained, proper books and records of accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, gains, losses and capital. The Chief Financial Officer shall have such other powers and perform such other duties as may be prescribed by the Chief Executive Officer or the Board.

(g)     Treasurer. The Treasurer shall have custody of the funds and securities of the Company, shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company, and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Board. The Treasurer shall have such other powers and perform such other duties as may be prescribed by the Chief Executive Officer or the Board.

(h)     Vice President(s). The Vice President(s), if any, shall perform such duties and have such other powers as the Chief Executive Officer or the Board may from time to time prescribe.

(i)     Secretary; Assistant Secretaries.

(i)     The Secretary shall attend all meetings of the Board and Members, and shall record all the proceedings of such meetings in books to be kept for that purpose, and shall perform like duties for the committees of the Board when required.

(ii)     The Secretary shall keep a record of all actions of the Members and the Board and a record of such other matters as may be required under the Act. The Secretary shall perform such other duties and have such other authority as may be prescribed elsewhere in this Agreement or from time to time by the Chief Executive Officer or the Board. Without limiting the foregoing, the Secretary shall have the general duties, powers and responsibilities of a secretary of a corporation.

(iii)    If the Board chooses to appoint an Assistant Secretary or Assistant Secretaries, the Assistant Secretaries, in the absence, disability or inability to act of the Secretary, shall perform the duties and exercise the powers of the Secretary, and shall perform such other duties as the Chief Executive Officer or the Board may from time to time prescribe.

SECTION 3.7.    Management Matters.

(a)    Transfer of Property.    All property owned by the Company, including securities, shall be registered in the Company's name, in the name of a nominee or in "street name" as the Board may from time to time determine.    Any corporation, brokerage firm or transfer agent called upon to Transfer any securities to or from the name of the Company shall be entitled to rely on instructions or assignments signed or purported to be signed by any Officer without inquiry as to the authority of the Person signing or purporting to sign such instructions or assignments or as to the validity of any Transfer to or from the name of the Company.    At the time of any such Transfer, any such corporation, brokerage firm or transfer agent shall be entitled to assume that (i) the Company is then in existence and (ii) this Agreement is in full force and effect and has not been amended, in each case unless such corporation, brokerage firm or transfer agent shall have received written notice to the contrary.

(b)    Existence and Good Standing.    The Board (and the Officers of the Company) may take all action which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Delaware (and of each other jurisdiction in which such existence is necessary to enable the Company to conduct the business in which it is engaged as of the Effective Date or thereafter) and (ii) for the maintenance, preservation and operation of the business of the Company in accordance with the provisions of this Agreement and applicable laws and regulations.    The Board (and the Officers of the Company) may file or cause to be filed for recordation in the office of the appropriate authorities of the State of Delaware, and in the proper office or offices in each other jurisdiction in which the Company does business, such certificates (including certificates of limited liability companies and fictitious name certificates) and other documents as are required by the applicable statutes, rules or regulations of any such jurisdiction or as are required to reflect the identities of the Members and the amounts of their respective capital contributions.

SECTION 3.8.    Securities Held By the Company.    The Company shall vote all securities held by the Company as directed by the Board.

SECTION 3.9.    Liability of Members.

(a)    No Personal Liability.    Except as otherwise required by applicable law and as expressly set forth in this Agreement, no Director, Officer or Member shall have any personal liability whatsoever in such Person's capacity as a Director, Officer or Member, whether to the Company, to any other Director, Officer or Member, to the creditors of the Company or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company.    Each Member shall be liable only to make such Member's initial Capital Contribution to the Company, if applicable, and the other payments expressly provided herein.

(b)    Return of Distributions. In accordance with the Act and the laws of the State of Delaware, a member of a limited liability company may, under certain circumstances, be required to return amounts previously distributed to such member. It is the intent of the Members that no distribution to any Member pursuant to Article V hereof shall be deemed a return of money or other property paid or distributed in violation of the Act. The payment of any such money or distribution of any such property to a Member shall be deemed to be a compromise within the meaning of the Act, and the Member receiving any such money or property shall not be required to return to any Person any such money or property. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to make any such payment, such obligation shall be the obligation of such Member and not of any Director or other Member.

SECTION 3.10.    Indemnification and Exculpation by the Company.

(a)    Indemnification. Subject to the limitations and conditions provided in this Section 3.10, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative (hereinafter a "Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he, she or it, or a Person of which he, she or it is a representative, is or was a Director, Officer or Member, or who is or was serving at the request or on behalf of the Company as a director, officer, employee, partner, manager, attorney, accountant or agent of, or in a similar capacity for, any other Person, including any employee benefit plan, and all Affiliates of such Persons (each, an "Indemnitee") shall be indemnified by the Company to the fullest extent permitted by applicable law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against all Losses actually incurred by such Person in connection with such Proceeding, appeal, inquiry or investigation if such Person acted in accordance with the Required Standard of Conduct, and indemnification under this Section 3.10 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Section 3.10 shall be deemed contract rights, and no amendment, modification or repeal of this Section 3.10 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings, appeals, inquiries or investigations arising prior to any amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Section 3.10 could involve indemnification for negligence or under theories of strict liability. As used in this Section 3.10, "Required Standard of Conduct" means, with respect to any Person, that such Person is acting in good faith and without willful misconduct, bad faith or fraud, and, with respect to a criminal Proceeding, that such Person has no reasonable cause to believe such Person's conduct is unlawful (it being understood that (i) a Director shall be deemed to have acted in accordance with the Required Standard of Conduct to the extent an action is taken by such Director in reliance upon information, opinions, reports or statements presented by any of the Company's or its Subsidiaries' officers or employees, or by any other Person if such Director reasonably believes that such information, opinion, report or statement is within such other Person's professional or expert competence and if such other Person has been selected with reasonable care to act on behalf of the Company, and (ii) an Indemnitee shall be deemed to have acted in accordance with

the Required Standard of Conduct to the extent that such Indemnitee has delegated any authority granted to it by this Agreement or applicable law to another Person (whether through an employment, independent contractor or other relationship) and in making such delegation, the Indemnitee has acted in accordance with the Required Standard of Conduct). For purposes of this Section 3.10, "Losses" means any and all direct or indirect liabilities, losses, damages, deficiencies, costs, expenses, obligations, responsibilities, penalties, fines, settlements or claims, including reasonable attorneys', experts' and accountants' fees, expenses and disbursements in connection with any of the foregoing, incurred by a Person.

(b)   Primacy of Indemnification.  The Company hereby acknowledges that certain Class A Members and their Affiliates, directors, officers, employees, partners, managers and agents may have certain rights to indemnification, advancement of expenses and/or insurance provided by certain of their Affiliates, which may include professional investment funds (collectively, the "Fund Indemnitors"). The Company hereby agrees that (i) it is the indemnitor of first resort (i.e., its obligations to each Indemnitee are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same Losses incurred by such Indemnitee are secondary), (ii) it shall be required to advance the full amount of expenses incurred by each Indemnitee and shall be liable for the full amount of all Losses to the extent legally permitted and as required by the terms of this Agreement and any other agreement between the Company and such Indemnitee, without regard to any rights such Indemnitee may have against the Fund Indemnitors, and (iii) it irrevocably waives, relinquishes and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Fund Indemnitors on behalf of any Indemnitee with respect to any claim for which such Indemnitee has sought indemnification from the Company shall affect the foregoing and the Fund Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Indemnitee against the Company pursuant to this Section 3.10 and otherwise. The Company and the Members agree that the Fund Indemnitors are express third-party beneficiaries of the terms of this Section 3.10(b).

(c)   Insurance.  The Company may, at the direction of the Board, maintain insurance, at its expense, to protect itself and any Indemnitee against any Losses, whether or not the Company would have the power to indemnify such person against such Losses under the Act.

SECTION 3.11.   Business Opportunities.  To the fullest extent permitted by law, the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to any Class A Member or its Affiliates, or any Director not serving as an employee of the Company or its subsidiaries (such Person, an "Exempted Party"). The Company renounces any interest or expectancy of the Company in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to any Exempted Party. If any Exempted Party acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Company, none of the Exempted Parties shall have any duty to communicate or offer such opportunity to the Company, and none of the Exempted Parties shall be liable to the Company or to any other Member for breach of any fiduciary or other duty by reason of the fact that any Exempted Party pursues such opportunity, directs such opportunity to another Person or does not communicate such opportunity to the Company. No amendment or

repeal of this Section 3.11 shall apply to or have any effect on the liability or alleged liability of any Exempted Party for or with respect to any opportunities of which any Exempted Party becomes aware prior to such amendment or repeal. The Company and its Members acknowledge that the Class A Members and their Affiliates are in the business of credit and private equity investing and, therefore, reviews the business plans and related proprietary information of many enterprises, including enterprises that may have products or services that compete, directly or indirectly, with those of the Company and any Affiliates or Subsidiaries of the Company. Nothing in this Agreement shall preclude or in any way restrict any Exempted Party from investing or participating in any enterprise whether or not such enterprise has products or services that compete with those of the Company.

SECTION 3.12.    Fundamental Decisions.    The Company shall not, without the prior approval of the Class A Members holding at least a majority of the outstanding Class A Units, engage in or take any of the following actions (and, for the avoidance of doubt, the Company shall be permitted to engage in or take any such action upon the prior approval of those Class A Members holding at least a majority of the issued and outstanding Class A Units, without the vote, consent or approval of any other Members):

        (a)        engage in a Sale of the Company;

        (b)        issue any new Company Equity Securities, whether of a new or existing class, subclass or series of Units, and whether such additional Units are junior, senior or *pari passu* with one or more classes, subclasses or series of existing Units, even if the issuance of such additional Units would have a dilutive effect on the economic, governance, voting or other rights of one or more classes or series of Units;

        (c)        voluntarily dissolve or adopt a plan of liquidation with respect to the Company, or effect a recapitalization or reorganization of the Company;

        (d)        commence, consent to or acquiesce in the appointment of a receiver or similar official with respect to the Company, or make a general assignment of the assets of the Company for the benefit of creditors of the Company; or

        (e)        enter into joint ventures, partnerships or limited liability companies on behalf of the Company, cause the Company to become a shareholder in a corporation, a partner in a partnership or member or manager of a limited liability company or act on behalf of the Company as a shareholder, partner, member or manager.

## ARTICLE IV.
## BOARD COMPOSITION; VOTING BY MEMBERS

SECTION 4.1.    Board Composition.

        (a)        Designation of Directors.    Each Director shall be elected by the Class A Members holding a majority of the Class A Units. All Directors shall hold office, subject to their earlier death, resignation or removal in accordance with this Agreement and applicable law, until their respective successors shall have been elected and shall have qualified.

(b)    <u>Removal</u>. A Director may be removed, and a successor appointed at any time, by the vote of the Class A Members holding a majority of the Class A Units.

(c)    <u>Resignation</u>. A Director may resign at any time from the Board by delivering his or her written resignation to the Board. Any such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event. The Board's acceptance of a resignation shall not be necessary to make it effective.

(d)    <u>Vacancy</u>. Any vacancies on the Board may be filled by the Class A Members holding a majority of the Class A Units; <u>provided</u>, <u>however</u>, that if the Class A Members fail to take such action for a period of more than 30 days after notice of such vacancy, then the vacant position may be filled by majority vote of the Board.

SECTION 4.2.    <u>Reimbursement; Board Fees</u>. The Company shall reimburse all persons who are serving as Directors for their reasonable and documented out-of-pocket expenses incurred in attending meetings of the Board and all committees thereof and otherwise incurred in fulfilling their duties as Directors. The Board shall have the authority to fix the compensation of the Directors from time to time.

SECTION 4.3.    <u>Meetings of Members; Action of Members Without a Meeting</u>.

(a)    <u>Meetings</u>. Any action required or permitted to be taken by a Class A Member or Class A Members entitled to vote or consent hereunder may be taken at a meeting called by Class A Members entitled to vote or consent holding at least a majority of the outstanding Class A Units entitled to vote or consent on such action on at least five (5) days' prior written notice to the other Class A Members entitled to vote or consent on such action, which notice shall state the purpose or purposes for which such meeting is being called. All meetings of the Class A Members entitled to vote or consent shall be presided over by the Chairman or any other Director selected by the Board who shall determine the order of business and the procedures at the meeting, including such regulation of the manner of voting and the conduct of discussion as it seems to him to be in order. The actions taken by Class A Members entitled to vote or consent thereon at any meeting (as opposed to actions by written consent), however called and noticed, shall be as valid as actions taken at a meeting duly held after regular call and notice if, either before, at or after the meeting, any Class A Members entitled to vote or consent as to whom such meeting was improperly called or held sign a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes thereof.

(b)    <u>Actions Without a Meeting</u>. Any action required or permitted to be taken by a Class A Member or Class A Members entitled to vote or consent hereunder may be taken without a meeting by a consent in writing setting forth the action so taken and signed by the Class A Members entitled to vote or consent thereon possessing not less than the minimum number or percentage, as applicable, of votes or Class A Units that are necessary to authorize or take such action. Prompt notice of the action so taken without a meeting shall be given to those Class A Members entitled to vote or consent thereon who have not consented in writing; <u>provided</u>, <u>however</u>, that the failure to provide such prompt notice shall not impact the validity of such action. Any action taken pursuant to any such written consent of the Class A Members entitled to

vote or consent shall have the same force and effect as if taken by such Class A Members at a meeting thereof and may be stated as such in any document or instrument filed with the Secretary of State of the State of Delaware.

SECTION 4.4.    Restrictions on Voting Arrangements.  No Member shall enter into any agreement or arrangement of any kind with any Person with respect to any Company Equity Securities inconsistent with the provisions of this Agreement (whether or not such agreements and arrangements are with other Members).

ARTICLE V.
CAPITAL CONTRIBUTIONS; ALLOCATIONS; DISTRIBUTIONS

SECTION 5.1.    Capital Contributions.  The Members listed on Exhibit A hereto on the date hereof are making on the date hereof the initial Capital Contributions to the Company described on Exhibit A hereto.  No Member shall be entitled to make any additional Capital Contributions without the approval of the Board and no Member shall be required to make any additional Capital Contributions without such Member's express written consent.  In connection with any issuance of additional Units, the Board may accept such additional Capital Contributions as it determines in its discretion.  Exhibit A shall be updated from time to time in the event additional Capital Contributions are made by the Members.

SECTION 5.2.    Capital Accounts.

(a)    Creation.  There shall be established for each Member on the books of the Company a Capital Account which shall be increased or decreased in the manner set forth in this Agreement.

(b)    Negative Balance.  A Member shall not have any obligation to the Company or to any other Member to restore any negative balance in the Capital Account of such Member.

SECTION 5.3.    Allocations of Net Income and Net Loss.

(a)    Timing and Amount of Allocations of Net Income and Net Loss.  Net Income and Net Loss of the Company shall be determined and allocated with respect to each fiscal year or other period of the Company as of the end of each such year or period, or as circumstances otherwise require or allow.  The Board shall allocate the Net Income and Net Loss among the Members in a manner that as closely as possible gives economic effect to the provisions of this Agreement.  Subject to the other provisions of this Section 5.3, an allocation to a Member of a share of Net Income or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Income or Net Loss.  For the avoidance of doubt, except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss, deduction or credit) of the Company shall be allocated among the Members in a manner such that, after giving effect to the regulatory allocations set forth in Section 5.3(b), the Capital Account balance of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Gross

Asset Value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Value of the assets securing such liability), and the net assets of the Company were distributed, in accordance with <u>Section 5.4(b)</u> to the Members immediately after making such allocation, minus (ii) such Member's share of "partnership minimum gain" (determined in accordance with the principles of Regulations Section 1.704-2(d)) and "partner nonrecourse debt minimum gain" (determined in accordance with the principles of Regulations Section 1.704-2(i)), computed immediately before the hypothetical sale of assets.

(b)      <u>Regulatory Allocations</u>.  Provisions governing the allocation of income, gain, loss, deduction and credit (and items thereof) are included in this Agreement as may be necessary to provide that the Company's allocation provisions contain a so-called "Qualified Income Offset" and comply with all provisions relating to the allocation of so-called "Non-recourse Deductions" and "Partner Non-recourse Deductions" and the chargeback thereof as set forth in the Regulations under Section 704(b) of the Code.  In addition, in the event an Unvested Unit is forfeited to or acquired by the Company pursuant to an applicable Award Agreement, the Company shall make such forfeiture and other allocations as necessary to cause the Company's allocations to comply with Section 704(b) of the Code.

(c)      <u>Allocations upon Transfer</u>.  For any fiscal year during which a Member's interest in the Company is assigned by such Member in accordance with the terms of this Agreement, the portion of the Net Income and Net Loss of the Company that is allocable in respect of such Member's interest shall be apportioned between the assignor and the assignee of such Member's interest using any permissible method under Code Section 706 and the Regulations thereunder, as determined by the Board.

(d)      <u>Required Tax Allocations</u>.  All items of income, gain, loss, deduction and credit for federal income tax purposes shall be allocated to each Member in the same manner as the Net Income or Net Loss (and each item of income, gain, loss and deduction related thereto) that is allocated to such Member pursuant to <u>Section 5.3(a), (b) and (c)</u> to which such tax items relate.  Notwithstanding the foregoing provisions of this <u>Section 5.3</u>, income, gain, loss, deduction and credits with respect to property contributed to the Company by a Member shall be allocated among the Members for federal and state income tax purposes pursuant to Regulations promulgated under Section 704(c) of the Code, so as to take account of the variation, if any, between the adjusted basis for federal income tax purposes of the property to the Company and its initial Gross Asset Value at the time of contribution using the remedial method, as described in Regulations Section 1.704-3(d).  In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (b), (c), or (d) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, deduction, and credits with respect to such asset shall take account of the variation, if any, between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the applicable Regulations consistent with the requirements of Regulations Section 1.704-1(b)(2)(iv)(g).  Unless otherwise determined by the Board, the Company shall use the remedial allocation method as described in Regulations Section 1.704-3(d) for purposes of this <u>Section 5.3(d)</u>.  Allocations pursuant to this <u>Section 5.3(d)</u> are solely for purposes of federal, state and local income taxes.

(e)     Members' Tax Reporting.  The Members acknowledge and are aware of the income tax consequences of the allocations made by this Section 5.3 and, except as may otherwise be required by applicable law or regulatory requirements, hereby agree to be bound by the provisions of Section 5.3 in reporting their shares of Company income, gain, loss, deductions and credits for federal, state and local income tax purposes.

SECTION 5.4.    Distributions.

(a)     Timing and Valuation.  The Company shall distribute Distributable Assets only at such times and in such amounts as is determined by the Board in its sole discretion (and all such Distributable Assets contemplated by this Section 5.4(a)(i) shall be valued by the Board in its discretion for purposes of distributions hereunder).

(b)     Priority in Distributions.  If Distributable Assets are distributed by the Company in accordance with Section 5.4(a), such Distributable Assets shall be, subject to Section 5.6, distributed in the following order and priority:

(i)     first, until an amount equal to two (2) times the Issue Price has been distributed with respect to each Class A Unit pursuant to this Section 5.4(b)(i), to the Class A Members on a pro rata basis determined by reference to each such Class A Member's Class Percentage;

(ii)     second, until an amount equal to two-and-one-half (2.5) times the Issue Price has been distributed with respect to each Class A Unit pursuant to the provisions of this Section 5.4(b), (A) to each Class B Member, an amount per Class B Unit determined by (1) multiplying 0.50 by such Class B Member's Overall Percentage, then (2) multiplying that product by (3) the Distributable Assets, including any amounts distributed under Section 5.4(b)(i), net of the Base Amount, and (B) the remaining Distributable Assets shall be distributed to the Class A Members on a pro rata basis determined by reference to each such Class A Member's Class Percentage;

(iii)     third, until an amount equal to three (3) times the Issue Price has been distributed with respect to each Class A Unit pursuant to this Section 5.4(b), (A) to each Class B Member, an amount per Class B Unit determined by (1) multiplying 0.10 by such Class B Member's Overall Percentage, then (2) multiplying that product by (3) any amounts previously distributed to any Member under this Section 5.4(b), net of the Base Amount; and (B) the remaining Distributable Assets shall be distributed to the Class A Members and Class B Members on a pro rata basis determined by reference to each Member's Overall Percentage; provided, however, that any Class B Units in the numerator and all Class B Units in the denominator of each Member's Overall Percentage calculated under this Section 5.4(b)(iii)(B) shall be multiplied by 0.60;

(iv)     fourth, until an amount equal to three-and-a-half (3.5) times the Issue Price has been distributed with respect to each Class A Unit pursuant to the provisions of this Section 5.4(b), (A) to each Class B Member, an amount per Class B Unit determined by (1) multiplying 0.10 by such Class B Member's Overall Percentage; then (2) multiplying that product by (3) any amounts previously distributed to any Member under this Section 5.4(b), net

of the Base Amount, and (B) the remaining Distributable Assets shall be distributed to the Class A Members and Class B Members on a pro rata basis determined by reference to each Member's Overall Percentage; provided, however, that any Class B Units in the numerator and all Class B Units in the denominator of each Member's Overall Percentage calculated under this Section 5.4(b)(iv)(B) shall be multiplied by 0.70;

(v)     fifth, until an amount equal to four (4) times the Issue Price has been distributed with respect to each Class A Unit pursuant to the provisions of this Section 5.4(b), (A) to each Class B Member, an amount per Class B Unit determined by (1) multiplying 0.15 by such Class B Member's Overall Percentage; then (2) multiplying that product by (3) amounts previously distributed to any Member under this Section 5.4(b), net of the Base Amount, and (B) the remaining Distributable Assets shall be distributed to the Class A Members and Class B Members on a pro rata basis determined by reference to each Member's Overall Percentage; provided, however, that any Class B Units in the numerator and all Class B Units in the denominator of each Member's Overall Percentage calculated under this Section 5.4(b)(v)(B) shall be multiplied by 0.85;

(vi)    sixth, until an amount has been distributed to each Class B Member pursuant to the provisions of this Section 5.4(b) equal to such Class B Member's Overall Percentage multiplied by the difference between all amounts previously distributed to any Member under this Section 5.4(b) and the Base Amount, to each Class B Member, an amount per Class B Unit determined by (A) multiplying 0.15 by such Class B Member's Overall Percentage; then (B) multiplying that product by (C) any amounts previously distributed to any member under this Section 5.4(b), net of the Base Amount; and

(vii)   thereafter, the remaining Distributable Assets shall be apportioned among the Class A Members and Class B Members on a pro rata basis determined by reference to each Member's Overall Percentage.

For purposes of determining whether a given multiple of Issue Price has been distributed under this Section 5.4(b), tax distributions under Section 5.4(c) shall not be treated as an advance of distributions.

(c)     Tax Distributions.

(i)     To the extent there is taxable income for a fiscal year and cash is available, subject to the last sentence of this Section 5.4(c)(i), the Board shall cause the Company to make a tax distribution in cash to each Member (whether or not such Member or such Member's investors are tax exempt and whether or not such Member holds Vested Units or Unvested Units) in an amount equal to the excess of (A) the product of (x) the cumulative taxable income allocated to such Member in excess of the cumulative taxable loss allocated to such Member for all fiscal years prior to the date such distribution is being made, as estimated in good faith by the Board and (y) the combined federal, state and local marginal income tax rate (taking into account the deductibility of state and local taxes and adjusted appropriately to take into account the Medicare tax and varying rates applicable to capital gains, qualified dividend income and ordinary income) applicable to such Member, or such other rate as determined by the Board in its good faith discretion (the "Tax Distribution Rate"), over (B) all prior distributions

pursuant to this Section 5.4(c). In no event shall the Company be obligated to distribute under this Section 5.4(c) if such distribution would result in a default or event of default under the senior credit facility of the Company or any of its Subsidiaries.

(ii)     For purposes of this Section 5.4(c), allocations of taxable income under Section 5.3(d) related to accounts receivables, allocations of taxable income that result from the application of remedial method of allocating tax items, and any taxable losses allocated solely as a result of Section 5.3(a) shall be disregarded in the calculation of cumulative taxable income or loss.

(iii)     No tax distributions to a Member shall be an advance of, offset against or reduce the amount of a Member's right to receive a distribution under Section 5.4(b).

(iv)     In no event shall the Company be obligated to distribute under this Section 5.4(c) for any period an amount that exceeds the product of the Company's taxable income for that period multiplied by the Tax Distribution Amount.

SECTION 5.5.     Right of Set-Off.  The Company shall have a right of setoff against all distributions of Distributable Assets in the amount of any withholding tax to which the Company or a Subsidiary thereof may be subject as a result of any act or status of any Member, or to which the Company or a Subsidiary thereof may become subject with respect to the interest of any Member. The Company may withhold distributions or portions thereof if it is required to do so by the Code or any other provision of federal, state or local tax or other applicable law. Any amount withheld or prepaid pursuant to the Code or any other provision of federal, state or local tax or other applicable law with respect to any Member shall be treated as an amount distributed to such Member for all purposes under this Agreement. Each Member agrees to indemnify the Company in full for any amounts paid by the Company to a governmental entity or regulatory authority that are specifically attributable to a Member or a Member's status as such (including any interest, penalties and expenses associated with such payments), and each Member shall promptly upon notification of an obligation to indemnify the Company pursuant to this Section 5.5 make a cash payment to the Company equal to the full amount to be indemnified with interest to accrue on any portion of such cash payment not paid in full, as reasonably determined by the Company, when requested by the Company. A Member's obligation to indemnify and make contributions to the Company under this Section 5.5 shall survive the termination, dissolution, liquidation and winding up of the Company, and for purposes of this Section 5.5, the Company shall be treated as continuing in existence.

SECTION 5.6.     Distributions with Respect to Unvested Units.  If the Company makes a distribution pursuant to Section 5.4(b), then any cash or property that is otherwise distributable pursuant to such sections with respect to Unvested Units shall instead be retained by the Company until such time as the holder's Unvested Units become Vested Units, if ever. When a holder's Unvested Units become Vested Units, the Company shall promptly distribute (in cash or in the same form of property) to the holder an amount equal to the amount of cash or other property retained pursuant to the preceding sentence that is attributable to the newly Vested Units. If any such Unvested Units fail to become Vested Units and are forfeited to or acquired by the Company, then an amount equal to the cash or other property that had been retained by the Company with respect to the Unvested Units pursuant to this Section 5.6 shall become

available for distribution (in cash or in the same form of property) to all of the other Members in accordance with Section 5.4(b).

ARTICLE VI.

WITHDRAWAL; DISSOLUTION; NEW AND SUBSTITUTE MEMBERS

SECTION 6.1.    Withdrawal.    Subject to the terms and provisions of the Equity Incentive Plan, no Member shall have the power or right to withdraw or otherwise resign or be expelled from the Company prior to the dissolution and winding up of the Company except pursuant to a Transfer permitted under this Agreement of all of such Member's Units and any other Membership Interests to either an Assignee or the Company.    Notwithstanding anything to the contrary contained in the Act, in no event shall any Member be deemed to have withdrawn from the Company or cease to be a Member upon the occurrence of any event described in Section 18-304 of the Act unless the Member, after the occurrence of such event, indicates in a written instrument delivered to the Company that the Member has so withdrawn.

SECTION 6.2.    Dissolution.

(a)    Events.    The Company shall be dissolved and its affairs shall be wound up on the first to occur of the following:

(i)    the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act; and

(ii)    upon the liquidation, dissolution or winding up of the Company as approved by the Board.

The death, retirement, resignation, expulsion, incapacity, bankruptcy or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company, and the Company shall continue in existence subject to the terms and conditions of this Agreement.

(b)    Actions Upon Dissolution.    When the Company is dissolved, the business and property of the Company shall be wound up and liquidated by the Board or, in the event of the unavailability of the Board, such Member or liquidating trustee as shall be named by the Board.    A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Members to minimize the normal losses attendant upon a liquidation.

(c)    Priority.    Following completion of the wind up and liquidation process, the assets of the Company shall be distributed in the following manner and order:

(i)    all debts and obligations of the Company, if any, shall first be paid, discharged or provided for by adequate reserves in accordance with the Act; and

(ii)    the balance shall be distributed to the Members in accordance with Section 5.4(b).

(d)     Cancellation of Certificate.  On completion of the distribution of Company assets as provided herein, the Company shall be terminated and shall file a certificate of cancellation with the Secretary of State of the State of Delaware, cancel any other filings made and take such other actions as may be necessary to terminate the Company.

SECTION 6.3.     Transfer of Units.  Any proposed Transfer or assignment by a Member of all or part of its interest in the Company shall be subject to the restrictions on Transfer set forth in Article VII.  Subject to the foregoing, any Member who shall assign any Units in the Company shall cease to be a Member of the Company with respect to such Units and shall no longer have any rights or privileges of a Member with respect to such Units.  Any Member or Assignee who acquires in any manner whatsoever any Units, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all of the terms and conditions of this Agreement that any predecessor in such Units or other interest in the Company was subject to or by which such predecessor was bound.

SECTION 6.4.     New and Substitute Members.

(a)     Admission.  The Board shall have the right but not the obligation to admit as a Substitute Member or an Additional Member, any Person who acquires an interest in the Company, or any part thereof, from a Member or from the Company; provided that the Board shall admit as a Substitute Member, subject to Section 6.4(b), (i) any transferee who acquires an interest in the Company by means of a Transfer from a Member permitted in accordance with Section 7.1(a) or (ii) any transferee of a Class A Member (or a transferee thereof).  Concurrently with the admission of a Substitute Member or an Additional Member, the Board shall forthwith cause any necessary papers to be filed and recorded and notice to be given wherever and to the extent required showing the substitution of a transferee as a Substitute Member in place of the transferring Member, or the admission of an Additional Member, all at the expense, including payment of any professional and filing fees incurred, of the Substitute Member or the Additional Member (unless otherwise approved by the Board, in which case, the Company may cover said expenses).

(b)     Conditions.  The admission of any Person as a Substitute Member or Additional Member shall be conditioned upon such Person's written acceptance and adoption of all of the terms and provisions of this Agreement, either by (i) execution and delivery of a counterpart signature page to this Agreement countersigned by an authorized Officer on behalf of the Company or (ii) if requested by the Board, a writing evidencing the intent of such Person to become a Substitute Member or Additional Member (in form and substance satisfactory to the Board).

ARTICLE VII.
TRANSFERS

SECTION 7.1.     Transfers.

(a)     Transfers Generally.  Subject only to Section 6.4(b), Section 7.2, Article VIII and Article XII, the Class A Members and their transferees may Transfer all or any part of

their Units without restriction or limitation hereunder. Each Class B Member agrees that it shall not Transfer any of its Units except (i) as expressly provided in Section 7.3, Article VIII or Article XII or (ii) with the prior written consent of the Class A Members holding at least a majority of the outstanding Class A Units. Any attempted Transfer of securities in violation of the provisions of this Agreement shall be null and void *ab initio* and of no effect.

      (b)   Legend. Unless and until the Board shall determine otherwise, the Company Equity Securities shall be uncertificated and recorded in the books and records of the Company (including on Exhibit A). If certificates representing Company Equity Securities are ever issued, such certificates shall bear a legend substantially to the following effect with such additions thereto or changes therein as the Company may be advised by counsel are required by applicable law or necessary to give full effect to this Agreement (the "Legend"):

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE LIMITED LIABILITY COMPANY AGREEMENT OF BD LONG PRODUCTS, LLC, AS AMENDED, MODIFIED, SUPPLEMENTED OR RESTATED FROM TIME TO TIME, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH AGREEMENT. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH AGREEMENT, INCLUDING THE TRANSFER RESTRICTIONS AND FORCED SALE PROVISIONS CONTAINED THEREIN.

      The Legend shall be removed by the Company by the delivery of substitute certificates without such Legend in the event of the termination of this Section 7.1 in accordance with Section 13.10. Nothing contained herein shall require the delivery of any certificate to any Member at any time when the Company Equity Securities are not certificated.

      SECTION 7.2.   Securities Law Compliance.

      (a)   Restrictions on Transfer. No Member shall effect any Transfer of Company Equity Securities unless such Transfer is made pursuant to an effective registration statement under the Securities Act or pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and, in either case, in compliance with all applicable state securities laws. The Company shall not cause or permit the Transfer of any Company Equity Securities to be made on its books (or on any register of securities maintained on its behalf) unless the Transfer is permitted by, and has been made in accordance with the terms of this Agreement and all applicable federal and state securities laws. In connection with any Transfer of Company Equity Securities by a Member that is not made pursuant to a registered Public Offering, the Company may, in its sole discretion, request an opinion in form and substance satisfactory to the Company of counsel to such Member (which may include internal counsel of a Member) satisfactory to the Company stating that such

transaction is exempt from registration under the Securities Act and in compliance with applicable state securities laws.

(b)     Legend.  From and after the date hereof, and until such time as such securities have been sold to the public pursuant to an effective registration statement under the Securities Act or pursuant to an exemption from such registration, all certificates (if any) representing Company Equity Securities that are held by any Member shall bear a legend which, in addition to the Legend, shall state the following:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE LAWS OF ANY STATE OR FOREIGN JURISDICTION, AND NO INTEREST HEREIN MAY BE SOLD, OFFERED, ASSIGNED, DISTRIBUTED, PLEDGED OR OTHERWISE TRANSFERRED UNLESS (A) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING ANY SUCH TRANSACTION, (B) THE COMPANY RECEIVES AN OPINION IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY OF COUNSEL SATISFACTORY TO THE COMPANY STATING THAT SUCH TRANSACTION IS EXEMPT FROM SUCH REGISTRATION AND IN COMPLIANCE WITH ALL APPLICABLE STATE SECURITIES LAWS OR (C) THE COMPANY AND ITS COUNSEL ARE OTHERWISE SATISFIED THAT SUCH TRANSACTION IS EXEMPT FROM SUCH REGISTRATION AND IN COMPLIANCE WITH ALL STATE SECURITIES LAWS.

Nothing contained herein shall require the delivery of any certificate to any Member at any time when the Units are not certificated.

SECTION 7.3.     Permitted Transfers.

(a)     A Class B Member may Transfer its Units to a trust or similar estate planning entity for the benefit of (i) such Class B Member or (ii) the spouse, a sibling or a lineal ancestor or descendant (including adopted children) thereof (any such transferee, a "Permitted Transferee").

(b)     Notwithstanding the foregoing, no Class B Member shall avoid the provisions of this Agreement by making one or more Transfers to one or more Permitted Transferees and then disposing of all or any portion of such Class B Member's interest in any such Permitted Transferee or otherwise make one or more Transfers or undertake any other actions that have the purpose or effect (whether direct or indirect) of circumventing the terms of this Agreement.

ARTICLE VIII.
DRAG-ALONG RIGHTS

SECTION 8.1.     Drag-Along Rights.     If the Class A Members holding at least a majority of the outstanding Class A Units (the "Drag-Along Class A Members") desire to effect a Sale of the Company (an "Approved Sale"), then each Member shall (i) consent to, vote for

and raise no objections against the Approved Sale on the terms approved by the Drag-Along Class A Members or the process pursuant to which the Approved Sale was arranged, (ii) waive any dissenters', appraisal and similar rights, if any, that such Member may have with respect thereto and (iii) if the Approved Sale is a sale of Units, agree to sell all of its Units (or any rights to acquire Units) on the terms and conditions of the Approved Sale. The Members shall take all actions deemed reasonably necessary or desirable by the Board in connection with the consummation of any Approved Sale including the execution of such agreements and instruments and other actions reasonably necessary to (A) cooperate with the purchaser in such Approved Sale to provide such access and information as may be reasonably requested by the purchaser, (B) subject to Section 8.4, provide the representations, warranties, indemnities, covenants, conditions, escrow agreements and other provisions and agreements relating to such Approved Sale and (C) effectuate the allocation and distribution of the aggregate consideration paid in connection with the Approved Sale as set forth below.

SECTION 8.2.    Drag-Along Rights Allocations.    The obligations of the Members pursuant to Section 8.1 are subject to each Member receiving the same amount and proportion of the aggregate consideration from an Approved Sale that such holder would have received if such aggregate consideration had been distributed by the Company or paid pursuant to Section 5.4(b), it being understood that such consideration may be in the form of cash, equity or other property.

SECTION 8.3.    No Inconsistent Agreements or Proxies.    No Member shall enter into any agreements or arrangements of any kind with any Person inconsistent with the provisions of this Agreement.

SECTION 8.4.    Purchase Agreement; Closing.    Each Member shall agree to the same representations, warranties and covenants (to the extent applicable) with respect to an Approved Sale as the Drag-Along Class A Members agree to in connection with such Approved Sale; provided that, (a) with respect to any representations and warranties regarding such Member's title and ownership of Units and authorization and authority to Transfer Units and enter into such agreements related thereto (to the extent the Drag-Along Class A Members make such representations and warranties), each Member shall make such representations and warranties on a several and not joint basis with the other Members, (b) no Class A Member shall be required to agree to any non-competition covenant, and (c) no Class B Member shall be subject to any liability with respect to a breach of any representation or warranty, other than as relates to such Class B Member's title and ownership of Units and authorization and authority to Transfer Units and enter into such agreements related thereto, other than pursuant to the negotiated indemnity provisions. Each Member shall be required to bear its proportionate share of all reasonable costs and expenses including any escrows, holdbacks or adjustments in purchase price under the terms of the purchase agreement relating to such Approved Sale and shall be obligated to join on a pro rata, several basis (based on the amounts to be distributed or paid pursuant to Section 5.4(b) or Section 5.4(d)) in any indemnification (excluding indemnification with respect to representations, warranties and covenants that relate specifically to a particular Member, such as indemnification with respect to representations and warranties given by a Member regarding such Member's title and ownership of Units or representations based upon such Member's authorization and authority to Transfer Units or any covenants specifically given by a Member, which indemnification shall not be provided on a pro rata basis but solely by such Member, but including indemnification with respect to all other representations, warranties and covenants

given to the purchaser in connection with such Approved Sale) or other obligations that the Drag-Along Class A Members agree to provide in connection with such Approved Sale; provided that the maximum indemnification of any Member shall not exceed the lesser of (i) the value of the consideration actually received by such Member as a result of such Approved Sale and (ii) such Member's pro rata share of any indemnification cap offered to and accepted by the Drag-Along Class A Members (it being understood that any indemnification cap agreed to by the Drag-Along Class A Members shall apply to all Members). The Drag-Along Class A Members shall be entitled to estimate each Member's proportionate share of such reasonable costs and expenses and to withhold such amounts from payments to be made to each Member at the time of closing of the Approved Sale; provided that (A) such estimate shall not preclude the Drag-Along Class A Members from recovering additional amounts from each Member in respect of such Member's proportionate share of such costs and expenses and (B) the Drag-Along Class A Members shall reimburse each Member to the extent actual amounts are ultimately less than estimated amounts or any such amounts are paid by the Company or another Person (other than the Drag-Along Class A Members).

SECTION 8.5.    Failure of Drag-Along Sale.  Notwithstanding anything in this Article VIII to the contrary, there shall be no liability on the part of the Board or any Drag-Along Class A Member to any Member if any Approved Sale is not consummated for whatever reason. It is understood that the Board and the Drag-Along Class A Members, in their respective sole discretion, shall determine whether to effect an Approved Sale.

ARTICLE IX.
CONFIDENTIALITY

SECTION 9.1.    Confidential Information.

(a)    Each Class B Member agrees that the Confidential Information will be kept confidential and will not be disclosed by it or its Representatives, except (i) as required by applicable law, regulation or legal process or in response to any inquiry from a regulatory authority having jurisdiction over such Class B Member or its Representatives, and only after compliance with Section 9.1(b), (ii) that it may disclose the Confidential Information or portions thereof to those of its advisors, auditors and other agents and representatives who need to know such information in connection with the investment by the Class B Member in the Company (the Persons to whom such disclosure is permissible being "Representatives"); provided that such Representatives are informed of the confidential and proprietary nature of the Confidential Information and (iii) any Class B Member who is a director, officer or employee of the Company or its Subsidiaries may use the Confidential Information in furtherance of such Class B Member's duties as a director, officer or employee of the Company or any of its Subsidiaries. Each Class B Member agrees to be responsible for any breach of this Article IX by its Representatives (it being understood that such responsibility shall be in addition to and not by way of limitation of any right or remedy the Company may have against such Representatives with respect to any such breach).

(b)    If any Class B Member or Representative thereof becomes legally compelled (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose any of the Confidential Information, such

Class B Member or Representative shall (if legally permissible) provide the Company with prompt prior written notice of such requirement to disclose such Confidential Information. Upon receipt of such notice, the Company may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, such Class B Member or Representative shall disclose only that portion of the Confidential Information which is legally required to be disclosed and shall take all reasonable steps to preserve the confidentiality of the Confidential Information. In addition, no Class B Member will, and such Class B Member shall make commercially reasonable efforts to cause its Representatives not to, oppose any action (and each Class B Member will, and will make commercially reasonable efforts to cause its Representatives to, if and to the extent requested by the Company and legally permissible to do so, cooperate with and assist the Company, at the Company's expense and on a reasonable basis, in any reasonable action) by the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information.

(c)    As used herein, "Confidential Information" means all oral and written information concerning the Company and its Subsidiaries (irrespective of the form of communication and whether such information is furnished before, on or after the date hereof and whether or not such information is marked as confidential or proprietary), and all analyses, compilations, data, studies, notes, interpretations, memoranda or other documents prepared by any Member or any Representative thereof containing or based in whole or in part on any such furnished information.

ARTICLE X.
REPRESENTATIONS AND WARRANTIES

SECTION 10.1.    Representations and Warranties of all Members.    Each Member, severally and not jointly, represents and warrants to the Company and the other Members as follows:

(a)    The execution, delivery and performance of this Agreement by such Member will not violate (i) any provision of the certificate or articles of incorporation or organization, bylaws, operating agreement, partnership agreement or other organizational documents of such Member (if applicable), (ii) any provision of applicable law or regulation, or any order of any court or other agency of government, or (iii) any provision of any agreement or other instrument to which such Member or any of such Member's properties or assets is bound, or conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument.

(b)    This Agreement has been duly executed and delivered by such Member, and, when executed by the other parties hereto, will constitute the legal, valid and binding obligation of such Member, enforceable against such Member in accordance with its terms.

SECTION 10.2.    Representations and Warranties of the Company.    The Company represents and warrants to each Member as follows:

(a)    The execution, delivery and performance of this Agreement by the Company will not violate (i) any provision of the Certificate, (ii) any provision of applicable law

or regulation, or any order of any court or other agency of government, or (iii) any provision of any indenture, agreement or other instrument to which the Company or any of its properties or assets is bound, or conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument.

(b)   This Agreement has been duly executed and delivered by the Company, and, when executed by the other parties hereto, will constitute the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

ARTICLE XI.
REPORTS TO MEMBERS; TAX MATTERS

SECTION 11.1.   Books of Account.

(a)   At all times during the continuance of the Company, the Company shall maintain at its registered office and principal place of business all records and materials the Company is required to maintain at each such location under the Act. Unless otherwise permitted by the Board, each Class A Member shall have the right, for any purpose reasonably related to such Member's interest as a Member, upon not less than 10 days' prior written notice to the Company, to obtain, review and inspect during the Company's normal business hours and at such Member's expense the books of accounts and records of the Company and to discuss the Company's affairs, finances and accounts with officers of the Company. Each Member holding only Class B Units shall have the right, for any purpose reasonably related to such Member's interest as a Member, upon not less than 10 days' prior written notice to the Company, to obtain, review and inspect during the Company's normal business hours and at such Member's expense, not more than once per fiscal year, only the following documents and information:

(i)   a current list of the name and last known business, residence or mailing address of each Member or Director; and

(ii)   a copy of this Agreement, the Certificate and all amendments thereto, together with copies of any written powers of attorney pursuant to which this Agreement, the Certificate and any amendments thereto have been executed.

(b)   The rights of the Members under this Section 11.1 are in lieu of (and, to the extent permissible under the Act, supersede) any rights of the Members under the Act to obtain, review and inspect documents and information relating to the Company.

SECTION 11.2.   Reports.

(a)   Tax Reporting. As promptly as practicable after the close of each taxable year of the Company, the Company shall furnish to each Member:

(i)   a statement prepared by the Company setting forth the balance of each Member's Capital Account and the amount of that Member's allocable share of the Company's Net Income or Net Loss and other Company income, gain, losses or deductions for such year for each of its Economic Interests; and

(ii)     all other Company information necessary to enable each Member to prepare its federal, state and local income tax returns, which information shall include a Schedule K-1.

(b)     Determinations.   All determinations, valuations and other matters of judgment required to be made for accounting purposes under this Agreement shall be reasonably made by the Board acting in good faith and, if so made, shall be conclusive and binding on all Members, their Successors in Interest and any other Person, and to the fullest extent permitted by applicable law, no such Person shall have the right to an accounting or an appraisal of the assets of the Company or any successor thereto.

SECTION 11.3.   Fiscal Year.   The fiscal year of the Company shall end at the close of business on December 31 of each calendar year unless otherwise determined by the Board in accordance with Section 706 of the Code.

SECTION 11.4.   Certain Tax Matters.

(a)     Preparation of Returns.   The Board shall cause to be prepared and filed all federal, state and local tax returns of the Company for each year for which such returns are required to be filed.   Except as expressly provided in this Agreement, the Board shall determine the appropriate treatment of each item of Company income, gain, loss, deduction and credit and the accounting methods and conventions to be used by the Company under the tax laws of the United States, the several states and other relevant jurisdictions.

(b)     Tax Matters Member.   The Company and each Member hereby designate the Initial Member as the "tax matters partner" for purposes of Section 6231(a)(7) of the Code and any analogous provisions of state law (the "Tax Matters Member").   The Tax Matters Member, on behalf of the Company and its Members, shall be permitted to make any filing or election under the Code, the Regulations or any other applicable law or regulations that it believes to be in the best interests of the Company or the Members.   The Company shall indemnify and reimburse the Tax Matters Member for all expenses (including legal and accounting fees) incurred as Tax Matters Member pursuant to this clause (b) in connection with any examination, any administrative or judicial proceeding, or otherwise.

(c)     Certain Filings.   Upon a sale of Company assets or a liquidation of the Company, the Members shall provide the Board with any tax filings reasonably requested by the Board and/or required under applicable law.

## ARTICLE XII.
## TAG-ALONG RIGHTS

SECTION 12.1.   Tag-Along Rights.

(a)     Except as provided in Section 12.3, if any Member or group of Members (the "Transferring Party") proposes to sell or otherwise dispose of Units to any Person or to one or more Persons constituting a group (a "Tag-along Purchaser") pursuant to a bona fide binding offer to purchase (a "Tag-along Offer"), the Transferring Party shall provide written notice (the "Tag-along Offer Notice") of such Tag-along Offer (the date of sending such notice being the

"Tag-along Notice Date") to the Company and each other Member that is eligible to participate in the Tag-along Offer in accordance with this Article XII (the "Tag-along Offerees") in the manner set forth in this Section 12.1. The Tag-along Offer Notice shall specify in reasonable detail (i) the number of Units which the Transferring Party proposes to Transfer, (ii) the material terms and conditions (including the form of consideration and price per security) upon which the Transferring Party proposes to Transfer such Units, and (iii) a good faith estimate of the proposed date of such Transfer. In the event that the terms set forth in the Tag-along Offer Notice are thereafter amended in any respect, the Transferring Party and the Company shall also give prompt written notice of the amended terms and conditions of the proposed transaction (an "Amended Notice") to the Tag-along Offerees.

(b)     Each Tag-along Offeree shall have the right, but not the obligation, exercisable as set forth below, to accept the Tag-along Offer for up to the number of Units assigned to such Tag-along Offeree pursuant to Section 12.2 on the terms and conditions set forth in the Tag-along Offer Notice or the most recent Amended Notice, as the case may be. Each holder of Units participating in the Tag-along Offer (each, a "Participating Party") will receive the same proportion of the aggregate consideration in the Tag-along Offer that such Participating Party would have received if the aggregate consideration had been distributed by the Company in a complete liquidation pursuant to Section 5.4(b) (assuming for purposes of this Section 12.1(b) that the Participating Parties constitute all Unitholders of the Company and that the Overall Percentage of each Participating Member is equal to the aggregate number of Units being sold by such Participating Party in the Tag-along Offer divided by the aggregate number of Units being sold by all Participating Parties in the Tag-Along Offer, including, in both numerator and denominator, all Classes of Units), it being understood that such consideration may be in the form of cash, equity or other property. Each Tag-along Offeree that desires to accept the Tag-along Offer shall provide the Transferring Party with written notice (a "Tag-along Notice") (specifying, subject to Section 12.2 below, such number of Units which such Tag-along Offeree desires to sell) within the later of (i) five (5) business days after the Tag-along Notice Date or (ii) two (2) business days after such Tag-along Offeree's receipt of the most recent Amended Notice (the "Tag-along Notice Period"), and shall simultaneously provide a copy of such Tag-along Notice to the Company. A Tag-along Notice shall be irrevocable and binding, and shall constitute an irrevocable acceptance of the Tag-along Offer by the Tag-along Offeree for the Units specified therein; provided, however, that such acceptance of the Tag-along Offer shall terminate at the election of the Tag-along Offeree if (A) the proposed Transfer does not occur within ninety (90) days after the proposed date of Transfer contained in the Tag-along Offer Notice, or (B) the material terms set forth in the Tag-along Offer Notice change in an adverse manner and, in any such event, the Tag-along Offerees will be provided prompt notice thereof.

(c)     Within ten (10) business days after the expiration of the Tag-along Notice Period, the Transferring Party shall notify the Company and each other Participating Party of the number of Units such Participating Party is obligated to sell or otherwise dispose of pursuant to the Tag-along Offer, such number to be calculated in accordance with Section 12.2. The Transferring Party shall notify the Company and each other Participating Party of the proposed date of any sale (the "Sale Date") pursuant to this Article XII no less than seven (7) days prior to the Sale Date, and each other Participating Party shall deliver to the Transferring Party the certificate or certificates (or other documents), if any, representing the Units to be sold or otherwise disposed of pursuant to such offer by such Participating Party, together with a limited

power-of-attorney authorizing the Transferring Party to sell or otherwise dispose of such Units pursuant to the terms of the Tag-along Offer, and all other documents reasonably required to be executed in connection with such Tag-along Offer, no less than two (2) days prior to the Sale Date. The Transferring Party will use commercially reasonable efforts to obtain the agreement of the Tag-along Purchaser to the participation of the other Participating Parties in such proposed Transfer and will not consummate any such proposed Transfer unless each Participating Party is permitted to participate in accordance with the provisions of this Article XII.

SECTION 12.2.    Tag-Along Rights Allocations. Each Participating Party shall have the right to sell, pursuant to any Tag-along Offer, that number of Units equal to the product obtained by multiplying (a) the aggregate number of Units to be Transferred in the proposed Transfer by (b) a fraction, the numerator of which is the number of Units at the time owned by such Participating Party, and the denominator of which is the sum of the total number of Units owned by all Participating Parties; provided that in the event any Tag-along Offeree(s) do not elect to sell the maximum number of Units they would otherwise be entitled to sell hereunder, the aggregate number of Units which such Tag-along Offeree(s) do not initially elect to sell (the "Unallocated Units") shall be reallocated among the other Participating Parties pro rata based upon the number of Units that each such Participating Party initially elected (and was entitled) to sell in the Tag-along Offer. If at the termination of the Tag-along Notice Period, any Tag-along Offeree shall not have accepted the Tag-along Offer, then, subject to the last sentence of Section 12.1(c), such Tag-along Offeree will be deemed to have waived any and all of its rights under this Article XII with respect to the sale or other disposition of any of its Units pursuant to such Tag-along Offer and no Units held by any such Tag-along Offeree will be included in such Tag-along Offer.

SECTION 12.3.    Exclusions. The provisions of this Article XII shall not apply to any proposed Transfer of Units by any Member or group of Members (a) to a Permitted Transferee or Affiliate of such Member or group of Members in accordance with this Agreement, (b) if such proposed Transfer of Units, when added together with all other Transfers of Units made by any such Member or group of Member prior to such proposed Transfer (except for Transfers described in clauses (a), (c) and (d) of this Section 12.3), is for less than fifty percent (50%) of the issued and outstanding Units as of the date of the proposed Transfer, (c) pursuant to a Public Offering or (d) in connection with a Transfer constituting a Sale of the Company, in which case Article VIII shall apply.

SECTION 12.4.    Failure of Tag-Along Sale. Notwithstanding anything contained in this Article XII, there shall be no liability on the part of the Transferring Party to any Tag-along Offeree if the sale of the Units to the Tag-along Purchaser is not consummated for whatever reason. Whether to effect a sale of Units to the Tag-along Purchaser by the Transferring Party is (and at all times shall remain) in the sole and absolute discretion of the Transferring Party.

SECTION 12.5.    Purchase Agreement; Closing. Each Participating Party shall agree to the same representations, warranties and covenants (to the extent applicable) with respect to such Participating Party as the Transferring Party agrees to in connection with such Transfer; provided that, (a) with respect to any representations and warranties regarding a Participating Party's title and ownership of Units and authorization and authority to Transfer Units and enter into agreements related thereto (to the extent the Transferring Party makes any such representations

and warranties), each Participating Party shall make such representations and warranties on a several and not joint basis with the other Participating Parties, and (b) no Participating Party shall be required to agree to any non-competition covenant. Each Participating Party shall be required to bear its proportionate share of all reasonable costs and expenses including any escrows, holdbacks or adjustments in purchase price under the terms of the purchase agreement relating to such Transfer and shall be obligated to join on a pro rata, several basis (based on the allocation of purchase price proceeds in the applicable Transfer) in any indemnification (excluding indemnification with respect to representations, warranties and covenants that relate specifically to a particular Participating Party, such as indemnification with respect to representations and warranties given by a Participating Party regarding such Participating Party's title and ownership of Units or representations based upon such Participating Party authorization and authority to Transfer Units or any covenants specifically given by a Participating Party, which indemnification shall not be provided on a pro rata basis, but solely by such Participating Party, but including indemnification with respect to all other representations, warranties and covenants given to the Tag-Along Purchaser in connection with such Transfer) or other obligations that the Transferring Party agrees to provide in connection with such Transfer; provided that the maximum indemnification of any Tag-along Offeree shall not exceed the lesser of (i) the value of the consideration actually received by such Tag-along Offeree as a result of such Transfer and (ii) such Tag-along Offeree's pro rata share of any indemnification cap offered to and accepted by the Transferring Party. The Transferring Party shall be entitled to estimate each Participating Party's proportionate share of such costs and expenses and to withhold such amounts from payments to be made to each other Participating Party at the time of closing of such proposed sale; provided that (A) such estimate shall not preclude the Transferring Party from recovering additional amounts from each other Participating Party in respect of such Participating Party's proportionate share of such costs and expenses and (B) the Transferring Party shall reimburse each other Participating Party to the extent actual amounts are ultimately less than estimated amounts or any such amounts are paid by the Company or another Person (other than the Transferring Party).

## ARTICLE XIII.
## MISCELLANEOUS

SECTION 13.1.    Schedules.  A Director may from time to time execute on behalf of the Company and deliver to the Members schedules which set forth the then current Capital Account balances of each Member and any other matters deemed appropriate by the Board or required by applicable law.  Such schedules shall be for information purposes only and shall not be deemed to be part of this Agreement for any purpose whatsoever.

SECTION 13.2.    Governing Law.  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.  In the event of a direct conflict between the provisions of this Agreement and any provision of the Certificate or any mandatory provision of the Act, the applicable provision of the Certificate or the Act shall control.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that

provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by applicable law.

SECTION 13.3.    Successors and Assigns.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective Successors in Interest and Assignees; provided that no Person claiming by, through or under a Member (whether as such Member's Successor in Interest, Assignee or otherwise), as distinct from such Member itself, shall have any rights as, or in respect to, a Member (including the right to approve or vote on any matter or to notice thereof).

SECTION 13.4.    Amendments and Waivers.    This Agreement may not be amended or supplemented except by an instrument in writing signed by (a) the Company and (b) holders of at least a majority of the outstanding Class A Units; provided that, notwithstanding anything in Section 2.1(b)(ii), no provision of this Agreement may be amended or waived in a manner materially adverse to a Member without the consent of such Member.   For the avoidance of doubt, and notwithstanding anything to the contrary above, the authorization and issuance of additional Membership Interests, whether of a new or existing class, subclass or series of Units, at the direction of the Board pursuant to Section 2.2 as consideration in any acquisition by the Company or a Subsidiary thereof or in connection with any equity investment in the Company (whether by an Independent Third Party or an Affiliate of the Company or a Member), whether such additional Units are junior, senior or *pari passu* with one or more classes, subclasses or series of existing Units, and the amendment of this Agreement and Exhibit A hereto to reflect the terms and relative rights, preferences or privileges of such additional Membership Interests, shall not require the approval of any Member, even if the issuance of such additional Units would have a dilutive effect on the economic, governance, voting or other rights of one or more classes or series of Units.   Each Member (and any Successor in Interest or Assignee thereof) shall be bound by any amendment, amendment and restatement, modification, waiver or supplement to the terms and provisions of this Agreement effected in accordance with this Section 13.4, whether or not such Member has consented thereto.

SECTION 13.5.    Notices.    All written notices, demands and requests of any kind which any party to this Agreement may be required or may desire to serve upon any other party hereto in connection with this Agreement shall be in writing and shall be delivered by courier or other means of personal service which provides written verification of receipt, by registered or certified mail return receipt requested or by electronic transmission (each, a "Notice").   Any such Notice delivered by registered or certified mail shall be deposited in the United States mail with postage thereon fully prepaid, or if by courier then deposited prepaid with the courier.   All Notices shall be addressed to any Member at its address shown on Exhibit A (as it may be amended or supplemented), or to the Company as follows:

Bayou Steel BD Holdings, L.L.C.
1 Sound Shore Drive, Suite 200
Greenwich, Connecticut 06830
Attention:  Sam Farahnak
            Legal Department
E-Mail:  sfarahnak@bdcm.com
         legal@bdcm.com

With a copy to (which shall not constitute notice):

Jones Walker LLP
201 St. Charles Avenue, Suite 5100
New Orleans, Louisiana 70170
Attention: Curtis R. Hearn
E-Mail: chearn@joneswalker.com

Service of any such Notice so made shall be deemed complete on the day of actual delivery thereof as shown by the addressee's registry or certification receipt or other evidence of receipt, or refusal of delivery. Any party may from time to time by notice in writing served upon the other as aforesaid designate a different mailing address or a different or additional Person to which all such notices or demands thereafter are to be addressed.

SECTION 13.6.    Counterparts; Execution by Electronic Means. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one (1) and the same instrument. The reproduction of signatures by means of facsimile device or other electronic means shall be treated as though such reproductions are executed originals.

SECTION 13.7.    Entire Agreement. This Agreement, including the Exhibits, and the other documents and agreements referred to herein or entered into concurrently herewith, embody the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein and therein. This Agreement and such other documents and agreements supersede all prior (but not contemporaneous) agreements and understandings between the parties with respect to such subject matter.

SECTION 13.8.    Jurisdiction. Except as expressly provided below, any suit, action or proceeding under or with respect to this Agreement, or any judgment entered by any court in respect of any thereof, shall be brought in any court of competent jurisdiction in the State of Delaware and each of the Company and the Members (and any Successor in Interest or Assignee thereof) hereby submits to the exclusive jurisdiction of such courts for the purpose of any such suit, action, proceeding or judgment. Each of the Company and the Members (and any Successor in Interest or Assignee thereof) hereby irrevocably waives any objections which it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any court of competent jurisdiction in the State of Delaware, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in any inconvenient forum.

SECTION 13.9.    Section Titles. Section titles and headings are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text hereof.

SECTION 13.10. Termination of Certain Provisions. Notwithstanding anything to the contrary contained in this Agreement, the rights and obligations of each Member contained in

Articles IV, VII, and VIII shall terminate as to each Member upon an Exit Event; provided that the provisions contained in Article VIII shall be operative in connection with a Sale of the Company. All other rights and obligations of each Member contained herein shall survive indefinitely until, by their respective terms, they are no longer applicable. Notwithstanding anything contained herein to the contrary, as to any particular Member, this Agreement (other than, as applicable, the provisions of Articles IX and X) shall no longer be binding or of any further force and effect as to such Member as of the date such Member has Transferred, in accordance with the applicable provisions hereof, all of such Member's Membership Interests (including all Units held by such Member).

SECTION 13.11. Intended Third Party Beneficiaries. Each Indemnitee that is not a direct party hereunder for purposes of Section 3.10 is and shall be considered an express third-party beneficiary for purposes of Section 3.10 and shall be entitled to enforce Section 3.10 (but only such section) to the same extent as a party hereunder.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have executed this Amended and Restated Limited Liability Company Agreement as of the day and year first above written.

COMPANY:                          BAYOU STEEL BD HOLDINGS, L.L.C.
                                  By:  Bayou Steel BD Holdings II, L.L.C.
                                  Its:  Member

                                       By:  Black Diamond Capital Management, L.L.C.
                                       Its:  Manager

                                       By: _____
                                       Name:  Stephen H. Deckoff
                                       Title:    Managing Principal

MEMBER:                           BAYOU STEEL BD HOLDINGS II, L.L.C.
                                  By:     Black Diamond Capital Management, L.L.C.
                                  Its:     Manager

                                  By _____
                                       Name:  Stephen H. Deckoff
                                       Title:  Managing Principal

[Signature Page to Limited Liability Company Agreement]

Exhibit A

## LIST OF MEMBERS, OUTSTANDING UNITS AND CAPITAL CONTRIBUTIONS

| Member | Initial Capital Contribution | Number and Class of Units | Threshold Amount |
|--------|------------------------------|---------------------------|------------------|
| Bayou Steel BD Holdings II, L.L.C. | $59,593,350.83 | 9,175 Class A | -- |

Exhibit B

DEFINITIONS

Unless otherwise defined in this Agreement (including the preamble and the recitals), the following terms shall have the meanings indicated, unless the context clearly indicates otherwise:

"Act" means the Delaware Limited Liability Company Act, Title 6, §§ 18-101, et seq., as it may be amended from time to time.

"Additional Member" means any Person that has been admitted to the Company as a Member pursuant to Section 6.4 by virtue of having received its Membership Interest from the Company and not from any other Member or Assignee.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person. As used in this definition, "control" shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or other equity or voting interests, by contract or otherwise).

"Affiliated Director" means a Director affiliated with Black Diamond Capital Management, L.L.C., the manager of the Initial Member, in a capacity other than merely serving as a director on the board or other governing body of a Person managed by Black Diamond Capital Management, L.L.C. (or any portfolio company thereof).

"Agreement" means this Amended and Restated Limited Liability Company Agreement of the Company, as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof.

"Amended Notice" has the meaning provided in Section 12.1(a).

"Approved Sale" has the meaning provided in Section 8.1.

"Assignee" means any transferee to which a Member or another Assignee has Transferred its interest in the Company in accordance with the terms of this Agreement, but who is not a Member.

"Award Agreement" means an award agreement or notice under the Equity Incentive Plan, executed by the Company and delivered to the recipient of Class B Units, pursuant to which such Class B Units shall be issued.

"Base Amount" means, with respect to any given Class B Unit, the aggregate Issue Price of all Class A Units or, if different, the Threshold Amount applicable to such Class B Unit.

"Board" means the Board of Directors of the Company.

"Capital Account" means, with respect to any Member, the account maintained for such Member in accordance with the following provisions:

(a)     To each Member's Capital Account there shall be added such Member's Capital Contributions, such Member's allocable share of Net Income and any items in the nature of income or gain which are specially allocated to such Member pursuant to Section 5.3(b), and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member.

(b)     From each Member's Capital Account there shall be subtracted the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's allocable share of Net Losses and any items in the nature of expenses or losses which are specially allocated to such Member pursuant to Section 5.3(b), and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company (to the extent not taken into account in determining such Member's Capital Contribution).

(c)     In the event any Economic Interest in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the Transferred Economic Interest.

(d)     In determining the amount of any liability for purposes of subparagraphs (a) and (b) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

(e)     The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Code Section 704(b) and the Regulations promulgated thereunder, and shall be interpreted and applied by the Board in a manner consistent with such Regulations.

"Capital Contribution" means the amount of cash and the initial Gross Asset Value (net of any liabilities of the Member assumed by the Company or secured by such property) of any property (other than cash) contributed from time to time to the Company by a Member.

"Certificate" has the meaning provided in the Recitals.

"Class" or "Classes" means the different classes of Units from time to time outstanding (which are initially the Class A Units and the Class B Units).

"Class A Member" means any Member who owns Class A Units.

"Class A Units" means the membership interests of the Company designated as "Class A Units" and having the relative rights, preferences, privileges, limitations and qualifications set forth in this Agreement.

"Class B Member" means any Member who owns Class B Units.

"Class B Units" means the membership interests of the Company designated as "Class B Units" and having the relative rights, preferences, privileges, limitations and qualifications set forth in this Agreement.

"Class Percentage" means, for a given Member, the aggregate number of Units of a given Class held by him or her divided by the aggregate number of Units of such Class then issued and outstanding.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute. Any reference herein to a particular provision of the Code shall mean, where appropriate, the corresponding provision in any successor statute.

"Company" has the meaning provided in the Preamble.

"Company Equity Securities" means Units and any other securities exercisable or exchangeable for or convertible into Units, and any right, option or warrant to acquire any of the foregoing.

"Confidential Information" has the meaning provided in Section 9.1(c).

"Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such fiscal year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such fiscal year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such fiscal year or other period bears to such beginning adjusted tax basis; provided that if the federal income tax depreciation, amortization or other cost recovery deduction for such fiscal year or other period is zero, Depreciation shall be calculated with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

"Director" means any member of the Board.

"Distributable Assets" means, with respect to any fiscal year or other period, all proceeds and cash receipts (including from any operating, investing, and financing activities) and other assets of the Company from any and all sources (excluding Capital Contributions), reduced by operating expenses, contributions of capital to Subsidiaries, investments and payments required to be made in connection with any loan to the Company and any reserve for contingencies or escrow required, in the judgment of the Board acting in good faith.

"Drag-Along Class A Members" has the meaning provided in Section 8.1.

"Economic Interest" means a Member's or Assignee's share of the Company's Net Income, Net Losses and distributions pursuant to this Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including the right to vote in the election of Directors, vote on, consent to or otherwise participate in any decision of

the Members or Directors, or any right to receive information concerning the business and affairs of the Company, in each case except as expressly otherwise required by the Act.

"Effective Date" has the meaning provided in the Preamble.

"Equity Incentive Plan" means the equity incentive plan of the Company, as approved by the Board.

"Equity Securities" means, as to any Person that is a corporation, the shares of such Person's capital stock, including all classes of common, preferred, voting and nonvoting capital stock, and, as to any Person that is not a corporation or an individual, the equity ownership, beneficial or membership interests in such Person, including the right to share in profits and losses, the right to receive distributions of cash and property, and the right to receive allocations of items of income, gain, loss, deduction and credit and similar items from such Person, whether or not such interests include voting or similar rights entitling the holder thereof to exercise control over such Person.

"Exempted Party" has the meaning provided in Section 3.11.

"Exit Event" means either a Sale of the Company or a Public Offering.

"Fund Indemnitors" has the meaning provided in Section 3.10(b).

"GAAP" means generally accepted accounting principles in the United States, consistently applied throughout the periods involved.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset on the date of the contribution, as determined by the contributing Member and the Company.

(b)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board, as of the following times:

(i)    the acquisition of an additional Membership Interest in the Company after the date hereof by a new or existing Member in exchange for more than a de minimis Capital Contribution, if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative Economic Interests of the Members in the Company;

(ii)    the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an entire or partial Membership Interest in the Company, if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative Economic Interests of the Members in the Company;

(iii)    the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g);

(iv)    the grant of a Membership Interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a Member capacity or by a new Member acting in a Member capacity or in anticipation of being a Member; and

(v)    such other times as the Board shall reasonably determine necessary or advisable in order to comply with Regulations Sections 1.704-1(b) and 1.704-2.

(c)    The Gross Asset Value of any Company asset distributed to a Member shall be the gross fair market value of such asset on the date of distribution, as reasonably determined by the Board taking into account the following proviso; provided that, in the case of such assets which are securities, the gross fair market value thereof shall be reduced (i) if and to the extent that a block sale of all of such securities is reasonably likely, in the good faith judgment of a registered broker dealer affiliated with a reputable, nationally recognized brokerage house, to depress the trading price of such securities, (ii) if and to the extent appropriate, in the good faith judgment of the Board, due to illiquidity of such securities and (iii) for any sales or other commissions reasonably likely to be incurred or applied in a sale of such securities.

(d)    The Gross Asset Value of any Company asset shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (d) to the extent that the Board determines that an adjustment pursuant to subparagraph (b) of this definition of Gross Asset Value is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

(e)    If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (a), (b) or (d), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset, for purposes of computing Net Income and Net Loss.

"Independent Third Party" means any Person who, immediately prior to the contemplated transaction, does not, directly or indirectly, own any Units, together with such Person's Affiliates.

"Indemnitee" has the meaning provided in Section 3.10(a).

"Initial Manager" has the meaning provided in the Recitals.

"Initial Member" has the meaning provided in the Preamble.

"Interim Chairman" has the meaning provided in Section 3.4.

"Issue Price" means Six Thousand Four Hundred Ninety-Five Dollars and Nineteen Cents ($6,495.19) (subject to customary adjustments for splits, combinations, mergers and like events).

"Legend" has the meaning provided in Section 7.1(b).

"Losses" has the meaning provided in Section 3.10(a).

"Member" means each Person listed on Exhibit A as of the date hereof and each other Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Act. The Members shall constitute the "members" (as that term is defined in the Act) of the Company.

"Membership Interest" means, with respect to each Member, such Member's Economic Interest and other rights as a Member.

"Net Income" or "Net Loss" means for each fiscal year or other period of the Company, an amount equal to the Company's taxable income or loss for such fiscal year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

    (a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition of Net Income or Net Loss shall be added to such taxable income or loss;

    (b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition of Net Income or Net Loss shall be subtracted from such taxable income or loss;

    (c)    In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (b) or (c) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain (if the adjustment increases the Gross Asset Value of the asset) or loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset for purposes of computing Net Income or Net Loss;

    (d)    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

    (e)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, Depreciation shall be taken into account for such fiscal year or other period;

(f)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Income or Net Loss; and

(g)     Notwithstanding any other provision of this definition of Net Income or Net Loss, any items which are specially allocated pursuant to Section 5.3(b) shall not be taken into account in computing Net Income or Net Loss.  To the extent permitted by the Regulations, the amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section 5.3(b) shall be determined by applying rules analogous to those set forth in this definition of Net Income or Net Loss.

"Notice" has the meaning provided in Section 13.5.

"Officer" means each Person designated as an officer of the Company pursuant to and in accordance with the provisions of Section 3.6.

"Original Agreement" has the meaning provided in the Preamble.

"Overall Percentage" means, for a given Member, the aggregate number of Units held by him or her divided by the aggregate number of Units then issued and outstanding, including, in both numerator and denominator, all Classes of Units.

"Participating Party" has the meaning provided in Section 12.1(b).

"Participating Units" has the meaning provided in Section 2.1(c).

"Permitted Transferee" has the meaning set forth in Section 7.3(a).

"Person" means any natural person, corporation, limited liability company, partnership, trust, joint stock company, business trust, unincorporated association, joint venture, governmental authority or other legal entity of any nature whatsoever.

"Proceeding" has the meaning provided in Section 3.10(a).

"Public Offering" means a public offering of the Equity Securities of the Company, any corporate successor to the Company or any parent entity or Subsidiary of the Company pursuant to an effective registration statement (other than on a Form S-4 or other similar form) under the Securities Act.

"Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Representatives" has the meaning provided in Section 9.1(a).

"Required Standard of Conduct" has the meaning provided in Section 3.10(a).

"Sale Date" has the meaning provided in Section 12.1(c).

"Sale of the Company" means (a) the closing of the lease, Transfer (other than the hypothecation or pledge of assets or Equity Securities in connection with financings of the Company or its Subsidiaries) or other disposition of all or substantially all of the Company's assets, determined on a consolidated basis with the Company's Subsidiaries, in any transaction or series of related transactions (other than sales in the ordinary course of business) to an Independent Third Party, (b) the consummation of a merger, consolidation or reorganization to which the Company and an Independent Third Party are party or among the constituent entities, unless, after giving effect to such merger, consolidation or reorganization, the holders of the Company's outstanding Class A Units immediately prior to the merger, consolidation or reorganization will own, directly or indirectly, immediately following the merger, consolidation or reorganization, Equity Securities of the Company (or the surviving or resulting Person or the Person whose securities are issued in such merger, consolidation or reorganization) holding at least a majority of the voting power to elect the Board (or comparable governing body of the surviving or resulting Person or the Person whose securities are issued in such merger, consolidation or reorganization) under ordinary circumstances, or (c) any sale or series of sales of Units by the holders thereof or the Company which results in any Independent Third Party owning Units holding a majority of the voting power of the Company to elect the Board or comparable governing body under ordinary circumstances. A sale (or multiple related sales) of one or more Subsidiaries of the Company to an Independent Third Party (whether by merger, consolidation, reorganization or sale of all or substantially all its assets or Equity Securities of such Subsidiary) that constitutes all or substantially all the consolidated assets of the Company shall be deemed a Sale of the Company.

"Securities Act" means the Securities Act of 1933, or any successor federal statute, and the rules and regulations of the Securities and Exchange Commission thereunder, as the same may be amended from time to time.

"Subsidiary" means, with respect to the Company or any other Person, any Person of which the Company (or such other Person) owns securities having a majority of the voting power in electing the board of directors (or other governing body) directly or through one or more Subsidiaries (or, in the case of a partnership, limited liability company or other similar entity, securities conveying, directly or indirectly, a majority of the economic interests in such partnership or entity), including any Person of which the Company (or such other Person) or any Subsidiary serves as general partner or managing member.

"Substitute Member" means any Person that has been admitted to the Company as a Member pursuant to Section 6.4 by virtue of such Person receiving all or a portion of a Membership Interest from a Member or its Assignee and not from the Company.

"Successor in Interest" means any (a) trustee, custodian, receiver or other Person acting in any bankruptcy or reorganization proceeding with respect to, (b) assignee for the benefit of the creditors of, (c) trustee or receiver, or current or former officer, director or partner, or other fiduciary acting for or with respect to the dissolution, liquidation or termination of, or (d) other

executor, administrator, committee, legal representative or other successor or assign of, any Member, whether by operation of applicable law or otherwise.

"Tag-along Notice" has the meaning provided in Section 12.1(b).

"Tag-along Notice Date" has the meaning provided in Section 12.1(a).

"Tag-along Notice Period" has the meaning provided in Section 12.1(b).

"Tag-along Offer" has the meaning provided in Section 12.1(a).

"Tag-along Offer Notice" has the meaning provided in Section 12.1(a).

"Tag-along Offerees" has the meaning provided in Section 12.1(a).

"Tag-along Purchaser" has the meaning provided in Section 12.1(a).

"Tax Distribution Rate" has the meaning provided in Section 5.4(c)(i).

"Tax Matters Member" has the meaning provided in Section 11.4(b).

"Threshold Amount" means, with respect to a Class B Unit, the "threshold amount" corresponding to such Class B Units as set forth in the applicable Award Agreement as determined by the Board in its reasonable discretion. The Threshold Amount with respect to any given award of Class B Units shall be at least equal to the fair market value of the Company on the date of grant of such Class B Units as determined by the Board in its reasonable discretion.

"Transfer" means any transfer, sale, conveyance, assignment, gift, hypothecation, pledge or other disposition, whether voluntary or by operation of applicable law.

"Transferring Party" has the meaning provided in Section 12.1(a).

"Unallocated Units" has the meaning provided in Section 12.2.

"Units" means units of Membership Interests in the Company from time to time outstanding hereunder (which are initially represented by Class A Units and Class B Units).

"Unvested Units" means any Class B Units issued pursuant the Equity Incentive Plan that have not vested in accordance with the terms of the applicable Award Agreement.

"Vested Units" means any Class B Units issued pursuant to the Equity Incentive Plan that have vested in accordance with the terms of the applicable Award Agreement.