## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BAYOU STEEL BD HOLDINGS, L.L.C., *et al.*, [1]<br><br>        Debtors. | Chapter 7<br><br>Case No. 19-12153 (KBO)<br>(Jointly Administered) |
| GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Bayou Steel BD Holdings, L.L.C., *et al.*,<br><br>        Plaintiff,<br><br>   v.<br><br>BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C., *et al.*,<br><br>        Defendants. | Adv. No. 21-51013 (KBO)<br><br><br>**Re: Adv. Docket Nos. 25, 27** |

## PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

| | |
|---|---|
| KAUFMAN, COREN & RESS, P.C.<br>Steven M. Coren, Esq.<br>Benjamin M. Mather, Esq.<br>Janice D. Felix, Esq.<br>2001 Market Street, Suite 3900<br>Philadelphia, PA 19103<br>Tel: (215) 735-8700<br>Fax: (215) 735-5170 | PACHULSKI STANG ZIEHL<br>& JONES LLP<br>Bradford J. Sandler (DE Bar No. 4142)<br>Colin R. Robinson (DE Bar No. 5524)<br>Peter J. Keane (DE Bar No. 5503)<br>919 North Market Street, 17th Floor<br>Wilmington, DE 19801<br>Tel: (302) 652-4100<br>Fax: (302) 652-4400 |

Dated: January 24, 2022                    *Attorneys for Plaintiff*

---

[1]  The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, are: Bayou Steel BD Holdings, L.L.C. (1984), BD Bayou Steel Investment, LLC (1222), and BD LaPlace, LLC (5783).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

NATURE AND STAGE OF THE PROCEEDING........................................................1

INTRODUCTION .........................................................................................................2

RELEVANT BACKGROUND .....................................................................................4

    A. Black Diamond Acquires Debtors in April 2016 ...............................................4

    B. Despite Crippling Undercapitalization and Chronic Liquidity Problems, Debtors, at
    Black Diamond's Direction, Issue a $30 Million Distribution to Fund IV ...........6

    C. Debtors' Financial Condition and Operating Performance Continue to Deteriorate
    Following the Distribution .....................................................................................7

    D. Debtors, at Black Diamond's Direction, Grant a Lien on Substantially All of Their
    Assets to BDCF and Fund IV.................................................................................7

MOTION TO DISMISS STANDARD...........................................................................9

ARGUMENT ...............................................................................................................11

    A. THE COMPLAINT SUFFICIENTLY STATES CLAIMS (COUNTS I-III) TO
    AVOID AND RECOVER THE DISTRIBUTION AS A FRAUDULENT
    TRANSFER ..........................................................................................................11

        1. The Trustee's Avoidance Claims Relating to the Distribution Are Subject to the
        Four-Year Period in Section 1309 of DUFTA (Under Which the Trustee's Claims
        Are Plainly Timely), Not the Three-Year Period in Section 18-607 of Delaware's
        LLC Act ...........................................................................................................11

            a. Section 18-607(c) Does Not Apply to the Trustee's Avoidance Claims ..................12

            b. Timeliness of State Law Claims Brought Pursuant To Section 544(b)(1) Is
            Measured As Of the Petition Date, As Congress Made Clear In Its Enactment
            of the Provisions of the Bankruptcy Code ...........................................................16

        2. The Section 546(e) Safe Harbor Does Not Bar Avoidance Claims Relating to the
        Distribution .....................................................................................................17

    B. THE COMPLAINT SUFFICIENTLY STATES CLAIMS (COUNT IV-VII) TO
    AVOID THE BD LIEN GRANT AS A FRAUDULENT TRANSFER UNDER
    DUFTA AND THE BANKRUPTCY CODE ......................................................22

        1. The Complaint Alleges Lack of Reasonably Equivalent Value ....................23

i

2. The Complaint Alleges Actual Intent to Defraud ........................................................... 25

C. COUNT VIII STATES A CLAIM FOR UNJUST ENRICHMENT .................................. 27

D. THE TRUSTEE'S BREACH OF FIDUCIARY DUTY (COUNT IX) AND
AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (COUNT X)
CLAIMS ARE SUFFICENTLY PLED ................................................................................ 28

1. The Complaint Sufficiently Alleges Breaches of Fiduciary Duty By Each of the
Directors ................................................................................................................................ 28

2. The Directors' Purported Exculpation Affirmative Defenses Cannot Be Resolved
at the Pleading Stage .......................................................................................................... 31

3. The Complaint States a Claim for Aiding and Abetting Breach of Fiduciary Duty,
Including Pleading an Underlying Breach ..................................................................... 33

E. THE COMPLAINT STATES A CLAIM FOR CORPORATE WASTE ........................... 34

F. COUNT XII STATES A CLAIM FOR EQUITABLE SUBORDINATION
PURSUANT TO 11 U.S.C. § 510 ....................................................................................... 35

G. COUNT XIII, ASSERTED IN THE ALTERNATIVE, SUFFICIENTLY PLEADS
ENTITLEMENT TO SURCHARGE UNDER 11 U.S.C. § 506(c) .................................... 37

H. IN THE ALTERNATIVE, IF THE COURT DETERMINES THAT DISMISSAL OF
ANY CLAIMS IS WARRANTED, LEAVE TO AMEND SHOULD BE GRANTED ...... 38

CONCLUSION ................................................................................................................................ 40

DOCS_DE:237945.1 57095/001

## TABLE OF AUTHORITIES

**Cases**

*A Communication Co., Inc. v. Bonutti*, 55 F. Supp. 3d 1119 (S.D. Ill. 2014) .............................. 14

*Alston v. Parker*, 363 F.3d 229 (3d Cir. 2004) ............................................................ 40

*Arnault v. Diamondhead Casino Corp.*, 277 F. Supp. 3d 671 (D. Del. 2017)............................ 38

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..................................................................... 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)......................................................... 10

*Buchwald Capital Advisors, LLC v. Papas*, 584 B.R. 161 (E.D. Mich. Jan. 23, 2018), *vacated and remanded on other grounds*, *In re Greektown Holdings, LLC*, 765 F. App'x 132 (6th Cir. 2019)......................................................................................... 19

*Buckley v. O'Hanlon*, 2007 WL 956947 (D. Del. Mar. 28, 2007)................................... 31

*Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096 (Del. Ch. 2008) ..................... 34

*Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993) ......................................... 29

*Citicorp Venture Capital Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982 (3d Cir. 1998)................................................................................ 36

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228 (3d Cir. 2003)................................................................................ 35

*Comba Telecom, Inc. v. Andrew, L.L.C.*, 2013 WL 12409853 (D. Del. Mar. 8, 2013)............... 40

*Continental Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219 (Del. Ch. 2000) ........................ 32

*Crescent Res. Litig. Trust ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464 (W.D. Tex. 2013) ................................................................................................ 19

*Crystallex Int'l Corp. v. Petroleos De Venezuela, S.A.*, 879 F.3d 79 (3d Cir. 2018) .................. 23

*Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267 (3d Cir. 2001) .................................. 39

*Del. Display Group LLC v. Lenovo Group Ltd.*, 2016 WL 720977 (D. Del. Feb. 23, 2016)....... 39

*Dix v. Total Petrochemicals USA, Inc.*, 2011 WL 2474215 (D.N.J. June 20, 2011)................... 19

*Dole v. Arco Chem. Co.*, 921 F.2d 484 (3d Cir. 1990) ......................................... 38, 40

*Feeley v. NHAOCG, LLC*, 62 A.3d 649 (Del. Ch. 2012)....................................... 31, 33

*Foman v. Davis*, 371 U.S. 178 (1962) ..................................................................... 39

*Forman v. Willix*, 2014 WL 1877628 (D.N.J. Apr. 30, 2014)....................................... 17

*In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004)....................................... 11

*In re AlphaStar Ins. Group Ltd.*, 383 B.R. 231 (Bankr. S.D.N.Y. 2008) ................................ 36

*In re Am. Bus. Fin. Servs., Inc.*, 360 B.R. 74 (Bankr. D. Del. 2007)................................... 36

*In re Am. Bus. Fin. Servs., Inc.*, 361 B.R. 747 (Bankr. D. Del. 2007)................................. 25

*In re Am. Home Mortg. Holding*, 458 B.R. 161 (Bankr. D. Del. 2011) ...................................... 18

*In re Boston Generating LLC*, 617 B.R. 442 (Bankr. S.D.N.Y. 2020),
    *aff'd*, 2021 WL 4150523 (S.D.N.Y. Sept. 12, 2021) ................................... 14, 15, 19

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ............................. 10, 19

*In re C.S. Assocs.*, 29 F.3d 903 (3d Cir. 1994) ...................................................................... 37

*In re Charys Holding Co.*, 2010 WL 2774852 (Bankr. D. Del. July 14, 2010).......................... 10

*In re Charys Holding Co., Inc.*, 443 B.R. 628 (Bankr. D. Del. 2010).......................................... 23

*In re Computer Personalities Sys., Inc.*, 284 B.R. 415 (E.D. Pa. 2002) ................................... 35

*In re DBSI, Inc.*, 477 B.R. 504 (Bankr. D. Del. 2012)................................................................ 13

*In re Die Fliedermaus LLC*, 323 B.R. 101 (Bankr. S.D.N.Y. 2005)) ......................................... 15

*In re Dreier LLP*, 452 B.R. 391 (Bankr. S.D.N.Y. 2011) .......................................................... 36

*In re Dry Wall Supply, Inc.*, 111 B.R. 933 (D. Colo. 1990) ..................................................... 16

*In re DSI Renal Holdings, LLC*, 574 B.R. 446 (Bankr. D. Del. 2017) ....................................... 29

*In re DVI, Inc.*, 2008 WL 4239120 (Bankr. D. Del. Sept. 16, 2008)........................................ 11

*In re FAH Liquidating Corp.*, 2018 WL 2793944 (D. Del. June 11, 2018) ................................ 25

*In re FAH Liquidating Corp.*, 572 B.R. 117 (Bankr. D. Del. 2017)...................................... 27, 28

*In re Fedders N. Am., Inc.*, 405 B.R. 527 (Bankr. D. Del. 2009) .................................................. 10

*In re Fruehauf Trailer Corp.*, 444 F.3d 203 (3d Cir. 2006) ..................................................... 23

*In re Global Crossing, Ltd.*, 385 B.R. 52 (Bankr. S.D.N.Y. 2008) .............................................. 18

*In re Greektown Holdings, LLC*, 621 B.R. 797 (Bankr. E.D. Mich. 2020) ................................. 21

*In re Hill*, 342 B.R. 183 (Bankr. D.N.J. 2006)........................................................................ 27

*In re Liquid Holdings Group, Inc.*, 2018 WL 2759301 (Bankr. D. Del. June 6, 2018)............... 31

*In re Lockwood Corp.*, 223 B.R. 170 (8th Cir. B.A.P. 1998) ................................................... 37

*In re Lois/USA, Inc.*, 264 B.R. 69 (Bankr. S.D.N.Y. 2001)...................................................... 36

*In re LSC Wind Down, LLC*, 610 B.R. 779 (Bankr. D. Del. 2020) ...................................... 12, 16

*In re Mach., Inc.*, 287 B.R. 755 (Bankr. E.D. Mo. 2002) ......................................................... 37

*In re Manhattan Inv. Fund Ltd.*, 310 B.R. 500 (Bankr. S.D.N.Y. 2002)..................................... 36

*In re Orfa Corp. of Philadelphia*, 170 B.R. 257 (E.D. Pa. 1994) .............................................. 38

*In re Our Alchemy, LLC*, 2019 WL 4447545 (Bankr. D. Del. Sept. 16, 2019) .......................... 28

*In re Phar-Mor, Inc. Sec. Litig.*, 178 B.R. 692 (W.D. Pa. 1995).............................................. 17

*In re Pitt Penn Holding Co.*, 484 B.R. 25 (Bankr. D. Del. 2012).............................................. 10

*In re Plassein Int'l Corp.*, 2008 WL 1990315 (Bankr. D. Del. May 5, 2008) ............................ 23

*In re PMTS Liquidating Corp.*, 490 B.R. 174 (D. Del. 2013) ................................................... 40

iv

*In re Polichuk*, 506 B.R. 405 (Bankr. E.D. Pa. 2014)................................................... 25, 26

*In re Polichuk*, 2010 WL 4878789 (Bankr. E.D. Pa. Nov. 23, 2010)........................................ 16

*In re Quebecor World (USA) Inc.*, 719 F.3d 94 (2d Cir. 2013). ........................................... 21

*In re R.M.L., Inc.*, 92 F.3d 139 (3d Cir. 1996)............................................................ 23

*In re Resorts Int'l, Inc.*, 181 F.3d 505 (3d Cir. 1999) ................................................... 21

*In re Simplexity, LLC*, 2017 WL 65069 (Bankr. D. Del. Jan. 5, 2017)). ................................... 31

*In re Student Fin. Corp.*, 335 B.R. 539 (D. Del. 2005) ................................................... 10

*In re SubMicron Sys. Corp.*, 432 F.3d 448 (3d Cir. 2006)................................................. 36

*In re The Brown Schools*, 368 B.R. 394 (Bankr. D. Del. 2007) ...................................... 32, 34, 35

*In re Towne, Inc.*, 536 F. App'x 265 (3d Cir. 2013)....................................................... 37

*In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66 (2d Cir. 2019) ........................... 21

*In re Tribune Co.*, 464 B.R. 126 (Bank. D. Del. 2011) .................................................... 26

*In re Tweeter Opco*, 452 B.R. 150 (Bankr. D. Del. 2011)................................................. 39

*In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275 (Del. Ch. 2003)....................................... 29

*In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693 (Del. Ch. 2005)....................................... 29

*Kane v. Chester County Dep't of Children, Youth and Families*, 10 F. Supp. 3d 671
    (E.D. Pa. 2014).................................................................................... 10

*Lake v. Arnold*, 232 F.3d 360 (3d Cir. 2000)............................................................. 39

*Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179
    (Del. Ch. Oct. 20, 2014).......................................................................... 29

*Matter of Princeton-New York Investors, Inc.*, 219 B.R. 55 (D.N.J. 1998)................................ 17

*Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018) ...................... 18, 20

*Miller v. Am. Real Estate Partners, L.P.*, 2001 WL 1045643 (Del. Ch. Sept. 6, 2001). .............. 33

*Nemec v. Schrader*, 991 A.2d 1120 (Del. 2010) ......................................................... 27

*Paul Elton, LLC v. Rommel Delaware, LLC*, 2020 WL 2203708 (Del. Ch. May 7, 2020).......... 14

*Pepper v. Litton,* 308 U.S. 295 (1939)................................................................... 36

*Pepsi-Cola Bottling Co. of Salisbury, Md. v. Handy*, 2000 WL 364199
    (Del. Ch. Mar. 15, 2000)........................................................................... 14

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008).............................................. 9

*Royal Equip. Leasing, LLC v. Willis*, 45 N.E.3d 610 (Table) (Mass. App. Ct. 2016)................. 14

*Sample v. Morgan*, 914 A.2d 647 (Del. Ch. 2007) ................................................... 34, 35

*Sands v. McCormick*, 502 F.3d 263 (3d Cir. 2007) ...................................................... 10

*Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014) ......................................................... 11

*Schock v. Nash*, 732 A.2d 217 (Del. 1999) ................................................................. 27

*Setters v. AI Props. and Devs. (USA) Corp.*, 139 A.D.3d 492 (N.Y. App. Div. 2016) ............... 15

*Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647 (S.D. Tex. 2007) ........................... 17

*Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362 (Del. 2006) ......................... 29

*Teamsters Local 456 Pension Fund v. Universal Health Servs.*, 2020 WL 2063474
   (E.D. Pa. Apr. 29, 2020) ........................................................................ 39

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006), *aff'd sub
   nom. Trenwick Am. Litig. v. Billett*, 931 A.2d 438 (Del. 2007) .............................. 13

*Upchurch v. Hester*, 2006 WL 1652666 (D. Del. June 8, 2006) ................................. 22

*U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242
   (3d Cir. 2016) .................................................................................. 39

*Zazzali v. AFA Fin. Group, LLC*, 2012 WL 4903593 (Bankr. D. Del. Aug. 28, 2012) ............... 18

**Statutes**

6 Del. C. § 18-1101 ................................................................................ 31

6 Del. C. § 18-607 ............................................................................ *passim*

6 Del. C. § 1301 .................................................................................. 26

6 Del. C. § 1304 ............................................................................. *passim*

6 Del. C. § 1309 .................................................................................. 11

11 U.S.C. § 101 ......................................................................... 18, 20, 26

11 U.S.C. § 108 ............................................................................... 9, 13

11 U.S.C. § 506 .................................................................................. 37

11 U.S.C. § 510 .............................................................................. 35, 36

11 U.S.C. § 544 ............................................................................. *passim*

11 U.S.C. § 546 ............................................................................. *passim*

11 U.S.C. § 550 .................................................................................. 11

**Rules**

FED. R. BANKR. P. 7008 ............................................................................ 38

FED. R. BANKR. P. 7012 ............................................................................. 2

FED. R. BANKR. P. 7015 ............................................................................ 38

FED. R. CIV. P. 8 ................................................................................. 38

FED. R. CIV. P. 9 ................................................................................. 10

FED. R. CIV. P. 12 ................................................................................. 2

FED. R. CIV. P. 15 ................................................................................ 38

DOCS_DE:237945.1 57095/001

**Other Authorities**

6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.)...................................................................................... 40

Plaintiff George L. Miller, in his capacity as the Chapter 7 Trustee (the "Trustee") for the jointly administered bankruptcy estates of Bayou Steel BD Holdings, L.L.C. ("Bayou Holdings"), BD Bayou Steel Investment, LLC ("Bayou Investment"), and BD LaPlace, LLC ("BD LaPlace") (collectively, "Debtors"), by and through his counsel, submits this Omnibus Memorandum of Law in opposition to the motions to dismiss filed by Defendants Black Diamond Capital Management, L.L.C. ("Black Diamond"), BDCM Opportunity Fund IV, L.P. ("Fund IV"), Black Diamond Commercial Finance, L.L.C. ("BDCF"),[2] Sam Farahnak, Phil Raygorodetsky, Rob Archambault, Terry Taft, and Bob Unfried.[3]

## NATURE AND STAGE OF THE PROCEEDING

Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on October 1, 2019 (the "Petition Date"). Debtors' bankruptcy cases were converted to Chapter 7 on February 25, 2020. On August 11, 2021, the Trustee commenced the instant adversary proceeding by filing the Complaint. The Trustee's Complaint asserts claims against the Black Diamond Entities for the avoidance and recovery of fraudulent transfers under the Bankruptcy Code and state law (Counts I-VII), unjust enrichment (Count VIII), and aiding and abetting breach of fiduciary duty (Count X). The Complaint asserts claims against the Directors for breach of fiduciary duty (Count IX) and corporate waste (Count XI). The Complaint also seeks equitable subordination of all Defendants' claims (Count XII) and, in the alternative, surcharge pursuant to 11 U.S.C. § 506(c) (Count XIII). Defendants responded to the Complaint by filing motions to

---

[2]     Black Diamond, Fund IV, and BDCF are referred to herein, collectively, as the "Black Diamond Entities" (and together with Farahnak and Raygorodetsky, the "Black Diamond Defendants").

[3]     Defendants Farahnak, Raygorodetsky, Archambault, Taft and Unfried are referred herein, collectively, as the "Directors."

dismiss (collectively, the "Motions")[4] pursuant to Federal Rule of Civil Procedure 12(b)(6), applicable here pursuant to Federal Rule of Bankruptcy Procedure 7012(b). The Trustee objects and responds to the Motions herein.

## INTRODUCTION

Black Diamond acquired Debtors, which manufactured and sold steel products, in April 2016 knowing full well that the business was losing money and critically in need of additional capital to stem losses and return to profitability. Promptly orchestrating the sale of Debtors' only profitable business, however, Black Diamond and Debtors' Directors (all of whom either worked for or were appointed by Black Diamond) squandered the opportunity to inject that much-needed capital into Debtors' remaining operations, choosing instead to direct a $30 million distribution (the "Distribution") to Black Diamond—thereby inflicting a mortal wound from which Debtors never recovered. Black Diamond later put in additional cash in an ill-fated attempt to keep Debtors afloat, but did so via subordinated debt which drastically increased Debtors' debt load beyond an amount they could bear, leading to severe liquidity issues and eventual default under their credit facility. Debtors never achieved profitability or cashflow positivity and went out of business leaving non-insider creditors with claims exceeding $85 million.

The Complaint seeks to avoid and recover the Distribution as a fraudulent transfer under Delaware law, to avoid the grant of a security interest to the Black Diamond Entities as a fraudulent transfer under Delaware law and the Bankruptcy Code, and to recover damages for breaches of fiduciary duty by the Directors (which were aided and abetted by Black Diamond). The Complaint

---

[4]    *See* D.I. Nos. 25, 26, and 31 (motion to dismiss, opening brief in support, and proposed order filed by Defendants Archambault, Taft, and Unfried); D.I. 27, 28, and 29 (motion to dismiss, memorandum in support, and declaration filed by Defendants Black Diamond, Fund IV, BDCF, Farahnak, and Raygorodetsky).

DOCS_DE:237945.1 57095/001

further asserts claims for unjust enrichment, corporate waste, equitable subordination, and, alternatively, surcharge under the Bankruptcy Code. The Complaint sets forth, in detail, the factual basis for each of these claims.

The Trustee's avoidance claims concerning the Distribution are well-pled—indeed, the Black Diamond Defendants do not even challenge that the Trustee states all elements of these claims, raising only affirmative defenses in their Motion. These defenses are baseless. The statute of limitations defense is based on a statute that does not apply to the Trustee's claims and preemption arguments which are refuted by, among other things, the plain language of the Bankruptcy Code. And, the expansive § 546(e) safe harbor arguments lodged by the Black Diamond Defendants are unsupported by facts (and could not be resolved at this stage even if they were) and are at odds with the Supreme Court's holdings concerning the scope of the safe harbor.

The Trustee also states claims to avoid the grant of a security interest in substantially all of Debtors' property. The Complaint alleges lack of reasonably equivalent value due to the totality of circumstances surrounding the grant. As the Third Circuit has made clear, this is not an issue which can be resolved using *per se* rules or without factual inquiries that would be premature at the pleading stage. The Complaint further alleges badges of fraud demonstrating actual intent—including insider status, lack of reasonably equivalent value, and insolvency—as well as a fraudulent motive on the part of the Defendants (*i.e.* to elevate Black Diamond over Debtors' other creditors).

Defendants' arguments concerning the breach of fiduciary duty and related claims likewise miss the mark. Defendants' purported exculpation affirmative defenses require fact-specific analyses that are premature at the pleading stage and do not provide a basis for dismissal—and, in any event, the relevant contractual language does not clearly exculpate liability for the breaches

alleged in the Complaint.  The Complaint clearly sets forth the basis for this claim against each of the Directors—specifically, against Farahnak and Raygorodetsky for orchestrating the transactions described in the Complaint and against Taft, Unfried, and Archambault for failing to take any good faith steps to prevent the transactions or the resulting losses to Debtors.  The Complaint's detailed allegations concerning this conduct support not only the breach of fiduciary duty claim, but also the corporate waste claim, the existence of an underlying breach for purposes of the aiding and abetting claim, and the existence of inequitable conduct for purposes of the equitable subordination claim.  To the extent Defendants dispute the alleged facts, that is not a basis for dismissal under Rule 12(b)(6).

The Motions should be denied.

## RELEVANT BACKGROUND

### A.      Black Diamond Acquires Debtors in April 2016

Prior to their bankruptcy filings on October 1, 2019 (the "Petition Date"), Debtors were in the capital-intensive business of manufacturing and selling steel products, in connection with which they operated a mini-mill at their LaPlace, Louisiana headquarters, a bar product rolling mill in Harriman, Tennessee, and distribution depots in Oklahoma, Illinois, and Pennsylvania.  *See* D.I. 1, Complaint ("Compl."), ¶¶ 2, 25-26.

Black Diamond previously owned Bayou Steel from May 2006 until July 2008, when it sold the company to ArcelorMittal for a significant profit.  *Id.*, ¶¶ 28-29.  The company did not perform well under ArcelorMittal's management and, in June 2015, ArcelorMittal decided to sell the Bayou Steel operations (which had been renamed ArcelorMittal LaPlace), as well as its other United States long steel assets including a facility in Vinton, Texas.  *Id.*, ¶¶ 2, 30-31, 35, 42.  In April 2016, Black Diamond—hoping to effect another successful turnaround of the company as it

4

had done previously—acquired the LaPlace-headquartered operations and the Vinton facility from ArcelorMittal (the "Acquisition"), knowing full-well that the LaPlace side of the business in particular was losing money and would need substantial capital infusions to stem losses and return to profitability. *Id.*, ¶¶ 2, 34, 36-41, 43.

The Acquisition terms are set forth in a Sale and Purchase Agreement dated as of March 23, 2016, between ArcelorMittal USA LLC and ArcelorMittal Bayou Acquisition LLC, as Sellers, and BD Long Products, LLC, as Buyer.[5] *Id.*, ¶ 44. The Acquisition closed on April 4, 2016. *Id.*, ¶ 45. As adjusted, the final purchase price was approximately $90.2 million—allocated $64.7 million to LaPlace, and $25.5 million to Vinton. *Id.* The Acquisition was funded by a combination of equity and debt. Black Diamond, through Fund IV, made an initial member contribution of $59.6 million, and owned 100% of Debtor Bayou Holdings, which in turn owned 100% of Debtors Bayou Investment and BD LaPlace. *Id.*, ¶¶ 46-47.

The balance of the purchase price was funded through a revolving loan with Bank of America, N.A. ("BoA") and SunTrust Robinson Humphrey, Inc., the terms of which are set forth in a Loan and Security Agreement dated as of April 4, 2016 (the "Revolving Loan"). *Id.*, ¶ 48. The Revolving Loan was secured by liens on substantially all of Debtors' assets, permitted borrowings of up to $75 million in the aggregate, and provided, *inter alia*, that if availability fell below a certain "trigger" then increased reporting and cash management obligations would be imposed (with availability below $10 million constituting a default). *Id.*, ¶¶ 49-50.

---

[5]      BD Long Products, LLC was formed on December 22, 2015 for purposes of the acquisition, with Fund IV as its sole member and Black Diamond as its manager. After closing, BD Long Products, LLC's name was changed to Bayou Steel BD Holdings, L.L.C. (i.e., Debtor Bayou Holdings). *See* Compl., ¶ 44.

**B.**      **Despite Crippling Undercapitalization and Chronic Liquidity Problems, Debtors, at Black Diamond's Direction, Issue a $30 Million Distribution to Fund IV**

Debtors were substantially undercapitalized and operated at a loss from the Acquisition in April 2016 continually until the Petition Date. *Id.*, ¶¶ 58-59, 83-89 (detailing Debtors' negative cash flows, negative EBITDA, and debt financing), 99-100, 112; *see also Id.*, ¶¶ 60, 136 (detailing communications involving the Directors and other members of Debtors' management concerning the company's undercapitalization and persistent liquidity deficits).

However, unlike the LaPlace-headquartered operations which burned cash and lost millions of dollars, the Vinton, Texas operation was cashflow positive. *Id.*, ¶ 61. For this reason, Black Diamond quickly pursued a sale of the Vinton business, which culminated in the December 20, 2016 of BD Vinton LLC to Kyoei Steel for $49 million (the "Vinton Sale"). *Id.*, ¶ 62. The Vinton Sale helped de-leverage Debtors' balance sheet and improve liquidity for a short time, *id.*, ¶¶ 63-64, but rather than using this improved liquidity to rescue the business and make capital investments necessary for the business to succeed long-term, Black Diamond decided to prefer itself by compelling Debtors to make a $30 million distribution to Fund IV on March 17, 2017 (the "Distribution"). *Id.*, ¶¶ 65, 78. Indeed, Black Diamond planned to withdraw every penny it could get away with, knowing full well that it would leave Debtors, including BD LaPlace, undercapitalized and in the same precarious financial condition that existed just a few months earlier before the Vinton Sale. *See id.*, ¶¶ 66-67 (detailing communications planning the Distribution). Black Diamond—ignoring liquidity concerns and input from Debtors' management—arranged a First Amendment to the Loan and Security Agreement dated as of March 16, 2017 (the "First Amendment") to permit the $30 million Distribution. *See id.*, ¶¶ 68, 71-76. The Distribution was paid by BD LaPlace to Fund IV the following day, on March 17, 2017. *Id.*, ¶ 69. The Distribution was made at the behest of Black Diamond and Directors Farahnak and

Raygorodetsky notwithstanding Debtors' operating losses and insolvency, while Directors Taft, Unfried, and Archambault made no effort to prevent the negative impacts to Debtors caused by the Distribution. *Id.*, ¶¶ 77-81.

**C.     Debtors' Financial Condition and Operating Performance Continue to Deteriorate Following the Distribution**

The increased financial leverage and limited borrowing availability on the Revolving Loan left Debtors, including BD LaPlace, with unreasonably small capital to operate the business. *Id.*, ¶ 93. Debtors' reported availability on the Revolving Loan cratered immediately after payment of the Distribution—decreasing from $35.3 million to $7.2 million, an 80% decline—and never recovered. *See id.*, ¶¶ 94-95 and Ex. A. To fund the Distribution, borrowings under the Revolving Loan were increased from $3.8 million to $33.9 million, reducing Debtors' available capital. *Id.*, ¶ 96. Debtors' cash position also deteriorated even further, and liquidity concerns that had been voiced by Debtors' CEO, Vice President of Finance, and others—but ignored by Farahnak and Raygorodetsky—pre-Distribution manifested themselves in short order. *Id.*, ¶¶ 103-04; *see also* ¶¶ 105-09, 111 (detailing communications concerning persistent liquidity and availability issues). By the end of 2017, the balance under the Revolving Loan had grown to over $38 million and Debtors suffered an operating loss of $18.7 million for the year. *Id.*, ¶¶ 112-13.

**D.     Debtors, at Black Diamond's Direction, Grant a Lien on Substantially All of Their Assets to BDCF and Fund IV**

In late 2017, Black Diamond explored injecting much-needed cash into the business in the form of a subordinated loan secured by a second lien on Debtors' assets. *Id.*, ¶¶ 114-15. On December 21, 2017, Debtors entered into a Subordinated Loan and Security Agreement with Fund IV and BDCF (the "BD Term Loan"), which provided, initially, for a $15 million subordinated term loan, from which the Debtors would draw in increments (the first of which was $5 million)

7

and granted a continuing security interest and lien on substantially all of Debtors' property to BDCF and Fund IV (the "BD Lien Grant"). *Id.*, ¶¶ 117-19. The BD Term Loan was subsequently amended on multiple occasions to increase the amount available for borrowing—first to $30 million, then to $40 million. *Id.*, ¶¶ 122-24; *see id.*, ¶ 125 (setting forth dates and amounts of draws made on the BD Term Loan). The BD Term Loan was subject to a 12% interest rate, which was paid-in-kind interest that accrued quarterly and was added to the principal amount. *See id.*, ¶ 127 (setting forth growing principal on BD Term Loan for each quarter, with final balance of $36,553,991.46 as of September 30, 2019). Debtors did not repay any portion of the BD Term Loan. *Id.*, ¶ 129. These capital infusions were necessitated only because of Black Diamond's conduct and the breaches of fiduciary duty by Debtors' directors in causing Debtors' distressed financial position following the Distribution, yet the BD Lien Grant had the effect of encumbering all of Debtors' assets and elevating Black Diamond and its affiliates to secured creditor status in advance of Debtors' bankruptcy. *Id.*, ¶¶ 130, 186, 197.

Despite the cash infusions made in connection with the BD Term Loan (which simultaneously increased the Debtors' indebtedness well beyond any amount they could hope to repay and encumbered substantially all of their assets), Debtors' financial and operational difficulties continued. *Id.*, ¶ 134. By late 2017 and throughout 2018, Debtors were in financial and operational disarray, with tensions between the Directors and Debtors' management negatively impacting operations, and with continuing poor financial results and liquidity crises. *Id.*, ¶¶ 136-37; *see also id.*, ¶ 135 (alleging Director Unfried acting as interim CEO during this time). Debtors' financial picture (including availability under the Revolving Loan) were even *worse* than what the financial projections reflected because, among other reasons: (i) the projections were reverse-engineered to satisfy Black Diamond's internal management rather than

8

accurately depict Debtors' financial status, and (ii) Debtors' borrowing base was overstated because ineligible items had been improperly included, in violation of the Revolving Loan Agreement—a situation Debtors' Directors and officers were aware of but failed to correct.  *See id.*, ¶¶ 67(viii), 90, 137-43, 145-47.  Once BoA demanded that the overstated borrowing base calculations be corrected, the adjustments caused Debtors to fall below the $10 million availability threshold under the Revolving Loan, triggering a default and permitting BoA to pursue default remedies.  *Id.*, ¶ 148.

By the summer of 2019, Debtors' operational and financial performance were dismal, liquidity was a persistent problem, and millions of dollars in subordinated debt from Black Diamond, as well as concessions from BoA, were necessary for Debtors to operate at the most basic level.  *Id.*, ¶ 150.  On September 12, 2019, BoA issued a Default Notice under the Revolving Loan and, after discovering certain cash reporting discrepancies, also brought in an outside consultant to assist Debtors with cash management, modeling, and managing the relationship with the banks.  *Id.*, ¶¶ 151-52.  A few weeks later, on October 1, 2019, Debtors filed their bankruptcy petitions.  *Id.*, ¶ 153.[6]

## MOTION TO DISMISS STANDARD

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state

---

[6]    The Trustee's Complaint was filed on August 11, 2021, within two years after Debtors' bankruptcy filings, as required by §§ 108(a) and 546(a) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 108(a), 546(a).

9

a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Claims for actual fraudulent transfer are generally subject to Federal Rule of Civil Procedure 9(b),[7] applicable here by Federal Rule of Bankruptcy Procedure 7009, which states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  FED. R. CIV. P. 9(b).  "It is not a defendant's fraudulent intent that must be pled with particularity, but the circumstances constituting fraud." *In re Charys Holding Co.*, 2010 WL 2774852, at *3 (Bankr. D. Del. July 14, 2010).  Moreover, because a bankruptcy trustee is a third-party outsider to the debtor's transactions, "[t]he requirements of Rule 9(b) are relaxed and interpreted liberally where a trustee … is asserting the fraudulent transfer claims." *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009).

For purposes of Rule 12(b)(6), "the court relies on the complaint, exhibits attached to the complaint, and matters of public record, including other judicial proceedings." *Kane v. Chester County Dep't of Children, Youth and Families*, 10 F. Supp. 3d 671, 680 (E.D. Pa. 2014) (citing *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007)); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (court may also consider an extrinsic document if it is "integral to or explicitly relied upon" in the complaint).

"The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case." *In re Student Fin. Corp.*, 335 B.R. 539, 546 (D. Del. 2005).  The plaintiff is not required to anticipate, overcome, or "plead around" affirmative

---

[7]    Constructive fraudulent transfer claims "are subject to the lower standard of Federal Rule of Civil Procedure 8." *In re Pitt Penn Holding Co.*, 484 B.R. 25, 36 (Bankr. D. Del. 2012).

DOCS_DE:237945.1 57095/001

defenses in the complaint. *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014) (citing *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004)); *see also In re DVI, Inc.*, 2008 WL 4239120, at *11 (Bankr. D. Del. Sept. 16, 2008) ("An affirmative defense with disputed facts is not a proper basis to dismiss a complaint.").

## ARGUMENT

### A.    THE COMPLAINT SUFFICIENTLY STATES CLAIMS (COUNTS I-III) TO AVOID AND RECOVER THE DISTRIBUTION AS A FRAUDULENT TRANSFER

The Trustee's Complaint asserts claims to avoid the Distribution as an actual fraudulent transfer and as a constructive fraudulent transfer under §§ 1304(a) and 1305(a) of the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301, *et seq.* ("DUFTA") and § 544 of the Bankruptcy Code, and to recover the Distribution or its value pursuant to § 550 of the Bankruptcy Code. *See* Compl., Counts I-III. The Black Diamond Defendants do not challenge that the Complaint sufficiently pleads the elements of these claims, but nonetheless seek dismissal based on alleged affirmative defenses under the Delaware Limited Liability Company Act, 6 Del. C. § 18-101, *et seq.* (the "LLC Act") and the Bankruptcy Code. These alleged defenses are meritless and do not provide a basis for dismissal under Rule 12(b)(6).

### 1.    The Trustee's Avoidance Claims Relating to the Distribution Are Subject to the Four-Year Period in Section 1309 of DUFTA (Under Which the Trustee's Claims Are Plainly Timely), Not the Three-Year Period in Section 18-607 of Delaware's LLC Act

Section 1309 of DUFTA sets forth the applicable statute of limitations for actual and constructive fraudulent transfer claims brought pursuant to §§ 1304 and 1305 of DUFTA, providing, *inter alia*, that such claims will be timely if brought "within 4 years after the transfer was made or the obligation was incurred." *See* 6 Del. C. §§ 1309(1) & (2) (setting forth statute of

limitations for claims brought under §§ 1304(a)(1), 1304(a)(2), and 1305(a)).[8]  Timeliness must

be determined as of the Petition Date.  *See In re LSC Wind Down, LLC*, 610 B.R. 779, 784-85

(Bankr. D. Del. 2020); 11 U.S.C. § 546(a); *infra* Section A.1.b.  Here, the Trustee's claims to avoid

the Distribution are plainly timely: the Distribution was made on March 17, 2017, within four

years of the Debtors' bankruptcy filings on October 1, 2019.  *See* Compl., ¶¶ 10, 69-70, 153, 155,

166.

Despite these straightforward facts and legal precepts, the Black Diamond Defendants

argue that the Trustee's claims to avoid the Distribution are time-barred because the LLC Act

provides a three-year period for an LLC to recover an improper distribution.  *See* 6 Del. C. § 18-

607(c).  According to the Black Diamond Defendants, even though the Trustee's claims are not

asserted under the LLC Act, they are nonetheless time-barred because the Complaint was filed

more than three years after the Distribution.[9]  *See* D.I. 28 at pp. 3, 18.  This argument fails for

several reasons—namely, that § 18-607 is inapplicable to the Trustee's claims, that the relevant

four-year limitations period is measured as of the Petition Date (not the date the Complaint was

filed), and that the Black Diamond Defendants' preemption arguments fundamentally

misunderstand the source of the Trustee's authority to assert these claims.

### a.    Section 18-607(c) Does Not Apply to the Trustee's Avoidance Claims

Section 18-607 of Delaware's LLC Act creates a corporate cause of action against an LLC

member who knowingly receives a distribution that strips the LLC of its assets and renders it

insolvent.  *See* 6 Del. C. § 18-607(b).  Section 18-607(c) states that "a member who receives a

---

[8]      *See also* Compl., Counts I-II (asserting actual fraudulent transfer claim under § 1304(a)(1) and constructive fraudulent transfer claim under §§ 1304(a)(2) and 1305(a), via strong-arm powers under § 544 of the Bankruptcy Code).

[9]      The Complaint was filed on August 11, 2021.  *See* D.I. 1.

12

distribution from a limited liability company shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of 3 years from the date of the distribution." 6 Del. C. § 18-607(c).

As an initial matter, the Trustee's claims to avoid and recover the Distribution as a fraudulent transfer are not being asserted pursuant to § 18-607 or any other provision of the LLC Act,[10] nor does his authority to pursue avoidance claims under DUFTA derive from the LLC Act. The Trustee's authority to pursue these claims derives from his strong-arm powers under § 544 of the Bankruptcy Code, which allows him to step into a creditor's shoes to assert state law avoidance claims for the benefit of all of the estate's creditors. *See* 11 U.S.C. § 544(b)(1); *In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000); *In re DBSI, Inc.*, 477 B.R. 504, 512-13 (Bankr. D. Del. 2012). Creditors have direct standing under DUFTA—which is significant in this context because such claims therefore do not implicate any corporate cause of action or time limitation contained in the LLC Act. *See, e.g.*, *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 198-99 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. v. Billett*, 931 A.2d 438 (Del. 2007) (explaining that creditors have "direct standing" to challenge a transaction under the law of fraudulent transfer).

Unlike the creditor claims available under DUFTA, § 18-607 of the LLC Act establishes a *corporate* cause of action. By its plain language, § 18-607 refers only to liability "to a limited liability company," not liability to creditors. 6 Del. C. § 18-607(b). The Black Diamond Defendants argue that the statute of repose applies anyway because it references "other applicable

---

[10]      In any event, even if the Trustee were asserting a claim under § 18-607 in his role as the party empowered to pursue claims that are property of the Debtors' estates, the claim would still be timely because the Distribution occurred within three years of the Petition Date and § 108(a) grants the Trustee an additional two years to assert such claims. *See* 11 U.S.C. §§ 108(a), 323, 541.

law." *See* 6 Del. C. § 18-607(c).  This argument is not supported by the statutory language or by

case law.  *See, e.g.*, *In re Boston Generating LLC*, 617 B.R. 442, 467-68 (Bankr. S.D.N.Y. 2020),

*aff'd*, 2021 WL 4150523 (S.D.N.Y. Sept. 12, 2021) (concluding that statute of repose in § 18-607

and in analogous New York statute do not apply to claims by creditors or the liquidating trustee

standing in creditors' shoes).

The Delaware courts have not ruled definitively on the issue of whether the statute of

repose in § 18-607 applies to creditor claims, but the Delaware Court of Chancery did recently

note (albeit in *dicta*) that "on its face, Section 18-607 does not expose LLC members to claims

brought by creditors, although such language could have been easily drafted."  *See Paul Elton,*

*LLC v. Rommel Delaware, LLC*, 2020 WL 2203708, at *15 n.88 (Del. Ch. May 7, 2020)

(comparing language of § 18-607, which only references liability to the LLC, with a provision of

Delaware's General Corporation Law which creates a comparable cause of action but expressly

references liability to creditors).[11]

Other courts have held that the plain language of § 18-607 makes clear that it does not

apply to creditor claims or, therefore, to claims by a trustee standing in creditors' shoes.  *See A*

*Communication Co., Inc. v. Bonutti*, 55 F. Supp. 3d 1119, 1126-27 (S.D. Ill. 2014) ("*Bonutti*")

(holding, based on language chosen by Delaware legislature, that § 18-607(c) "applies to causes

of action between a limited liability company and a member" and does not apply outside that

context); *Royal Equip. Leasing, LLC v. Willis*, 45 N.E.3d 610 (Table) (Mass. App. Ct. 2016)

---

[11]    The Delaware Court of Chancery has also cautioned against the overbroad application of
§ 18-607.  *See Pepsi-Cola Bottling Co. of Salisbury, Md. v. Handy*, 2000 WL 364199, at *5 (Del.
Ch. Mar. 15, 2000) ("The defendants, however, give a far more expansive reading to § 18-607 than
its language warrants.  They claim that the statute shields LLC members against *any* other claims
against them, *i.e.*, against *all* claims except those that arise under § 18-607.  Nothing in § 18-607
so provides.") (emphasis in original).

14

(agreeing with *Bonutti*); *Boston Generating*, 617 B.R. at 467 (adopting reasoning of *Bonutti* and holding that § 18-607(c) did not apply to liquidating trustee's claims).

The Black Diamond Defendants do not cite any cases finding otherwise under Delaware law. They cite an outdated case addressing New York law (*see* D.I. 28 at p. 19, citing *In re Die Fliedermaus LLC*, 323 B.R. 101, 109 (Bankr. S.D.N.Y. 2005)),[12] but more recent authority from New York's intermediate appellate court rejected the underpinnings of the conclusion reached in *Die Fliedermaus*. In *Setters v. AI Props. and Devs. (USA) Corp.*, the New York Supreme Court, Appellate Division addressed New York's three-year limitation period for wrongful distributions by an LLC, and found:

> The three-year limitation period imposed by LLCL § 508(c) does not override the six-year statute of limitations for fraudulent conveyance claims brought under [New York's fraudulent conveyance statutes], since the plain language of section 508 indicates that the statute applies to members of an LLC, holding them "liable to the limited liability company" for wrongful distributions.

*Setters v. AI Props. and Devs. (USA) Corp.*, 139 A.D.3d 492, 493 (N.Y. App. Div. 2016) (citations omitted); *see also Boston Generating*, 617 B.R. at 468 n.13 (explaining that *Setters* "overruled and/or [rendered] unpersuasive" earlier cases which applied § 508(c) of New York's LLC Law to creditor claims). Applying this analysis to Delaware's statute, it is clear that the three-year limitation in § 18-607(c) does not apply to the Trustee's claims or override the four-year limitation period set forth in DUFTA.

---

[12]     In *Die Fliedermaus*, the court concluded that the time limitations in § 508(c) of New York's LLC Law, which is analogous to § 18-607 of Delaware's LLC Act, applied to, *inter alia*, bar a trustee's state law avoidance claim. 323 B.R. at 109. As discussed above, however, New York's intermediate appellate court has since found that § 508(c) does not apply to creditor claims and does not override the longer statute of limitations for fraudulent conveyance claims under New York law. *See Setters*, 139 A.D.3d at 493.

15

### b.  Timeliness of State Law Claims Brought Pursuant To Section 544(b)(1) Is Measured As Of the Petition Date, As Congress Made Clear In Its Enactment of the Provisions of the Bankruptcy Code

In addition to applying the wrong statute of limitations, the Black Diamond Defendants also incorrectly calculate the relevant limitations period from the date the Complaint was filed, rather than the Petition Date.  *See* D.I. 28 at pp. 3, 18.  It is well established that "so long as an underlying state law avoidance claim is not time-barred as of the commencement of a bankruptcy case, a section 544(b)(1) claim may be brought provided that it is commenced within the time periods prescribed by section 546(a)." *LSC Wind Down*, 610 B.R. at 785 and n. 32 (collecting cases).  Section 546(a) grants the Trustee two years from the Petition Date to assert avoidance claims which were not time-barred as of the Petition Date.  *See* 11 U.S.C. § 546(a).  This provision evinces Congress's intention to grant the Trustee "broad powers . . . under §§ 544, 547 and 548 of the Code to recover property for the benefit of the estate." *LSC Wind Down*, 610 B.R. at 785 (quoting *In re Dry Wall Supply, Inc.*, 111 B.R. 933, 937 (D. Colo. 1990)).  Further, "the timeframe set forth by section 546(a) is not altered if the state law avoidance claim is governed by a statute of repose rather than a statute of limitations." *Id.* (citing *In re Polichuk*, 2010 WL 4878789, at *3 n.9 (Bankr. E.D. Pa. Nov. 23, 2010) (noting "judicial consensus" on this issue)).  Here, there can be no reasonable dispute that the Distribution was made less than four years before the Petition Date (such that DUFTA claims are timely) and that the Trustee filed his Complaint within two years of the Petition Date.

The Black Diamond Defendants attempt to skirt the application of § 546(a) by arguing Congress has not demonstrated a "clear and manifest" intent to preempt statutes concerning "corporate governance" such as § 18-607.  *See* D.I. 28 at p. 22.  But as set forth above, the Trustee's claims are not "corporate" causes of action and § 18-607 does not apply.

The primary case on which the Black Diamond Defendants rely, *In re Phar-Mor, Inc. Sec. Litig.*, 178 B.R. 692 (W.D. Pa. 1995), is readily distinguishable because it "relied on the inherent state interest (and corresponding lack of federal interest) in controlling probate matters," whereas Congress's enactment of a comprehensive Bankruptcy Code "evidence[s] a much stronger intention to regulate bankruptcy." *Forman v. Willix*, 2014 WL 1877628, at *3 (D.N.J. Apr. 30, 2014). Unlike probate matters, "[s]tate avoidance actions do not present countervailing state interests which would outweigh the fulfillment of congressional goals." *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 678-79 (S.D. Tex. 2007) (quotation marks omitted).

The Trustee's avoiding powers under § 544(b) are created by the Bankruptcy Code, not by state law. *See Matter of Princeton-New York Investors, Inc.*, 219 B.R. 55, 64 (D.N.J. 1998) ("The Code, while utilizing state substantive law, creates these avoiding powers. This is not a cause of action available to a trustee outside a bankruptcy court."). Given Congress's creation of the Trustee's avoiding powers, its goals in enabling the Trustee to maximize the bankruptcy estate for creditors' benefit, and its inclusion of § 546(a) in the Bankruptcy Code, Congress has exhibited a clear and manifest intent to extend the statute of limitations in this context. *See id.* at 64-66 (holding that § 546(a) preempted statute of repose in New Jersey's fraudulent transfer act).

Given the principles set forth above, the Black Diamond Defendants fail to establish any basis on which the Trustee's avoidance claims concerning the Distribution could possibly be time-barred.

### 2. The Section 546(e) Safe Harbor Does Not Bar Avoidance Claims Relating to the Distribution

The Black Diamond Defendants argue that because the Distribution was made using, at least in part, proceeds from the Vinton Sale—a separate transaction which had occurred four months earlier—the Distribution falls into the safe harbor for securities transactions set forth in 11

17

U.S.C. § 546(e).  These safe harbor arguments must be rejected because they are unsupported by

the alleged facts, are at odds with Supreme Court precedent concerning the scope of the safe

harbor, and require factual determinations that cannot be made at the pleading stage.

The § 546(e) safe harbor operates as a limit to the Trustee's general avoiding powers in

certain circumstances.  *See Merit Mgmt. Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 888

(2018).  Section 546(e) provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b)
> of this title, the trustee may not avoid . . . a transfer made by or to
> (or for the benefit of) a . . . financial institution . . . in connection
> with a securities contract, as defined in section 741(7), . . . that is
> made before the commencement of the case, except under section
> 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).  The § 546(e) safe harbor is an affirmative defense which cannot be resolved

on a motion to dismiss unless the face of the Complaint shows beyond doubt that the defense is

dispositive[13]—which is plainly not the case here.

The Distribution was not made "in connection with a securities contract" or "by or to (or

for the benefit of) a . . . financial institution."  11 U.S.C. § 546(e).[14]  As alleged in the Complaint,

the Distribution was made on March 17, 2017, approximately four months after the Vinton Sale

had been completed on December 20, 2016.  *See* Compl., ¶¶ 62, 69.  The Distribution was not

made as part of the Vinton Sale or pursuant to any of the Vinton Sale documents[15]; rather, the

---

[13]    *See In re Am. Home Mortg. Holding*, 458 B.R. 161, 172 (Bankr. D. Del. 2011); *Zazzali v. AFA Fin. Group, LLC*, 2012 WL 4903593, at *11 (Bankr. D. Del. Aug. 28, 2012).

[14]    The Distribution also was not a "settlement payment" as that term is used in § 546(e), because it did not effectuate any sale of securities or complete a securities transaction.  *See* 11 U.S.C §§ 101(51A), 741(8); *In re Global Crossing, Ltd.*, 385 B.R. 52, 57 n.1 (Bankr. S.D.N.Y. 2008) (discussing definition of "settlement payment," which courts generally consider to be a "transfer of cash or securities made to complete a securities transaction").  The Black Diamond Defendants do not argue otherwise.

[15]    In connection with the motion to dismiss, the Black Diamond Defendants filed under seal copies of the Sale and Purchase Agreement and Assignment of Membership Interests for the

Distribution was arranged after the Vinton Sale had already closed, pursuant to completely separate documents. *See id.*, ¶ 67(ii)-(vi) (setting forth communications concerning the arrangement of the Distribution, after the Vinton Sale had already closed); ¶ 68 ("On March 16, 2017, Debtors, BoA, and SunTrust executed the First Amendment to Loan and Security Agreement dated as of March 16, 2017, which, *inter alia*, amended the Revolving Loan to permit the payment of a distribution in the amount of $30 million."); ¶ 70 (alleging wire transfer of Distribution was initiated and approved on March 17, 2017); ¶ 72.

Given these facts, it is clear that the Distribution was not made "in connection with a securities contract." 11 U.S.C. § 546(e). The cases cited by the Black Diamond Defendants are distinguishable because they involved integrated transactions or other situations where the distribution was clearly a component of the purchase of securities. *See* D.I. 28 at p. 16 (citing, *e.g.*, *Boston Generating*, 617 B.R. at 493 (distribution paid "as part of a single, integrated transaction" to settle repurchase of shares); *Buchwald Capital Advisors, LLC v. Papas*, 584 B.R. 161, 168-69, 184 (E.D. Mich. Jan. 23, 2018), *vacated and remanded on other grounds*, *In re Greektown Holdings, LLC*, 765 F. App'x 132 (6th Cir. 2019) (payments at issue were authorized by the securities purchase agreement and were contemplated throughout the transaction documents as a necessary part of the closing); *Crescent Res. Litig. Trust ex rel. Bensimon v. Duke Energy*

---

Vinton Sale. *See* D.I. 29, Exs. 4 and 5. These documents cannot properly be considered on a motion to dismiss. None of the Trustee's claims are based on these documents or on transfers made as part of the Vinton Sale. *Burlington Coat Factory*, 114 F.3d at 1426 (internal citations omitted) (extrinsic document may only be considered on a motion to dismiss if it is "integral to or explicitly relied upon" in the complaint); *Dix v. Total Petrochemicals USA, Inc.*, 2011 WL 2474215, at *1 (D.N.J. June 20, 2011) ("It is not enough that a putatively integral document be critical for an affirmative defense…"). Furthermore, even to the extent the Black Diamond Defendants consider these documents relevant to their safe harbor defense, they contain no reference to a contemplated distribution like the one later made by the Debtors in March 2017 and thus do nothing to establish that the Distribution was made in connection with a securities contract.

*Corp.*, 500 B.R. 464, 476 (W.D. Tex. 2013) (distribution was referenced in sale agreement and "the sale price was dependent upon the distribution occurring")).  Unlike the payments in these cases, the Distribution was not part of an integrated transaction to settle a securities purchase, was not authorized or contemplated in the transaction documents, and had no bearing on the terms or closing of the Vinton Sale.  *See* Compl., ¶¶ 62-70.

The Black Diamond Defendants' arguments that Fund IV was a "customer" of a "financial institution" for purposes of § 546(e) must be similarly rejected.  "Financial institution" is defined broadly in the Bankruptcy Code to include a "customer" when a financial institution "is acting as agent or custodian for a customer . . . in connection with a securities contract."  11 U.S.C. § 101(22)(A).  The fact that the Distribution was not made in connection with a securities contract dooms this argument from the start.  Additionally, this argument must fail because the unreasonably broad construction of "customer" that is encouraged by the Black Diamond Defendants (whereby a bank's involvement in a separate transaction months earlier *or* simply the receipt of funds into a bank account would subject a transfer to § 546(e)) is at odds with Supreme Court precedent.

In *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018), the Supreme Court held that the relevant transfer for purposes of the § 546(e) safe harbor is the overarching transfer the trustee is seeking to avoid, not component transfers that may have involved banks only as intermediaries.  *See id.* at 888, 892-93, 897 (holding § 546(e) did not apply because overarching transfer was not between financial institutions, even though it passed through several banks which had no financial interest in the funds).  *Merit* resolved a Circuit split over whether a financial institution's involvement as an intermediary or mere conduit in a component

of a transaction is a sufficient basis for the safe harbor to apply—holding that it is not.  *See id.* at 892, 897.[16]

The Black Diamond Defendants rely on *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 78-79 (2d Cir. 2019), in which the Second Circuit found, post-*Merit*, that payments from the debtor to its shareholders fell within the safe harbor because the debtor had hired Computershare Trust Company to effectuate its LBO tender offer.  While *Tribune* dodges *Merit* by finding that the debtor itself qualified as a "financial institution" because it was a customer of the bank acting as its agent, its holding has been criticized as being an end-run around *Merit*:

> [T]he Court is not persuaded by the agency analysis in *In re Tribune Co.* [. . .]  Under *Tribune's* analysis any intermediary hired to effectuate a transaction would qualify as its customer's agent. And consequently, if such an intermediary would be a financial institution, the debtor's status would transform to one of a financial institution itself. This would result in a complete workaround of *Merit Management*, which opined that the safe harbor provision does not insulate a transfer simply because a qualified intermediary acted as a mere conduit. [. . .]  Given the purpose of § 546(e), as examined by *Merit Management*, it is crucial to distinguish between agents as defined under common law and mere intermediaries.

*In re Greektown Holdings, LLC*, 621 B.R. 797, 827 (Bankr. E.D. Mich. 2020) (criticizing *Tribune's* failure to engage in sufficient analysis concerning the existence of a traditional agency relationship).

The approach set forth in *Tribune* has not been adopted by the Third Circuit, and this Court should decline to follow it here.  As explained in *Greektown*, the overbroad application of the § 546(e) safe harbor in *Tribune* and its progeny allows, in essence, a return to the old approach (rejected by *Merit*) where the mere existence of a bank as an intermediary is used to dictate whether

---

[16]    The cases abrogated by *Merit* include, among others, *In re Resorts Int'l, Inc.*, 181 F.3d 505 (3d Cir. 1999), and *In re Quebecor World (USA) Inc.*, 719 F.3d 94 (2d Cir. 2013).

21

the safe harbor applies.  But as *Merit* instructs, the Distribution does not fall within the safe harbor

merely because BoA or JP Morgan Chase were involved in the separate Vinton Sale or because

the Distribution funds were transferred into a bank account at JP Morgan Chase.

Finally, even if the safe harbor had some relevance to the facts of this case (which it does

not), its application turns on factual determinations which cannot be made on a motion to dismiss.

For example, the Black Diamond Defendants ask the Court to examine the transaction agreements

from the Vinton Sale (on which none of the Trustee's claims are based) and use those documents

to make determinations concerning the existence of an "agency" relationship between Fund IV

and JP Morgan Chase in connection with the Distribution months later.  *See* D.I. 28 at p. 14.

Determinations concerning agency relationships "are typically resolved only after a fact-based

inquiry."  *Upchurch v. Hester*, 2006 WL 1652666, at *3 (D. Del. June 8, 2006).  Furthermore,

whatever JP Morgan Chase's role in the Vinton Sale may have been, its only role in the

Distribution was that the funds were wired to Fund IV's bank account there.  *See* Compl., ¶ 70.

The mere fact that Fund IV had a bank account at JP Morgan Chase comes nowhere near being a

sufficient basis upon which to conclude that an agency relationship existed or that the § 546(e)

safe harbor applies.  *See Greektown*, 621 B.R. at 827; Restatement (Third) Of Agency § 1.01

(2006); *see also In re Centaur, LLC*, 595 B.R. 686, 698 (Bankr. D. Del. 2018) ("The [§ 546(e)]

inquiry does not include intermediaries within the transaction[.]").

## B.    THE COMPLAINT SUFFICIENTLY STATES CLAIMS (COUNT IV-VII) TO AVOID THE BD LIEN GRANT AS A FRAUDULENT TRANSFER UNDER DUFTA AND THE BANKRUPTCY CODE

The Complaint seeks to avoid the BD Lien Grant as a fraudulent transfer under both the

Bankruptcy Code and DUFTA.  *See* Compl., Counts IV-V (asserting actual and constructive

fraudulent transfer claims pursuant to § 548 of the Bankruptcy Code) and Counts VI-VII (asserting

actual and constructive fraudulent transfer claims pursuant to §§ 1304(a) and 1305(a) of DUFTA

and § 544 of the Bankruptcy Code).  Contrary to the Black Diamond Defendants' arguments, the

Complaint sufficiently alleges lack of reasonably equivalent value and actual intent to defraud in

connection with the BD Lien Grant.

### 1.    The Complaint Alleges Lack of Reasonably Equivalent Value

Constructive fraudulent transfer claims require, as an element, that the Debtors received

less than reasonably equivalent value in exchange for making the transfer or incurring the

obligation.  *See* 6 Del. C. §§ 1304(a)(2) & 1305(a); 11 U.S.C. § 548(a)(1)(B)(i).[17]  In the Third

Circuit, the existence of reasonably equivalent value is evaluated using a fact-intensive "totality of

the circumstances" analysis, including such factors as "(1) the 'fair market value' of the benefit

received as a result of the transfer, (2) 'the existence of an arm's-length relationship between the

debtor and the transferee,' and (3) the transferee's good faith."  *In re Fruehauf Trailer Corp.*, 444

F.3d 203, 213 (3d Cir. 2006) (quoting *In re R.M.L., Inc.*, 92 F.3d 139, 148-49 (3d Cir. 1996)).

Courts generally find that a party receives reasonably equivalent value when it "got roughly the

value it gave."  *Id.* at 212-13; *see also In re Plassein Int'l Corp.*, 2008 WL 1990315, at *6 (Bankr.

D. Del. May 5, 2008).  Value determinations are "inherently fact driven" and "typically require[]

testing through the discovery process."  *In re Charys Holding Co., Inc.*, 443 B.R. 628, 637-38

(Bankr. D. Del. 2010).

---

[17]    The requirements to state claims for avoidance of actual and constructive fraudulent transfers under DUFTA are substantially the same as those under Section 548 of the Bankruptcy Code.  *See Crystallex Int'l Corp. v. Petroleos De Venezuela, S.A.*, 879 F.3d 79, 86 (3d Cir. 2018).  Thus, when evaluating whether the substantive elements of such claims have been sufficiently pled, "the result under Delaware law should be the same as the outcome under the Bankruptcy Code."  *Id.*

The Complaint alleges that, although the BD Lien Grant was granted in connection with the BD Term Loan, it granted a lien on substantially all of Debtors' assets to the Black Diamond Entities in exchange for cash infusions which had only been necessitated by those same entities stripping Debtors of desperately-needed cash in connection with the Distribution earlier that same year, at the behest of the Black Diamond-affiliated Directors in violation of their fiduciary duties. *See* Compl., ¶¶ 95, 132, 186, 197.  These allegations, which must be accepted as true at this stage, set forth a transaction that was not at arm's-length and was not conducted in good faith—both relevant factors in the Third Circuit's totality of circumstances analysis.  *Fruehauf Trailer*, 444 F.3d at 213.  Further, the BD Lien Grant had the effect of elevating the Black Diamond Entities to secured creditors in advance of Debtors' bankruptcy.  *See* Compl., ¶ 130.  Defendants argue that because it was subordinated to the Revolving Loan and interest was paid-in-kind, that the BD Lien Grant did not prioritize them over other creditors, but this is incorrect.  If not for the BD Lien Grant, the Black Diamond Entities would have been only equity holders—last in the Bankruptcy Code's priority scheme—or at best general unsecured creditors, but with the BD Lien Grant elevated themselves over all such creditors.  *See* 11 U.S.C. §§ 507, 726.

The Black Diamond Defendants, citing cases from outside the Third Circuit, argue that dismissal is warranted because the BD Lien Grant was made for reasonably equivalent value as a matter of law.  *See* D.I. 28 at p. 10.  But *per se* rules concerning the existence of reasonably equivalent value, like that proposed by the Black Diamond Defendants, conflict with the Third Circuit's totality of circumstances test.  *See, e.g.*, *In re Exide Techs., Inc.*, 299 B.R. 732, 747-48 (Bankr. D. Del. 2003) (rejecting *per se* rule that a transfer to secure new or antecedent debt constitutes reasonably equivalent value, because Third Circuit requires application of totality of circumstances test); *In re Qimonda Richmond, LLC*, 467 B.R. 318, 326-27 (Bankr. D. Del. 2012)

24

(same); *In re FAH Liquidating Corp.*, 2018 WL 2793944, at *4-5 (D. Del. June 11, 2018) (rejecting *per se* rule that payments to satisfy a contractual obligation constitute reasonably equivalent value because such a rule "would conflict with the factually driven test set forth by the Third Circuit"); *see also In re Solomon*, 300 B.R. 57, 65, 67-68 (Bankr. N.D. Okla. 2003), *aff'd*, 299 B.R. 626 (10th Cir. B.A.P. 2003) ("Congress left the determination of 'reasonably equivalent value' to the courts.") (determining reasonably equivalent value by examining the facts and circumstances surrounding lien grant, including the effect on other creditors). Given the totality of circumstances surrounding the BD Lien Grant and the Third Circuit's rejection of *per se* rules concerning this issue, determinations concerning the existence of reasonably equivalent value in connection with the BD Lien Grant are "not suitable for determination on a motion to dismiss." *In re Am. Bus. Fin. Servs., Inc.*, 361 B.R. 747, 760 (Bankr. D. Del. 2007).

### 2.    The Complaint Alleges Actual Intent to Defraud

Transfers are avoidable as actually fraudulent when they were made with "actual intent to hinder, delay, or defraud" the Debtors' creditors. *See* 6 Del. C. § 1304(a)(1); 11 U.S.C. § 548(a)(1)(A). Because parties to an actual fraudulent transfer rarely acknowledge their fraudulent intent, courts rely on "badges of fraud" as circumstantial proof of actual fraudulent intent. *Charys Holding*, 2010 WL 2774852, at *3, *5; *In re Polichuk*, 506 B.R. 405, 417 (Bankr. E.D. Pa. 2014). The badges of fraud courts often consider include, but are not limited to: "(1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction." *Fedders*, 405 B.R. at 545; *see also In re OODC, LLC*, 321 B.R. 128, 140 (Bankr. D. Del. 2005); 6 Del. C. § 1304(b) (setting forth non-exhaustive list of badges

25

for consideration under DUFTA). "A court may, of course, consider factors other than the traditional badges of fraud in an analysis of fraudulent intent," such as, for example, if the "natural consequence" of the transfer is that the debtor's creditors were hindered, delayed, or defrauded. *In re Tribune Co.*, 464 B.R. 126, 162 (Bank. D. Del. 2011). Ultimately, the determination of whether a transfer was made with fraudulent intent is a question of fact "rarely susceptible to resolution at the summary judgment stage," let alone on a motion to dismiss. *Polichuk*, 506 B.R. at 418; *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 35 (Bankr. S.D.N.Y. 2007).

Here, the Trustee alleges that the BD Lien Grant was intended to hinder, delay, or defraud creditors because it was intended to elevate insiders of Debtor over other creditors in advance of Debtors' bankruptcy. *See* Compl., ¶¶ 130, 180, 192. Black Diamond and Fund IV are insiders of Debtors, given their 100% ownership of Debtors and domination and control of Debtors' management decisions, and BDCF—as an affiliate and insider of Black Diamond and Fund IV—likewise qualifies as an insider of Debtors under the Bankruptcy Code and DUFTA. *See id.*, ¶¶ 17-19, 44, 47, 51-54, 56, 132; *see also* 11 U.S.C. § 101(2) & (31) (defining "insider" and "affiliate"); 6 Del. C. § 1301(1) & (7) (same, under DUFTA).[18] In addition to the transferee's insider status, the Complaint alleges lack of reasonably equivalent value due to, as discussed above, the totality of circumstances surrounding the BD Lien Grant, and further contains extensive allegations concerning Debtors' poor financial condition—including insolvency, undercapitalization, and unmanageable indebtedness—before, at the time of, and after the BD Lien Grant.[19] *See, e.g.*, Compl., ¶¶ 83-89, 95, 108, 114, 133-34, 136; *see also id.*, ¶¶ 101, 108(viii),

---

[18]    Insiders include, among others, an "affiliate, or an insider of an affiliate as if such affiliate were the debtor." 11 U.S.C. § 101(31)(E); *see also* 6 Del. C. § 1301(7)(d).

[19]    The Black Diamond Defendants, in their motion, do not challenge the Trustee's allegations concerning Debtors' insolvency, undercapitalization, and otherwise poor financial condition in support of his constructive fraudulent transfer claims. *See* 11 U.S.C. § 548(a)(1)(B)(ii); 6 Del. C.

110, 116, 140-52 (allegations that the continually-increasing borrowings under the BD Term Loan were made in the face of threats of default under the Revolving Loan).

The Complaint thus alleges a fraudulent motive and a confluence of at least three badges of fraud—*i.e.*, insider status, lack of reasonably equivalent value, and Debtors' insolvency.  While the presence or absence of any single badge of fraud is "not conclusive," "[t]he presence of a single … badge of fraud may cast suspicion on the transferor's intent," and "the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud."  *In re Hill*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006).  Given the badges of fraud alleged and the facts surrounding the BD Lien Grant, the Trustee has adequately alleged the existence of actual fraudulent intent.  The Black Diamond Defendants' motion to dismiss Counts IV and VI should be denied.

## C.     COUNT VIII STATES A CLAIM FOR UNJUST ENRICHMENT

Under Delaware law, unjust enrichment is defined as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999).  To state a claim, the plaintiff must allege five elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."  *In re FAH Liquidating Corp.*, 572 B.R. 117, 130 (Bankr. D. Del. 2017) (citing *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).  Here, the Complaint alleges at length that the Distribution enriched the Black Diamond Entities in exchange for no consideration to Debtors, and that there was no justification for making the

---

§§ 1304(a)(2) & 1305(a).  Those same allegations support the badge of fraud concerning insolvency or indebtedness of Debtors for the Trustee's actual fraudulent transfer claims.

Distribution given Debtors' poor financial condition at the time. *See* Compl., ¶¶ 77, 81, 91-92, 201. The Complaint also alleges that Fund IV and BDCF were granted security interests which encumbered substantially all of Debtors' assets, and that there was an absence of justification for structuring the BD Term Loan in that way. *See id.*, ¶¶ 132-34, 197, 202, 208(b).

It is "entirely acceptable" to pursue alternative theories at the pleading stage. *FAH Liquidating*, 572 B.R. at 131. The Court may ultimately determine that unjust enrichment does not apply to some or all of the transactions at issue, either because those transactions are covered by fraudulent transfer law, because certain writings govern the applicable relationship among the parties, or for some other reason. But this is no cause to dismiss the unjust enrichment claims at this stage of the proceedings. As this Court has held, a claim for unjust enrichment should survive a motion to dismiss where it is plausible that the plaintiff would otherwise be left without a remedy at law. *See id.* (citing *In re Green Field Energy Servs. Inc.*, 2015 WL 5146161, at *10 (Bankr. D. Del. Aug. 31, 2015)); *see also In re Our Alchemy, LLC*, 2019 WL 4447545, at *11 (Bankr. D. Del. Sept. 16, 2019) (denying motion to dismiss unjust enrichment claim because, *inter alia*, it was plausible the trustee would be left without an adequate remedy at law if his fraudulent transfer claims ultimately failed). Count VIII should thus survive at this stage.

**D.    THE TRUSTEE'S BREACH OF FIDUCIARY DUTY (COUNT IX) AND AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (COUNT X) CLAIMS ARE SUFFICENTLY PLED**

**1.    The Complaint Sufficiently Alleges Breaches of Fiduciary Duty By Each of the Directors**

Under Delaware law,[20] fiduciary duties encompass duties of care, loyalty, and good faith. *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 32-33 (Del. Ch. 2014). The duty of

---

[20]    Each Debtor is a Delaware limited liability company. Compl., ¶ 13.

DOCS_DE:237945.1 57095/001

loyalty requires fiduciaries to avoid financial or other cognizable fiduciary conflicts of interest. *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *10 (Del. Ch. Oct. 20, 2014); *see also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ("[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."). The fiduciary duty of loyalty is breached, *inter alia*, (1) when fiduciaries fail to act in the face of a known duty to act, demonstrating a conscious disregard for their responsibilities; (2) when fiduciaries "abdicate" their responsibilities; and/or (3) when fiduciaries fail to act in good faith. *See, e.g.*, *Stone*, 911 A.2d at 370; *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 278 (Del. Ch. 2003).

The duty of care requires fiduciaries to manage the company with the "care which ordinarily careful and prudent men would use in similar circumstances" and not act with gross negligence. *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). This constitutes a "duty to act on an informed basis." *In re DSI Renal Holdings, LLC*, 574 B.R. 446, 470 (Bankr. D. Del. 2017). "The precise behavior constituting gross negligence varies depending on the context," but generally involves fiduciaries' "fail[ure] to inform themselves fully and in a deliberate manner." *In re USDigital, Inc.*, 443 B.R. 22, 41 (Bankr. D. Del. 2011).

The allegations in the Complaint are sufficiently specific to set forth claims against each Defendant. The Complaint alleges breaches of fiduciary duty by the Directors in connection with causing the Debtors to make the Distribution, structuring cash infusions as debt rather than equity and encumbering all of Debtors' assets, elevating Black Diamond's interests over the Debtors, and

failing to be fully informed and/or take actions to prevent these breaches. *See* Compl., ¶¶ 208-10. In this regard, Directors Farahnak and Raygorodetsky were the driving force behind the Distribution and the BD Lien Grant. *See id.*, ¶¶ 67, 72, 78, 108, 118, 126. The Complaint's detailed allegations concerning these transactions and Farahnak and Raygorodetsky's involvement in them are more than sufficient to provide notice of the basis for the Trustee's claims, even if the Complaint alleges breaches and corresponding harm as to all of the Debtors rather than attempting to parse individual harms to each Debtor—indeed, such allegations make sense given that all three Debtors were driven into bankruptcy as a result of the events described in the Complaint.[21] Further, the Complaint is clear on each Debtor's role in the Distribution and the BD Lien Grant. *See* Compl., ¶¶ 69-70, 118-19.

As to Directors Taft, Unfried, and Archambault, they made no efforts to inquire about the negative impacts of these transactions or to prevent them from occurring. *See id.*, ¶¶ 72, 79, 108; *see also id.*, ¶¶ 135-37 (alleging Unfried was acting as interim CEO during time of BD Term Loan and related cash infusions). These allegations accordingly set forth a failure to act in the face of a fiduciary duty to do so, an abdication of fiduciary responsibilities by failing to take any action to prevent harm to Debtors, and/or a failure to properly inform themselves of the harms that would result from these transactions.[22] *See id.*, ¶¶ 206-07, 208(d). In short, they "took no good faith

---

[21]    Debtors operated in an intertwined manner—all under the direction and control of the Black Diamond-appointed Board. *See, e.g.*, Compl., ¶¶ 14, 17, 51-54, 56. The LLC agreements, which Defendants attached to their motions, state that Debtors Bayou Investment and BD LaPlace invested their management powers in Debtor Bayou Holdings (formerly BD Long Products), which in turn invested its management authority in its Board of Directors. *See* D.I. 26, Ex. A at § 4.1, Ex. B at § 4.1, and Ex. C at §§ 3.1, 3.2.

[22]    As Taft, Unfried, and Archambault acknowledge in their opening brief, with respect to the Distribution the Trustee's allegations demonstrate that they either approved the transaction or that they were "derelict" by not participating in the consideration of it or inquiring about its impact. *See* D.I. 26 at p. 11. Either way, such conduct constituted a breach of fiduciary duty. Furthermore,

steps to ameliorate the situation" and "the company suffered losses as a result." *Buckley v. O'Hanlon*, 2007 WL 956947, at *3 (D. Del. Mar. 28, 2007) (citing *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996)).

The Trustee's allegations accordingly set forth a breach of fiduciary duty on the part of each Director.

### 2.   The Directors' Purported Exculpation Affirmative Defenses Cannot Be Resolved at the Pleading Stage

The Directors argue that Debtors' LLC agreements exculpate them from liability for all of the breaches of fiduciary duty alleged by the Trustee.  This argument does not provide a basis for dismissal because it cannot be resolved at the pleading stage and because the terms of the LLC agreements do not exculpate or eliminate all of the duties implicated by the Trustee's claims.

The effect of an exculpatory provision cannot be determined at the motion to dismiss stage. *In re The Brown Schools*, 368 B.R. 394, 401 (Bankr. D. Del. 2007) ("The exculpation clause is an affirmative defense and the determination of the viability of that defense is not proper at this stage."); *see also In re Liquid Holdings Group, Inc.*, 2018 WL 2759301, at *12 (Bankr. D. Del. June 6, 2018) (same) (citing *In re Simplexity, LLC*, 2017 WL 65069, at *6 (Bankr. D. Del. Jan. 5, 2017)).

Delaware law does permit an LLC to restrict or eliminate liability for fiduciary duties in its operating agreement, though it cannot restrict or eliminate liability for "a bad faith violation of the implied contractual covenant of good faith and fair dealing."  6 Del. C. § 18-1101(e).  Any intention to restrict or eliminate duties must be made "plain and unambiguous" in the agreement. *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012).  Additionally, modification of one

---

these allegations are not "inferred from the sheer fact that [they] were members of the Board" (*Id.*), but are based on the Trustee's review of Debtors' records.  *See* Compl., ¶ 79.

DOCS_DE:237945.1 57095/001

aspect of fiduciary duties does not operate to eliminate or modify other aspects of the duties owed. *See, e.g.*, *Continental Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1236-37 (Del. Ch. 2000) (modification of general partner's obligations regarding partnership opportunities did not operate to also modify the prohibition on self-dealing).

Here, the LLC agreements (attached to Defendants' motions) state that Debtors Bayou Investment and BD LaPlace invested their management powers in Debtor Bayou Holdings (formerly known as BD Long Products), *see* D.I. 26, Ex. A at § 4.1, Ex. B at § 4.1, which in turn invested its management authority in its Board of Directors. *See id.*, Ex. C at §§ 3.1, 3.2.[23] Contrary to Defendants' arguments, the Bayou Holdings LLC Agreement[24] does *not* exculpate the members of the Board of Directors for liability for breach of fiduciary duty. Defendants contend that § 3.9 of the Bayou Holdings LLC Agreement exculpates them for any liability for breach of fiduciary duty, but § 3.9 merely states that a Director will not be personally liable "for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company" due solely to his role as a Director. *See id.*, Ex. C at § 3.9(a).[25] That is not the same thing as eliminating a Director's liability for monetary damages caused by a breach of his fiduciary duties. Section 3.9(a) does not reference fiduciary liability, and it is not enough to exculpate

---

[23] Even to the extent that the Bayou Investment and BD LaPlace LLC Agreements eliminate liability for their Manager (i.e., Bayou Holdings), *see* D.I. 26, Exs. A and B at § 9.3, it is clear, as discussed herein, that the Bayou Holdings LLC Agreement does not eliminate the Directors' liability for the breaches of fiduciary duty alleged in the Complaint.

[24] *See* D.I. 26, Ex. C, Bayou Holdings' Amended and Restated Limited Liability Company Agreement (the "Bayou Holdings LLC Agreement").

[25] Additionally, § 3.9(a) of the Bayou Holdings LLC Agreement is qualified by the phrase "[e]xcept as otherwise required by applicable law and as expressly set forth in this Agreement." *See* D.I. 26, Ex. C at § 3.9(a). As discussed herein, the Directors owe fiduciary duties under applicable law and the agreement because there is no provision which plainly and unambiguously exculpates liability or eliminates the fiduciary duties imposed by Delaware's LLC Act, except relating to the corporate opportunity doctrine which is not relevant here.

liability "coyly" or by implication. *Miller v. Am. Real Estate Partners, L.P.*, 2001 WL 1045643, at *8 (Del. Ch. Sept. 6, 2001).

Nothing in the Bayou Holdings LLC Agreement eliminates or exculpates liability for the breaches of fiduciary duty alleged in the Complaint. The agreement contains a section entitled "Indemnification and Exculpation by the Company" but, despite the title, that section only contains indemnification provisions, not an exculpation provision. *See* D.I. 26, Ex. C at § 3.10. Furthermore, the indemnification provisions actually recognize the continuing existence of the fiduciary duties owed under the agreement, insofar as they confirm the requirement for the Directors to "act[] in good faith and without willful misconduct, bad faith or fraud" in order to be indemnified. *See id.* at § 3.10(a) (setting forth "Required Standard of Conduct"); *Feeley*, 62 A.3d at 664-65 (language in agreement referencing "gross negligence" and "willful misconduct" did not limit or eliminate fiduciary duties, but instead "recognize[d] their continuing existence" because those are standards used to evaluate breaches of fiduciary duty). And, while § 3.11 eliminates liability for breaches of the corporate opportunity doctrine, that section is not relevant here because none of the Trustee's claims are based on the usurping of a corporate opportunity.

It would be premature and inappropriate at this stage to make piecemeal factual determinations as to the applicability and scope of the exculpation defenses raised by Defendants, particularly given the lack of clear exculpatory language in the Bayou Holdings LLC Agreement and the significant duty of care, loyalty, and good faith violations alleged in the Complaint.

### 3. The Complaint States a Claim for Aiding and Abetting Breach of Fiduciary Duty, Including Pleading an Underlying Breach

The Complaint asserts a claim for aiding and abetting breach of fiduciary duty against the Black Diamond Entities. *See* Compl., Count X. Under Delaware law, a claim of aiding and abetting breaches of fiduciary duty requires: "(1) the existence of a fiduciary relationship; (2) proof

33

that the fiduciary breached its duty; (3) proof that a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) a showing that damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary." *Fedders*, 405 B.R. at 543-44 (citing *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1125 (Del. Ch. 2008)).  The underlying breaches of fiduciary duties by the Directors are adequately alleged, as described above.  Because that is the only basis on which the Black Diamond Defendants challenge Count X,[26] their motion to dismiss this claim should  be denied.

## E.     THE COMPLAINT STATES A CLAIM FOR CORPORATE WASTE

A claim for corporate waste under Delaware law requires alleging facts showing an exchange of corporate assets "for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade" or for "no corporate purpose." *Brown Schools*, 368 B.R. at 408.  "The doctrine of waste … allows a plaintiff to pass go at the complaint stage even when the motivations for a transaction are unclear by pointing to economic terms so one-sided as to create an inference that no person acting in good faith pursuit of the corporation's interests could have approved the terms."  *Sample v. Morgan*, 914 A.2d 647, 670 (Del. Ch. 2007).

Defendants argue that the corporate waste claim should be dismissed for the same reasons as the breach of fiduciary duty claim, including based on Defendants' purported exculpation defenses.  As set forth above, those arguments are without merit and do not provide a basis for dismissal.

The Complaint alleges that the Distribution and the BD Lien Grant constituted corporate waste because they were commercially unreasonable, served no rational business purpose for

---

[26]     *See* D.I. 28 at p. 23 n.21.

Debtors, and were intended only to benefit the Black Diamond Entities. *See* Compl., ¶ 218. The Distribution provided no benefit at all to Debtors—instead stripping them of desperately-needed capital and rendering them insolvent in order to essentially "gift" $30 million to the Black Diamond Entities in exchange for no consideration. *See id.*, ¶¶ 77, 81, 91-92; *Brown Schools*, 368 B.R. at 408. The BD Lien Grant encumbered all of Debtors' assets for the Black Diamond Entities' benefit because the cash infusions made under the BD Term Loan were structured as debt rather than equity, even though the need for those cash infusions was caused largely by Black Diamond's stripping of Debtors' cash in connection with the Distribution. *See* Compl., ¶¶ 130, 134. These allegations sufficiently set forth unreasonable transactions which served Black Diamond's corporate interests rather than Debtors', therefore suggesting a lack of good faith in pursuing Debtors' interests. *See Sample*, 914 A.2d at 670. The corporate waste claim should not be dismissed.

## F.     COUNT XII STATES A CLAIM FOR EQUITABLE SUBORDINATION PURSUANT TO 11 U.S.C. § 510

"The bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233-34 (3d Cir. 2003). "The purpose of equitable subordination is to undo or to offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *In re Computer Personalities Sys., Inc.*, 284 B.R. 415, 427 (E.D. Pa. 2002) (internal quotation marks omitted).

Section 510 of the Bankruptcy Code provides that the Court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another

allowed interest." 11 U.S.C. § 510(c). The Third Circuit has explained that "[b]efore ordering

equitable subordination, most courts have required a showing involving three elements: (1) the

claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have

resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3)

equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy

Code." *Citicorp Venture Capital Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d

982, 986-87 (3d Cir. 1998). Equitable subordination is "grounded in bankruptcy courts' equitable

authority to ensure 'that substance will not give way to form, that technical considerations will not

prevent substantial justice from being done.'" *In re SubMicron Sys. Corp.*, 432 F.3d 448, 454 (3d

Cir. 2006) (quoting *Pepper v. Litton,* 308 U.S. 295, 305 (1939)). "Without question, cases of this

character are fact intensive." *In re Lois/USA, Inc.*, 264 B.R. 69, 134 (Bankr. S.D.N.Y. 2001).

The Complaint alleges that equitable subordination of Defendants' claims (including Claim

Nos. 59, 60, 62, and 63 filed by Fund IV and BDCF)[27] should be equitably subordinated below the

rights of all other innocent creditors because the inequitable conduct described in detail throughout

the Complaint caused injury to Debtors and their creditors and provided an unfair advantage to the

---

[27]   The Complaint also seeks equitable subordination for any other claims "subsequently scheduled, filed, or otherwise asserted" by Defendants. *See* Compl., ¶ 223. While "[t]here is no requirement of maturity for an equitable subordination claim," *see In re Am. Bus. Fin. Servs., Inc.*, 360 B.R. 74, 83 (Bankr. D. Del. 2007), due to the reference in § 510(c) to an "allowed claim" some courts have found that "[t]he issue of equitable subordination is more properly raised if and when [d]efendants file a proof of claim." *See In re Dreier LLP*, 452 B.R. 391, 451 (Bankr. S.D.N.Y. 2011). However, such a claim may still be ripe if the facts underlying the claim are "closely entwined" with the factual bases for other surviving claims. *See In re Manhattan Inv. Fund Ltd.*, 310 B.R. 500, 513 (Bankr. S.D.N.Y. 2002); *see also In re AlphaStar Ins. Group Ltd.*, 383 B.R. 231, 276 (Bankr. S.D.N.Y. 2008) (acknowledging that equitable subordination claim "intertwined" with the other surviving claims would not be premature). While Count XII may end up being unnecessary against those Defendants which have not filed claims against the estate, it should survive at this stage because it is based on the same underlying facts and misconduct (and thus intertwined with) the Trustee's other claims.

Black Diamond Entities.  *See* Compl., ¶¶ 221-23.  Defendants argue that Count XII fails to plead inequitable conduct for the "very same reasons" as the Trustee's other claims,[28] but as set forth above the Trustee's other claims are sufficiently pled and Defendants' arguments otherwise are without merit.  Because Defendants assert no other basis upon which the Trustee's allegations are deficient (and none exists), their motions as to Count XII must be denied.

**G.    COUNT XIII, ASSERTED IN THE ALTERNATIVE, SUFFICIENTLY PLEADS ENTITLEMENT TO SURCHARGE UNDER 11 U.S.C. § 506(c)**

Count XIII of the Complaint seeks alternative relief in the form of costs and expenses incurred by the estate to preserve and maximize the value of Debtor property, should the Court determine that one or more of the Black Diamond Entities holds a valid lien on that property (which the Trustee disputes).  *See* Compl., ¶¶ 225-32.

Section 506(c) of the Bankruptcy Code is designed to prevent a "windfall" to a secured creditor at the expense of the Trustee or Debtors by shifting costs of preserving or disposing of collateral from the estate to the secured creditor who benefitted from them.  *See In re Towne, Inc.*, 536 F. App'x 265, 268 (3d Cir. 2013).  A debtor may surcharge a secured creditor's claim under § 506(c) either "when the secured creditor either directly or impliedly consents to the expense," *In re Mach., Inc.*, 287 B.R. 755, 767 (Bankr. E.D. Mo. 2002), or when the amounts sought to be recovered were reasonable and necessary for the preservation of the alleged collateral and provided a direct benefit to the secured creditor.  *See, e.g.*, *In re Lockwood Corp.*, 223 B.R. 170, 175 (8th Cir. B.A.P. 1998); *In re C.S. Assocs.*, 29 F.3d 903, 906 (3d Cir. 1994).

The Complaint alleges that the costs identified in the Complaint (*see* ¶¶ 227-28) were "reasonable and necessary" for the preservation of the alleged collateral and provided a "direct

---

[28]    *See* D.I. 26 at p. 15; *see also* D.I. 28 at p. 27.

benefit" to the Black Diamond Entities.  *Id.*, ¶ 230.  To the extent the Black Diamond Entities dispute the necessity, reasonableness, or benefit of these expenses, those are "factual issues that rest with the sound discretion of the trial judge," not bases for dismissal under Rule 12(b)(6).  *In re Orfa Corp. of Philadelphia*, 170 B.R. 257, 272 (E.D. Pa. 1994) (citation omitted).[29]

Finally, the surcharge claim is not premature.  The Trustee is asserting this claim in the alternative, such that the claim will only be relevant should the Court later determine that the Black Diamond Entities hold a valid lien.  It is permissible at the pleading stage to pursue alternative theories, even inconsistent theories.  *See* Fed. R. Civ. P. 8(d); Fed. R. Bankr. P. 7008.

## H.    IN THE ALTERNATIVE, IF THE COURT DETERMINES THAT DISMISSAL OF ANY CLAIMS IS WARRANTED, LEAVE TO AMEND SHOULD BE GRANTED

Federal Rule of Civil Procedure 15(a)(2), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7015, provides that leave to amend should be granted freely.  *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  The decision whether to grant or deny leave to amend rests within the court's discretion, but "[t]he Third Circuit has adopted a liberal approach to the amendment of pleadings."  *Arnault v. Diamondhead Casino Corp.*, 277 F. Supp. 3d 671, 674 (D. Del. 2017); *see also Dole v. Arco Chem. Co.*, 921 F.2d 484, 486-87 (3d Cir. 1990).  Leave to amend should be denied only when "it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the

---

[29]    Alternatively, the Black Diamond Entities' consent to these expenses, particularly in relation to the sale of Debtors' assets to Liberty BSG Holdings Inc., may be inferred from their agreement to the process for preserving and disposing of Debtors' business.  *See* Compl., ¶ 231; *In re Annett Ford, Inc.*, 64 B.R. 946, 947 (D. Ne. 1986); *In re Mach.*, 287 B.R. at 767.  Pre-conversion, Debtors filed a motion seeking surcharge of the proceeds from the asset sale for the costs and expenses incurred preserving the value of the assets.  *See* Main Bankruptcy Case, D.I. 486 (filed February 21, 2020).  The motion was never adjudicated by the Court due to Debtors' conversion to Chapter 7 on February 25, 2020.

other party." *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000) (*citing Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Otherwise, leave to amend should be granted.  *See Foman*, 371 U.S. at 182; *U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 249 (3d Cir. 2016).

The Trustee alternatively seeks leave to amend, in the event that the Court determines any of his claims are insufficiently stated.  In such event, the Trustee anticipates amending his Complaint to, if necessary, remedy any deficiencies identified by the Court in its ruling on Defendants' Motions.  Granting leave to amend for this purpose is appropriate and accords with the Third Circuit's liberal approach to the amendment of pleadings.  *See In re Total Containment, Inc.*, 335 B.R. 589, 601 (Bankr. E.D. Pa. 2005) (leave to amend, rather than dismissal, is ordinarily appropriate, unless repleading could not correct the defects in the claim).

None of the grounds for denying leave to amend exist here.  There has been no undue delay. Courts typically find undue delay in situations where a party seeks leave to amend at a late stage in the case when interests in judicial economy, finality of judgments, and prejudice are implicated. *See, e.g.*, *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001) (plaintiff waited until after summary judgment had been granted to adverse party before seeking leave to amend); *Del. Display Group LLC v. Lenovo Group Ltd.*, 2016 WL 720977, at *9 (D. Del. Feb. 23, 2016) (plaintiffs "intentional[ly] . . . wait[ed] until the last moment," when discovery was closed, to seek leave to add a new theory of liability).  Such is obviously not the case here, where the case is still in the pleading stage.  *See Teamsters Local 456 Pension Fund v. Universal Health Servs.*, 2020 WL 2063474, at *10 (E.D. Pa. Apr. 29, 2020) (no undue delay, bad faith, or dilatory motive where party promptly sought leave to amend following Court's ruling on Rule 12(b)(6) motion); *In re Tweeter Opco*, 452 B.R. 150, 155 (Bankr. D. Del. 2011) (alternatively seeking leave to amend in opposition to motion to dismiss was procedurally acceptable).

39

Nor will Defendants be prejudiced.  The Trustee's amendments would simply correct any pleading deficiencies in his claims while the case is still in an early stage, before any discovery has been conducted.  This would not create any unfair disadvantage or deprive Defendants of an opportunity to obtain or present facts or evidence relating to Plaintiff's allegations.  *See Dole*, 921 F.2d at 488; *Comba Telecom, Inc. v. Andrew, L.L.C.*, 2013 WL 12409853, at *2 n. 5 (D. Del. Mar. 8, 2013) (finding no prejudice where case was in early procedural posture and discovery had not begun).

Finally, amendment would not be futile because the Trustee would be amending for the purpose of correcting any deficiencies identified by the Court in its eventual ruling on the Motions.  The futility analysis looks at whether a proposed amendment would survive a motion to dismiss, so the Trustee's correction of deficiencies which would enable his claims to survive such a motion plainly would not be futile.  *See In re PMTS Liquidating Corp.*, 490 B.R. 174, 184 (D. Del. 2013); 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.) ("If a proposed amendment is not clearly futile, then denial of leave to amend is improper.").  The Court should therefore grant the Trustee leave to amend as to any claim determined to have been insufficiently pled.  *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (curative amendment should be permitted unless amendment would be inequitable or futile).

## CONCLUSION

In light of the foregoing facts and authorities, the Motions should be denied.

Dated: January 24, 2022               **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Bradford J. Sandler*
Bradford J. Sandler (DE Bar No. 4142)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor, P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Tel: (302) 652-4100
Fax: (302) 652 -4400
E-mail: bsandler@pszjlaw.com
         crobinson@pszjlaw.com
         pkeane@pszjlaw.com

**KAUFMAN, COREN & RESS, P.C.**
Steven M. Coren, Esq.
Benjamin M. Mather, Esq.
Janice D. Felix, Esq.
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
E-mail: scoren@kcr-law.com
         bmather@kcr-law.com
         jfelix@kcr-law.com

*Counsel for George L. Miller, Chapter 7 Trustee*