# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BAYOU STEEL BD HOLDINGS, L.L.C., *et al.*,[1]<br><br>          Debtors. | Chapter 7<br><br>Case No. 19-12153 (KBO)<br><br>(Jointly Administered) |
| GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Bayou Steel BD Holdings, L.L.C., *et al.*,<br><br>          Plaintiff,<br><br>v.<br><br>BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C.; BDCM OPPORTUNITY FUND IV, L.P.; BLACK DIAMOND COMMERCIAL FINANCE, L.L.C.; SAM FARAHNAK; PHIL RAYGORODETSKY; ROB ARCHAMBAULT; TERRY TAFT; and BOB UNFRIED,<br><br>          Defendants. | Adv. Proc. No.: 21-51013 (KBO)<br><br>**Re: Adv. D.I. 1, 26, & 35** |

**REPLY BRIEF IN SUPPORT OF**
**INDEPENDENT DIRECTORS' MOTION TO DISMISS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Bayou Steel BD Holdings, L.L.C., a Delaware limited liability company (1984), BD Bayou Steel Investment, LLC, a Delaware limited liability company (1222), and BD LaPlace, LLC, a Delaware limited liability company (5783).

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

Jennifer R. Hoover (No. 5111)
Kevin M. Capuzzi (No. 5462)
1313 North Market Street, Suite 1201
Wilmington, Delaware 19801
Telephone: (302) 442-7010
Email: jhoover@beneschlaw.com

-and-

Sven T. Nylen (admitted *pro hac vice*)
Jacob H. Marshall (admitted *pro hac vice*)
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone: (312) 212-4949
Email: snylen@beneschlaw.com
         jmarshall@beneschlaw.com

*Counsel to Defendants Rob Archambault, Terry Taft, and Bob Unfried*

February 28, 2022

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................ 1

REPLY ........................................................................................................................................... 4

    I.    <u>The Complaint Fails to Make Specific Factual Allegations Against the Independent Directors</u> ................................................................................ 4

    II.    <u>The Complaint Lacks a Coherent Theory of Director Liability</u> .............................. 8

        A.    Delaware Law Imposes Oversight and *Caremark* Duties for Systemic Issues ................................................................................................ 9

        B.    The Complaint Fails to Allege Any Breach of Fiduciary Duty Related to the Challenged Distribution ............................................ 10

        C.    Securing Liquidity for a Struggling Company is Not a Breach of Fiduciary Duty ........................................................................ 12

CONCLUSION ............................................................................................................................. 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
   911 A.2d 362 (Del. 2006) ................................................................................................3, 9, 11

*In re Caremark Intern. Inc. Derivative Litigation*,
   688 A.2d 959 (Del. Ch. 1996) ...........................................................................................3, 9, 10

*Matter of Lifschultz Fast Freight*,
   132 F.3d 339 (7th Cir. 1997) ....................................................................................................13

*Off. Comm. of Unsecured Creditors v. Comvest Grp. Holdings, LLC* (*In re HH Liquidation, LLC*),
   590 B.R. 211 (Bankr. D. Del. 2018) ..........................................................................................4

*In re Optim Energy, LLC*,
   527 B.R. 169 (Bankr. D. Del. 2015) ..........................................................................................1

*In re Riddell Concussion Red. Litigation*,
   77 F. Supp.3d 422 (D.N.J. 2015) ...............................................................................................2

*In re SGK Ventures, LLC*,
   2017 WL 2683686 (N.D. Ill. 2017) .........................................................................................12

*In re SubMicron Sys. Corp.*,
   291 B.R. 314 (D. Del. 2003) ....................................................................................................13

**Statutes**

11 U.S.C. § 364(c) and (d) .............................................................................................................13

Defendants Rob Archambault, Terry Taft, and Bob Unfried (collectively, the "Independent Directors") submit this reply brief in support of their motion to dismiss each of the claims asserted against them in this adversary proceeding.[1]

## PRELIMINARY STATEMENT[2]

The only counts against the Independent Directors are claims that the Independent Directors breached their fiduciary duties to the Debtors in connection with the approval of (i) a dividend funded through the proceeds of a profitable sale of a subsidiary and (ii) secured loans which provided a struggling company desperately needed liquidity (the "Challenged Transactions") and a related equitable subordination claim.[3] The Complaint does not allege that the Independent Directors were conflicted or had some financial incentive to approve the Challenged Transactions. The Complaint does not suggest that the Independent Directors acted

---

[1] For the convenience of the Court, and to promote efficiency, the Independent Directors hereby adopt and incorporate by reference the legal arguments and analyses of the other Defendants' reply in support of their motion to dismiss filed on the date hereof, to the extent relevant, as if fully set forth herein. Similarly, the Independent Directors do not attempt to address in detail every argument from their *Opening Brief in Support of Independent Directors' Motion to Dismiss* [Adv. D.I. 26] (the "Opening Brief") that the *Plaintiff's Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss* [Adv. D.I. 35] (the "Opposition") fails to refute, and reserve the right to further discuss such failures in oral argument on the motions to dismiss.

[2] Nothing herein constitutes an admission of any allegations of the Complaint, which are assumed to be true for purposes of the Independent Directors' motion to dismiss only.

[3] The equitable subordination claim rests on the theory that, to the extent the Independent Directors breached their fiduciary duties or otherwise acted inequitably, their claims against the Debtors should be subordinated. Compl. ¶¶ 221-23. Because the standard of inequitable conduct is either the same or higher than the standard for breach of fiduciary duties, this Reply focuses on the fiduciary duty claims. *See In re Optim Energy, LLC*, 527 B.R. 169, 176 (Bankr. D. Del. 2015) ("Courts recognize three general categories of behavior that may constitute inequitable conduct: 1) fraud, illegality, or breach of fiduciary duties; 2) undercapitalization; and 3) claimant's use of the debtors as a mere instrumentality or alter ego.") (internal quotations omitted).

1

in bad faith. Indeed, the Complaint fails to allege *any* specific conduct on the part of the Independent Directors with respect to the Challenged Transactions.

Instead, the Complaint relies on the absence of evidence to support its allegations: as the Trustee admits in his Opposition, the claims against the Independent Directors are based on the Trustee's review of the Debtors' records, "which reflect no involvement or participation on the part of Independent Directors" in approving the Challenged Transactions. *See* Opp. 30. Yet the absence of documents is not sufficient to support an allegation of breach of fiduciary duty. This is not a case where the Complaint alleges that the Independent Directors missed meetings or failed to respond to requests. The Complaint merely states that, based on the documents the Trustee had, nothing explicitly documented Independent Director involvement.[4] Compl.¶ 79.

Yet this allegation is contradicted by the remaining allegations in the Complaint: there are numerous allegations discussing emails involving the Independent Directors and an allegation that Director Unfried was extremely active in company management. Compl. ¶¶ 108(ii); (x); (xiii) (documenting emails to/from the Independent Directors discussing business performance); 135 (Independent Director "Unfried took on a more active role with the Debtors' finance and operations teams. . . .). Contradictory allegations in a complaint are a hallmark of implausible claims. *See In re Riddell Concussion Red. Litigation*, 77 F. Supp.3d 422, 438 (D.N.J. 2015) (noting that internal inconsistencies and contradictions in a complaint can render it facially implausible).

---

[4] It should be noted that any Board action required involvement of at least one Independent Director in order to form a quorum (a quorum is a majority of Board members; there were six members during the relevant time periods and three Independent Directors), yet the Complaint does not allege that the Challenged Transactions were approved without a proper quorum, a startling omission if that is the Trustee's theory. Though it should be noted that, as set forth in the Opening Brief (at pages 12-13), not all of the Debtors' management decisions required Board authorization.

2

Moreover, even when supplemented by the Opposition, the Complaint fails to allege factual allegations giving rise to a fiduciary duty claim against any Independent Director. The Trustee's so-called "*Caremark* claims" for lack of oversight require that the Trustee prove that the Independent Directors knew that they were failing to properly exercise their fiduciary duties. *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006). The Trustee admits as much. Opp. 29 (noting that Delaware law requires a "fail[ure] to act in the fact of a **known duty** to act, demonstrating a **conscious disregard** for their responsibilities. . . .") (emphasis added). Yet despite the parties agreeing on this heightened *scienter* requirement, the Complaint does not even attempt to make a factual allegation regarding any Independent Director's conscious disregard for their duty to the Debtors. In fact, there is not even a *legal conclusion* to that effect.

In short, the allegations that the Independent Directors were completely absent from company management is contradicted by the other allegations in the Complaint. Given the threadbare nature of the allegations that the Independent Directors were derelict—the Complaint never even alleges a lack of involvement; instead, the Trustee hedges by noting that the allegations against the Independent Directors are based solely on a lack of records in the Trustee's possession—it is hard to see how a plausible fiduciary claim count exists against the Independent Directors. This is doubly true when considering that the Trustee's theory requires a showing of conscious disregard for fiduciary duties. Instead of the Trustee's absence of evidence theory, the Court should focus its analysis on what is missing from the Complaint: specific, factual allegations that tie each individual Independent Director to a breach of fiduciary duty. Because such allegations are absent from the Complaint, the counts against the Independent Directors must be dismissed.

**REPLY**

I. **The Complaint Fails to Make Specific Factual Allegations Against the Independent Directors**

Analysis of fiduciary duty claims begins with determining what duties were owed by whom on a company-by-company and director-by-director basis. *See Off. Comm. of Unsecured Creditors v. Comvest Grp. Holdings, LLC* (*In re HH Liquidation, LLC*), 590 B.R. 211, 274 (Bankr. D. Del. 2018). The Trustee concedes that the "Complaint alleges breaches and corresponding harm to all of the Debtors rather than attempting to parse" any of them, yet assures this approach "makes sense" given that all "three Debtors were driven into bankruptcy as a result of the events described in the Complaint." Opp. 30.

Perhaps recognizing that there is no "driven to bankruptcy" exception under Delaware fiduciary duty law, the Trustee does attempt to highlight the specific allegations against the Independent Directors, citing several paragraphs of the Complaint for the proposition that the Independent Directors "made no efforts to inquire about the negative impacts of these transactions or to prevent them from occurring." Opp. 30. Even if the Independent Directors were somehow obligated to prevent the Challenged Transactions (they were not), the Complaint paragraphs cited by the Trustee simply do not support his position:

| Paragraph | Contents of Allegation Cited by Trustee | Issue with Citation |
|---|---|---|
| 69 | The Distribution was paid by BD LaPlace to Fund IV the following day, on March 17, 2017. | Does not mention the Independent Directors at all. |
| 70 | The wire confirmation from Bank of America Merrill Lynch shows that on March 17, 2017 $30,000,000.00 was wired from the "BD LaPlace A/P Account" to a JP Morgan Chase account belonging to Fund IV. Per the wire confirmation, the wire was initiated in the system by Soileau at 12:56 PM on March 17, 2017 and "Approved' by Bill Pax, the Debtors' Financial Planning & Analysis Manager, a few minutes later at 1:05 PM. | Does not mention the Independent Directors at all. |
| 72 | Black Diamond (Farahnak and Raygordetsky, in particular) arranged the Distribution and the First Amendment without input from Debtors' CEO. On March 16, 2017— after the First Amendment had been executed and BoA had green-lighted the transfer—Farahnak forwarded the executed documents to Simon, noting: "Rob, we are ready to return $30m of BD capital. Let me know today if any concerns." Simon replied: "Not sure I have much say so [] on this but I would like a better understanding of what our position will be on our revolver after this withdrawal. How much access to cash will be available as we will more than likely need to draw from the revolver starting in approximately 30 to 45 days for a period of about 90 days..." | Does not mention or implicate the Independent Directors at all. |
| 79 | As for the other Director Defendants—Taft, Unfried, and Archambault—the records available to the Trustee reflect no involvement or participation on their part in the decision to authorize the Distribution and no inquiry as to the impact the Distribution would have on the Debtors. | Based solely on records the Trustee reviewed; attempts to prove *scienter* based on absence of evidence. |
| 108 | Debtors' poor performance continued into May 2017 and beyond. Numerous communications and other documents in the Trustee's possession demonstrate Debtors' insufficient liquidity, under capitalization and worsening financial performance in the period following the Distribution (list of 16 examples and hanging paragraph omitted) | This contradicts the Trustee's theory: the communications show that the Independent Directors were included on communications regarding company performance and that, at a minimum, Director Unfried was reviewing the |

5

| Paragraph | Contents of Allegation Cited by Trustee | Issue with Citation |
|---|---|---|
| | | reports and asking follow-up questions. |
| 118 | The Subordinated Loan and Security Agreement identifies Debtor BD LaPlace as "Borrower," Debtor Bayou Holdings as "Parent," Debtor Bayou Investment as a "Guarantor," Fund IV as a "Lender," and BDCF as "Agent." The agreement was executed by Farahnak on behalf of each Debtor, Deckoff on behalf of Fund IV, and Hugo Gravenhorst on behalf of BDCF. | Does not mention or implicate the Independent Directors at all. |
| 119 | Section 7 of the Subordinated Loan and Security Agreement grants to the "Secured Parties" (defined to mean the Agent and the Lenders under the agreement—i.e., BDCF and Fund IV) a continuing security interest and lien upon substantially all of the property of each of the Obligors (defined to include BD LaPlace, Bayou Investment, and "any other Person that is liable for payment of any Obligations or that has granted a Lien on its assets in favor of Agent to secure any Obligations"). Debtors' grant of these security interests is referred to herein as the "BD Lien Grant." | Does not mention or implicate the Independent Directors at all. |
| 135 | Debtors' poor performance continued into May 2017 and beyond. Numerous communications and other documents in the Trustee's possession demonstrate Debtors' insufficient liquidity, under capitalization and worsening financial performance in the period following the Distribution. | This contradicts the Trustee's theory: it alleges that Director Unfried was extremely active in company management. |
| 136 | Like those in 2017, emails throughout 2018 consistently acknowledged poor financial results, operational problems, and liquidity crises. For example:<br>    (i) A February 28, 2018 email update from Unfried to Farahnak and Raygorodetsky explaining that cash flow was "still highest priority on a daily basis" and that BoA had concerns related to "suppressed availability" and lack of "positive EBITDA and cash flow";<br>    (ii) A March 27, 2018 email from Gregory Schunk to Unfried, Farahnak, Raygorodetsky, and the executive leadership team discussing how "February was another poor month at an adjusted EBITDA of -$812k";<br>    (iii) A March 28, 2018 email from Gilboy to Unfried, Farahnak, Raygorodetsky, and the executive leadership team concerning the 14-week availability forecast reported, "We have many vendors that are seriously past due, materially past | This contradicts the Trustee's theory: the Independent Directors were kept informed of company performance, Director Unfried asked follow-up questions, and company management and the other Directors clearly felt obligated to keep the Independent Directors informed (suggesting they had not abdicated their |

| Paragraph | Contents of Allegation Cited by Trustee | Issue with Citation |
|---|---|---|
| | their 'stretch' terms. We are beginning to have a broad pullback of vendors, particularly in scrap.";<br>    (iv) An April 6, 2018 email from Unfried to Farahnak noted Debtors' "cash flow tap dance" and encouraged another cash infusion;<br>    (v) A December 31, 2018 memorandum to Black Diamond's files prepared by Raygorodetsky describing that "second half of 2018" had been characterized by "operational performance issues;" and,<br>    (vi) A January 16, 2019 email from Raygorodetsky describing December 2018 as a "[v]ery disappointing month." | positions as Board members) |
| 137 | Tensions between the Directors and Debtors' leadership team continued to impact Debtors' operations, as an April 15, 2018 email from Dan Lay (who had been hired as Vice President of Sales & Marketing in June 2017) to Raygorodetsky highlight[t]s:<br>…<br>I'd take the money you put into [Bob Unfried's] salary and turn it into inventory. That would help! (That's a joke. Sort of.) | This contradicts the Trustee's theory: it does not paint a picture of a derelict Board but rather one actively involved in managing the company (which explains why management is complaining about the involvement of Director Unfried). |
| 206 | The duty of loyalty is breached, inter alia: (a) when a fiduciary fails to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his/her responsibilities; (b) when a fiduciary "abdicates" his fiduciary responsibilities; (c) when a fiduciary acts in bad faith; and/or (d) when a fiduciary engages in self-dealing. | Not a factual allegation. |
| 207 | The duty of care is breached, inter alia: (a) when a fiduciary engages in an irrational decision-making process; and (b) when the conduct of a fiduciary rises to the level of gross negligence. | Not a factual allegation. |
| 208(d) | The Director Defendants breached their fiduciary duties to the Debtors by, inter alia:<br>    (d) Failing to be fully informed and/or to take actions to prevent Debtors from paying the Distribution and granting the BD Lien Grant. | Not a factual allegation but rather a "threadbare recitation" of the elements of a claim. |

7

According to the Opposition, the above paragraphs are the balance of the Trustee's allegations against the Independent Directors. Opp. 30. Half of them contradict the theory of the Independent Directors being absentee directors while the remainder offer no plausible support for a conscious disregard of fiduciary duties. There are no allegations that the Independent Directors ignored management reports, failed to attend meetings, or otherwise abdicated their roles.

The Trustee presents no evidence that company management was frustrated with the inability to obtain requisite Board approval of items or that the Independent Directors prevented the Board from having a quorum at meetings. It is implausible to believe that, were the Independent Directors as derelict as the Trustee alleges, such issues would not be in the records of the company (or that Black Diamond, a sophisticated private equity firm, would let the Independent Directors continue to serve as directors). The entire basis for the Trustee's claims against the Independent Directors appears to be simply that the Trustee found no written record of their involvement in approving the Challenged Transactions, yet the Trustee gives no weight to the absence of any complaints about the Independent Directors. Simply put, the lack of written documentation is simply not sufficient to establish that the Independent Directors *willfully and consciously disregarded* their fiduciary duties.

## II. The Complaint Lacks a Coherent Theory of Director Liability

The Trustee seems to assume that the two Challenged Transactions were so obviously improper that fiduciaries had a duty to take all necessary action to prevent a dividend and a secured loan. Not only does this overstate the responsibilities of directors under Delaware law, but it assumes, without any factual basis, that the Challenged Transactions were facially improper. They were not.

A.  **Delaware Law Imposes Oversight and *Caremark* Duties for Systemic Issues**

Typically, fiduciary duties are evaluated through two lenses: a duty of care, which requires that directors exercise sound judgment (usually evaluated using a gross negligence standard) and the duty of loyalty, which prohibits self-dealing and conflicts of interest. *Caremark*, or oversight, liability stems from a separate kind of issue: what duty do directors have to make sure that systemic problems do not harm a corporation? For example, in *Caremark*, the issue was whether the directors were liable for the systemic violation of healthcare regulations by corporate employees. *See In re Caremark Intern. Inc. Derivative Litigation*, 688 A.2d 959 (Del. Ch. 1996). Similar cases included ongoing anti-trust violations. *Stone*, 911 A.2d at 368.

The duty to prevent systemic issues through oversight is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Stone*, 911 A.2d at 372. The Delaware Supreme Court has set a clear, and high, standard:

> "We hold that *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations."

*Id.* at 370. It is this standard that the *Stone* court was explaining when it stated that oversight liability requires a known duty to act. Opp. 30 (citing *Stone* but omitting the *Caremark* standard set forth above).

When properly framed as a duty to create reporting systems, the Trustee's *Caremark* claims fall apart: the Complaint lacks any allegation suggesting that there were systemic issues at the Debtors, that the Independent Directors failed to create necessary reporting systems or that the

9

Independent Directors received information that required them to act and didn't.[1] Indeed, the factual allegations make clear that the Independent Directors were regularly being updated on company performance and were involved in decision-making. Compl. ¶¶ 60, 108, 136, 137.

Again, the Trustee's liability theory appears to hinge solely on the fact that the Trustee found no written record of the Independent Directors approving the Challenged Transactions. This absence of evidence—particularly in light of the contradictory factual allegations that the Independent Directors did receive performance reports and responded to them—is insufficient to plead a plausible theory of recovery under *Caremark*. There are zero allegations about reporting systems and the Complaint does not identify any information that would have demanded that the Independent Directors take action. The Trustee simply hopes to find the Independent Directors liable because the business judgment of the Board ended up looking wrong in retrospect. That is not a viable claim under Delaware law.

### B. The Complaint Fails to Allege Any Breach of Fiduciary Duty Related to the Challenged Distribution

As noted above, the Trustee appears to base his theory of liability against each Independent Director on an oversight theory. Opp. 30. Yet the Complaint lacks any evidence that there was a lack of information related to the Challenged Distribution beyond the generalized allegation that the Trustee can locate no records related to the involvement of the Independent Directors.

As noted above, this "absence of evidence" is insufficient to adequately plead a fiduciary duty claim. However, the Complaint also fails to allege that the circumstances surrounding the

---

[1]  With respect to the Trustee's asserted *Caremark* claims, this Reply focuses on the insufficiency of the Complaint's allegations and, therefore, this Reply assumes, *arguendo*, the *Caremark* standard applies with respect to the Challenged Transactions. The Independent Directors reserve the right to dispute such application, given the dearth of case law applying *Caremark* to single transactions like the Challenged Transactions.

Challenged Distribution were the type of "red flags" the *Stone* court requires to heighten the oversight duties of directors. 911 A.2d at 373. Indeed, the Complaint admits that the Challenged Distribution was supported by cash flow projections and a budget. Compl. ¶ 67.[2] Under Delaware law, a director has fulfilled his duty by relying on reasonable information and reporting systems. *Id.* The Complaint does nothing to suggest that reliance on the company's budget was unreasonable beyond *ex post* critiques.

Moreover, the Challenged Distribution was approved by Bank of America, the Debtors' senior secured lender, and left the Debtors with more liquidity than they had prior to the sale of the Vinton business. Compl. ¶ 94; p. 21 (chart showing availability under the Bank of America loan facility; the Debtors had under $5MM of availability prior to the sale and $7.2MM after the Challenged Distribution).

Taking the Complaint as true, the Board was presented with a budget that had been vetted by management and the Company's senior lender. That budget supported a distribution that would leave the Debtors with more availability than they had prior to the sale whose proceeds were being used to fund the distribution.[3] Given those facts, it is difficult to see how the Board failed to properly exercise their business judgment. It appears the Trustee simply wants to challenge the

---

[2] The Complaint suggests that perhaps the budget was "rosier" than it should have been (Compl. ¶ 89) but it is unclear how the Independent Directors were supposed to identify those issues, particularly when the Complaint, which has the benefit of hindsight, fails to allege the specific deficiencies in those projections. *Accord Stone*, 911 A.2d at 373 ("With the benefit of hindsight, the plaintiffs' complaint seeks to equate a bad outcome with bad faith. The lacuna in the plaintiffs' argument is a failure to recognize that the directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability. . . .").

[3] It should be noted that the timing of the Distribution further supports that the company and Board acted responsibly: the Complaint suggests that liquidity would be tightest in February. Compl. ¶ 67(iv). The Challenged Distribution did not occur until the company had managed through what was then expected to be its most challenging period.

11

Board's decision with the benefit of hindsight. That type of Monday-morning quarterbacking is not supported by Delaware law. The claims against the Independent Directors regarding the Challenged Distribution should be dismissed.

### C. Securing Liquidity for a Struggling Company is Not a Breach of Fiduciary Duty

Turning to the Challenged Loans, the Trustee argues that the Independent Directors somehow failed the Debtors by not forcing Black Diamond to "structur[e] the cash infusions" as "equity investments." Compl. ¶ 208(b). Yet nowhere in the Complaint does the Trustee explain how the Independent Directors could have forced a capital contribution or that Black Diamond was willing to provide liquidity to the Debtors through an equity investment.[4]

The Trustee appears to be arguing that equity may never provide secured debt to a company. That simply is not accurate. As recognized by the U.S. District Court for the Northern District of Illinois:

> [I]nsiders must be permitted to make loans to their company even when the company could not have secured similar loans from anyone else, and even when the insiders are consciously aware that they might not ever recoup their investment. The law does not limit insiders to equity contributions as a means to save a flagging enterprise. *See Lifschultz*, 132 F.3d at 347 ("The insiders here contributed fresh working capital. They were under no obligation to do so. Assuming there was no deception, we see no reason to treat an insider's loan to a company more poorly than that of a third party's.").

*In re SGK Ventures, LLC*, 2017 WL 2683686, at *8 (N.D. Ill. 2017) (affirming bankruptcy court's denial of liquidating trustee's claim for recharacterization of loan to equity).

Again, the absence of any meaningful factual allegations in the Complaint is telling. The Trustee does not allege that the Challenged Loan was too expensive or that the Board ignored

---

[4] A review of the underlying operating agreements, attached to the Opening Brief as exhibits, confirms that the Board had no power to require capital contributions from Black Diamond.

12

alternative sources of financing in favor of the Black Diamond loan. The Complaint is also devoid of any allegations suggesting that more favorable alternatives (*i.e.*, unsecured loans or equity contributions) were realistically available in light of the challenges facing the Debtors. Instead, the sole basis for liability appears to be that the Board permitted the "structuring [of the] cash infusions [from Black Diamond] as debt rather than equity and encumbering all of Debtors' assets. . . ." Opp. 29. Such an argument strains credulity and is in direct conflict with multiple cases. *See Matter of Lifschultz Fast Freight*, 132 F.3d 339, 345 (7th Cir. 1997) ("That the insiders made a secured loan to the company is not wrongful per se. . . ."); *In re SubMicron Sys. Corp.*, 291 B.R. 314, 325 (D. Del. 2003) (recognizing that the law does not discourage loans from insiders and equity because "it is the shareholders who are most likely to have the motivation to salvage a floundering company.") (internal quotations omitted).

The Complaint seems to acknowledge that, without additional liquidity, the Debtors' business would have failed sooner. Compl. ¶ 114 (Debtors were "running out of cash"). The Complaint does not allege that the company ignored alternatives or that the Challenged Loan was somehow overly favorable to Black Diamond. It simply asserts, with no justification, either factual or legal, that the Board should have somehow forced equity to provide additional capital in the form of equity. Such a position defies logic[5] and cannot be the basis for a plausible fiduciary duty claim.

## CONCLUSION

The Complaint's allegations against the Independent Directors rest on a single allegation: that the Trustee has no records in his possession indicating that the Independent Directors were

---

[5] If equity could be compelled to provide additional capital as equity contributions, it would seem to upend the requirements of debtor-in-possession financing under 11 U.S.C. § 364(c) and (d).

involved in approving the Challenged Transactions. This absence of evidence argument, by itself, is insufficient to plead a plausible claim for breach of fiduciary duty.

Yet the Complaint goes on to contradict the assertion that the Independent Directors were derelict in their duties: they were regularly updated on company performance and asked questions about the company's liquidity situation. Nothing in the Complaint comes close to alleging that the Independent Directors **knowingly** violated their fiduciary duties or **consciously disregarded** their obligations as directors. Indeed, the fact that the Trustee's records contain no evidence of Black Diamond or company management complaining about the unavailability of the Independent Directors (at least one of whom was required for a quorum) completely undermines the argument that the Independent Directors abdicated their positions.

Finally, the Complaint makes clear that each Challenged Transaction was within the Board's business judgment when made. The Distribution, when viewed as part of the Vinton sale, left the Debtors *better capitalized* than they were prior to the Vinton Sale. And the fact that equity provided additional liquidity to a struggling company through secured loans, with no further allegations, is not a breach of fiduciary duty.

WHEREFORE, for the foregoing reasons, and those set forth in the other Defendants' briefing that are incorporated herein, the Independent Directors respectfully request that the Court grant their motion to dismiss the Ninth, Eleventh, and Twelfth Claims with prejudice.

| | |
|---|---|
| Dated: February 28, 2022<br>Wilmington, Delaware | BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP<br><br> /s/ *Kevin M. Capuzzi*<br>Jennifer R. Hoover (No. 5111)<br>Kevin M. Capuzzi (No. 5462)<br>1313 North Market Street, Suite 1201<br>Wilmington, Delaware 19801<br>Telephone: (302) 442-7010<br>Email: jhoover@beneschlaw.com |

-and-

Sven T. Nylen (admitted *pro hac vice*)
Jacob H. Marshall (admitted *pro hac vice*)
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone: (312) 212-4949
Email: snylen@beneschlaw.com

*Counsel to Defendants Rob Archambault, Terry Taft, and Bob Unfried*

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

PACHULSKI STANG ZIEHL & JONES LLP
Bradford J. Sandler
Colin R. Robinson
Peter J. Keane
919 North Market Street, 17th Floor
P O Box 8705
Tel: 302-652-4100
Fax: 302-652-4400
E-mail: bsandler@pszjlaw.com
  crobinson@pszjlaw.com
  pkeane@pszjlaw.com

-and-

KAUFMAN, COREN & RESS, P.C.
Steven M. Coren, Esq.
Benjamin M. Mather, Esq.
Janice I. Daul, Esq.
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: 215-735-8700
Fax: 215-735-5170
E-mail: scoren@kcr-law.com
  bmather@kcr-law.com
  jdaul@kcr-law.com

*Counsel to Chapter 7 Trustee*

Lawrence S. Robbins
William J. Trunk
Jack A. Herman
Leslie C. Esbrook
ROBBINS, RUSSELL, ENGLERT, ORSECK
  & UNTEREINER LLP
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
Email: lrobbins@robbinsrussell.com

-and-

ZAIGER LLC
Jeffrey H. Zaiger (admitted *pro hac vice*)
Judd A. Lindenfeld (admitted *pro hac vice*)
2187 Atlantic Street, 9th Floor
Stamford, CT 06902
Tel: (917) 572-7701
Email: jzaiger@zaigerllc.com

-and-

FOX ROTHSCHILD LLP
Seth A. Niederman (DE No. 4588)
919 N. Market Street, Suite 300
Wilmington, DE 19801-3062
Tel.: (302) 654-7444
Fax: (302) 656-8920
Email: sniederman@foxrothschild.com

*Counsel for Defendants Black Diamond Capital Management, L.L.C., BDCM Opportunity Fund IV, L.P., Black Diamond Commercial Finance, L.L.C., Sam Farahnak, and Phil Raygorodetsky*

  /s/ *Kevin M. Capuzzi*
  Kevin M. Capuzzi (No. 5462)