## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| BAYOU STEEL BD HOLDINGS, L.L.C., *et al.* | Case No. 19-12153 (KBO) |
| Debtors. | |
| George L. Miller, in his capacity as the Chapter 7 Trustee for the jointly administered bankruptcy estates of Bayou Steel BD, L.L.C., *et al.*, | |
| Plaintiff, | Adv. Proc. No. 21-51013 (KBO) |
| v. | **Related Docket to Nos. 25 & 27** |
| Black Diamond Capital Management, L.L.C.; BDCM Opportunity Fund IV, L.P.; Black Diamond Commercial Finance, L.L.C.; Sam Farahnak; Phil Raygorodetsky; Rob Archambault; Terry Taft; and Bob Unfried, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

In this proceeding, the chapter 7 trustee (the "<u>Trustee</u>") for the jointly administered bankruptcy estates of Bayou Steel BD Holdings, LLC ("<u>Bayou Holdings</u>"), BD Bayou Steel Investment, LLC ("<u>Bayou Investment</u>"), and BD LaPlace, LLC ("<u>BD LaPlace</u>" and, together with Bayou Holdings and Bayou Investment, the "<u>Debtors</u>") asserts an assortment of claims related to a prepetition distribution and secured loan against the following defendants (collectively, the "<u>Defendants</u>"): Black Diamond Capital Management L.L.C., ("<u>BDCM</u>"), BDCM Opportunity Fund IV, L.P. ("<u>Fund IV</u>"), Black Diamond Commercial Finance, L.L.C. ("<u>BDCF</u>" and together with BDCM and Fund IV, "the <u>Black Diamond Entities</u>"), Sam Farahnak and Phil Raygorodetsky (together, the "<u>Black Diamond Directors</u>"), and Rob Archambault, Terry Taft, and Bob Unfried (together, the "<u>Independent Directors</u>" and, collectively with the Black Diamond Directors, the "<u>Director Defendants</u>").[1]  The Defendants have moved to dismiss all claims (the "<u>Motions</u>").[2]

---

[1] Adv. D. I. 1 (the "<u>Compl.</u>").

[2] Adv. D.I. 25, 27.

Briefing on the Motions completed on February 28, 2022,[3] and oral argument followed on May 25, 2022.  For the reasons discussed herein, the Motions will be denied and granted in part.

## I.    SUMMARY OF ALLEGED RELEVANT FACTS

Prior to their bankruptcy filings, the Debtors manufactured and sold steel products.[4]  They did so from several mills and depots including their headquarters in LaPlace, Louisiana and a facility in Vinton, Texas.[5]  In 2016, Fund IV and BDCM purchased the Debtors from Arcelor Mittal (the "Acquisition").[6]  The final purchase price was $90.2 million, funded by a combination of equity and debt.[7]  BDCM, through Fund IV, made an initial member contribution of $59.6 million, and the balance of the Acquisition purchase price was funded through a revolving loan (the "Revolving Loan") with Bank of America ("BoA") and SunTrust Robinson Humphrey, Inc. ("SunTrust"), that permitted borrowings in the aggregate amount not to exceed $75 million, secured by liens on substantially all of the Debtors' assets.[8]  BDCM thereafter owned 100% of Bayou Holdings, which in turn owned 100% of Bayou Investment and BD LaPlace.[9]

The Debtors are Delaware limited liability companies (an "LLC") established pursuant to the Delaware Limited Liability Company Act (the "Act")[10] and subject to separate LLC agreements (each, an "LLC Agreement").[11]  Shortly after the Acquisition, BDCM appointed to the Board of Directors two of its own managing directors – Messrs. Farahnak and Raygorodetsky – and three independent directors – Messrs. Unfried, (a former steel industry executive), Archambault (a private-equity executive), and Taft (a former metals industry executive).[12]

From about June through December 2016, the Debtors operated at a loss.[13]  But unlike the LaPlace operations, the Vinton operations were cash flow positive.[14]  In or around December 20,

---

[3] Adv. D.I. 26, 28, 29, 35, 46, 27.

[4] Compl. ¶¶ 2, 25.

[5] *Id.* ¶¶ 25, 26, 30.

[6] *Id.* ¶ 43.

[7] *Id.*  ¶¶ 45-46.

[8] *Id.* ¶¶ 47-49.

[9] *Id.* ¶ 47; *see also id.* ¶ 44 (explaining that "BD Long Products, LLC was formed on December 22, 2015 for purposes of the [A]cquisition, with Fund IV as its sole member and [BDCM] as its manager.  After closing, BD Long Products, LLC's name was changed to Bayou Steel BD Holdings, LLC (*i.e.*, Debtor Bayou Holdings).").

[10] 6 DEL. C. §§ 18-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.

[11] *Id.* ¶ 13.

[12] *Id.* ¶¶ 52-53.

[13] *Id.* ¶¶ 58-60(i)-(viii).

[14] *Id.* ¶ 61.

2016, BDCM sold the Vinton facility for $49 million (the "Vinton Sale").[15]  The Debtors used the proceeds to reduce the Revolving Loan balance from $55.3 million to $6.4 million.[16]

On March 16, 2017, the Debtors, BoA, and SunTrust executed an amendment to the Revolving Loan to permit a distribution (the "Distribution") of $30 million from BD LaPlace to Fund IV.[17]  The Distribution was paid on March 17, 2017.[18]  The Trustee alleges that the Debtors' then-chief executive officer expressed concerns regarding the negative impact of the Distribution on the Debtors' cash position and liquidity but that nevertheless, the funds were wired and the Distribution was consummated.[19]  The Trustee has no records of the Independent Directors' involvement in the Distribution and there are no resolutions or consents of the Board of Directors with respect to the amendment or the Distribution.[20]

Throughout 2017 the Debtors faced severe liquidity issues and a struggling business, which the Trustee contends was a direct result of the Distribution.[21]  By late 2017, the Debtors were "running out of cash" and BDCM explored "injecting" some.[22]  In December 2017, the Debtors entered into a Subordinated Loan and Security Agreement (the "BD Term Loan"), which provided an initial $15 million credit line.[23]  The BD Term Loan identifies BD LaPlace as "Borrower," Bayou Holdings as "Parent," Bayou Investment as "Guarantor," Fund IV as "Lender," and BDCF as "Agent."[24]  In exchange for the BD Term Loan, each of the "Obligors" granted a continuing security interest and lien upon substantially all of their property (the "BD Lien Grant").[25]  The Complaint defines "Obligors" as "BD LaPlace, Bayou Investment, and 'any other Person that is liable for payment of any Obligations or that has granted a Lien on its assets in favor of Agent to secure any Obligations.'"[26]

The BD Term Loan was subordinated to the BoA Revolving Loan, and BoA and SunTrust approved the additional borrowing.[27]  During the first half of 2019, the BD Term Loan was amended to increase the maximum term loan commitment once to $30 million and again to $40

---

[15] Id. ¶ 62.

[16] Id. ¶ 63.

[17] Id. ¶¶ 68-69.

[18] Id.

[19] Id. ¶¶ 67(i)-(viii), 73-75 (detailing communications among Company management and the Board of Directors related to the Distribution).

[20] Id. ¶¶ 79-80.

[21] Id. ¶¶ 93-113.

[22] Id. ¶114.

[23] Id. ¶ 117.

[24] Id. ¶ 118.

[25] Id. ¶ 119.

[26] Id. (quoting the loan agreement).

[27] Id. ¶¶ 115, 121.

million.[28]  Notwithstanding this additional availability, the Debtors continued to face difficulties and their "operational and financial performance were dismal."[29]

By early September 2019, the Debtors had drawn $33 million on the BD Term Loan.[30]  On September 12, 2019, following conversations with BoA related to the Debtors' liquidity struggles, including BoA-required adjustments triggering a default under the Revolving Loan, BoA brought in an outside consultant to assist the Debtors with financial management.[31]  On October 1, 2019 (the "Petition Date"), the Debtors filed for bankruptcy under chapter 11 of the Bankruptcy Code.[32]  As of that date, the outstanding principal amount owing under the BD Term Loan was approximately $36.5 million with the Debtors never having made a repayment.[33]  Following the sale of substantially all of their assets under section 363 of the Bankruptcy Code, the Debtors converted their cases to ones under chapter 7, and the Trustee was appointed.[34]

## II.    THE ADVERSARY PROCEEDING

On August 11, 2021, the Trustee filed the Complaint.  It contains thirteen counts substantially focused on the Distribution and the BD Lien Grant.  Specifically, the Trustee seeks to avoid the Distribution and the BD Lien Grant as fraudulent transfers, recover the Distribution, and recover damages in excess of $65 million for breaches of fiduciary duty, aiding and abetting, and corporate waste.  He also seeks to equitably subordinate the Defendants' claims and to surcharge the Black Diamond Entities.  The Defendants each move to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules"), arguing that the Trustee fails to state a claim upon which relief may be granted.

## III.    APPLICABLE LEGAL STANDARD

When reviewing a motion to dismiss under Federal Rule 12(b)(6) challenging the sufficiency of a plaintiff's statement of claim, a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[35]  This is a plausibility standard, requiring more than a sheer possibility that a defendant acted unlawfully but it is not a probability standard.[36]  Rather, a plaintiff must allege sufficient facts that nudge the

---

[28] *Id.* ¶¶ 122-23.

[29] *Id.* ¶ 150.

[30] *Id.* ¶ 125.

[31] *Id.* ¶¶ 147-52.

[32] *Id.* ¶ 153.

[33] *Id.* ¶¶ 127-29.

[34] *Id.* ¶¶ 11-12.

[35] *Crystallex Int'l Corp. v Petrolesos De Venezuela, S.A.*, 879 F.3d 79, 83 n.6 (3d Cir. 2018) (quoting *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 242 (3d Cir. 2015)).

[36] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2007).

claims "across the line from conceivable to plausible[.]"[37]

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of will not do[.]"[38] "[T]he tenet that a court must accept as true all factual allegations contained in a complaint is inapplicable to legal conclusions."[39] Thus, a plaintiff's threadbare recitals of a cause of action that are only supported by conclusory statements will not suffice.[40]

While a court may draw from "judicial experience and common sense" in considering a motion to dismiss,[41] it must only consider alleged facts that are within the scope of the court's review.[42] The scope of what is reviewable includes the complaint, public record, and documents that are "integral to or explicitly relied upon" by a plaintiff, such as documents attached to a complaint and any undisputedly authentic documents upon which the claims are based.[43] Rather than being a mini trial for parties to put forth their whole case and competing viewpoints of what the ultimate outcome should be, a motion to dismiss focuses solely on the narrow and fundamental question of whether, if everything the plaintiff alleges is true, the plaintiff can prevail.[44]

## IV.    LEGAL DISCUSSION

### A.    Claims for Fraudulent Transfer – The Distribution

In Counts I through III, alleged against Fund IV and BDCM, the Trustee seeks to avoid the Distribution as an actual and constructive fraudulent transfer pursuant to sections 1304(a)(1), 1304(a)(2), and 1305(a) of the Delaware Uniform Fraudulent Transfer Act ("DUFTA")[45] and his strong-arm powers of section 544(b)(1) of the Bankruptcy Code.[46]

---

[37] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[38] *Id.* at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (internal citation omitted).

[39] *Iqbal*, 556 U.S. at 678.

[40] *Id.*

[41] *Id.* at 679.

[42] *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016); *see also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

[43] *Tanksley v. Daniels*, 902 F.3d 165, 172 (3d Cir. 2018); *see also McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009); *Davis*, 824 F.3d at 341.

[44] *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

[45] 6 DEL. C. §§ 1301-1311.

[46] Section 544(b)(1) of the Bankruptcy Code provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under application of law by a creditor holding an unsecured claim that is allowable under section 502 of [the Bankruptcy Code] or that is not allowable only under section 502(e) of [the Bankruptcy Code]."

Fund IV and BDCM raise two arguments in support of dismissal.  First, they assert that the claims are time barred under section 18-607(c) of the Act.  Second, they contend that the Distribution is protected from avoidance by the Bankruptcy Code's safe harbor contained in section 546(e) (the "Section 546(e) Safe Harbor").  These are affirmative defenses.  While the applicability of an affirmative defense generally cannot be determined by way of a motion to dismiss, "[a] complaint may be dismissed under Rule 12(b)(6) where an unanswered affirmative defense appears on its face[.]"[47]  "If the bar is not apparent on the face of the complaint, then it may not be afforded the basis for a dismissal".[48]

### 1.    Timeliness Under the Act

Section 546(a) of the Bankruptcy Code sets forth when a trustee must bring an avoidance action under section 544 and, with limited exception, provides him or her two years from the entry of a debtor's order for relief to do so:

> An action or proceeding under section 544 . . . [of the Bankruptcy Code] may not be commenced after the earlier of – (1) the later of – (A) 2 years after the entry of the order for relief; or (B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of [the Bankruptcy Code] if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or (2) the time the case is closed or dismissed.[49]

The Debtors' Petition Date and, thus the date when the Debtors' order for relief was entered,[50] occurred on October 1, 2019.  The Trustee commenced this proceeding on August 11, 2021, less than two years from the Debtors' Petition Date, in compliance with section 546(a).

Nonetheless, Fund IV and BDCM argue that the claims are untimely because they were brought over four years from the March 17, 2017 Distribution[51] in alleged violation of section 18-607(c) of the Act.  That Delaware statute provides a three-year statute of repose[52] measured from the date of a distribution:

---

[47] *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005); *accord ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994).

[48] *Bethel v. Jendoco Const. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978).

[49] 11 U.S.C. § 546(a).

[50] *Id.* § 301(b).

[51] Compl. ¶ 69.

[52] *Holliday v. K Road Power Mgmt., LLC (In re Boston Generating, LLC)*, 617 B.R. 442, 463 (Bankr. S.D.N.Y. 2020), *aff'd sub nom. Holliday v. Credit Suisse Sec. (USA) LLC*, No. 20 CIV. 5404 (GBD), 2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021) (defining 6 DEL. C. § 18-607(c) as a statute of repose).

> Unless otherwise agreed, a member who receives a distribution from
> a limited liability company shall have no liability under this chapter
> or other applicable law for the amount of the distribution after the
> expiration of 3 years from the date of the distribution unless an
> action to recover the distribution from such member is commenced
> prior to the expiration of the said 3-year period and an adjudication
> of liability against such member is made in the said action.[53]

Fund IV and BDCM argue that section 546(a) of the Bankruptcy Code does not preempt section 18-607(c) because it is a statute of repose targeted at regulating the corporate affairs of business entities organized in the Delaware, a unique state interest.  Therefore, it is their position that the time for creditors (and thus, the Trustee) to challenge the Distribution expired on March 17, 2020.[54]  The Trustee maintains that section 546(a) preempts and extends the time to bring his state law avoidance claims because they were not time-barred as of the Petition Date.

The Court agrees with the Trustee.  As it explained in *UMB Bank, N.A. v. Sun Capital Partners V, LP (In re LSC Wind Down, LLC)*, "so long as an underlying state law avoidance claim is not time-barred as of the commencement of a bankruptcy case, a section 544(b)(1) claim may be brought provided that it is commenced within the time periods prescribed by section 546(a)."[55]  This principle generally applies whether the underlying state statute is a statute of limitations or a repose.[56]  Here, even if section 18-607(c) applies to the Trustee's DUFTA claims targeted at the Distribution (which is in dispute[57]), the claims were not time-barred as of the Petition Date (which was less than three years from the alleged Distribution) and therefore, may be pursued by the Trustee who complied with section 546(a) in bringing this action.[58]

---

[53] 6 Del. C. § 18-607(c).

[54] Compl. ¶ 69.

[55] 610 B.R. 779, 785 (Bankr. D. Del. 2020).

[56] *Id.* at 785 n.32 (collecting cases).

[57] Fund IV and BDCM argue that the Act applies to extinguish members' liability to creditors in addition to the LLC itself.  They contend that, unlike the text of section 18-607(b) that addresses liability to LLCs for improper distributions, subsection (c) does not contain any liability limiting language.  Its broad language providing that a member "shall have no liability" would therefore apply to anyone.  Moreover, they highlight that the subsection cuts liability off under the Act or "other applicable law" thereby including DUFTA claims.  On the other hand, the Trustee contends that section 18-607 applies only to claims brought by LLCs and not to the creditors' state law avoidance claims under DUFTA that he is bringing under section 544 of the Bankruptcy Code.  For purposes of this Opinion, the Court has made no decision as to whether section 18-607(c) applies to the Trustee's DUFTA claims.

[58] Fund IV and BDCM do not argue that the Trustee's claims are untimely under DUFTA. *See* 6 Del. C. § 1309 (setting forth the required timeframes for bring fraudulent transfer actions under sections 1304(a)(1), 1304(a)(2), and 1305(a)).

When federal and state law conflict, the Supremacy Clause of the United States Constitution requires that state law give way to federal law.[59]  Federal preemption is not favored[60] and should not be lightly presumed.[61]  It has been described as a "necessary but precarious component of our system of federalism under which the states and the federal government possess concurrent sovereignty."[62]

To determine if a state statute is preempted by a federal law, a court's "sole task is to ascertain the intent of Congress."[63]  Intent may be found either explicitly through Congress's express terms or implicitly through Congress's adoption of a "scheme of federal regulation . . . sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation."[64]  The former situation is referred to as express preemption and the latter, field preemption.  Alternatively, under conflict preemption, "in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law."[65]  "Such a conflict occurs either because compliance with both federal and state regulations is a physical impossibility, or because the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[66]  "In an area that has been traditionally occupied by the states, the court must assume that the prerogatives of the states were not to be superseded by a federal law unless it is the clear and manifest purpose of Congress."[67]

The overwhelming majority of courts that have been asked to decide whether section 546(a) preempts a state statute of repose have concluded that it is does under conflict preemption.[68]  For instance, in the New Jersey bankruptcy decision of *Gibbons v. First Fid. Bank, N.A. (In re Princeton-New York Invs., Inc.)*, a trustee commenced a proceeding pursuant to section 544 to

---

[59] *Rosenberg v. DVI Receivables XVII, LLC*, 835 F.3d 414, 418 (3d Cir. 2016) (citing U.S. CONST. art. VI, cl. 2. ("This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; . . ., any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.")).

[60] *Witco Corp. v. Beekhuis*, 38 F.3d 682, 687 (3d Cir. 1994).

[61] *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280-81 (1987) (citations and internal quotations omitted).

[62] *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 687 (3d Cir. 2016).

[63] *Guerra*, 479 U.S. at 280-81 (citations and internal quotations omitted); *accord Cipollone v. Liggett Grp. Inc.*, 505 U.S. 504, 516 (1992) ("'[t]he purpose of Congress is the ultimate touchstone' of pre-emption analysis." (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978)).

[64] *Guerra*, 479 U.S. at 280-81 (citations and internal quotations omitted).

[65] *Id.*

[66] *Id.*

[67] *Witco*, 38 F.3d at 687.

[68] *See Forman v. Willix*, No. 13-5291, 2014 WL 1877628, at *2 (D.N.J. Apr. 30, 2014) (denying leave to appeal bankruptcy court's denial of a motion to dismiss based on a state fraudulent transfer statute of repose and stating that "[n]early every court that has confronted this issue has come to the same conclusion" that preemption is warranted); *accord Genter v. Reed (In re Genter)*, No. 3:19-CV-01951-E, 2020 WL 3129637, at **2-3 (N.D. Tex. June 12, 2020).

avoid and recover alleged fraudulent transfers made five years prior.[69]  The defendant argued that the applicable New Jersey fraudulent transfer statute contained a statute of repose that cut off actions four years after the transfer date, thereby making the proceeding one year too late.[70]  The bankruptcy court determined that the time to bring the action under the New Jersey statute of repose had not expired as of the debtor's petition date, that the trustee complied with section 546(a), which preempted the state statute, and that the action was therefore timely.[71]

In rendering the preemption decision, Judge Gambardella held that the state statute "present[ed] an obstacle to the objectives of Congress in enacting the Bankruptcy Code."[72]  More specifically, Congress intended to provide trustees bringing claims under section 544 "some breathing room to determine what claims to assert" and fulfill their goal of "maximizing the bankruptcy estate for the benefit of creditors."[73]  If the state statute were to apply, the court observed that it would "so severely restrict[] the trustee's ability to recover property for the benefit of the bankruptcy estate that it [would] obstruct[] the accomplishment and execution of the full purposes and objectives of Congress in enacting the Bankruptcy Code."[74]  On appeal, the decision was affirmed.[75]  The district court determined that section 544 gives the trustee a right created by the Bankruptcy Code, that the time to exercise such right is governed by section 546(a), and that the application of state laws to truncate that time would impede the accomplishment and execution of Congressional objectives for the reasons set forth by the bankruptcy court.[76]

Other courts tackling the preemption issue have reached the same conclusion as the courts in *Princeton*, following similar analyses.[77]  The reasoning and holdings of *Princeton* and its progeny are persuasive.  This Court adopts their reasoning, applies it to the issue before it, and concludes that section 546(a) preempts the Act's statute of repose in section 18-607(c).

Fund IV and BDCM submit that section 18-607(c) is a statute governing the capacity of a state's citizen to be sued and that such an area is not one in which Congress has expressed a clear and manifest intent to preempt.  They rely heavily on the decision of *Committee of Unsecured Creditors of Phar-Mor, Inc. v. Action Indus., Inc. (In re Phar-Mor, Inc. Secs. Litig.)*[78] and Federal

---

[69] 199 B.R. 285, 297 (Bankr. D.N.J. 1996), *aff'd*, 219 B.R. 55 (D.N.J. 1998).

[70] *Id.* at 292-94.

[71] *Id*. at 293, 298.

[72] *Id.* at 297.

[73] *Id*.

[74] *Id*.

[75] *Princeton*, 219 B.R. at 59-66.

[76] *Id.*

[77] *See, e.g.*, *Rund v. Bank of Am. Corp. (In re EDP Inv. Co.*), 523 B.R. 680, 691-92 (BAP 9th 2015); *O'Cheskey v. CitiGroup Global Markets, Inc. (In re Am. Housing Foundation)*, 543 B.R. 245, 259 n.15 (N.D. Tex. 2015); *Smith v. Am. Founders Fin. Corp.*, 365 B.R. 647, 676-79 (S.D. Tex. 2007).

[78] 178 B.R. 692 (W.D. Pa. 1995), *aff'd sub nom.* 101 F.3d 689 (3d Cir. 1996).

Rule 17(b) to support their position.[79]  In *Phar-Mor*, the United States District Court for the Western District of Pennsylvania determined that section 546(a) did not preempt an Ohio nonclaim statute that barred all noncontingent claims against a decedent's estate that were not presented within one year of death.[80]  As a result, fraudulent transfer claims brought by an official committee of unsecured creditors against the debtor's former shareholder more than one year after his death were barred.[81]  Similar to other courts tackling preemption, *Phar-Mor* focused heavily on the second element of conflict preemption – whether the Ohio nonclaim statute presented an obstacle to the objective of Congress in enacting the Bankruptcy Code.[82]

The district court found that the Ohio nonclaim statute did not present an obstacle to Congress's objectives.[83]  It acknowledged that Congress designed section 546 to provide trustees with breathing room to determine what claims to bring under section 544 and that the application of the nonclaim statute could severely limit a bankruptcy trustee's claims.[84]  Nonetheless, preemption was deemed inappropriate because the Bankruptcy Code did not express a clear and manifest intention "to override the state's strong and traditional interest in regulating the probate matters of its citizens."[85]  To that end, the court described the nonclaim statute at issue as one that "forever terminates the estate's capacity to be sued, regardless of the cause of action asserted."[86]  It concluded that the right to determine the capacity of its citizens to be sued is a traditional right of state regulation and a matter that Congress expressly left to state law when it incorporated Federal Rule 17(b) into the Bankruptcy Code through Bankruptcy Rule 7017.[87]

*Phar-Mor* is distinguishable from the matter at hand.  Section 18-607(c) is not a nonclaim statute that determines a member's capacity to be sued in a manner implicating Federal Rule 17(b) like the Ohio statute in *Phar-Mor*.  Federal Rule 17(b) "sets forth the rules for determining the capacity of a party to sue or be sued in the federal courts."[88]  "[C]apacity is conceived to be a party's personal right to litigate in a federal court."[89]  It "has been defined as a party's personal

---

[79] Federal Rule 17(b) provides in part that:

> Capacity to sue or be sued is determined as follows:  (1) for an individual who is not acting in a representative capacity, by the law of the individual's domicile; (2) for a corporation, by the law under which it was organized; and (3) for all other parties, by the law of the state where the court is located . . . ."

[80] *Phar-Mor*, 178 B.R. at 696.

[81] *Id.* at 697.

[82] *Id.* at 694-95.

[83] *Id.* at 695.

[84] *Id.* at 695-96.

[85] *Id.* at 696.

[86] *Id.*

[87] *Id.*

[88] 6A FED. PRAC. & PROC. CIV. § 1559 (3d ed.).

[89] *Id.* § 1542.

right to come into court and should not be confused with the question of whether a party has an enforceable right or interest[.]"[90] It deals "with the personal qualifications of a party to litigation" and is "not dependent on the character of the specific claim involved in the litigation."[91]

The Ohio nonclaim statute at issue in *Phar-Mor* eliminated a decedent's capacity to be sued if a claim was not presented within one year of the death.[92] It expressly implicated Federal Rule 17(b) as it was not dependent on the cause of action asserted but rather eliminated a decedent-estate's capacity after a selected time-period. Many courts recognize that there is a significant interest in respecting state law governing an estate's capacity to be sued. "Long-standing precedent recognizes that federal claims against decedents' estates are subject to state probate laws and procedures, unless federal law specifically provides otherwise."[93] Those laws, similar to bankruptcy bar dates, aim to provide "certainty and promptness in the settlement and distribution of decedent's estates."[94] As has been observed by the Third Circuit, statutes that would act to expand the time to assert claims against a decedent's estate pose a significant risk of unsettling fully-administered estates and creating havoc when a judgment obtained is attempted to be collected from beneficiaries who already received their distribution from the estate.[95]

The same policies underlying probate nonclaim statutes support other nonclaim statutes, such as those governing suits against dissolved corporate entities. These too go to capacity and have prevailed in preemption questions. For instance, in determining that CERCLA did not preempt a California statute barring suit against a dissolved corporation, the Ninth Circuit in *Levin Metals Corp. v. Parr-Richmond Terminal Co.* focused in on and rejected the plaintiff's

---

[90] *Id.* § 1559; *see also De Franco v. United States*, 18 F.R.D. 156, 159 (S.D. Cal. 1955) (citing *Magee v. McNany*, 10 F.R.D. 5, 11 (W.D. Pa. 1950)); *United States v. Ass'n of Am. R.Rs.*, 4 F.R.D. 510, 517 (D. Neb. 1945)).

[91] 6A FED. PRAC. & PROC. CIV. § 1559.

[92] *Phar-Mor*, 178 B.R. at 694.

[93] *Witco*, 38 F.3d at 689. In reaching its conclusion, the court in *Phar-Mor* relied upon the Third Circuit's decision in *Witco* that addressed a conflict between a three year statute of limitations provided for in the Comprehensive Environmental Response Contamination and Liability Act (CERCLA) and a Delaware probate statute that required all claims arising before the death of a decedent to be presented within eight months of death. 38 F.3d at 684. In the underlying action, a corporate owner of contaminated property sought contribution against a decedents' estate. *Id.* at 686. The action was filed after the deadline for submitting claims against the estate. *Id.* The court determined that Delaware probate law preempted the CERLCA statute of limitations and granted summary judgment for the estate. *Id.* at 684. In doing so, the court determined that "a state's interest in the prompt settlement of its citizens' estates is particularly strong." *Id.* at 688-89. It further determined that nothing in CERCLA intended to impose liability on the estates of the statute's classes of responsible parties in a manner contrary to state probate law and procedures and that state capacity statutes, like the Delaware nonclaim statute at issue, were incorporated into CERCLA through the applicable of Federal Rule 17(b). *Id.* at 689-90.

[94] *Id.* at 690.

[95] *Id.* ("[I]n order to collect the judgment, the money in the estate must be traced and retrieved subject to the applicable defenses. The possibility of a CERCLA claim arising long after the settlement of the estate would hang as a dark cloud over any such settlement, thereby comprising the goals of certainty and promptness in the settlement and distribution of decedent's estates.").

characterization of the state statute as one that simply limited the imposition of liability against the corporation.[96]   Rather, the court found that the dissolution statute determined a California corporation's capacity to be sued and did not stand as an obstacle to the purposes of CERCLA.[97] Other Courts of Appeals confronted with similar questions have concluded that federal law should not preempt state nonclaim statutes limiting a party's capacity to be sued.[98]

Statutes of reposes are slightly, but notably, distinct from nonclaim statutes.  They create a substantive right to be free from liability related to specific wrongful actions[99] but do not determine capacity.[100]  Like statutes of limitations, reposes "are mechanisms used to limit the temporal extent or duration of liability for tortious acts."[101]  They "put[] an outer limit on the right to bring a civil action . . . measured not from the date on which the claim accrues but instead from the last culpable act or omission of the defendant."[102]  The statute of repose found in section 18-607(c) demonstrates the distinction.  It imposes a temporal limit on liability related to distributions received by members of an LLC measured from the distribution date.[103]  "Like a discharge in bankruptcy, [it] can be said to provide a fresh start or freedom from liability."[104]  However, it does not address a member's ability to come into federal court to litigate or defend as a general matter under Federal Rule 17(b) like a nonclaim statute.

It is true, as Fund IV and BDCM point out, that the courts in the *Princeton* case and the like confronted state fraudulent transfer statutes of repose whereas this Court is presented with a repose established by the Act that is designed to regulate corporate affairs, an area of traditional state importance.  But that is a distinction without a difference for purposes of determining when a trustee must bring a section 544 claim given Congress's clear purpose in enacting section 546(a).[105]  Section 18-607(c), if applicable to DUFTA claims, truncates the state law time periods to assert such claims related to distributions to three years.  If not preempted by section 546(a), the statute of repose would significantly erode Congress's effort in enacting that provision to provide

---

[96] 817 F.2d 1448, 1451 (9th Cir. 1987).

[97] *Id.*

[98] *Marsh v. Rosenbloom*, 499 F.3d 165, 179 (2d Cir. 2007); *Onan Corp. v. Indus. Steel Corp.*, 770 F. Supp. 490, 494 (D. Minn. 1989), *aff'd,* 909 F.2d 511 (8th Cir.1990); *Witco* 38 F.3d at 690.

[99] *CTS Corp. v. Waldburger*, 573 U.S. 1, 9 (2014).

[100] *See Levin Metals*, 817 F.2d at 1451 (interpreting a California dissolution statute and explaining that the appellants' "preemption argument turns on its characterization of the California law here involved as law limiting imposition of *liability.*  A more accurate characterization is that the law determines *capacity* to be sued.") (emphasis in original)); *De Franco*, 18 F.R.D. at 159 (citing *Magee* 10 F.R.D. at 11).

[101] *CTS*, 573 U.S. at 7.

[102] *Id.* at 8.

[103] *See e.g.*, *A Commc'n Co. v. Bonutti*, 55 F. Supp. 3d 1119, 1126-27 (S.D. Ill. 2014) (describing section 18-607 and explaining that it "sets forth limitations on distributions from a limited liability company").

[104] *CTS*, 573 U.S. at 9.

[105] *See e.g.*, 1 RIBSTEIN AND KEATINGE ON LTD. LIAB. COS. § 7:9 Direct Liability ("Liability for wrongful distributions substantially duplicates fraudulent conveyance law.").

time to trustees to, among other things, identify valuable causes of action and pursue them for the benefit of all creditors. Given this conflict, section 18-607(c) of the Act must give way to section 546(a) of the Bankruptcy Code.

## 2.    The Section 546(e) Safe Harbor

The Section 546(e) Safe Harbor limits the Trustee's avoidance powers. It provides, in relevant part, that:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid . . . a transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract, as defined in section 741(7), . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.[106]

Fund IV and BDCM contend that the Distribution is shielded from avoidance under this provision because it (1) was a transfer, (2) made by or to a financial institution, (3) in connection with a securities contract. The Trustee has not disputed that the Distribution is a qualifying transfer. He takes issue with the latter two elements. Because the Court concludes that there are questions of fact as to whether the Distribution was made "in connection with a securities contract", the Court will not apply the Section 546(e) Safe Harbor at this stage and need not address the parties' arguments as to whether the Distribution was made by or to a financial institution.

In support of their position that the Distribution was made in connection with a securities contract, Fund IV and BDCM assert that it was made in connection with the Vinton Sale, which was governed by a sale and purchase agreement (the "Vinton Agreement") effectuating a transfer of Bayou Holdings' LLC membership units in BD Vinton LLC to Kyoei Steel.[107] Section 546(e) adopts the definition of "securities contract" set forth in section 741(7). Section 741(7)(A)(i) provides that a "securities contract" includes "a contract for the purchase, sale, or loan of a security". While the Bankruptcy Code's definition of "security" does not specifically include membership interests in an LLC, courts hold that these fall within the definition's broad category capturing a "claim or interest commonly known as 'security'[.]"[108]

---

[106] 11 U.S.C. § 546(e).

[107] *See* Adv. D.I. 29 (*Decl. of William J. Trunk*), Ex. 4 (Sale and Purchase Agreement by and between Bayou Steel BD Holdings, L.L.C. and Kyoei Steel America LLC dated as of December 20, 2016), Ex. 5 (Assignment of Membership Interests).

[108] 11 U.S.C. § 101(49)(A)(xiv); *see, e.g.*, *Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec., LLC*), 773 F.3d 411, 417 (2d Cir. 2014); *Lehman Bros. Holdings Inc v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 855 F.3d 459, 473 (2d Cir. 2017); *Boston Generating*, 617 B.R. at 485 ("LLC member units and warrants most certainly qualify as securities under the Bankruptcy Code's broad definition"); *O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*, 488 B.R. 394, 399 (B.A.P. 9th Cir. 2013) (membership interest in an LLC is a "security"); *SunEdison Litig. Tr.*

The Trustee does not argue that the Vinton Agreement fails to qualify as a securities contract. Rather, he contends that the Distribution was not made as part of the Vinton Sale or in connection with or pursuant to the Vinton Agreement, and that nothing alleged in the Complaint supports a contrary conclusion. Fund IV and BDCM, on the other hand, contend that "[t]he Complaint alleges that the Distribution was expressly contemplated by the" Vinton Sale and that "the Distribution was comprised, in part, [of] proceeds from that" sale.[109]

Fund IV and BDCM misconstrue the Complaint. It alleges that BDCM "compelled" the Debtors to make the Distribution approximately three months after the Vinton Sale closed.[110] The Complaint further describes internal conversations indicating that BDCM contemplated a distribution to itself prior to the Vinton Sale but that the Distribution was not finalized and approved until well after.[111] Moreover, as the Trustee points out, the Vinton Agreement does not reference a contemplated distribution, and nowhere does the Trustee allege that the Distribution was comprised of Vinton Sale proceeds. Rather, the Complaint alleges that the proceeds were used to pay down the Revolving Loan balance[112] and that the Distribution was later made out of borrowings made available under the Revolving Loan following the paydown.[113] Simply put, nothing in the Complaint supports BDCM's argument that the Distribution was expressly contemplated by the Vinton Sale and comprised of its proceeds.[114]

To satisfy the "in connection with" requirement of the Section 546(e) Safe Harbor, Fund IV and BDCM argue that there is "a low bar for the required relationship between the securities

---

*v. Seller Note, LLC (In re SunEdison, Inc.),* 620 B.R. 505, 515 (S.D.N.Y. 2020) ("LLC member units" "are securities").

[109] Adv. D.I. 28 at 17; Adv. D.I. 46 at 5.

[110] *Compare* Compl. ¶ 62 (asserting that the sale occurred on December 20, 2016), *with id.* ¶¶ 65, 69, 70 (alleging that the Distribution was made on March 17, 2017).

[111] *See id.* ¶ 67 (describing post-sale correspondence regarding the amount of a distribution, the effect of a distribution on cash flows, and BoA's approval); *id.* ¶ 68 (describing the amendment of the Revolving Loan permitting the payment of the Distribution); *id.* ¶¶ 72, 73 (describing cash flow concerns articulated by the Debtors' chief executive officer on March 16, 2017 after learning of the impending Distribution).

[112] *Id.* ¶¶ 62-63.

[113] *Id.* ¶ 96.

[114] *See, e.g., Boston Generating,* 617 B.R. at 486 (relying on transaction documents to determine that a challenged distribution was expressly contemplated as part of an integrated securities transaction); *Crescent Res. Litig. Tr. v. Duke Energy Corp.,* 500 B.R. 464, 471-76 (W.D. Tex. 2013) (applying similar reasoning to shield transfer under section 546(e)); *Buchwald Cap. Advisors, LLC v. Papas,* 584 B.R. 161, 172, 182-85 (E.D. Mich. 2018) (determining that the totality of circumstances, including governing transaction documents, supported a finding that dividend was made in connection with a note purchase agreement), *vacated and remanded on other grounds by* 765 Fed. Appx. 132 (6th Cir. 2019); *Lehman,* 469 B.R. at 442 (applying section 546(e) to dismiss certain avoidance claims where complaint stated that challenged collateral transfers were made "under" and "pursuant to" securities contracts despite allegations that transfers were excessive and not contractually required).

contract and the transfer sought to be avoided."[115]  Moreover, they argue that the transfer must merely be "related to" or "associated with" the contract, and that there is "no required language to connect agreements" and no "temporal or existential requirement" that must link a transfer and an agreement.[116]  Even so, the relationship between the Distribution and the Vinton Sale is not clear from the face of the Trustee's Complaint and requires further factual development.

## B.    Claims for Fraudulent Transfer – The BD Lien Grant

In Counts IV through VII, alleged against Fund IV and BDCF, the Trustee seeks to avoid the BD Lien Grant as an actual and constructive fraudulent transfer under the Bankruptcy Code and Delaware state law.[117]  Fund IV and BDCF argue that the Trustee has not asserted plausible claims.  The Court agrees.

### 1.    Constructive Fraudulent Transfer

In Counts V and VII, the Trustee seeks avoidance of the BD Lien Grant as a constructive fraudulent transfer pursuant to section 548(a)(1)(B) of the Bankruptcy Code and sections 1304(a)(2) and 1305(a) of DUFTA and section 544.  To state claims under these statutes, the Trustee must allege sufficient facts to reasonably support the conclusion that, among other things, the Debtors did not receive reasonably equivalent value in exchange for the obligation.[118]  To that

---

[115] *Madoff*, 773 F.3d at 422 (finding that customer withdrawals amounting to fictitious Ponzi scheme payments were related to, and associated with, investment advisory unit's contractual promise to transact securities using customer's deposited money and therefore "in connection with" a securities contract).

[116] *Id.*; *Lehman*, 469 B.R. at 442.

[117] The state law and Bankruptcy Code fraudulent transfer statutes are materially indistinguishable. Therefore, the Court will rely on case law from the Bankruptcy Court in its analysis.  *See In re Maxus Energy Corp.*, No. 16-11501 (CSS), 2022 WL 2240122, at *19 (Bankr. D. Del. June 22, 2022) (analyzing Delaware and Bankruptcy law explaining that they have "no material distinction"); *In re F-Squared Inv. Mgmt., LLC*, 633 B.R. 663, 670 (Bankr. D. Del. 2021) (stating that the relevant state law fraudulent transfer statute was "materially identical" to that of the Bankruptcy Code and explaining that the Court would not distinguish between the two); *Stanziale v. Brown-Minneapolis Tank ULC, LLC (In re BMT-NW Acquisition, LLC)*, 582 B.R. 846, 856 (Bankr. D. Del. 2018) (finding that a fraudulent transfer under 6 Del. C. § 1304 is the "Delaware state law equivalent of 11 U.S.C. § 548" as the "two statutes contain equivalent substantive requirements."); *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 567 (Bankr. D. Del. 2012) ("It is undisputed that the Delaware . . . Fraudulent Transfer Acts track section 548 of the Bankruptcy Code (or vice versa)").

[118] 11 U.S.C. § 548(a)(1)(B) provides, in pertinent part, that "[t]he trustee may avoid any transfer . . . of an interest of the debtor in property, or an obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the [petition date] . . . if the debtor . . . received less than a reasonably equivalent value in exchange for such transfer or obligation" and was or became insolvent as a result of such transfer or obligation, had unreasonably small capital, or intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.  6 DEL. C. §§ 1304(a)(2) and 1305(a) are similar.  *See* 6 DEL. C. § 1304(a)(2) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . (2) [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor

end, the Trustee alleges that the BD Lien Grant was in derogation of the Directors' fiduciary duties because it secured capital infusions necessary only because of the prior Distribution.[119]  Even if the Court assumes that this allegation is true however, it does not reasonably support the conclusion that the Debtors failed to receive reasonably equivalent value.

The Bankruptcy Code does not define "reasonably equivalent value," and courts "have rejected the application of any fixed mathematical formula to determine reasonable equivalence."[120]  Rather, the Third Circuit employs a "common sense" approach and has held that "a party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave."[121]  In conducting this analysis, a totality of the circumstances may be examined.[122]  Relevant circumstances include the market value of the transfer, whether the parties dealt at arm's length, and whether the transferor acted in good faith.[123]

The Trustee alleges that Fund IV lent $33 million by way of the BD Term Loan to provide additional capital at a time when the Debtors were experiencing a severe liquidity crisis.[124]  He acknowledges that the BD Lien Grant secures the Debtors' outstanding obligations under the BD Term Loan.[125]  He does not allege that it provides anything more than the right to receive the amount owed on account of the BD Term Loan.[126]  Furthermore, no facts are alleged to reasonably suggest that the value received by the Debtors in return for the BD Lien Grant was less than the value of the BD Lien Grant.  Thus, because the Debtors received the same value from Fund IV

---

were unreasonably small in relation to the business or transaction; or . . . [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."); *see id.* § 1305(a) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.").

[119] Compl. ¶¶ 186, 197.

[120] *Off. Comm. of Unsecured Creditors of Fedders N. Am., Inc., v. Goldman Sachs Credit Partners L.P. (In re Fedders North America, Inc.)*, 405 B.R. 527, 546 (Bankr. D. Del. 2009).

[121] *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (internal quotation marks omitted); *see also Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212 (3d Cir. 2006) (analyzing the value surrendered and gained as a result of a transfer to determine "whether the debtor got roughly the value it gave.").

[122] *In re SRC Liquidation LLC*, 581 B.R. 78, 97 (D. Del. 2017), aff'd, 765 F. App'x 726 (3d Cir. 2019).

[123] *Mellon Bank, N.A. v. Off. Comm. of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 153 (3d Cir. 1996).

[124] Compl. ¶¶ 114-125.

[125] *Id.* ¶¶ 117-121.

[126] It is alleged that the BD Term Loan was subject to a 12% paid-in-kind interest rate that accrued quarterly and was added to principal.  *Id.* at ¶ 127. The Trustee however makes no allegations that the interest rate was excessive or otherwise unreasonable.

and BDCF (*i.e.* the new money loans) as they gave in exchange (*i.e.* the challenged lien securing the debt),[127] reasonably equivalent value was given under the facts alleged.[128]  Indeed, as explained by one bankruptcy court, it is "easy to understand why the loan of new monies . . . constitutes reasonably equivalent value" because when the debtor receives new financing, it receives "significant value in the form of new cash," while the "debtor's net worth remains unaltered."[129]

The Trustee does not offer any facts to contradict the value exchange.  He focuses on the alleged reason underlying the necessity for the BD Term Loan and BD Lien Grant (*i.e.* the prior Distribution and its negative effect on the financial strength of the Debtors).  He argues that this is a relevant factor in assessing reasonably equivalent value because it indicates that the BD Term Loan and BD Lien Grant were not at arm's-length and lacked good faith.[130]  Because these are two relevant factors of the totality of circumstances test, he argues that the claims should not be dismissed.  In support he cites several cases that declined to adopt a *per se* rule that transfers to secure a new or antecedent debt constitute reasonably equivalent value but instead opted to develop the factual record to determine the value exchanged.

In dismissing the Trustee's constructive fraudulent transfer claims related to the BD Lien Grant, the Court is not adopting a *per se* rule.  Rather, as the case law explains, the appropriate analysis to determine reasonably equivalent value requires the Court to identify what the Debtors received from Fund IV and BDCF for the BD Lien Grant and determine the value of the exchange.

---

[127] *Johnson v. First Nat'l Bank*, 81 B.R. 87, 89 (Bankr. N.D. Fla. 1987) ("The extent of the interest transferred is only the amount of the loan secured by the mortgage, not the value of the property encumbered"); *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 329 n.69 (Bankr. S.D.N.Y. 2001); *Pheifer v. Hudson Valley Bank (In re Pfeifer)*, No. 12-13852 (ALG), 2013 WL 3828509, at *4 (Bankr. S.D.N.Y. July 23, 2013) (explaining that a grant of collateral does not "expand the amount of a creditor's debt and only priorities the payment of the debt from specific assets.").

[128] *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991) ("The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred.").

[129] *Stillwater Nat'l Bank & Trust Co. v. Kirtley (In re Solomon)*, 300 B.R. 57, 66 (Bankr. N.D. Okla. 2003); *see also Fedders*, 405 B.R. at 547 (holding that a complaint failed to state a claim for constructive fraud when it pled that the debtors received a term loan in exchange for a security interest, fees, and expenses); *Off. Comm. of Unsecured Creditors v. Hancock Park Cap. II, L.P. (In re Fitness Holdings Int'l, Inc.)*, 529 F. App'x 871, 874 (9th Cir. 2013) ("Because the complaint alleges that Fitness Holding granted Pacific Western the security interest in exchange for a $25 million loan, and does not allege that the value of the security interest exceeded the value of the loan, the trustee failed to plausibly allege that the security interest was given for less than reasonably equivalent value"); *Geron v. Palladin Overseas Fund, Ltd. (In re Applied Theory Corp.)*, 323 B.R. 838, 841 (Bankr. S.D.N.Y. 2005) (determining that security interest granted by a debtor to its lenders to secure a prior indebtedness for monies loaned did not lack reasonably equivalent value); *In re Pardo v. Gonzaba, M.D. (In re APF Co.)*, 308 B.R. 183, 186-87 (Bankr. D. Del. 2004) (dismissing constructive fraudulent transfer claim where debtor simply paid down existing note obligations); *Smokey's Bar-B-Que v. Horner (In re Kelley)*, 7 B.R. 384, 389 (Bankr. D.S.D. 1980) (determining that a security interest granted when money was lent but not perfected until later was reasonably equivalent value).

[130] The Trustee also argues that the BD Lien Grant elevated Fund IV and BDCF over other creditors of the Debtors.  This argument is unpersuasive for the reasons explained in Section IV.B.2.

The totality of the circumstances test is a tool to do so.[131]  However, it is to be employed when there is a question of value.[132]  And here value is not reasonably in question.  Regardless of the effect of the Distribution, the allegations of the Complaint establish that the consideration received by the Debtors on account of the BD Term Loan was reasonably equivalent to the value of the BD Lien Grant.  A lack of good faith or failure to transact at arms'-length cannot affect this math.  Indeed, the Court is unaware of any case in which a transfer otherwise for reasonable equivalent value was transformed into one that was lacking because it was not arms-length or made in bad faith.  If that is the Trustee's contention, he cites no cases to support such a result.

The relevant cases cited by the Trustee declined to dismiss constructive fraudulent transfer claims against lenders that received debtor-assets because they presented factual disputes as to value.[133]  For instance, the Trustee cites *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs.)*.[134]  In *Exide*, the bankruptcy court denied a request to dismiss a constructive fraudulent transfer claim that challenged multiple prepetition guarantees, pledges, and security interests granted to the debtors' lenders in exchange for funding, financial covenant suspensions, and forbearance.[135]  The court declined to adopt a *per se* rule that transfers to secure new or antecedent debt constitute reasonably equivalent value.[136]  There were allegations that several of the guarantees and pledges were granted by debtors who did not have borrowing rights under the credit facility and that some of the consideration given to the lenders was in exchange for intangible benefits and antecedent debt.[137]  Given the uncertainty regarding the value the debtors received in exchange for the value they transferred to the lenders, the claims as alleged withstood dismissal.  For similar reasons, in *EPLG I, LLC v. Citibank, N.A. (In re Qimonda Richmond, LLC)*, the bankruptcy court allowed a constructive fraudulent transfer claim to continue where the trustee alleged that a pledge given to a letter of credit issuer to secure the debtors' already secured reimbursement obligations and then a later cash deposit given to allow for such reimbursement were gratuitous.[138]

---

[131] *Fruehauf*, 444 F.3d at 212 ("the 'totality of the circumstances' is considered in determining whether the values surrendered and gained as a result of the transfer are reasonably equivalent.").

[132] *See, e.g.*, *id.* at 211-12 (considering the totality of circumstances to determine whether the debtor got roughly the value it gave when its rights to a surplus generated by a pension benefit plan were decreased); *R.M.L.*, 92 F.3d at 148 (weighing the totality of circumstances to determine whether a commitment letter issued in connection with a $53 million loan conferred reasonably equivalent value in exchange for $515,000 in fees); *Emerald Cap. Advisors Corp. v. Bayerische Motoren Werke Aktiengesellschaft (In re FAH Liquidation Corp.)*, No. 17-160, 2018 WL 2793944, at *5 (D. Del. June 11, 2018) (explaining that a dollar-for-dollar extinguishment of a debt "does not create a genuine doubt that Trustee may test reasonably equivalent value through discovery" whereas allegations of contractual non-performance by a non-debtor transferee do).

[133] *See* Adv. D.I. 35 at 24-25.

[134] 299 B.R. 732 (Bankr. D. Del. 2003).

[135] *Id.* at 735-36, 746-48.

[136] *Id.* at 748.

[137] *Id.* at 735-36, 746-48.

[138] 467 B.R 318, 326-27 (Bankr. D. Del. 2012).  The Trustee's other cases are also unpersuasive.  *See Solomon*, 300 B.R. at 64-68 (avoiding mortgages that expanded a bank's collateral and control positions

Contrast these cases, however, with *Gellert v. Coltec Indus., Inc. (In re Crucible Materials Corp.)*.[139]   The court dismissed claims seeking to avoid a payment satisfying outstanding bond obligations as constructively fraudulent.[140]   In doing so, the court explained that "[w]hen the transfer to a creditor is in dollar-for-dollar satisfaction of an antecedent debt, there can be no claim for constructive fraudulent transfer.  . . . .  This is because the goal of fraudulent transfer law is the preservation of the estate against diminution and a payment which reduces a debt dollar-for-dollar does not diminish the estate."[141]   Analogous circumstances are presented here.

The Complaint therefore fails to sufficiently allege that the BD Lien Grant was a constructive fraudulent transfer and Counts V and VII must be dismissed.  Nonetheless, the Court will grant the Trustee leave to amend.  Federal Rule 15(a) provides that "[t]he court should freely give leave [to amend] when justice so requires."[142]   Amendments are left to the discretion of the Court.[143]   Among the grounds that could justify a denial of leave to amend are:  (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies by amendments previously allowed; (4) undue prejudice to the opposing party by virtue of allowing the amendment; and (5) futility.[144]   None of these factors appear present here.

### 2.    Actual Fraudulent Transfer

In Counts IV and VI, the Trustee seeks avoidance of the BD Lien Grant as an actual fraudulent transfer pursuant to section 548(a)(1)(A) of the Bankruptcy Code, section 1304(a)(1) of the DUFTA, and section 544 of the Bankruptcy Code.  These provisions allow the Trustee to avoid the BD Lien Grant if it was incurred by the Debtors "with actual intent to hinder, delay, or defraud" a creditor.[145]   The Trustee contends avoidance of the BD Lien Grant as an actual

---

for a short forbearance and other unquantifiable benefits that did not constitute reasonably equivalent value); *Miller v. Greenwich Cap. Fin. Prods., Inc. (In re Am. Bus. Fin. Servs., Inc.)*, 361 BR. 747, 760 (acknowledging defendant's argument that a transfer on account of an antecedent debt may be an exchange of value but noting that it is not necessarily an exchange of reasonably equivalent value); *FAH*, No. 17-160, 2018 WL 2793944, at *5 (refusing to dismiss a constructive fraudulent transfer claim where contract counterparty allegedly failed to perform under a contract but still received payments from the debtors).

[139] No. 11-53884, 2012 WL 5360945 (Bankr. D. Del. Oct. 31, 2012).

[140] *Id.* at *8.

[141] *Id.*; *see also supra* note 129.

[142] FED. R. CIV. P. 15(a).

[143] *See Dole v. Arco Chem. Co.*, 921, F.2d 484, 486 (3d Cir. 1990).

[144] *Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).

[145] 11 U.S.C. § 548(a)(1)(A) provides that "[t]he trustee may avoid any transfer . . . of an interest of the debtor in property, or an obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the [petition date] . . . if the debtor . . . made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud . . . " a creditor.  6 DEL. C. § 1304(a)(1) provides that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay or defraud any creditor of the debtor . . . ."

fraudulent transfer is warranted because it was motivated by an intention to elevate the Black Diamond Entities over other creditors in advance of the Debtors' bankruptcy.[146]  As further support, the Trustee points the Court to the Complaint's allegations that Fund IV and BDCF are insiders of the Debtors and that the BD Lien Grant was incurred for less than reasonably equivalent value while the Debtors were insolvent, undercapitalized, or otherwise in poor financial condition.[147]  In urging the Court to dismiss these counts, Fund IV and BDCF argue that these assertions do not sufficiently support a reasonable inference of actual fraud.  The Court concurs.

To start, the Complaint's allegations do not support the contention that the Debtors secured the BD Term Loan by way of the BD Lien Grant to elevate Fund IV and BDCF at the expense of the Debtors' creditors.  The Trustee acknowledges that Fund IV extended the BD Term Loan to provide additional capital at a time when the Debtors were experiencing a severe liquidity crisis.[148]  The BD Term Loan was secured by the BD Lien Grant but subordinated to the BoA Revolving Loan.[149]  BoA consented.[150]  Interest was paid-in-kind, accrued quarterly, and added to the principal amount outstanding.[151]  The Debtors were not required to make any payments on the loan prior to its maturity.[152]  The initial $15 million commitment of the BD Term Loan was increased two times as the Debtors exhausted their borrowing, did not repay, and interest compounded.[153]

These facts negate the contention that the BD Lien Grant was designed to elevate Fund IV and BDCF and "hinder, delay, or defraud" creditors.  Rather than elevating, the new money loan did the opposite.  It rendered Fund IV and BDCF creditors of the Debtors and exposed them to a substantial known risk of nonpayment given the loan's subordinated nature and the company's historical underperformance and current financial stress.[154]  Even if the cash infusion was necessitated by the earlier Distribution as the Trustee has argued, there are no facts to suggest that Fund IV was required to lend the additional funds to the Debtors, let alone on an unsecured basis.  And, as already explored, there are no allegations that the BD Lien Grant secured more than the amounts borrowed and outstanding under the BD Term Loan or was otherwise given for less than reasonably equivalent value.[155]  The facts suggest that Fund IV and BDCF were trying to

---

[146] Compl. ¶ 192.

[147] Id. ¶¶ 132, 186-87.

[148] Id. ¶¶ 114-16.

[149] Id. ¶ 121.

[150] Id.

[151] Id. ¶ 127.

[152] Id. ¶ 128.

[153] Id. ¶¶ 122-29.

[154] Id. ¶ 133 ("Given Debtors' poor financial condition, the Black Diamond Entities knew when it made the BD Term Loan (and caused the Debtors to make the BD Lien Grant) that the Debtors had no ability to repay even the initial loan amount, much less the increased borrowings provided for in the amended loan documents.").

[155] See, e.g., In re N. Merch., Inc., 371 F.3d 1056, 1059 (9th Cir. 2004) (stating that the "primary focus of Section 548 is on the net effect of the transaction on the debtor's estate"); Fitness Holdings, 529 F. App'x at 874 ("We cannot reasonably infer that Fitness Holdings was attempting to 'hinder, delay, or defraud' its

improve the Debtors' liquidity position and by extension, creditors' chances of repayment. Indeed, the Debtors did not file for bankruptcy until almost two years following the BD Term Loan.

The Trustee also points the Court to several other facts in the Complaint as circumstantial evidence of fraudulent intent – the insider status of Fund IV and BDCF and the Debtors' poor financial condition. However, while these are traditionally relied upon by courts as two of the "badges of fraud" that can support a finding of actual fraud,[156] they alone fail to support even a speculation of it under the circumstances present.[157] As Fund IV and BDCF highlight, insiders are likely lender candidates for a distressed entity in need of financing. Therefore, permitting a claim to advance that rests on insider status and financial distress alone would discourage rescue financing to the detriment of borrowers with limited options like the Debtors.[158]

For Counts IV and VI to survive a motion to dismiss, the Trustee must "do more" than identify the alleged fraudulent transfer.[159] He must plead facts that allow the Court to "reasonably infer actual fraud."[160] He has failed to do so with respect to the BD Lien Grant and, accordingly, the Court will dismiss Counts IV and VI with leave to amend.

---

creditors . . . simply because it took secured debt to replace unsecured debt; borrowers regularly give security interests to obtain financing."); *Agin v. Grasso (In re Luciani)*, 584 B.R. 449, 459 (Bankr. D. Mass. 2018) (dismissing actual fraudulent transfer claim where the challenged mortgage was supported by reasonably equivalent value and thus "neutral in terms of creditors' ability to collect their debts").

[156] *Fedders*, 405 B.R. at 545 ("Because direct evidence of fraudulent intent is often unavailable, courts usually rely on circumstantial evidence to infer fraudulent intent.").

[157] *Luciani*, 584 B.R. at 462 ("While transactions involving insiders are subject to greater scrutiny than those that are arms length, not every transfer among parents and children can withstand a motion to dismiss without sufficient facts to raise a right to relief above the speculative level."); *see Off. Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat. Amusements, Inc. (In re Midway Games, Inc.)*, 428 B.R. 303, 325 (Bankr. D. Del. 2010) (dismissing actual fraudulent transfer claim despite payments made to controlling shareholder); *Kaye v. Nath Cos., Inc. (In re Duke & King Acquisition Corp.)*, 508 B.R. 107, 140 (Bankr. D. Minn. 2014) (presence of three badges, including transfer to insider and insolvency, "did not ignite in common to the inference" of actual fraud; "it did not even smolder"); *Goodman v. H.I.G. Cap., LLC (In re Gulf Fleet Holdings, Inc.)*, 491 B.R. 747, 767-68 (W.D. La. 2013).

[158] *See, e.g.*, *Fairchild Dornier GMBH v. Off. Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 234 (4th Cir. 2006) ("We think it important to note that a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim. In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans. However, when other factors indicate that the transaction is not a loan at all, recharacterization is appropriate to ensure the consistent application of the Bankruptcy Code."); *see also In re Miller v. ANConnect, LLC (Our Alchemy, LLC)*, No. 16-11596 (KG), 2019 WL 4447535, at *10 (Bankr. D. Del. Sept. 16, 2019) ("For struggling businesses, an insider is often the only party willing to lend")

[159] *Walker v. Sonafi Pasteur a/k/a Aventis (In re Aphton Corp.)*, 423 B.R. 76, 85 (Bankr. D. Del. 2010).

[160] *Miller v. Bradley (In re W.J. Bradley Mortg. Cap., LLC)*, 598 B.R. 150, 169 (Bankr. D. Del. 2019); *Our Alchemy*, No. 16-11596 (KG), 2019 WL 4447535, at *11.

### C.    Claim for Unjust Enrichment

Count XIII is the Trustee's unjust enrichment claim against the Black Diamond Entities for the Distribution and the BD Lien Grant.  Under Delaware law, unjust enrichment is "the unjust retention of a benefit to the loss of another."[161]  The elements include: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[162]

With regard to the BD Lien Grant, the Trustee alleges that Fund IV and BDCF unjustly retained the benefit of a security interest on substantially all of the Debtors' assets.  Fund IV and BCDF move to dismiss the claim, arguing that Debtors received access to the BD Term Loan of equal value to the BD Lien Grant and therefore no "benefit" could have come at the Debtors' "expense."  The Court agrees.  As alleged, the Debtors received much-needed liquidity in exchange for a lien on their assets.  Therefore, there is no factual support for the Trustee's "enrichment" conclusion and the claim will be dismissed with leave to amend.

With regard to the Distribution, the Trustee alleges that Fund IV and BDCM "received all or a portion of the Distribution" that conferred a benefit on them "which has been unjustly retained at the expense of the Debtors' estates."[163]  Fund IV and BDCM argue that the claim cannot stand because the Distribution was governed by the LLC Agreements, eliminating the Trustee's right to pursue an unjust enrichment claim.[164]  The Court agrees that the agreements, whose existence and enforcement are not at issue, govern the Distribution.[165]  Specifically, Bayou Holdings' LLC Agreement provides that "[t]he Company shall distribute Distributable Assets[166] only at such times and in such amounts as is determined by the Board in its sole discretion (and all such Distributable Assets contemplated by this [section] shall be valued by the Board in its discretion for the purposes of distributions hereunder)."[167]  Bayou Investment and BD LaPlace's LLC Agreements provide that "[s]ubject to Section 18-607 of the Act, the Manager may from time to time declare, and the Company may pay, such distributions or dividends as the Manager may determine in its sole

---

[161] *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988).

[162] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[163] Compl. ¶ 201.

[164] Fund IV and BDCM also argue that the Court should dismiss the unjust enrichment claim because it is based on the same facts as the Trustee's fraudulent transfer claims and therefore must fail if the Court determines that the transfers are protected by section 546(e).  The Court has not yet made that determination, so this argument is premature.

[165] Adv. D.I. 26, Ex. C ("Bayou Holdings LLC Agreement") § 5.4(a)); *Id.*, Ex. A ("Bayou Investment LLC Agreement") § 5.1; *Id.*, Ex. B ("BD LaPlace LLC Agreement") § 5.2.

[166] "Distributable Assets" is defined as "with respect to any fiscal year or other period, all proceeds and cash receipts (including from any operating, investing, and financing activities) and other assets of the Company from any and all sources (excluding Capital Contributions), reduced by operating expenses, contributions of capital to Subsidiaries, investments and payments required to be made in connection with any loan to the Company and any reserve for contingencies or escrow required, in the judgment of the Board acting in good faith."  *See* Bayou Holdings LLC Agreement, Ex. B at B-4.

[167] Bayou Holdings LLC Agreement § 5.4(a).

discretion."[168]  Unjust enrichment was developed "as a theory of recovery to remedy the absence of a formal contract."[169]   In this way, a party cannot seek recovery under an unjust enrichment theory when an enforceable contract "is the measure of [the] plaintiff's right."[170]   Accordingly, the claim with respect to the Distribution will be dismissed without leave to amend.[171]

### D.    Claim for Breach of Fiduciary Duty

Count IX seeks to recover damages from the Director Defendants for alleged breaches of fiduciary duties of care and loyalty owed to the Debtors.  In particular, the Trustee alleges that the Director Defendants breached their duties by (a) causing the Debtors to make the Distribution; (b) structuring the cash infusions extended under the BD Term Loan as secured debt rather than equity investments; (c) elevating the interests of the Black Diamond Entities over those of the Debtors and; (d) failing to be fully informed and/or to take actions to prevent Debtors from paying the Distribution and granting the BD Lien Grant.[172]

The Director Defendants argue that the claims must be dismissed because the Trustee fails to allege them on a company-by-company basis and director-by-director basis.  The Court agrees.  The Trustee treats the Debtors as a singular entity rather than three different LLCs, with three different governing agreements and distinct possible injuries.  He makes no effort to separate the specific debtor entities, the specific duties of the Director Defendants to each entity, and the specific actions taken by the Director Defendants in violation of their alleged duties owed to each entity.  Indeed, the Trustee admits that the Complaint alleges breaches and harm collectively rather than attempting to parse through each Debtor.[173]

---

[168] Bayou Investment LLC Agreement § 5.1; BD LaPlace LLC Agreement § 5.1.

[169] *Bakerman v. Sidney Frank Importing Co.*, No. CIV.A. 1844-N, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006) (citing *ID Biomedical Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *15 (Del. Ch. Mar.16, 1995)).

[170] *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979) ("Because the contract is the measure of plaintiffs' right, there can be no recovery under an unjust enrichment theory independent of it."); *see Chrysler Corp. v. Airtemp Corp.*, 426 A.2d 845, 854 (Del. Super. Ct. 1980).

[171] In assessing "futility" for purposes of amendments, a court applies the same standard of legal sufficiency under Federal Rule 12(b)(6) and may properly deny leave to amend where the amendment would not withstand a motion to dismiss. *Burlington*, 114 F.3d at 1434; *Stanziale v. Richards, Layton & Finger, P.A. (In re EP Liquidation, LLC)*, 583 B.R. 304, 313 (Bankr. D. Del. 2018); *Charys Liquidating Trust v. Hades Advisors, LLC (In re Charys Holding Co., Inc.)*, 443 B.R. 638, 643 (Bankr. D. Del. 2011).

[172] Compl. ¶ 208.

[173] Adv. D.I. 35 at 30 (contending that structuring the Complaint in such a fashion "makes sense given all three Debtors were driving into bankruptcy as a result of the events described in the Complaint" and that the "Debtors operated in an intertwined manner").

To state a claim for breach of fiduciary duty under Delaware law, a complaint must plausibly allege that the directors owed a fiduciary duty and that they breached it.[174] Delaware embraces and protects corporate separateness unless exceptional circumstances are present.[175] "Liability is assessed on a director-by-director and company-by-company basis."[176] "The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director."[177] As has been observed, "in the alternative entity context, it is frequently impossible to decide fiduciary duty claims without close examination and interpretation of the governing instrument of the entity giving rise to what would be, under default law, a fiduciary relationship."[178] Accordingly, Count IX requires more specificity via an amendment.

Notwithstanding, a close read of the Complaint reveals that amending the claims for breach of fiduciary duty owed to BD LaPlace and Bayou Investment is futile. BD LaPlace allegedly made the Distribution[179] and is allegedly the "Borrower" on the BD Term Loan[180] and grantor of security interests in its assets pursuant to the BD Lien Grant.[181] Bayou Investment did not make the Distribution, but the Complaint alleges that it was a "Guarantor" of the BD Term Loan[182] and that its assets are also subject to the BD Lien Grant.[183] With respect to the businesses and affairs of these entities, both the BD LaPlace LLC Agreement and the Bayou Investment LLC Agreement exclusively vest management in Bayou Holdings as their manager.[184] In turn, the Bayou Holdings'

[174] *Our Alchemy*, No. 16-11596, 2019 WL 4447541, at *10 (citing *Beskrone v. OpenGate Cap. Grp. (In re PennySaver USA Publ'g, LLC*), 587 B.R. 445, 463-64 (Bankr. D. Del. 2018)); *see also Estate of Eller v. Barton*, 31 A.3d 895, 897 (Del. 2011).

[175] *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 714 (Del. Ch. 2021).

[176] *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 252 (Del. Ch. 2014); *Off. Comm. of Unsecured Creditors of HH Liquidation v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R, 211, 274 (Bankr. D. Del. 2018).

[177] *In re Emerging Commc'ns, Inc. S'holders Litig.,* 2004 WL 1305745, at *38 (Del. Ch. June 4, 2004); *accord Venhill Ltd. P'ship ex rel. Stallkamp v. Hillman,* 2008 WL 2270488, at *23 (Del. Ch. June 3, 2008); *see also In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1182 (Del. 2015) ("this Court and the Court of Chancery have emphasized that each director has a right to be considered individually when the directors face claims for damages in a suit challenging board action.").

[178] *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.3d 1146, 1149-50 (Del. Ch. 2006).

[179] Compl. ¶ 69.

[180] *Id.* ¶¶ 117-18.

[181] *Id.* ¶ 119.

[182] *Id.* ¶ 118.

[183] *Id.* ¶ 119.

[184] *See* Bayou Investment LLC Agreement § 4.1(a) (vesting all management in BD Long Products as its sole "Manager"); BD LaPlace LLC Agreement § 4.1(a) (same); *see also* Bayou Holdings LLC Agreement at 1 (stating that BD Long Products, LLC changed its name on April 6, 2016 to Bayou Holdings). The arguments of all parties rely on the Debtors' LLC agreements attached to the Independent Directors' dismissal briefing, and they are integral to the Complaint's claims. Accordingly, the Court can consider them in rendering its decision. *W.J. Bradley*, 598 B.R. at 166 ("It would be judicially uneconomic for the

LLC Agreement vests management in its Board of Directors to the fullest extent permitted by Delaware law and subject to the ultimate control and authority of the "Class A Members" and the terms of LLC Agreement.[185]

The Trustee does not specifically allege that the Director Defendants served on Bayou Holdings' Board of Directors. He asserts that, collectively, the "Debtors" maintained a five-member Board of Directors.[186] Defendants Farahnak and Raygorodetsky are alleged Managing Directors of BDCM and members of the Board of Directors from April 2016 until September 30, 2019.[187] The remaining individual defendants – Messrs. Archambault, Taft and Unfried – are alleged to have served as independent members of the Board of Directors from May 2016 (Unfried) and September 2016 (Archambault and Taft) through the Petition Date.[188] Accepting all factual allegations as true and construing them in a light most favorable to the Trustee, the Court infers that the Director Defendants served on Bayou Holdings' Board of Directors as opposed to what the Trustee collectively refers to as the "Debtors' Board of Directors".

These Director Defendants, however, cannot be held liable for any breach of fiduciary duty for their decisions and actions on behalf of BD LaPlace and Bayou Investment related to the Distribution, the BD Term Loan, and the BD Lien Grant (as applicable) because section 9.3 of the BD LaPlace and Bayou Investment LLC Agreements provides them with exculpation against such liability. Section 9.3 states that "[n]o member or Manager shall be liable for breach of any duty (including any fiduciary duty) provided for in the Act or otherwise, other than to the extent not permitted to be eliminated under the Act."

"The manager of a Delaware limited liability company owes the traditional fiduciary duties of loyalty and care to its members unless the LLC agreement provides otherwise."[189] Delaware LLCs "are creatures of contract, 'designed to afford the maximum amount of freedom of contract, private ordering and flexibility to the parties involved.'"[190] As set forth in section 18-1101(b) of the Act, it "is the policy of [the Act] to give the maximum effect" to this freedom "and to the enforceability of limited liability company agreements."[191] To this end, section 18-1101(c) of the

---

Court to consider the Trustee's breach of fiduciary duty claims without considering the Operating Agreement.").

[185] Bayou Holdings LLC Agreement § 3.1(a).

[186] *See, e.g.*, Compl. ¶¶ 20-21.

[187] *Id.* ¶¶ 20-21, 52.

[188] *Id.* ¶¶ 22-24, 53.

[189] *Glick v. KF Pecksland LLC*, No. 12624-CB, 2017 WL 5514360, at *19 (Del. Ch. Nov. 17, 2017) (citing *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 856 (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del. 2012)); *accord Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 & n.1 (Del. Ch. 2012) (collecting and discussing cases); *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, No. 3658-VCS, 2009 WL 1124451, at *8 (Del. Ch. Apr. 20, 2009).

[190] *TravelCenters of Am., LLC v. Brog*, 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008) (quoting *In re Grupo Dos Chiles, LLC*, 2006 WL 668443, at *2 (Del. Ch. Mar. 10, 2006)).

[191] 6 DEL. C. § 18–1101(b).

Act allows an LLC agreement to expand, restrict, or eliminate a manager's fiduciary duties.[192] Section 18-1101(e) allows for something different. It permits an LLC agreement to "leave the default duties in place, but limit or eliminate monetary liability for breach of duty".[193] It is broad, allowing exculpation of all liabilities for breach of fiduciary duty, including the duty of loyalty:

> A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.[194]

The BD LaPlace and Bayou Investment LLC Agreements do not eliminate the Director Defendants' fiduciary duties as contemplated by section 18-1101(c) of the Act, but they do provide exculpation from liability as authorized by section 18-1101(e). Therefore, the Trustee's ability to seek monetary liability against the Director Defendants for breaches of fiduciary duty owed to BD LaPlace and Bayou Investment is gone,[195] and the claims must be dismissed.[196]

With respect to the Trustee's claim that the Director Defendants breached their fiduciary duties to Bayou Holdings, the Court will allow the Trustee to amend his complaint to make clear what transactions, actions, and related facts form the basis for the claim as they have not been sufficiently alleged in the Complaint. Bayou Holdings is not alleged to have made the Distribution.

---

[192] *Id.* § 18-1101(c) ("To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.").

[193] *Feeley*, 62 A.3d at 664.

[194] 6 DEL. C. § 18-1101(e); *see also DG BF, LLC v. Ray*, No. CV 2020-0459-MTZ, 2021 WL 776742, at *10 (Del. Ch. Mar. 1, 2021) (distinguishing the Act from Delaware's General Corporation Law that permits exculpation of liability only for a director's duty of care); *Kelly v. Blum*, No. 4516-VCP, 2010 WL 629850, at *11 (Del. Ch. Feb. 24, 2010) (same).

[195] *Feeley*, 62 A.3d at 664 ("Monetary liability may be out, but injunctive relief, a decrease of specific performance, rescission, the imposition of a constructive trust, and a myriad of other non-liability-based remedies remain in play.").

[196] *See generally Cornerstone*, 115 A.3d at 1175 ("A plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct"); *see e.g.*, *DG BF*, No. CV 2020-0459-MTZ, 2021 WL 776742, at *10 (dismissing breach of fiduciary duty claims because managers were exculpated from the monetary liability sought by the plaintiffs).

Bayou Holdings is allegedly identified in the BD Term Loan agreement as "Parent," but there is no allegation that Bayou Holdings is an obligor on the BD Term Loan [197] or that its property was the subject of the BD Lien Grant.  The Complaint does so with respect to BD LaPlace and Bayou Investment, but details regarding Bayou Holdings are absent.[198]  Clarity is needed to put the Director Defendants on proper notice of the claims against them.

Authorizing the Trustee to amend his Complaint to adequately state a claim for breach of fiduciary duty owed to Bayou Holdings is not futile like BD LaPlace and Bayou Investment.  The Trustee argues that nothing in the Bayou Holdings' LLC Agreement exculpates liability for the fiduciary duty breaches alleged in the Complaint while the Director Defendants argue the opposite and point to section 3.9 in support.  That section states, in pertinent part, that:

> Except as otherwise required by applicable law and as expressly set forth in this Agreement, no Director, Officer or Member shall have any personal liability whatsoever in such Person's capacity as Director, Officer or Member, whether to the Company, to any other Director, Officer or Member, to the creditors of the Company or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company.[199]

This section expands the Act's protection of members and managers from personal liability for an LLC's debts, obligations, and liabilities solely by reason of being a member or acting as a manager.[200]  An example of such default protection can be found in the LLC Agreements of BD LaPlace and Bayou Investment that provide:  "Notwithstanding anything to the contrary set forth in this Agreement, and except as otherwise set forth in the Act, no Member, Manager, employee or agent of the Company shall be liable in such capacity for a debt, obligation or liability of the Company solely due to such Person's status as a Member, Manager, employee or agent of the Company."[201]  Section 3.9 of the Bayou Holdings' LLC Agreement, on the other hand, broadens liability limitations to circumstances beyond those that arise solely because of a protected party's

---

[197] Compl. ¶ 118.

[198] *Id.* ¶ 119 ("Section 7 of the . . . Agreement grants to the 'Secured Parties' . . . a continuing security interest and lien upon substantially all of the property of each of the Obligors (defined to include BD LaPlace, Bayou Investment, and 'any other Person that is liable for payment of any Obligations or that has granted a Lien on its assets in favor of Agent to secure any Obligations.').").

[199] Bayou Holdings LLC Agreement § 3.9.

[200] *See* 6 DEL. C. § 18-303(a) ("Except as otherwise provided by this chapter, the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company.").

[201] Bayou Investment LLC Agreement § 9.1(a); BD LaPlace LLC Agreement § 9.1(a).

status as a director, officer, or member of Bayou Holdings.[202]  It also limits liability that may be owed to Bayou Holdings in addition to Bayou Holdings' creditors, other directors, officers, members, and third parties.  Further, it includes Bayou Holdings' "commitments" and "losses" to the sources of limited liabilities.

Based on these expansions, the Director Defendants argue that section 3.9 serves to exculpate them for breaches of fiduciary duty if, and only if, alleged damages are based on Bayou Holdings' debts, liabilities, obligations, commitments, or losses.  They concede that, under their theory, not all fiduciary duty liability is eliminated.  In support, they point to section 3.11 of Bayou Holdings' LLC Agreement titled "Business Opportunities" that eliminates liability of certain directors for breaches of fiduciary duty if they pursue a potential Bayou Holdings' opportunity, direct such opportunity to another person, or fail to communicate such opportunity.[203]  The Director Defendants argue that this section is intended to capture other types of fiduciary duty liability not based on Bayou Holdings' debts, liabilities, obligations, commitments, or losses – i.e. where the director misappropriates a corporate opportunity for his own benefit.

This Court is not persuaded that section 3.9 exculpates the Director Defendants.  The Director Defendants offer no case in which similar language was held to exculpate liability for breach of fiduciary duty, and the Court's independent research did not reveal any.  Delaware law permits parties to an LLC agreement to limit eliminate or limit liability for breaches of fiduciary duty so long as it is plain and unambiguous.[204]  The Court acknowledges that Delaware cases primarily address the need of drafters to clearly evince their intent when eliminating fiduciary duties.  The need to make exculpation provisions plain and unambiguous is less discussed.  Nonetheless, the Court believes the principle should apply equally to exculpation of liability given the Act's respect for fiduciary duties and their default application.  Here, the Bayou Holdings' LLC Agreement did not eliminate the Director Defendants' fiduciary duties and therefore the Court is careful when interpreting and applying related exculpation for breaches of such duties.

---

[202] *See, e.g.*, *Lubaroff & Altman*, DEL. L. OF CORP. & BUS. ORG. § 20.7 (4th ed, 2022-1 Supp). ("The word "solely," which is used in Section 18-303, indicates that a member or manager will not be liable for the debts, obligations, or liabilities of a Delaware LLC only by reason of being a member or manager; however, other acts or events could result in the imposition of liability upon or assumption of liability by a member or manager.  Examples of such acts or events would be (i) the imposition of liability on a member or manager for tortious conduct by the member or manager resulting in a finding of liability . . . .").

[203] Bayou Holding LLC Agreement § 3.11 ("To the fullest extent permitted by law, the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to any Class A Member or its Affiliates, or any Director not serving as an employee of the Company or its subsidiaries (such Person, an "Exempted Party").  The Company renounces any interest or expectancy of the Company in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to any Exempted Party.  If any Exempted Party acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Company, none of the Exempted parties shall have any duty to communicate or offer such opportunity to the Company, and *none of the Exempted parties shall be liable to the Company or to any other Member for breach of any fiduciary or other duty by reason of the fact that any Exempted Party pursues such opportunity, directs such opportunity to another Person or does not communicate such opportunity to the Company*. . . .") (emphasis added).

[204] *See, e.g.*, *Feeley*, 62 A.3d at 665; *Bay Ctr.*, No. 3658-VCS, 2009 WL 1124451, at *9.

Examples of plain and unambiguous exculpation language is found in the aforementioned section 3.9 of the subsidiary LLC Agreements and section 3.11 of Bayou Holdings' LLC Agreement. The drafters knew how to limit liability for breach of fiduciary duty in a clear fashion but did not do so in section 3.9 of Bayou Holdings' agreement. This deviation must be meaningfully respected.[205] Moreover, a claim for misappropriation of a corporate opportunity necessarily involves a taking and a concomitant loss of a corporate asset.[206] Therefore, if the Court were to interpret section 3.9 as exculpating liability for breach of fiduciary duty based on Bayou Holdings' "losses" as the Director Defendants urge, then section 3.11 would be rendered unnecessary and superfluous as it too limits liability for breach of fiduciary duty based on a loss.[207] In such a circumstance, the Court's interpretation would be unreasonable under Delaware law because "[i]t is a maxim of contract interpretation that, 'given ambiguity between potentially conflicting terms, a contract should be read so as not to render any term meaningless.'"[208]

Similarly, section 3.10 titled "Indemnification and Exculpation by the Company" further erodes the Director Defendants' position. This provision provides for indemnification (not exculpation) of Bayou Holdings' directors to the fullest extent permitted by law against all "Losses" they actually incur so long as they acted in accordance with a "Required Standard of Conduct".[209] "Losses" is defined to include any and all direct or indirect liabilities incurred by the directors.[210] "Required Standard of Conduct" requires the directors to act "in good faith and without willful misconduct, bad faith or fraud . . . ."[211] Acting in bad faith (including engaging in willful misconduct) is a standard by which to evaluate whether a fiduciary breaches the duty of

---

[205] *See, e.g.*, *Norton, III v. K-Sea Transp. Partners, L.P.*, 67 A.3d 354, 364 (Del. 2013) (declining to infer sloppy drafting when the "drafters knew how to impose an affirmative obligation when they so intended").

[206] *Guth v. Loft, Inc.*, 5 A.2d 503, 272-73 (Del. 1939) ("[I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if, in such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired); *see also Broz v. Cellular Info. Sys., Inc.*, 673 A.3d 148, 154-55 (Del. 1996) (describing the modern theory of the corporate opportunity doctrine); *Borden v. Sinskey*, 530 F.2d 478, 490 (3d Cir. 1976) (applying and interpreting Delaware law and stating that if the elements of the doctrine of corporate opportunity are present, "the opportunity is treated as a corporate asset and the corporate officer's or director's illicit diversion of it to his own use constitutes a violation of his fiduciary duty).

[207] The Director Defendants do not offer a definition of section 3.9's term "losses" and the Court will not attempt to do so on its own. Perhaps a distinction could be made from a "loss" of a corporate opportunity, but none was made.

[208] *Bay Ctr.*, No. 3658-VCS, 2009 WL 1124451, at *9 (quoting *Hexion Specialty Chems. v. Huntsman Corp.*, 965 A.2d 715, 741 (Del. Ch. 2008)).

[209] Bayou Holdings LLC Agreement § 3.10.

[210] *Id.*

[211] *Id.*

loyalty.[212]  Read together then, this section thus recognizes that any liabilities incurred by Bayou Holdings' directors for certain breaches of the duty of loyalty will not be indemnified by Bayou Holdings.  Similar to section 3.11, if section 3.09 eliminated such liabilities, there would be no reason to address their indemnification in section 3.10.

### E.      Claim for Aiding and Abetting a Breach of Fiduciary Duty

Count X charges the Black Diamond Entities with aiding and abetting the Director Defendants' alleged fiduciary duty breaches.[213]  Under Delaware law, the elements of an aiding and abetting a breach of fiduciary duty claim are "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[214]  Because the Complaint does not make out a claim for breach of fiduciary duties, this claim will be dismissed with leave to re-plead.[215]  Despite the Court's dismissal of the Trustee's fiduciary duty claims related to BD LaPlace and Bayou Investment, the Trustee may amend his aiding and abetting claim with respect to all of the Debtors as exculpation does not protect aiders and abettors of fiduciary duty breaches.[216]

### F.      Claim for Corporate Waste

Count XI directed at the Director Defendants alleges that the Distribution and the BD Lien Grant constituted corporate waste.  In support, the Trustee contends that they were "commercially unreasonable, served no rational business purpose for the Debtors, and [were] intended only to benefit the Black Diamond Entities."[217]

---

[212] *Stone v. Ritter*, 911 A.2d 362, (Del. 2006); *Feeley*, 62 A.3d at 664.

[213] Compl. ¶¶ 214-15.

[214] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 836 (Del. Ch. 2011) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (internal punctuation omitted)).

[215] *See, e.g.*, *Related Westpac LLC v. JER Snowmass LLC*, No. 5001-VCS, 2010 WL 2929708, at *8 (Del. Ch. July 23, 2010) (collecting and citing cases for its holding that "because the breach of fiduciary duty claim is dismissed, the aiding and abetting claim must also be dismissed").

[216] *Chester Cnty. Emps.' Ret. Fund v. KCG Holdings, Inc.*, No. CV 2017-0421-KSJM, 2019 WL 2564093, at *3 (Del. Ch. June 21, 2019) ("Claims for breach of the duty of care, though exculpated, provide a valid predicate for claims of aiding and abetting."); *Morrison v. Berry*, No. CV 12808-VCG, 2020 WL 2843514, at *9 (Del. Ch. June 1, 2020) ("Because a 102(b)(7) clause exculpated the Board from violations of the duty of care, I did not consider whether the Directors had breached their duties in this regard . . . however, that fact does not insulate aiders-and-abettors from liability."); *In re BioClinica, Inc. S'holder Litig.*, No. CV 8272-VCG, 2013 WL 5631233, at *11 (Del. Ch. Oct. 16, 2013) ("because Section 102(b)(7) solely exculpates directors (as opposed to secondary actors), it is possible that an aider and abettor could be liable for a directors' otherwise exculpated breach of the duty of care.") (citing *Del Monte*, 25 A.3d at 838 ("By their terms, Sections 102(b)(7) and 141(e) do not protect aiders and abetters, and disgorgement of transaction-related profits may be available as an alternative remedy.")).

[217] Compl. ¶ 218.

Under Delaware law, corporate waste exists where there is "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade."[218]  Corporate waste claims are reserved only for the "rare unconscionable case where directors irrationally squander or give away corporate assets."[219] "Directors are guilty of corporate waste, only when they authorize a transaction that is so one-sided that no business person of ordinary, sound judgment could conclude the corporation has received adequate consideration." [220]  Substantial consideration and good faith judgment negate theories of corporate waste:

> If, however, there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstance the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky.[221]

Where a distribution is attacked, "the size of the [distribution] cannot be compared to any amount received by the corporation and the test for waste of corporate assets appears to be the same as that for bad faith."[222]

Delaware courts view corporate waste claims as covered by exculpation provisions.[223] Therefore, the corporate waste claims related to BD LaPlace and Bayou Investment will be dismissed.  The corporate waste claim related to Bayou Holdings is not properly alleged for the same reasons explained with respect to the Trustee's breach of fiduciary duty claims, and the Trustee will be given leave to re-plead.

## G.     Claim for Equitable Subordination

Count XII seeks equitable subordination of any and all claims filed against the Debtors by the Director Defendants and the Black Diamond Entities pursuant to 11 U.S.C. § 510(c).  In support, the Trustee alleges that the Director Defendants and the Black Diamond Entities engaged in inequitable conduct by causing the Debtors to make the Distribution to enrich the Black Diamond Entities and by intentionally causing the Debtors to enter into secured loan agreements

---

[218] *Miller v. McCown De Leeuw & Co. (In re Brown Schools)*, 368 B.R. 394, 408 (Bankr. D. Del. 2007).

[219] *Binks v. DSL.net, Inc.*, C.A. No. 2823-VCN, 2010 WL 1713629, at *12 (Del. Ch. Apr. 29, 2010).

[220] *Glazer v. Zapata Corp.,* 658 A.2d 176, 183 (Del. Ch. 1993).

[221] *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (quoting *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997)).

[222] *In re Rexene Corp. S'holders Litig.*, No. CIV. A. 10-897, 1991 WL 77529, at *4 (Del. Ch. May 8, 1991), *aff'd sub nom. Eichorn v. Rexene Corp.*, 604 A.2d 416 (Del. 1991) (citing *Saxe v. Brady,* 184 A.2d 602, 610 (Del. Ch. 1962)).

[223] *Green v. Phillips*, No. 14436, 1996 WL 342093, at **6-7 (Del. Ch. June 19, 1996).

which the Debtors could never hope to repay and elevating the Black Diamond Entities to secured creditors in advance of the Debtors' Petition Date.[224]

Section 510(c)(1) of the Bankruptcy Code is remedial in nature, permitting courts to "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim . . . ."[225] It is a drastic and unusual remedy, "springing from bankruptcy courts' traditional powers as courts of equity 'to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of bankruptcy results.'"[226] Subordination is applied in limited circumstances "when three conditions are satisfied: '(1) [t]he claimant must have engaged in some type of inequitable conduct; (2) '[t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;' and (3) '[e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].'"[227]

As a threshold matter, this Court recently held in *Tilton v. MBIA Inc. (In re Zohar III, Corp.)* that equitable subordination claims against entities that have not filed claims against a debtor must be dismissed.[228] The Complaint alleges that only Fund IV and BDCF have filed claims.[229] Accordingly, the Court will dismiss the equitable subordination claim asserted against the remaining relevant defendants. With respect to Fund IV and BDCF, the Court will not dismiss the claim given the Trustee's stated fraudulent transfer claims with respect to the Distribution.[230] Fund IV and BDCF argue that the Trustee's claim is not ripe because their claims have not yet been allowed but "a claim that is properly filed under Rule 3001 and Code section 501 is deemed allowed unless a party in interest objects."[231] Here, the Court is unaware of any allegations that the claims of Fund IV and BDCF are not properly filed or that there is a pending objection.

---

[224] Compl. ¶ 221.

[225] 11 U.S.C. § 510(c)(1).

[226] *Tilton v. MBIA Inc. (In re Zohar III, Corp.)*, 639 B.R. 73, 90 (Bankr. D. Del. 2022) (quoting *Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233 (3d Cir. 2003)).

[227] *Id.* (quoting *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009) (alterations in original) (quoting *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977))).

[228] 639 B.R. at 103.

[229] Compl. ¶ 223.

[230] *See, e.g.*, *In re OODC, LLC*, 321 B.R. 128, 146 (Bankr. D. Del. 2005) (allowing a claim for equitable subordination to survive a motion to dismiss where the court determined that the complaint sufficiently stated a claim for actual and constructive fraud); *In re DVI, Inc.*, 326 B.R. 301, 310-11 (Bankr. D. Del. 2005) (noting that "equitable subordination may operate in tandem with the trustee's power to set aside fraudulent transfers in situations where the court determines that the creditor should be deprived of any remedy against the estate"); *see also Wilson v. Huffman (In re Missionary Baptist Found. of Am.)*, 818 F.2d 1135, 1147 (5th Cir.1987) (noting that some courts have ordered subordination even though a claim was voidable as a preference or a fraudulent conveyance).

[231] *In re New Century TRS Holdings, Inc.*, 495 B.R. 625, 633 (Bankr. D. Del. 2013).

### H.    Claim for Surcharge

Count XIII is an alternative claim to surcharge the Black Diamond Entities pursuant to 11 U.S.C. § 506(c).  If the Court holds that one or more of the Black Diamond Entities hold a valid lien on debtor property, the Trustee seeks to recover various pre- and post-petition costs and expenses incurred by the estate in connection with efforts to preserve and maximize the value of that property.[232]  Efforts include a sale of the Debtors' assets, identifying and preserving books and records, collecting accounts receivable, and pursuing turnover of funds.[233]  The Complaint alleges that the costs and expenses were reasonable and necessary to collateral preservation, that they provided the Black Diamond Entities with a direct benefit, and that the Black Diamond Entities directly and implicitly consented to the efforts and expenditures.[234]

Section 506(c) of the Bankruptcy Code provides the following:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.[235]

Recovery under this section requires that a claimant "demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a *direct* benefit to the secured creditors."[236]  "Section 506(c) was not intended to encompass ordinary administrative expenses that are attributable to the general operation and dissolution of an estate in bankruptcy."[237]  Rather, it is narrowly applied to "those expenses that are specifically incurred for the express purpose of ensuring that the property is preserved and disposed of in a manner that provides the secured creditor with a maximum return on the debt".[238]

The Black Diamond Entities argue that the surcharge claim is premature because their claims are not yet allowed.  The Court has discussed why this argument is not persuasive.  The remaining issues raised in an effort to have the claim dismissed go to questions like benefit and necessity, implicating factual questions that cannot be resolved now.  Count XIII will remain.

---

[232] Compl. ¶¶ 225-32.

[233] *Id.* ¶¶ 227-28.

[234] *Id.* ¶¶ 230-31.

[235] 11 U.S.C. § 506(c).

[236] *United Jersey Bank v. Miller (In re C.S. Assocs.)*, 29 F.3d 903, 906 (3d Cir. 1994) (emphasis in original).

[237] *Id.* at 907 (quoting *In re Parr Meadows Racing Ass'n,* 92 B.R. 30, 35-36 (E.D.N.Y. 1988) (citations omitted), *aff'd in part, rev'd in part on other grounds,* 880 F.2d 1540 (2d Cir. 1989)).

[238] *Id.*

## V.    CONCLUSION

The Court will dismiss the following Counts or claims ***with leave to amend***:  (a) Counts IV through VII; (b) the claim in Count VIII for unjust enrichment with respect to the BD Lien Grant; (c) with respect to Bayou Holdings, the claims in Counts IX and XI for breach of fiduciary duty and corporate waste; (d) Count X; and (e) the claims in Count XII for equitable subordination asserted against the Director Defendants and BDCM.  The Court will dismiss the following claims ***without leave to amend***:  (a) the claim in Count VIII for unjust enrichment with respect to the Distribution; and (b) with respect to BD LaPlace and Bayou Investment, the claims in Counts IX and XI for breach of fiduciary duty and corporate waste.  All remaining relief requested in the Motions will be denied.

Dated:  August 3, 2022
Wilmington, Delaware

Karen B. Owens
United States Bankruptcy Judge