**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re:**<br><br>**BAYOU STEEL BD HOLDINGS, L.L.C., *et al.*,**[1]<br><br>**Debtors.** | **Chapter 7**<br><br>**Case No. 19-12153 (KBO)**<br>**(Jointly Administered)** |
| **GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Bayou Steel BD Holdings, L.L.C., *et al.*,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C.; BDCM OPPORTUNITY FUND IV, L.P.; BLACK DIAMOND COMMERCIAL FINANCE, L.L.C.; SAM FARAHNAK; PHIL RAYGORODETSKY; ROB ARCHAMBAULT; TERRY TAFT; and BOB UNFRIED,**<br><br>**Defendants.** | **Adv. No. 21-51013 (KBO)**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**<u>FIRST AMENDED COMPLAINT</u>**[2]

---

1 The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, are: Bayou Steel BD Holdings, L.L.C. (1984), BD Bayou Steel Investment, LLC (1222), and BD LaPlace, LLC (5783).

2 The Court's August 3, 2022 Memorandum Opinion and Order dismissed certain claims in the Trustee's original Complaint. While, in this First Amended Complaint, the Trustee has removed (i) claims which the Court dismissed without leave to amend and (ii) dismissed claims

## I. INTRODUCTION

1. Plaintiff George L. Miller, Chapter 7 Trustee (the "Trustee") for the jointly administered Chapter 7 bankruptcy estates of Bayou Steel BD Holdings, L.L.C. ("Bayou Holdings"), BD Bayou Steel Investment, LLC ("Bayou Investment"), and BD LaPlace, LLC ("BD LaPlace") (collectively, "Debtors"), by and through his counsel, brings this action to, *inter alia*: (a) avoid and recover a $30 million distribution made to or for the benefit of the Debtors' equity holders—Defendants Black Diamond Capital Management, L.L.C. and affiliate Fund IV ("Black Diamond")—a distribution which rendered Debtors insolvent, fatally undercapitalized and struggling to stay afloat; (b) recover damages in excess of $65 million for breaches of fiduciary duty by the Black Diamond-controlled director defendants and aiding and abetting breaches of fiduciary duty by Black Diamond; and, (c) equitably subordinate Black Diamond's claims below those of Debtors' innocent creditors.

2. Prior to their bankruptcy filings on October 1, 2019, Debtors manufactured and sold steel products—capital intensive businesses that struggled under the ownership of steel-giant ArcelorMittal. In April 2016, Black Diamond acquired Debtors from ArcelorMittal at distressed-based values—knowing full-well that the businesses were losing money and critically in need of a substantial capital infusion to stem losses and return to profitability.

3. Promptly orchestrating the sale of Debtors' only profitable business, Black Diamond squandered the opportunity to inject much-needed capital into the Debtors' remaining operations, choosing instead to direct a $30 million distribution (the "Distribution") to itself, thereby inflicting a mortal wound from which Debtors never recovered.

---

which the Trustee has elected not to amend, the Trustee hereby expressly preserves his appellate rights with respect to all such dismissed claims.

4. After Black Diamond stripped out the proceeds generated by the sale of Debtors' only profitable business, Debtors' management (a) faced liquidity and cash flow challenges daily, (b) struggled with access to limited credit hampered by Black Diamond having used the company's credit line to fund the Distribution to itself, and (c) managed Black Diamond-directed cost cutting measures and facility shutdowns, along with strained vendor relationships caused by Debtors having failed to pay debts as they became due. Simply stated, Black Diamond acquired a capital-intensive business and then starved the business of the capital needed to modernize equipment, improve product quality, prevent facility shutdowns, eliminate the need for personnel layoffs and other cost cutting measures, achieve appropriate inventory levels to maximize sales and profit margins, and improve customer service and satisfaction.

5. Debtors never achieved profitability or cashflow positivity and went out of business leaving non-insider creditors with claims exceeding $85 million. Through this litigation, the Trustee seeks to recover the damages inflicted by Defendants' wrongdoing—as detailed in this First Amended Complaint—for the benefit of Debtors' bankruptcy estates.

## II. JURISDICTION & VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 of the United States Code (the "Bankruptcy Code"), or in or related to cases under the Bankruptcy Code.

7. The Trustee demands a jury trial before an Article III judge in connection with all claims to which he is entitled to a jury trial under the Constitution and applicable law, and the Trustee does not consent to the entry of any final judgment, order or adjudication by a bankruptcy judge as to jury-triable claims.

8. Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a).

## III. PARTIES

### A. The Plaintiff

9. Plaintiff George L. Miller is the duly-appointed Chapter 7 Trustee of Debtors' bankruptcy estates.

10. On October 1, 2019 (the "Petition Date"), Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the cases are being jointly administered under the caption *In re Bayou Steel BD Holdings, L.L.C., et al.*, U.S.B.C. D. Del. Case No. 19-12153 (KBO).

11. On February 25, 2020 (the "Conversion Date"), the Bankruptcy Court entered an Order converting Debtors' Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code.

12. On the Conversion Date, Plaintiff was appointed Chapter 7 Trustee of the Debtors' estates, and he continues to serve in that capacity.

13. Each Debtor is a Delaware limited liability company.

14. Bayou Holdings and Bayou Investment are holding companies with no operations. After the Vinton Sale (described below), BD Laplace was the sole operating entity in the Debtors' corporate structure.

15. Bayou Holdings is the sole Member and 100% owner of Bayou Investment, which in turn is the sole Member and 100% owner of BD LaPlace.

16. The LLC Agreements of Bayou Investment and BD LaPlace (dated April 4, 2016, and April 5, 2016, respectively) each name Bayou Holdings as the "sole Manager" in which "[a]ll management powers over the business and affairs of the Company" are "exclusively vested." Accordingly, Bayou Holdings, through its Board of Directors (of which the Director Defendants

defined herein were members), managed the business and affairs of all three Debtors, including operating entity BD LaPlace.

17. Debtors' business consisted of recycling scrap to produce a variety of structural steel, merchant bar, and specialty products. Debtors operated facilities in Louisiana and Tennessee, as well as distribution depots in Oklahoma, Illinois, and Pennsylvania.

18. Prior to conversion, Debtors sold substantially all of their assets to Liberty BSG Holdings Inc. pursuant to Section 363 of the Bankruptcy Code. The Bankruptcy Court approved the sale on December 26, 2019, and it closed on January 31, 2020.

**B. The Defendants**

19. Defendant Black Diamond Capital Management, L.L.C. ("Black Diamond," and together with its affiliates, including Fund IV and BDCF referenced herein, the "Black Diamond Entities") is a Delaware limited liability company with a place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830. Black Diamond is a private equity firm that, among other things, invests in distressed businesses. Black Diamond is the 100% owner of Debtor Bayou Holdings, which in turn owns 100% of Debtors Bayou Investment and BD LaPlace.

20. Defendant BDCM Opportunity Fund IV, L.P. ("Fund IV") is a Delaware limited partnership with a place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830. Fund IV is a private equity fund managed by Black Diamond.

21. Defendant Black Diamond Commercial Finance, L.L.C. ("BDCF") is a Delaware limited liability company with a place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830. BDCF is an affiliate of Black Diamond.

22. Defendant Sam Farahnak is an individual and a Managing Director of Black Diamond, with a place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830.

Farahnak spear-headed Black Diamond's acquisition of Debtors in 2016 and was a member of Bayou Holdings' Board of Directors from April 2016 until September 30, 2019.

23. Defendant Phil Raygorodetsky is an individual and a Managing Director of Black Diamond, with a place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830. Raygorodetsky was a member of Bayou Holdings' Board of Directors and Chairman from April 2016 until September 30, 2019.

24. Defendant Rob Archambault is an individual with an address of 145 Standish Street, Duxbury, MA 02332. Archambault was a member of Bayou Holdings' Board of Directors from September 2016 through the Petition Date.

25. Defendant Terry Taft is an individual with an address of 4633 Riverview Drive, Hoover, AL 35244. Taft was a member of Bayou Holdings' Board of Directors from September 2016 through the Petition Date.

26. Defendant Bob Unfried is an individual with an address of 2041 Incrociato, New Braunfels, TX 78132. Unfried was a member of Bayou Holdings' Board of Directors from May 2016 through the Petition Date. Defendants Farahnak, Raygorodetsky, Archambault, Taft and Unfried are referred to herein, collectively, as the "Director Defendants."

## IV. <u>FACTS</u>

### <u>Black Diamond's Acquisition of the Debtors</u>

27. Bayou Steel Corporation was founded in 1979. At its headquarters in LaPlace, Louisiana, the company operated a mini-mill with electric arc furnace steelmaking, continuous billet casting, and a medium section rolling mill. The company also operated a bar product rolling mill in Harriman, Tennessee, as well as distribution depots in Tulsa, Oklahoma, Chicago, Illinois, and Pittsburgh, Pennsylvania.

28. Typical steelmaking production flow included processing scrap at the LaPlace headquarters, which was then sent to steel making operations and then to rolling mills where it was converted into rolled products, which were then sold from the LaPlace or Harriman facilities or shipped to distribution depots. Finished goods were sent to customers via truck, rail, barge, or internationally via ocean vessel.

29. In January 2003, Bayou Steel Corporation and its subsidiaries filed for Chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas. The company emerged from bankruptcy in February 2004, pursuant to a plan of reorganization.

30. In May 2006, Black Diamond acquired Bayou Steel and its subsidiaries for approximately $184 million.

31. A couple years later, in July 2008, Black Diamond sold the company to ArcelorMittal, one of the world's largest steel producers, for $475 million. Post-closing, Bayou Steel operations were renamed ArcelorMittal LaPlace.

32. Around June 2015, ArcelorMittal put its United States long steel assets on the market, which included: (i) ArcelorMittal LaPlace, (ii) a facility in Steelton, Pennsylvania (formerly part of Bethlehem Steel), and (iii) a facility in Vinton, Texas (formerly known as Border Steel).

33. On June 19, 2015, Farahnak emailed Steve Deckoff—Black Diamond's founder and managing principal—and Les Meier—a Black Diamond principal—reporting: "Arcelor is selling the old Bayou assets and a few other plants ($750m/35m rev/EBITDA). They have not done well with them and are looking to get out. It is a limited process and we are the only sponsor getting a look. I've attached the teaser and will send across the [Confidential Information Memorandum] once we get it. First round bids will be due in early July."

34. Black Diamond's first-round bid was $190 million, based on $33 million estimated 2015 EBITDA. This bid was for the LaPlace-headquartered operations (which also included the Harriman facility and the three depots), the Steelton facility, and the Vinton facility.

35. On July 21, 2015, Farahnak emailed Deckoff and Meier, reporting: "We are through to the next round on Arcelor mills and will start digging in to more detailed company information and financials over the next few weeks. We can sit down and go through it once we have done some more work. The bottom end of our current value range is $190m (5.4x)."

36. Black Diamond's goal was to repeat its lucrative turnaround and re-sale of Bayou Steel, as a July 23, 2015 email exchange between Farahnak and Eddie Lehner (President and CEO of Ryerson, a metal processor and distributor based in Chicago) confirmed: "Black Diamond completed a gem of a deal when they sold Bayou in 2008 to Mittal for $475m before the crash. In 2002 you could not have sold Bayou for $75m." (Lehner); "Yes Bayou was a home run and with steel having a tough time in 2015 we're hoping to get in at a good time again." (Farahnak).

37. The former Bayou Steel assets had not performed well when owned by ArcelorMittal. On July 27, 2015, Raygorodetsky commented to one of his Black Diamond colleagues that "Sam [Farahnak] told me that this underperformed for arcelor bc arcelor fucked it up (mis managed). Arcelor doesn't strike [me] as a company that fucks things up but I may be wrong." A September 2015 presentation prepared by Black Diamond also characterized the mills as "undermanaged."

38. To assist with due diligence, Black Diamond hired Alton Davis as a consultant. Davis—an experienced steel industry executive—had served as Bayou Steel's Vice President of Plant Operations during Black Diamond's prior ownership and Chief Operating Officer of ArcelorMittal's Long Carbon North America unit before retiring in 2013.

39. Davis highlighted operational problems: “finished product inventory [was] low compared to when Bayou owned the facilities;” and “loss of sales due to possible lack of inventory at the right locations.” His October 16, 2015 email identified improving performance at the LaPlace rolling mill and “gain[ing] market share and increase[ing] sales” as pivotal.

40. On September 12, 2015, Farahnak updated Deckoff and Meier: “first round bid was $190m (based on $33m 2015EBITDA—provided in CIM)” and that they “plann[ed] to bid $100m for second round this week and request exclusivity (based on $20m 2015E EBITDA and $130m NWC—our volume, price, margin assumptions, their stand alone cost assumptions).” Due to poor performance in Q1 15, Farahnak expected an actual purchase price “closer to $70m,” based on $15 million estimated 2015 EBITDA. According to Farahnak, “Q1 ’15 was a period of rapidly dropping scrap prices leading to high cost inventory being sold at low prices and significant negative EBITDA.”

41. Black Diamond’s lower second round of bid of $100 million reflected the significant decline in ArcelorMittal’s operations during 2015, as compared with management’s projections of 2015 EBITDA. ArcelorMittal’s management projected $33 million EBITDA for 2015 versus actual first quarter results of significant negative EBITDA, thereby causing Black Diamond to reduce its bid by $90 million, or $47%.

42. In February 2016, an article published on AMM.com reported ArcelorMittal’s having recorded impairment charges of $200 million during the fourth quarter of 2015 related to the intended sale of the LaPlace, Vinton, and Steelton mills, the planned sale of which came as the company’s losses surged.

43. The executive summary contained in Black Diamond’s Control Investment Committee Transaction Review dated March 23, 2016 stated “ArcelorMittal at its core is a flat roll

company and has been unable to successfully operate long mill products." The presentation also provided historical performance and future projections for the LaPlace and Vinton mills:

| | LaPlace | Vinton |
|---|---|---|
| 2015 EBITDA | ($6.1MM) | $0.5MM |
| LTM January 2016 | ($6.1MM) | $0.1MM |

44. According to Raygorodetsky, the business had been "mismanaged" by ArcelorMittal and product prices had been discounted to quickly generate cash, at the expense of margin and profits.

45. ArcelorMittal and Black Diamond reached an agreement in March 2016, as Farahnak confirmed in a March 16, 2016 email: "We have formally shaken hands on a [LaPlace] and [Vinton] deal with [ArcelorMittal] and will be announcing the deal as soon as Monday with a closing scheduled for the end of the month." The deal included the LaPlace-headquartered operations and the Vinton, Texas facility. Though it initially was to include the Steelton, Pennsylvania facility, ArcelorMittal kept that facility.

46. The acquisition ("Acquisition") terms are set forth in a Sale and Purchase Agreement dated as of March 23, 2016, between ArcelorMittal USA LLC and ArecelorMittal Bayou Acquisition LLC, as Sellers, and BD Long Products, LLC, as Buyer. BD Long Products, LLC was formed on December 22, 2015 for purposes of the acquisition, with Fund IV as its sole member and Black Diamond as its manager. After closing, BD Long Products, LLC's name was changed to Bayou Steel BD Holdings, L.L.C. (*i.e.*, Debtor Bayou Holdings).

47. As adjusted, the final purchase price was approximately $90.2—allocated $64.7 million to LaPlace, and $25.5 million to Vinton—and the transaction closed on April 4, 2016.

48. The Acquisition was funded by a combination of equity and debt.

49. Black Diamond, through Fund IV, made an initial member contribution of $59.6 million, and owned 100% of Debtor Bayou Holdings, which in turn owned 100% of Debtors Bayou Investment and BD LaPlace.

50. The balance of the purchase price was funded through a revolving loan with Bank of America, N.A. ("BoA") and SunTrust Robinson Humphrey, Inc. ("SunTrust"), the terms of which are set forth in a Loan and Security Agreement dated as of April 4, 2016 (the "Revolving Loan").

51. The Revolving Loan permitted borrowings in the aggregate not to exceed $75 million—with availability determined by a prescribed borrowing base of inventory and accounts receivable—secured by liens on substantially all of Debtors' assets. BD LaPlace is the Borrower under the Revolving Loan, and Bayou Holdings and Bayou Investment are Guarantors.

52. Under the loan documents, availability below a "trigger" imposed cash management and increased reporting obligations and below $10 million constituted a default.

53. Black Diamond had the right to appoint all members of Bayou Holdings' Board of Directors, and it did so.

54. Appointed in April 2016, the first two directors, Farahnak and Raygorodetsky, were Black Diamond managing directors. Raygorodetsky was appointed Chairman.

55. Thereafter, Black Diamond appointed three more directors: (i) Bob Unfried, a former steel industry executive, appointed in May 2016; (ii) Rob Archambault, a private equity operating executive, appointed in September 2016; and (iii) Terry Taft, a former metals industry executive, appointed in September 2016.

56. Black Diamond also controlled the recruitment and hiring of Debtors' executives. While executives' employment agreements were with Debtor BD LaPlace, final decisions

concerning compensation and other terms of employment were typically made by Farahnak or other individuals associated with Black Diamond.

57. Alton Davis was hired as Debtors' President and Chief Operating Officer, and Rob Simon as Debtors' Chief Executive Officer. Debtors also had a series of interim Chief Financial Officers until March 2017 when Tom Gilboy was hired in that role on a permanent basis.

58. Black Diamond played an active role in the Company's management and decision-making. Representatives of Black Diamond (including but not limited to Black Diamond-affiliated Board members and various associate-level employees of Black Diamond, such as Daniel Ozen and Gregory Schunk) maintained regular contact with Debtors' executives and other personnel regarding Debtors' financial performance, liquidity, sales, operational issues, and other matters. Ozen, a Senior Associate with Black Diamond, also served as Debtors' interim CFO. Representatives of Black Diamond also maintained regular contact with BoA regarding the Debtors' credit facility, financials, liquidity needs, and related matters.

59. In their decision making, the Director Defendants routinely favored the interests of Black Diamond over those of the Debtors (and the Debtors' creditors).

**Crippled by Undercapitalization and Chronic Liquidity Problems, Debtors, Acting at Black Diamond's Direction, Nevertheless Issue a $30 Million Distribution To Fund IV**

60. Commencing upon Black Diamond's Acquisition in April 2016, and continuing to the Petition Date, Debtors were substantially undercapitalized and operated at a loss.

61. Debtors recorded an operating loss of $16.4 million for 2016. The LaPlace operations reported negative EBITDA of $13.6 million for 2016, including negative EBITDA in each month of 2016.

62. A series of post-Acquisition communications confirms Debtors' undercapitalization and persistent liquidity deficits.

For example:

(i) A June 13, 2016 email from Farahnak to Paul Meyers (Debtors' interim CFO) states, "Do we think we will have to draw the revolver over the next few weeks? This week['s] cash is the lowest we've seen it." Meyers responded "Yes, we will likely draw next week or the week after." Meyers further explained that the poor cash situation was "not a surprise" and that the company had been sustaining itself by "moving cash between entities and pushing payments when able."

(ii) A July 13, 2016 email from Farahnak to Kevin Torres (Debtors' Vice President of Recycling & Scrap Procurement) directs him to "push out payment on scrap purchases or pull back purchases in general" in order to "help out our cash position significantly" because "[w]e are going to be tight going through Q3."

(iii) A July 27, 2016 email chain among Ozen, Farahnak and Raygorodetsky reports that Debtors' management was in "hand to hand combat mode" and "busy making sure the lights stay on [and] the cash account stays above zero."

(iv) An August 18, 2016 daily shipments report reflected significant negative variances of over 15% in shipments for the month to date prompting Raygorodetsky's alarming comment to Alton Davis: "looking at shipments below – I am growing pessimistic we hit 27kt in august, although I hope I am wrong!"

(v) An October 15, 2016 email from Bob Unfried to Farahnak laments, "When I saw the Sept financials I almost threw up."

(vi) An October 23, 2016 status report from Davis to Farahnak provides:

> Here I sit at the Laplace plant of the Bayou Steel Group in a facility that is shut down for one week with 5 cars in the parking lot (everyone else is on layoff). This is due to lack of business. It is a terrible shame to be in this situation. We have plant assets that are idle, inventory assets that are consuming huge amounts of cash, and a majority of our people assets are on one week layoff (after having worked with reduced pay since July). In addition we are burning cash and certainly not increasing the value of this investment.
>
> I believe that everyone from owners, board members, executives, other managers, and hourly employees feel a high degree of frustration, concern, anxiety, anger, fear, and who knows what other kinds of emotions that are not good.

(vii) A November 14, 2016 13-week cash forecast prepared by Debtor management and forwarded by Ozen to Farahnak reports, "Razor thin liquidity." Later the same day, Ozen informs, "There is an impromptu call that is taking place with BSG

management to discuss an urgent decision coming up in regards to our declining borrowing base and if we should be drawing some liquidity in advance of this."

(viii) The Debtors were unable to pay for desperately needed modernization. For example, on November 15, 2016, Farahnak emailed Raygorodetsky and Ozen concerning the Debtors' need for certain e-commerce software solutions to improve customer service, saying "It looks like ecommerce is going to require $2m investment which will need to come from BD as equity or a loan given liquidity position at Bayou."

61. Unlike the LaPlace operations—which burned cash and lost millions of dollars—the Vinton, Texas operation was cashflow positive.

62. Accordingly, post-Acquisition, Black Diamond pursued a sale of the Vinton business—an effort which succeeded with the December 20, 2016 sale of BD Vinton LLC to Kyoei Steel for $49 million (the "Vinton Sale").

63. The Debtors recognized a gain of $12.8 million from the Vinton Sale, utilizing the proceeds to reduce the Revolving Loan balance from $55.3 million to $6.4 million.

64. For a short time, the Vinton Sale de-leveraged Debtors' balance sheet, and significantly improved liquidity.

65. Rather than using the improved liquidity to rescue the business and make the capital investments necessary for the business to succeed, Black Diamond preferred itself—compelling Debtors to make a $30 million distribution to Black Diamond-controlled Fund IV on March 17, 2017.

66. A series of internal Black Diamond communications confirms that Black Diamond planned to withdraw every penny that it could get away with, knowing full well that it would leave the Debtors, including BD LaPlace, undercapitalized and in the same precarious financial condition that existed before the Vinton Sale.

67. For example:

(i) A November 30, 2016 email chain from Farahnak suggests: "Maybe we propose to increase availability to 15m (pay down 14m) and take the rest (36m) out. See if BofA will waive the other dividend restrictions…."

(ii) In January 2017, Farahnak discussed the proposed distribution with Terry McKinney of BoA. McKinney expressed concern about "the effect on cash flow for Bayou Steel".

(iii) On January 26, 2017, Farahnak emailed Michael Soileau, Debtors' Vice President of Finance, requesting projections that supported taking out as much money as possible, "Can you put together a package that shows us drawing the maximum amount possible in Feb without going under 15m of availability in 2017?"

(iv) The following week, Soileau sent a cash flow projection and explained: "We can draw $32,850,000 in February. February is actually the lowest point of the year for our availability because inventory and AR are at a low point in February. This is contingent upon the budget being met – if we miss the sales goal and therefore do not build as much inventory as in the budget then our availability will be lower. We certainly would like to have a little contingency in case things don't go as planned." Farahnak replied asking for revisions to the projection, including lowering the availability block in the projection to $10 million rather than $15 million.

(v) On February 7, 2017 Farahnak reported to Raygorodetsky that "BofA is directionally good with a $33m dividend." Farahnak further explained that he had asked BoA to agree to remove the $15 million "trigger" from the loan, and leave only the $10 million minimum availability requirement.

(vi) On February 9, 2017, Raygorodetsky commented to Farahnak: "[W]hile I like the fact that we are basically taking all of the money out that we got for [V]inton net of paying off [V]inton collateral backed borrowings – are we leaving enough liquidity in for [K]evin [Torres] to capitalize on any scrap dislocation opportunities. . . . I don't think he would need more than 2 mil extra at a time but it may be worth confirming." Farahnak, however, remained unconcerned: "Yes I agree with looking at liquidity if they miss budget. I imagine they still stay well above the 10m block because we wouldn't build inventory if volumes looked that far off which is a big use of cash during the year."

(vii) While planning the Distribution, Farahnak and Rayogorodetsky were well aware that Debtors were liquidity-challenged. For example, just two weeks before the Distribution was made, Raygorodetsky told Simon that 3.5% salary increases for employees who had not received any increase in several years had to wait, because "we need to start making money first."

(viii) Rather than creating a realistic budget for Debtors' 2017 operations, Farahnak and Rayogorodetsky white-washed Debtors' operational and financial struggles. On

> March 8, 2017, Rayogorodetsky emailed Soileau and Kevin Castellanos (Associate at Black Diamond) expressing frustration that Debtors' management had been unable to reverse engineer a budget reflecting an acceptable EBITDA forecast for 2017, reporting to Soileau, "[w]e had an internal sitdown on this already and indicated 12 mil budget EBITDA number to folks here [at Black Diamond] – so now we would need to come up with a plan/budget to get this back up as to $12 [million] as we can to avoid heavy pain and 1000s of additional questions."

68. On March 16, 2017, Debtors, BoA, and SunTrust executed the First Amendment to Loan and Security Agreement dated as of March 16, 2017 (the "First Amendment"), which, *inter alia*, amended the Revolving Loan to permit the payment of a distribution in the amount of $30 million (the "Distribution").

69. The Distribution was paid by BD LaPlace to Fund IV the following day, on March 17, 2017.

70. The wire confirmation from Bank of America Merrill Lynch shows that on March 17, 2017 $30,000,000.00 was wired from the "BD LaPlace A/P Account" to a JP Morgan Chase account belonging to Fund IV. Per the wire confirmation, the wire was initiated in the system by Soileau at 12:56 PM on March 17, 2017 and "Approved' by Bill Pax, the Debtors' Financial Planning & Analysis Manager, a few minutes later at 1:05 PM.

71. The wire was facilitated by the Debtors' finance team at the direction of the Black Diamond-affiliated Directors. But those Directors ignored concerns over the liquidity impact of the Distribution and did not consult management in any meaningful way as to the detrimental impact the Distribution would have on the Debtors' operations and ability to pay debts as they became due.

72. Black Diamond (Farahnak and Raygordetsky, in particular) arranged the Distribution and the First Amendment without input from Debtors' CEO. On March 16, 2017—*after* the First Amendment had been executed and BoA had green-lighted the transfer—Farahnak

forwarded the executed documents to Simon, noting: "Rob, we are ready to return $30m of BD capital. Let me know today if any concerns." Simon replied: "Not sure I have much say so [] on this but I would like a better understanding of what our position will be on our revolver after this withdrawal. How much access to cash will be available as we will more than likely need to draw from the revolver starting in approximately 30 to 45 days for a period of about 90 days..."

73. After inquiring as to Debtors' cash position, Simon expressed concern to Farahnak: "Sam my understanding from Mike is we currently have $47M of availability which will be $17 after the transfer. This is subject to a $10M min, and a $12M trigger which leaves us with $5M of availability. Given AR and inventories in January this would have been $3M. We are projected to draw from the revolver $3M in the next two to three months. This seems extremely close. Am I missing something? Running a business with $5M of availability seems very limited..."

74. Later the same day (March 16, 2017), Soileau sent an email to Farahnak and Simon expressing similar liquidity concerns – specifically, that "liquidity gets tight April – July," that "if we don't achieve the [sales] volumes and have to reduce production we don't have a lot of wiggle room and inventories (especially scrap) don't always move as smoothly as in a budget," and that if scrap costs increased significantly they may run into other issues under the Revolving Loan.

75. The liquidity concerns expressed by Simon and Soileau were not heeded and, as set forth above, BD LaPlace wired the Distribution to Fund IV the following day.

76. In an August 28, 2017 email to Farahnak, Tom Gilboy (Debtors' then-CFO) wrote that, as he and Soileau recalled, "to the extent that there was any discussion of trailing fixed charge coverages . . . in connection with the [Distribution]," those issues were "put aside" and the Distribution was instead "supported . . . more on future coverage (based on the budget)"—even

though, as noted above, that budget was knowingly unrealistic, having been engineered to support Black Diamond's agenda.

77. The Distribution stripped the Debtors, including BD LaPlace, of much-needed capital to benefit Black Diamond and Fund IV at the expense of the Debtors and their creditors.

78. Farahnak and Raygorodetsky—who were both well aware of the Debtors' liquidity struggles at the time—elevated the interests of Black Diamond and Fund IV over those of the Debtors.

79. As for the other Director Defendants—Taft, Unfried, and Archambault—the records available to the Trustee reflect no involvement or participation on their part in the decision to authorize the Distribution and no inquiry as to the impact the Distribution would have on the Debtors.

80. The Board did not execute any resolutions or written consents approving the First Amendment or the Distribution.

81. The Distribution was issued when the Debtors, including BD LaPlace were operating at a loss and were insolvent—or the Distribution rendered Debtors, including BD LaPlace insolvent and without adequate capital to conduct business and pay debts as they became due.

82. A company's financial condition and solvency are commonly determined by reference to an income-based approach, which measures a company's ability to generate positive cash flows from operations and earnings.

83. From Black Diamond's Acquisition of Debtors in 2016, through Debtors' bankruptcy filings in 2019, Debtors failed to generate positive cash flows from operations—rather,

Debtors consistently reported significant negative cash flows as confirmed by the following information contained in their audited financial statements:

| | 2016 | 2017 | 2018 |
|---|---|---|---|
| Cash Flow from Operations (000) | ($13,174) | ($9,873) | ($2,915) |
| Cash Flow from Investing[3] (000) | ($2,943) | ($5,935) | ($5,869) |
| Cumulative Negative Cash Flow (000) | ($16,117) | ($15,808) | ($8,784) |

84. Debtors' significant negative cash flows evidenced their inability to operate profitably and thus their insolvency.

85. Debtors' also failed to generate any significant earnings during this period and primarily reported negative EBITDA as reflected in their internal financial statements as follows:

| | 2016 | 2017 | 2018 | YTD AUG. 2019 |
|---|---|---|---|---|
| EBITDA (000) | ($13,679) | ($8,999) | $1,435 | ($21,839) |

86. Companies are often valued using a multiple of EBITDA to formulate enterprise value. Debtors' poor earnings history implies a negative enterprise value thus also yielding a negative equity value throughout the period from the Distribution through the Petition Date. Debtors' relatively small positive EBITDA for 2018 was woefully inadequate to increase enterprise value and yield positive equity.

87. As a result, Debtors' liabilities exceeded Debtors' assets rendering them insolvent from the date of the Distribution and thereafter.

3 Reflects purchases of property, plant and equipment (i.e., capital expenditures).

88. Debtors' operating losses and capital expenditures were funded by debt financing, principally through the Revolving Loan and the BD Loan, which grew year-over-year until the Debtors' bankruptcy filings, as reflected below:

| | 2016 | 2017 | 2018 | Petition Date |
|---|---|---|---|---|
| Total Debt Financing (000) | $3,813 | $46,879 | $61,437 | $78,824 |
| Total Liabilities (000) | $41,960 | $88,621 | $109,659 | $145,287 |

89. Debtors' insolvency deepened from ongoing operating losses, as they were unable to generate positive cash flows during the entirety of Black Diamond's ownership.

90. To the extent Black Diamond's/management's projections presented a rosier picture, they are unreliable, having been reverse engineered to a predetermined result for Black Diamond's internal purposes.

91. The Distribution was made on account of Fund IV and/or Black Diamond's equity interests in the Debtors, not on account of any debt or services rendered.

92. Accordingly, the Distribution conferred no value on the Debtors.

**Debtors' Financial Condition and Operating Performance**
**Further Deteriorate Following the Distribution**

93. The increased financial leverage and limited borrowing availability on the Revolving Loan—caused by having funded the Distribution while reducing the facility from $75 million to $60 million—left Debtors, including BD LaPlace, with unreasonably small capital to operate the business.

94. Debtors' reported availability on the Revolving Loan decreased from $35.3 million prior to the Distribution to $7.2 million after—a decline of $28.1 million or 80%—and worsened thereafter as Debtors continued to lose money.

95. As the chart below and the information set forth in EXHIBIT A attached hereto demonstrate, Debtors' Revolving Loan availability cratered immediately after payment of the Distribution and never recovered:




96. Debtors funded the Distribution by increasing borrowings under the Revolving Loan—thereby increasing the balance under the Revolving Loan from $3.8 million to $33.9 million and reducing Debtors' available capital.

97. Debtors' financial leverage increased dramatically upon and as a result of the Distribution.

98. Debtors' financial leverage was negatively impacted by poor operating performance which reduced the value of members' equity.

99. Prior to the Distribution, Debtors reported operating losses of $16.4 million for the year ended December 31, 2016, and $2.2 million for the two months ended February 28, 2017.

100. Debtors' operating losses continued after the Distribution, through Debtors' bankruptcy filing on October 1, 2019.

101. As admitted by the Debtors in a first-day filing, "the Company has suffered under its debt load, which eventually led to severe liquidity issues, and eventually default under the [Revolving Loan] Documents." (*See* Declaration of Alton Davis, Main Bankruptcy Docket, D.I. 14).

102. Accordingly, the Distribution significantly increased the Debtors' financial leverage and severely limited borrowing capabilities and available capital necessary to operate the business.

103. Debtors' cash position similarly deteriorated as a result of the Distribution.

104. Simply stated, pre-Distribution liquidity concerns voiced by Simon, Soileau, and others manifested themselves in short order.

105. On April 12, 2017—less than a month after the Distribution and only 12 days after approving a 2017 budget (which was based on the unrealistic and unattainable goal of $12 million positive EBITDA)—Farahnak and Raygorodetsky had an email discussion with Simon concerning the Debtors' customer accounts, shipping volumes, and lack of profitability. Farahnak wrote that they needed to discuss further discounting some key accounts, that he was "laser focused" on increasing shipments, and that he was "tired of reporting to Steve [Deckoff] that we are negative Ebitda." Simon responded: "Keep in mind that we also had a serious discussion while you guys were here about not discounting too much in order to maximize EBITDA from a margin perspective. I think a thorough review of some key accounts is warranted too but I also am of the

opinion that as our inventory position improves, our volumes will improve accordingly." Unhappy with this response, Raygorodetsky replied: "Hey rob – do u have a plan to get to positive EBITDA? Is it more volume or cost cuts? Or both? How do we get volume? How do you plan on meeting the budget? Looking forward to hearing from you as the leader and the management team you are leading."

106. In an April 26, 2017, Simon highlighted Debtors' operational shortcomings in an email to Farahnak and Raygorodetsky, highlighting that inventory would be "greatly devalue[d]" due to product discounting and that "[the Debtors'] product is viewed as inferior in quality, appearance and service."

107. Simon further complained that he was not being given authority as CEO to implement needed changes to operations or even to personnel. As evidenced by Simon's complaints, the Black Diamond-affiliated directors inserted themselves into daily operations, constantly pestering the Debtors' management and limiting their ability to implement necessary changes or focus on daily operations.

108. Debtors' poor performance continued into May 2017 and beyond. Numerous communications and other documents in the Trustee's possession demonstrate Debtors' insufficient liquidity, under capitalization and worsening financial performance in the period following the Distribution.

For example:

(i) A May 10, 2017 email from Raygorodetsky to Simon, "Can u remind us of plan to cover budget shortfall for may?," to which Simon responded, "the goal is to make May positive in the EBITDA line. We are trying to hit the budget number for shipments really hard right now! Hitting budget EBITA of $1+ million is out of reach at this point given the metal margin";

(ii) A June 30, 2017 email from Unfried to Gilboy commenting that "looks like another very poor financial performance" and asking for "breakdown of why selling price tumbled so much";

(iii) A July 18, 2017 forecast reporting actual cumulative negative EBITDA of $1.2 million for the first six months of 2017 (a miss of $3.8 million from the original budgeted EBITDA forecast) and forecasted cumulative negative EBITDA of $1.9 million for the second half of 2017, as well as underperformance for the first six months of 2017 in all major performance metrics, including shipping volume, average sales price, margin, and other costs;

(iv) A July 18, 2017 email from Farahnak to Andersen Tax, commenting "we will have significant 2017 loss";

(v) A July 29, 2017 email chain between Raygorodetsky, Simon, and Farahnak about the company's "need to start making money," "lack of cash availability," and attempts "to show break even right now, the next step is to show a profit.";

(vi) Another July 29, 2017 email chain between Raygorodetsky and Simon lamenting that "the company is losing money at a rapid clip" and had been "missing budget by a mile";

(vii) September 18, 2017 emails between Simon, Raygorodetsky, and others discussing cost-cutting measures due to "severity of our situation";

(viii) Emails throughout September 2017 between Farahnak, Raygorodetsky, Simon, and Gilboy expressing concerns about cash management, the possibility of falling below the $10 million availability block (which would trigger an event of default on the Revolving Loan), and negative EBITDA;

(ix) A September 28, 2017 email from Gilboy to Raygorodetsky and others concerning errors in the borrowing base calculation and commenting that "By the end of Aug we were in such a crisis (still are) we started liquidating more [inventory]";

(x) A September 29, 2017 email from Raygorodetsky to Unfried, Taft, and Archambault stating, "I am sad to communicate this to all of you but the latest fcast which we have not vetted yet is showing a much bigger loss for bayou for 2017. We are looking at ebitda of -7 mil […] I have received an approval from our boss to go cut costs in a manner that reflects a very tough situation. The company is also likely to require funding which we will support. Don't know yet when and how much.";

(xi) An October 27, 2017 email from Farahnak about projections, "[W]e'll need to show [BoA] something that proves September isn't as bad as it looks on surface," to which Raygorodetsky replied "And we as an owner need it ourselves frankly";

(xii) An October 28, 2017 email from Gilboy concerning adjustments to projections, commenting "to the extent that 'normalize' Sept to take account of unusually high expenses, that would mean that earlier months would 'normalize' to be more bad";

(xiii) An October 31, 2017 email from Unfried to Farahnak and Rayogoretsky, "I have been studying last month's financial package for a while now....depressing and disgusting. The $5,000 EBITDA/$13,000 net income loss for 9 months is beyond belief.";

(xiv) Q3 2017 Board Discussion Materials noting "Business results have been **very poor** with TYD October EBITDA of ($6,253K) and tight cash availability" (emphasis in original) and showing negative cash flows and negative net income;

(xv) A November 2, 2017 email from Simon to Raygorodetsky and Farahnak, "Current projections show us falling below the $10M threshold on our revolver as early as the first week of December, with conditions worsening quite significantly by late January, (net availability as low as $4M)."; and

(xvi) A December 22, 2017 email from Les Meier to Steve Deckoff noting "significant Bayou cash burn."

109. In an August 25, 2017 email to Farahnak attaching a 13-week availability forecast, Gilboy explained:

> This is the "bank" availability. In other words, this is our best estimate of what the bank will have in their system, and takes into account the benefit we get from "float" on checks issued.
>
> As you can see, there are a few weeks where we dip below $10 million of net availability for the bank. This is a serious concern.
>
> Let me assure you that the trade is getting pushed hard. There is not much left there, without having critical vendors starting to cut us off….

Gilboy also explained that having to file borrowing base certificates with BoA on a weekly basis—a heightened reporting requirement that had kicked in after the Debtors fell below the availability "trigger" provided in the Revolving Loan—caused volatility in the borrowing base when receivables were paid late. Gilboy concluded, "The purpose of this email is to highlight that I believe we are cutting this too tight."

110. Debtors' post-Distribution losses accelerated throughout 2017, triggered severe cost cutting measures, and eventually a declared default under the Revolving Loan.

111. Debtors cut employee salaries and benefits in October 2017. As notes from an October 25, 2017 meeting among Alton Davis, Kristen Barney and union representatives confirm: (i) Debtors' Board and executive leadership had taken pay cuts; (ii) salaried jobs had been reduced; (iii) changes had been made to employee's medical and other benefits; (iv) 401(k) match had been discontinued (along with other cost-cutting measures); (v) Debtors' "[p]roblem is [it's] losing money"; and, (vi) that "[p]rojection for the rest of the year will end up -[$]8m so all coming months are projected to be negative and so will Jan[uary] unless something changes in cost and selling price."

112. Debtors recorded an operating loss of $18.7 million for 2017.

113. By the end of 2017, the balance under the Revolving Loan had grown to over $38 million.

**<u>The BD Term Loan</u>**

114. In late 2017, as Debtors were running out of cash, Black Diamond explored injecting cash into the business.

115. On October 19, 2017, Black Diamond's legal counsel emailed Terrance McKinney at BoA, reporting that, "BD is planning to provide additional capital to BD Laplace in the form of a subordinated loan and BD would like the subordinated loan to be secured by a second lien," and seeking BoA's consent to the subordinated loan (as required by the Revolving Loan documents).

116. While Black Diamond and BoA negotiated a subordinate loan structure, Debtors' liquidity problem exacerbated. On November 16, 2017, Gilboy advised Farahnak that Debtors' 13-week cash forecast showed a $7 million deficit below the $10 million threshold that applied

under the Revolving Loan, due to low sales and expenditures related to a planned shutdown in December and rebates that would hit in January. Farahnak responded, "We are not going to get through process with [BoA] until end of December to put in the $5m. We need the team to find a way to make it deeper in to the month without tripping the availability block. We also need to find a way to make it through January with $5m. Neither of these are optional."

117. On December 21, 2017, Debtors entered into a Subordinated Loan and Security Agreement with Fund IV and BDCF (the "BD Term Loan"), which provided, initially, for a $15 million subordinated term loan, from which the Debtors would draw in increments (the first of which was $5 million, on the date of the agreement).

118. The Subordinated Loan and Security Agreement identifies Debtor BD LaPlace as "Borrower," Debtor Bayou Holdings as "Parent," Debtor Bayou Investment as a "Guarantor," Fund IV as a "Lender," and BDCF as "Agent." The agreement was executed by Farahnak on behalf of each Debtor, Deckoff on behalf of Fund IV, and Hugo Gravenhorst on behalf of BDCF.

119. Section 7 of the Subordinated Loan and Security Agreement grants to the "Secured Parties" (defined to mean the Agent and the Lenders under the agreement—*i.e.*, BDCF and Fund IV) a continuing security interest and lien upon substantially all of the property of each of the Obligors (defined to include BD LaPlace, Bayou Investment, and "any other Person that is liable for payment of any Obligations or that has granted a Lien on its assets in favor of Agent to secure any Obligations"). Debtors' grant of these security interests is referred to herein as the "BD Lien Grant."

120. The Maturity Date of the BD Term Loan was April 5, 2022.

121. The BD Term Loan was subordinated to the BoA Revolving Loan. BoA (as agent for the lenders under the Revolving Loan) and BDCF entered into a Subordination and

Intercreditor Agreement, dated December 21, 2017, reflecting the parties' agreement to subordinate the BD Term Loan to the Revolving Loan. BoA and SunTrust also executed a Limited Consent Letter (dated same) consenting to Debtors' incurrence of the subordinated debt and to the related liens securing the subordinated debt.

122. Contemporaneously with the execution of the Subordinated Loan and Security Agreement and the Subordination and Intercreditor Agreement, Bayou Holdings and Bayou Investment also executed a Guaranty dated December 21, 2017 (the "Guaranty") in favor of BDCF (as Agent) and the secured parties under the BD Term Loan. The Guaranty defines Bayou Holdings as the "Parent Guarantor" and Bayou Investment as a "Guarantor," and provides that they each "irrevocably and unconditionally guarantie[d], jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, the due and punctual payment when due (whether at the stated maturity, by required prepayment, by acceleration or otherwise) and performance by the Borrowers [*i.e.*, BD LaPlace] of all Obligations [under the BD Term Loan]." Farahnak executed the Guaranty on behalf of Bayou Holdings and Bayou Investment.

123. The BD Term Loan was amended on January 4, 2019 to increase the maximum term loan commitment from $15 million to $30 million. In connection with the First Amendment to the BD Term Loan, a substitute term loan note was prepared, which reflected that $17.5 million had been borrowed under the loan as of January 4, 2019 (made up of $14 million that had been drawn during 2017 and 2018, and an additional $3.5 million drawn on the date of the First Amendment).

124. The BD Term Loan was amended again on May 5, 2019, to increase the amount available for borrowing—from $30 million to $40 million. As of that date (and as reflected in a second substitute term loan note) Debtors had borrowed $30.5 million under the BD Term Loan.

125. A Third Amendment to the BD Term Loan was executed August 30, 2019, amending Schedule 1.1 of the loan agreement to "reflect[] the aggregate principal amount of Term Loans borrowed as of the date hereof," which amended Schedule 1.1 states was $40 million.

126. According to Notices of Borrowing prepared by Debtors and quarterly Notices sent by BDCF to Debtors, draws were made on the BD Term Loan as follows:

| Date | Amount |
|---|---|
| 12/21/2017 | $5,000,000 |
| 5/2/2018 | $5,000,000 |
| 12/26/2018 | $4,000,000 |
| 1/4/2019 | $3,500,000 |
| 4/4/2019 | $7,500,000 |
| 4/30/2019 | $5,000,000 |
| 8/30/2019 | $1,000,000 |
| 9/6/2019 | $2,000,000 |
| TOTAL | $33,000,000 |

127. Upon information and belief, each draw was approved by Farahnak on behalf of Debtors and by Deckoff on behalf of the Black Diamond Entities.

128. The BD Term Loan was subject to a 12% interest rate. As reflected on quarterly Notices sent by BDCF to Debtors, the interest was paid-in-kind (PIK) interest which accrued quarterly and was then added to the principal amount. Between the draws being made on the loan and the compounding PIK interest, the outstanding balance owed on the BD Term Loan grew as follows:

| Date | Outstanding Principal |
|---|---|

| | |
|---|---|
| 12/31/2017 | $5,016,666.67 |
| 3/31/2018 | $5,167,166.67 |
| 6/30/2018 | $10,422,237.39 |
| 9/30/2018 | $10,741,852.67 |
| 12/31/2018 | $15,077,936.15 |
| 3/31/2019 | $19,130,607.57 |
| 6/30/2019 | $32,530,069.33 |
| 9/30/2019 | $36,553,991.46 |

129. Despite the growing balance, neither the loan agreements nor the quarterly Notices prepared by BDCF required Debtors to make any payments on the loan in advance of the maturity date.

130. Debtors did not repay any portion of the BD Term Loan.

131. By causing the Debtors to grant security interests on substantially all of their property, the Black Diamond Entities used the BD Term Loan to elevate themselves to secured creditor status before Debtors' bankruptcy.

132. BDCF and Fund IV have filed proofs of claim in Debtors' bankruptcy in the amount of $36,553,991.46 and assert security interests in substantially all of Debtors' property.

133. The Black Diamond Entities were insiders, and through Bayou Holdings' Board, dominated and controlled many of Debtors' management decisions, in particular its financial decisions (including the decision to make the Distribution and to enter into the BD Term Loan). The BD Term Loan was not made at arm's length and was made at a time when the Debtors were insolvent and inadequately capitalized.

134. Given Debtors' poor financial condition, the Black Diamond Entities knew when it made the BD Term Loan (and caused the Debtors to make the BD Lien Grant) that the Debtors had no ability to repay even the initial loan amount, much less the increased borrowings provided for in the amended loan documents.

**The Debtors' Descent Into Bankruptcy**

135. Despite the cash infusions made in connection with the BD Term Loan (which simultaneously increased the Debtors' indebtedness well beyond any amount they could hope to repay and encumbered substantially all of their assets), Debtors' financial and operational difficulties continued.

136. Simon, the Debtors' CEO, had been fired in November 2017. Debtors did not hire a new CEO until almost a year and half later, in May 2019. After Simon's firing, Director Unfried took on a more active role with the Debtors' finance and operations teams, functioning as interim CEO.

137. Like those in 2017, emails throughout 2018 consistently acknowledged poor financial results, operational problems, and liquidity crises. For example:

(i) A February 28, 2018 email update from Unfried to Farahnak and Raygorodetsky explaining that cash flow was "still highest priority on a daily basis" and that BoA had concerns related to "suppressed availability" and lack of "positive EBITDA and cash flow";

(ii) A March 27, 2018 email from Gregory Schunk to Unfried, Farahnak, Raygorodetsky, and the executive leadership team discussing how "February was another poor month at an adjusted EBITDA of -$812k";

(iii) A March 28, 2018 email from Gilboy to Unfried, Farahnak, Raygorodetsky, and the executive leadership team concerning the 14-week availability forecast reported, "We have many vendors that are seriously past due, materially past their 'stretch' terms. We are beginning to have a broad pullback of vendors, particularly in scrap.";

(iv) An April 6, 2018 email from Unfried to Farahnak noted Debtors' "cash flow tap dance" and encouraged another cash infusion;

(v) A December 31, 2018 memorandum to Black Diamond's files prepared by Raygorodetsky describing that "second half of 2018" had been characterized by "operational performance issues;" and,

(vi) A January 16, 2019 email from Raygorodetsky describing December 2018 as a "[v]ery disappointing month."

138. Tensions between the Directors and Debtors' leadership team continued to impact Debtors' operations, as an April 15, 2018 email from Dan Lay (who had been hired as Vice President of Sales & Marketing in June 2017) to Raygorodetsky highlighs:

> **Look I came into this situation with some seriously wrong information about the solvency of Bayou but I'm here working to turn it around. Quite honestly I was lied to about where BSG stood financially when I agreed to come onboard.**
>
> I am 100% engaged and strive to make money. I don't get to retire after this. I know we are still not making money.
>
> So, question all you want. That's your right. You own the place. But don't think this is easy. It's not. When the only focus seemed to be volume I was focused on price too. It's the hardest part of this job.
>
> I'm not sure I have the trust of you guys even after almost 10 months. I guess the gong show that's [the finance team] stains my credibility. If you think someone else knows better than me then search them out. I can tell you I've got a handle on this market. I won't get my forecast right every month but in total I'll be pretty spot on for this year.
>
> I'd take the money you put into [Bob Unfried's] salary and turn it into inventory. That would help! (That's a joke. Sort of.)

(emphasis added).

139. Undeterred, Black Diamond persisted in setting unachievable goals and micromanaging Debtors' reporting and forecasting.

140. On March 21, 2019, Lay emailed Schunk: "[I]f there is some magical number you need me to get to then just say and we can stop the back and forth. The market sucks and I've now given you three scenarios to work with (original, pessimistic and optimistic). I've got nothing else. You want bridges to numbers that aren't within reach given our position right now and the market."

141. Debtors' financial difficulties eroded availability under the Revolving Loan and caused disputes with BoA—exacerbated by Debtors having miscalculated the borrowing base in violation of the Revolving Loan agreement.

142. In fact, Debtors' Revolving Loan availability was *worse* than reflected in its financial projections because ineligible items had been included in the borrowing base.

143. In a March 6, 2018 email, Gilboy had explained to Farahnak and Schunk that the Debtors may have been including items in the borrowing base which, under the Revolving Loan, were improper:

> There is Language in the credit agreement that would exclude from the BB the reserves for slow moving. […]
>
> That is ordinary and customary language. This issue has not been raised in any of our field exams, or valuations done by Level 3. We do have such a reserve on our Balance Sheet today of $424 k (we raised that reserve in Dec 2017.)
>
> Not having eyes on this issue (that it has never been factored out of our BB) is what tripped me up when we were looking at the disposition of old secondary materials in the summer.
>
> So maybe it is an esoteric question of steel being "Obsolete" which steel never is technically, or a "recoverable value" question. In any case, digging thru this document more, this is an "open" exposure for us.
>
> In addition, there is language that arguably would lead us to taking an offset for our Lower of Cost or Market reserve […]
>
> Our current LCM reserve is $335 k. Likewise, this issue has never been raised in Field Exams or valuations.

> We should discuss (not email) before I decide what to do re electrodes

144. On March 30, 2018, Schunk emailed Gilboy:

> I've been doing some digging and it seems that the budget is overstating the amount of availability in the revolver. I'm also not sure I understand the timing of how this is set up in the "availability calc." Tab – i.e. column C is pulling AR and revolver balance for January but also inventory for January and I would have expected a lag there (I've made this change in the attached). We were also including electrodes in the borrowing base for Jan/Feb.> >
>
> The reason for the overstatement is a bust in the BS detail tab for AR ending balance, the first few months don't appear to be following the formula so that overstates the ending AR by ~$1M and the "collections from the beginning AR" are larger than the beginning AR. Those two things would offset but based on January results we seem to be collecting current month invoices as well because ending January balance is ~$3M higher than actual. Changing the collections formula so that I end on the January and February ending AR balances does start to have us running into availability issues in March.

145. On April 5, 2018, Farahnak asked Terrence McKinney at BoA whether they could include electrodes in the borrowing base. McKinney said no: "Electrodes are a manufacturing supply - not inventory for the borrowing base. The bank doesn't allow electrodes as eligible even for profitable clients. This doesn't have anything to do with the company's financial performance." McKinney further explained, "The decrease in availability was caused by the company's poor operating results and negative cash flow. Black Diamond should contribute capital to replenish liquidity. The bank's position hasn't changed about this either." Farahnak replied that Black Diamond was "planning to contribute capital," and asked McKinney what amount the bank would "need to see from us to increase the size of the [Revolving Loan] line." McKinney replied, "Probably will need to see Bayou Steel generating positive cash flow for a few months. Not just positive EBITDA."

146. Exclusion of the electrodes did not resolve the problems with the Debtors' borrowing base calculations. As referenced in Gilboy's March 6, 2018, there was also a problem concerning the LCM (Lower of Cost or Market) Reserve. Despite having been alerted to the issue by March 2018, the problem had not been corrected by summer of 2019.

147. On August 20, 2019, Farahnak and McKinney discussed an inventory audit performed by Sector3 Appraisals, Inc. (who had been hired by BoA), the results of which reduced available borrowings. As McKinney explained:

> The inventory advance rates have always been determined by the appraisals. The appraisal results are a function of the current market conditions, which are commonly known. The company was forewarned about this a long while ago, when the appraisal was originally engaged, and based on initial feedback from the appraiser. Frankly, the appraiser had thought the results would be worse. Also, the company was not reporting the inventory values appropriately at the lower of cost or market, so the borrowing base has been overstated. Moreover, the company doesn't have enough liquidity because of operating losses and negative cash flow have been ongoing and significant.

148. The next day, on August 21, 2019, Kevin Kirkland (Debtors' VP of Finance) emailed Mike Williams (Debtors' new CEO, hired in May 2019) and others reporting that the results of the inventory audit were "worse than we had expected" and that, between the audit results and the changes concerning the LCM Reserve, Debtors' borrowing base had been negatively impacted by approximately $5 million. Kirkland also reported:

> I had a conversation with Terry McKinney of BOA this afternoon regarding the situation and he indicated that BOA was holding firm on the calculations to include the LCM reserve. I told him our position has been since the inception to not include the LCM reserve and he indicated this was just an oversight on their part and were insisting it be included going forward. It is in the agreement as he indicated, however, it has been audited numerous times and acknowledged to not be included in our calculations which is the practice we followed in the cash flow model we prepared. We will

> prepare another cash flow model in the morning with the changes BOA has given us.

149. The BoA-required adjustments caused Debtors to fall below the $10 million availability threshold under the Revolving Loan, triggering a default and permitting BoA to pursue default remedies.

150. Throughout August 2019, Farahnak and McKinney were emailing back and forth concerning the Debtors' desperate need for capital, with McKinney demanding to know when Black Diamond would be funding more subordinated debt to keep the Debtors afloat.

151. Debtors' operational and financial performance were dismal, liquidity was a persistent problem, and millions of dollars in subordinated debt from Black Diamond, as well as concessions from BoA, were necessary for Debtors to operate at the most basic level. Indeed, on the morning of August 29, 2019, McKinney emailed Farahnak that "Based on preliminary information so far [that day], Bayou Steel does not have enough loan availability, even to fund payroll this morning, without creating a default with the minimum availability covenant. And aside from additional funding request to pay critical vendors. Expecting that you do understand the circumstances this will create."

152. On September 12, 2019, McKinney emailed Kirkland, Lisa Savoie (Debtors' Manager of Financial Reporting), Williams, and Farahnak about a $2 million discrepancy in cash reporting (between the borrowing base and amount in the collection account):

> Bank of America and SunTrust were compelled to approve loan advances to BD LaPlace up to $900,000 for today. Loan operations dept has been notified.
>
> Please be advised that the diversion of cash collections is a serious violation of the loan agreement, and especially in light of the existing default, and pending forbearance negotiations.

> Be advised further, the company should retain that cash in trust, and deposit in the collection account today, as is required by the loan agreement. The company should not use that cash for any other purpose.
>
> The collateral coverage for the revolver has deteriorated even further, as a result of the actions yesterday and today by BD LaPlace and Black Diamond. All future loan advance requests from the bank will be under serious scrutiny.
>
> Please advise when Black Diamond will be funding additional sub debt to the company. It seems that tomorrow will likely be a necessity.
>
> Pending further investigations by the bank and legal counsel.

153. The same day, BoA brought in CR3 Partners LLC as an outside consultant for the Debtors, to assist with cash management, modeling, and managing Debtors' relationship with the banks. BoA also issued a Default Notice that day, due to Debtors' failure to maintain availability of $10 million or more.

154. A few weeks later, on October 1, 2019, Debtors filed their bankruptcy petitions.

## V. THE CLAIMS

### FIRST CLAIM – AVOIDANCE OF TRANSFER - DISTRIBUTION
**Pursuant to 6 Del. C. § 1304(a)(1), and 11 U.S.C. § 544**
**(Against Fund IV and Black Diamond)**

155. Paragraphs 1 through 154 above are incorporated herein by reference, as if restated in their entirety.

156. As set forth in detail above, the Trustee seeks to avoid and recover the Distribution paid in March 2017.

157. The Distribution payment is avoidable as a "transfer" within the meaning of 6 Del. C. § 1301(12) and 11 U.S.C. § 101(54).

158. At all times material hereto, Debtors had at least one general unsecured creditor holding an allowed claim who, but for Debtors' bankruptcy filings, would have standing to bring claims to avoid and recover the Distribution, including but not limited to general unsecured creditors which have filed proofs of claim in the Debtors' bankruptcy cases, as reflected in the Claims Register.

159. Accordingly, actual fraudulent transfers as to these predicate creditors are avoidable pursuant to 11 U.S.C. § 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301, *et seq.*

160. The Distribution was made with actual intent to hinder, delay, and/or defraud the Debtors' creditors, including but not limited to insofar as the Distribution was intended to enrich Fund IV and Black Diamond at the expense of and without regard for the Debtors or their creditors.

161. The Distribution was paid to an insider of the Debtors.

162. The Debtors did not receive reasonably equivalent value in exchange for paying the Distribution.

163. At the time the Distribution was paid, Debtors were insolvent (or were rendered insolvent shortly after and as a result of paying the Distribution), had unreasonably small capital, and/or had incurred or intended to incur debts beyond their ability to pay as such debts matured.

164. The goal of the Distribution was to strip out as much of the Debtors' available capital as possible, for Fund IV and Black Diamond's benefit.

165. Accordingly, the Distribution is avoidable as an actual fraudulent transfer pursuant to 6 Del. C. § 1304(a)(1) and Section 544 of the Bankruptcy Code.

## SECOND CLAIM – AVOIDANCE OF TRANSFER - DISTRIBUTION
**Pursuant to 6 Del. C. §§ 1304(a)(2) & 1305(a), and 11 U.S.C. § 544**
**(Against Fund IV and Black Diamond)**

166. Paragraphs 1 through 165 above are incorporated herein by reference, as if restated in their entirety.

167. As set forth in detail above, the Trustee seeks to avoid and recover the Distribution paid in March 2017, which constitutes an avoidable "transfer" within the meaning of 6 Del. C. § 1301(12) and 11 U.S.C. § 101(54).

168. At all times material hereto, Debtors had at least one general unsecured creditor holding an allowed claim who, but for Debtors' bankruptcy filings, would have standing to bring claims to avoid and recover the Distribution, including but not limited to general unsecured creditors which have filed proofs of claim in the Debtors' bankruptcy cases, as reflected in the Claims Register.

169. Accordingly, constructive fraudulent transfers as to these predicate creditors are avoidable pursuant to 11 U.S.C. § 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301, *et seq.*

170. As set forth more particularly above, at the time the Distribution was paid the Debtors were insolvent (or were rendered insolvent shortly after and as a result of paying the Distribution), had unreasonably small capital, and/or had incurred or intended to incur debts beyond their ability to pay as such debts matured.

171. The Debtors did not receive reasonably equivalent value in exchange for paying the Distribution.

172. Accordingly, the Distribution is avoidable as a constructively fraudulent transfer pursuant to 6 Del. C. §§ 1304(a)(2) and 1305(a), and Section 544 of the Bankruptcy Code.

## **THIRD CLAIM – RECOVERY OF TRANSFER UNDER 11 U.S.C. § 550**
## **(Against Fund IV and Black Diamond)**

173. Paragraphs 1 through 172 above are incorporated herein by reference, as if restated in their entirety.

174. As more particularly set forth above, the Trustee is entitled to avoid the Distribution pursuant to 11 U.S.C. § 544 and applicable state law.

175. As more particularly set forth above, the Distribution was paid to Fund IV, for the benefit of Fund IV and Black Diamond. Accordingly, Fund IV was the initial transferee of the transfer and Black Diamond was an entity for whose benefit the transfer was made, or, alternatively, the immediate or mediate transferee of such initial transferee.

176. Accordingly, the Trustee is entitled to recover the Distribution or its value pursuant to Section 550 of the Bankruptcy Code.

**FOURTH CLAIM – AVOIDANCE OF TRANSFER - BD LIEN GRANT**
**Pursuant to 11 U.S.C § 548(a)(1)(A)**
**(Against Fund IV and BDCF)**

177. [The Fourth Claim was dismissed and is not replead.]

**FIFTH CLAIM – AVOIDANCE OF TRANSFER - BD LIEN GRANT**
**Pursuant to 11 U.S.C § 548(a)(1)(B)**
**(Against Fund IV and BDCF)**

178. [The Fifth Claim was dismissed and is not replead.]

**SIXTH CLAIM – AVOIDANCE OF TRANSFER - BD LIEN GRANT**
**Pursuant to 6 Del. C. § 1304(a)(1), and 11 U.S.C. § 544**
**(Against Fund IV and BDCF)**

179. [The Sixth Claim was dismissed and is not replead.]

**SEVENTH CLAIM – AVOIDANCE OF TRANSFER - BD LIEN GRANT**
**Pursuant to 6 Del. C. §§ 1304(a)(2) & 1305(a), and 11 U.S.C. § 544**
**(Against Fund IV and BDCF)**

180. [The Seventh Claim was dismissed and is not replead.]

**EIGHTH CLAIM – UNJUST ENRICHMENT**
**(Against the Black Diamond Entities)**

181. [The Eighth Claim was dismissed and is not replead.]

**<u>NINTH CLAIM – BREACH OF FIDUCIARY DUTY</u>**
**(Against the Director Defendants)**

182. Paragraphs 1 through 181 above are incorporated herein by reference, as if restated in their entirety.

183. As members of Bayou Holdings' Board of Directors, the Director Defendants owed fiduciary duties of loyalty and care to Bayou Holdings.

184. As the sole manager of Debtors' Bayou Investment and BD LaPlace, Debtor Bayou Holdings owed fiduciary duties of loyalty and care to Bayou Investment and BD LaPlace.

185. The duty of loyalty obligated the Director Defendants to commit themselves to the business of Bayou Holdings and not themselves or other entities with which they were affiliated.

186. The duty of loyalty obligated Bayou Holdings to commit itself to the business of Bayou Investment and BD LaPlace and not itself or other entities with which it was affiliated.

187. The duty of loyalty is breached, *inter alia*: (a) when a fiduciary fails to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his/her responsibilities; (b) when a fiduciary "abdicates" his fiduciary responsibilities; (c) when a fiduciary acts in bad faith; and/or (d) when a fiduciary engages in self-dealing.

188. The duty of care is breached, *inter alia*: (a) when a fiduciary engages in an irrational decision-making process; and (b) when the conduct of a fiduciary rises to the level of gross negligence.

189. The Director Defendants breached their fiduciary duties to Bayou Holdings by, *inter alia*:

a. Causing the Distribution to be made using borrowings from the Revolving Loan, which was guaranteed by Bayou Holdings and caused Debtor BD LaPlace and the other Debtors to become insolvent.

b. Elevating the interests of the Black Diamond Entities over those of BD LaPlace and the other debtors in connection with the Distribution and the BD Term Loan and BD Lien Grant.

c. Failing to be fully informed and/or to take actions to prevent the payment of the Distribution, the BD Term Loan and the BD Lien Grant and resulting harm to Debtor BD LaPlace and the other debtors; and/or

d. Structuring the cash infusions made under the BD Term Loan as debt rather than equity investments, encumbering substantially all of the Debtors' assets, and, in connection therewith, causing Bayou Holdings to guaranty the payment and performance of the BD Term Loan, which none of the Debtors could ever hope to repay.

190. Bayou Holdings breached its fiduciary duties to BD LaPlace and Bayou Investment by, *inter alia*: causing and/or permitting BD LaPlace to borrow funds from the Revolving Loan (for which Bayou Investment and Bayou Holdings were guarantors) in order to pay the Distribution, which rendered all of the Debtors insolvent, constituted a fraudulent transfer, and prioritized the Black Diamond Entities' interests.

191. The conduct of the Director Defendants, as alleged herein, was intentional, reckless, or grossly negligent.

192. At all times relevant hereto, the Director Defendants prioritized the interests of the Black Diamond Entities over those of Debtor BD LaPlace, the non-insider creditors of that

insolvent entity, and Debtor Bayou Holdings for which they served as directors.

193. As a result of the various breaches of fiduciary duty described above, Debtors have suffered damages in an amount to be determined at trial.

**TENTH CLAIM – AIDING & ABETTING BREACH OF FIDUCIARY DUTY**
**(Against the Black Diamond Entities)**

194. Paragraphs 1 through 193 above are incorporated herein by reference, as if restated in their entirety.

195. The Director Defendants owed fiduciary duties to Bayou Holdings and breached those duties in connection with the Distribution, the BD Term Loan, and the BD Lien Grant.

196. Debtor Bayou Holdings—as the sole Manager of Debtors BD LaPlace and Bayou Investment, with full power and authority over all aspects of their business and affairs—owed fiduciary duties to BD LaPlace and Bayou Investment and breached those duties in connection with the Distribution, the BD Term Loan, and the BD Lien Grant.

197. The Black Diamond Entities knowingly participated in the breaches of the Director Defendants and of Bayou Holdings set forth above , as demonstrated by: (i) their role as the entities through which the Director Defendants carried out their plan to enrich Black Diamond and Fund IV at the Debtors' expense via the Distribution, and to encumber Debtors' assets for their own benefit in connection with the BD Term Loan and BD Lien Grant; (ii) the improper benefits the Black Diamond Entities received as a result of the Distribution; and (iii) Farahnak and Raygorodetsky's abuse and neglect in their roles as Directors of Bayou Holdings for the benefit of the Black Diamond Entities.

198. As a result of the Director Defendants' and Bayou Holdings' breaches of fiduciary duty and the Black Diamond Entities' knowing participation therein, Debtors have suffered damages.

**<u>ELEVENTH CLAIM – CORPORATE WASTE</u>**
**(Against the Director Defendants)**

199. [The Eleventh Claim was dismissed and is not replead.]

**<u>TWELFTH CLAIM - EQUITABLE SUBORDINATION</u>**
**Pursuant to 11 U.S.C. § 510**
**(Against Fund IV and BDCF)**

200. Paragraphs 1 through 199 above are incorporated herein by reference, as if restated in their entirety.

201. Fund IV and BDCF have filed claims against the Debtors. *See* Claim Nos. 59 and 62 (proofs of claim filed by BDCF); Claim Nos. 60 and 63 (proofs of claim filed by Fund IV).

202. As set forth in detail above, the Director Defendants and the Black Diamond Entities, including Fund IV and BDCF, engaged and/or knowingly participated in inequitable conduct with respect to the Debtors, including: (i) causing BD LaPlace to make the Distribution to enrich the Black Diamond Entities, to the detriment of the Debtors, and (ii) intentionally causing the Debtors to enter into secured loan agreements which the Debtors could never hope to repay and which had the effect of elevating the Black Diamond Entities to secured creditors in advance of Debtors' bankruptcy filing.

203. As a result of this inequitable conduct, non-insider creditors have been injured and Fund IV and BDCF have obtained an unfair advantage over those creditors.

204. Given the willful, unfair, bad faith, and/or inequitable conduct described herein, Claim Nos. 59, 60, 62, and 63 filed by Fund IV and BDCF should be equitably subordinated below the rights of all other innocent creditors of the Debtors, pursuant to Section 510(c) of the Bankruptcy Code.

**<u>THIRTEENTH CLAIM - SURCHARGE PURSUANT TO 11 U.S.C. § 506(c)</u>**
**(In The Alternative)**

205. Paragraphs 1 through 204 above are incorporated herein by reference, as if restated in their entirety.

206. Should the Court hold that one or more of the Black Diamond Entities holds a valid lien on Debtors' property—which the Trustee disputes—the Trustee seeks to recover the costs and expenses incurred by the estate to preserve and maximize the value of that property.

207. Section 506(c) of the Bankruptcy Code provides, in relevant part:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim….

11 U.S.C. § 506(c).

208. Prior to the Conversion Date, Debtors incurred more than $1.1 million in fees and expenses (including, but not limited to, estate professional fees) to preserve and maximize the value of Debtors' estates, including in connection with the sale of Debtors' assets to Liberty BSG Holdings Inc.

209. Since the Conversion Date, the Trustee and his professionals have undertaken a variety of efforts (and incurred related costs and expenses, in an amount which has yet to be fully quantified) to preserve, maintain, recover, collect and dispose of the assets of Debtors' estates, including, but not limited to, the following:

(i) Preservation of Debtors' Documents: The Trustee has incurred professional time and related expenses in connection with identifying, preserving and gaining access to Debtors' books and records from various third parties.

(ii) Collection of Accounts Receivable: The Trustee has incurred professional time and related expenses associated with pursuing collection of Debtors' accounts receivable

balances. As a result of the Trustee's efforts to date, Debtors' estates have recovered in excess of $3 million.

(iii) Turnover of Estate Funds: The Trustee has incurred professional time and related expenses associated with analyzing and pursuing the turnover of funds held in various escrow accounts, Debtors' prior cash management system, and various cash collateralizing letters of credit in excess of $23 million.

210. The Trustee may recover from Debtors' secured creditors the costs and expenses associated with the above-referenced efforts to preserve and maximize the underlying collateral pursuant to 11 U.S.C. § 506(c).

211. To the extent the Black Diamond Entities hold liens on Debtors' assets, the above-referenced costs and expenses were reasonable and necessary for the preservation of the alleged collateral and, therefore, provided a direct benefit to the Black Diamond Entities as secured creditors.

212. The Black Diamond Entities were aware of the estate's efforts and expenditure of resources in this regard because they directly or impliedly consented to them in connection with certain pre-conversion agreements and/or had actual or constructive knowledge of them (including insofar as they received notice of all bankruptcy case filings, which included Rule 9019 settlement motions and interim professional fee applications).

213. Based on the above facts, the Trustee is entitled to charge the above-referenced costs and expenses, which benefited the Black Diamond Entities and were reasonable and necessary to preserve and maximize Debtors' assets, against the Black Diamond Entities' alleged collateral.

## VI. RELIEF REQUESTED

WHEREFORE, Plaintiff George L. Miller, Chapter 7 Trustee for the jointly administered estates of the Debtors, demands judgment in his favor and against the Defendants, jointly and severally where appropriate, for:

(a) Avoidance and recovery of the Distribution or the value thereof, plus interest;

(b) Judgment in favor of the Trustee and against Fund IV and Black Diamond in the amount of the fraudulent transfers received by each, plus interest;

(c) Damages in excess of $65 million against the Director Defendants and the Black Diamond Entities;

(d) The entry of a judgment granting equitable subordination;

(e) Punitive damages in the amount to be determined by the jury;

(f) Pre-judgment interest, reasonable attorneys' fees and costs;

(g) Surcharge damages (in the alternative) under 11 U.S.C. § 506(c); and,

(h) Such additional relief as this Court deems just.

## VII. JURY DEMAND

The Trustee demands a jury trial before an Article III Judge on all claims asserted in this Complaint that are triable to a jury under the Constitution and applicable law.

Dated: August 24, 2022

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Bradford J. Sandler*

Bradford J. Sandler (DE Bar No. 4142)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P O Box 8705
Wilmington, DE 19899 (Courier 19801)
Tel: (302) 652-4100
Fax: (302) 652 -4400

E-mail: bsandler@pszjlaw.com
crobinson@pszjlaw.com
pkeane@pszjlaw.com

and

KAUFMAN, COREN & RESS, P.C.
Steven M. Coren, Esq.
Benjamin M. Mather, Esq.
Janice D. Felix, Esq.
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
E-mail: scoren@kcr-law.com
bmather@kcr-law.com
jfelix@kcr-law.com

*Counsel for George L. Miller, Chapter 7 Trustee*