**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| BAYOU STEEL BD HOLDINGS, L.L.C., *et al*,[1] | Case No. 19-12153 (KBO) (Jointly Administered) |
| Debtors. | |
| GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Bayou Steel BD Holdings, L.L.C., *et al.*, | Adv. No. 21-51013 (KBO) |
| Plaintiff, | |
| v. | **Re: Adv. D.I. 59** |
| BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C.; BDCM OPPORTUNITY FUND IV, L.P.; BLACK DIAMOND COMMERCIAL FINANCE, L.L.C.; SAM FARAHNAK; PHIL RAYGORODETSKY; ROB ARCHAMBAULT; TERRY TAFT; and BOB UNFRIED, | |
| Defendants. | |

## TERRY TAFT'S ANSWER TO FIRST AMENDED COMPLAINT

Defendant Terry Taft ("Defendant"), for his Answer to the First Amended Complaint (the "Complaint"), states as follows:

## GENERAL DENIAL

Defendant states that the headings, sub-headings, unnumbered paragraphs, and graphic material in the Complaint do not constitute well-pleaded allegations of fact and therefore require

---

[1]    The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, are: Bayou Steel BD Holdings, L.L.C. (1984), BD Bayou Steel Investment, LLC (1222), and BD LaPlace, LLC (5783).

no response.  To the extent that a response is required, those allegations are denied.  Defendant also denies any allegations of the Complaint not admitted specifically herein and all allegations to the extent they suggest that Defendant's conduct and the transactions at issue were improper in any respect or that Defendant otherwise has liability.  In addition, nothing herein is an admission as to the time or manner when or by which Defendant obtained any information.  This litigation is at an early stage and Defendant's factual investigation into the matters alleged in the Complaint is ongoing; Defendant reserves the right to amend this Answer as the action proceeds.

## I.    __INTRODUCTION__

1.      Plaintiff George L. Miller, Chapter 7 Trustee (the "Trustee") for the jointly administered Chapter 7 bankruptcy estates of Bayou Steel BD Holdings, L.L.C. ("Bayou Holdings"), BD Bayou Steel Investment, LLC ("Bayou Investment"), and BD LaPlace, LLC ("BD LaPlace") (collectively, "Debtors"), by and through his counsel, brings this action to, *inter alia*: (a) avoid and recover a $30 million distribution made to or for the benefit of the Debtors' equity holders-Defendants Black Diamond Capital Management, L.L.C. and affiliate Fund IV ("Black Diamond")-a distribution which rendered Debtors insolvent, fatally undercapitalized and struggling to stay afloat; (b) recover damages in excess of $65 million for breaches of fiduciary duty by the Black Diamond-controlled director defendants and aiding and abetting breaches of fiduciary duty by Black Diamond; and, (c) equitably subordinate Black Diamond's claims below those of Debtors' innocent creditors.

**ANSWER:**    The allegations in Paragraph 1 characterize Plaintiff's requested relief in this action and therefore no response is required.    To the extent that a response is required, Defendant denies that Plaintiff is entitled to the relief he seeks.

2.      Prior to their bankruptcy filings on October 1, 2019, Debtors manufactured and sold steel products-capital intensive businesses that struggled under the ownership of steel-giant ArcelorMittal. In April 2016, Black Diamond acquired Debtors from ArcelorMittal at distressed-based values-knowing full-well that the businesses were losing money and critically in need of a substantial capital infusion to stem losses and return to profitability.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 2 and therefore denies them, except admits that Debtors manufactured and sold steel products.

3.      Promptly orchestrating the sale of Debtors' only profitable business, Black Diamond squandered the opportunity to inject much-needed capital into the Debtors' remaining operations, choosing instead to direct a $30 million distribution (the "Distribution") to itself, thereby inflicting a mortal wound from which Debtors never recovered.

**ANSWER:**    Defendant denies the allegations in Paragraph 3.

4.      After Black Diamond stripped out the proceeds generated by the sale of Debtors' only profitable business, Debtors' management (a) faced liquidity and cash flow challenges daily, (b) struggled with access to limited credit hampered by Black Diamond having used the company's credit line to fund the Distribution to itself, and (c) managed Black Diamond-directed cost cutting measures and facility shutdowns, along with strained vendor relationships caused by Debtors having failed to pay debts as they became due. Simply stated, Black Diamond acquired a capital-intensive business and then starved the business of the capital needed to modernize equipment, improve product quality, prevent facility shutdowns, eliminate the need for personnel layoffs and

other cost cutting measures, achieve appropriate inventory levels to maximize sales and profit margins, and improve customer service and satisfaction.

**ANSWER:**   The allegations in Paragraph 4 characterize Plaintiff's requested relief in this action and therefore no response is required.   To the extent that a response is required, Defendant denies that Plaintiff is entitled to the relief he seeks.

5.   Debtors never achieved profitability or cashflow positivity and went out of business leaving non-insider creditors with claims exceeding $85 million. Through this litigation, the Trustee seeks to recover the damages inflicted by Defendants' wrongdoing-as detailed in this First Amended Complaint-for the benefit of Debtors' bankruptcy estates.

**ANSWER:**   The allegations in Paragraph 5 characterize Plaintiff's requested relief in this action and therefore no response is required.   To the extent that a response is required, Defendant denies that Plaintiff is entitled to the relief he seeks.

## II.   <u>JURISDICTION & VENUE</u>

6.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 of the United States Code (the "Bankruptcy Code"), or in or related to cases under the Bankruptcy Code.

**ANSWER:**   The allegations in Paragraph 6 state a legal conclusion to which no response is required.  To the extent that a response is required, Defendant respectfully refers the Court to 28 U.S.C. § 1334.

7.   The Trustee demands a jury trial before an Article III judge in connection with all claims to which he is entitled to a jury trial under the Constitution and applicable law, and the Trustee does <u>not</u> consent to the entry of any final judgment, order or adjudication by a bankruptcy judge as to jury-triable claims.

**ANSWER:**   The allegations in Paragraph 7 characterize Plaintiff's requested form of trial in this action and therefore no response is required.  To the extent a response is required, Defendant admits that Plaintiff requests a jury trial.

8.   Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a).

**ANSWER:**     The allegations in Paragraph 8 state a legal conclusion to which no response is required.  To the extent that a response is required, Defendant respectfully refers the Court to 28 U.S.C. § 1409(a).

## III.   **PARTIES**

### A.     **The Plaintiff**

9.     Plaintiff George L. Miller is the duly-appointed Chapter 7 Trustee of Debtors' bankruptcy estates.

**ANSWER:**     Defendant admits the allegations in Paragraph 9 on information and belief.

10.     On October 1, 2019 (the "Petition Date"), Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the cases are being jointly administered under the caption *In re Bayou Steel BD Holdings, L.L.C., et al.,* U.S.B.C. D. Del. Case No. 19-12153 (KBO).

**ANSWER:**     Defendant admits the allegations in Paragraph 10.

11.     On February 25, 2020 (the "Conversion Date"), the Bankruptcy Court entered an Order converting Debtors' Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code.

**ANSWER:**     Defendant admits the allegations in Paragraph 11.

12.     On the Conversion Date, Plaintiff was appointed Chapter 7 Trustee of the Debtors' estates, and he continues to serve in that capacity.

**ANSWER:**     Defendant admits the allegations in Paragraph 12 on information and belief.

13.     Each Debtor is a Delaware limited liability company.

**ANSWER:**     Defendant admits the allegations in Paragraph 13 on information and belief.

14.     Bayou Holdings and Bayou Investment are holding companies with no operations. After the Vinton Sale (described below), BD Laplace was the sole operating entity in the Debtors' corporate structure.

**ANSWER:**     Defendant admits the allegations in Paragraph 14.

15.     Bayou Holdings is the sole Member and 100% owner of Bayou Investment, which in turn is the sole Member and 100% owner of BD LaPlace.

**ANSWER:**     Defendant admits the allegations in Paragraph 15 on information and belief.

16.     The LLC Agreements of Bayou Investment and BD LaPlace (dated April 4, 2016, and April 5, 2016, respectively) each name Bayou Holdings as the "sole Manager" in which "[a]ll management powers over the business and affairs of the Company" are "exclusively vested." Accordingly, Bayou Holdings, through its Board of Directors (of which the Director Defendants defined herein were members), managed the business and affairs of all three Debtors, including operating entity BD LaPlace.

**ANSWER:**     To the extent the allegations in the first sentence of Paragraph 16 refer to the contents of specific LLC Agreements, those agreements speak for themselves, and Defendant denies any allegations in Paragraph 16 that are inconsistent therewith. Defendant denies the allegations in the second sentence of Paragraph 16.

17.     Debtors' business consisted of recycling scrap to produce a variety of structural steel, merchant bar, and specialty products. Debtors operated facilities in Louisiana and Tennessee, as well as distribution depots in Oklahoma, Illinois, and Pennsylvania.

**ANSWER:**     Defendant admits the allegations in Paragraph 17.

18.     Prior to conversion, Debtors sold substantially all of their assets to Liberty BSG Holdings Inc. pursuant to Section 363 of the Bankruptcy Code. The Bankruptcy Court approved the sale on December 26, 2019, and it closed on January 31, 2020.

**ANSWER:**     The procedural history of the main bankruptcy case is a matter of the public record, which speaks for itself. Defendant denies any allegations in Paragraph 18 that are inconsistent therewith.

**B.     The Defendants**

19.     Defendant Black Diamond Capital Management, L.L.C. ("Black Diamond," and together with its affiliates, including Fund IV and BDCF referenced herein, the "Black Diamond Entities") is a Delaware limited liability company with a place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830. Black Diamond is a private equity firm that, among other things, invests in distressed businesses. Black Diamond is the 100% owner of Debtor Bayou Holdings, which in turn owns 100% of Debtors Bayou Investment and BD LaPlace.

**ANSWER:**     Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 19 and therefore denies them, except admits that Black Diamond is a private equity firm that, among other things, invests in distressed businesses.

20.     Defendant BDCM Opportunity Fund IV, L.P. ("Fund IV") is a Delaware limited partnership with a place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830. Fund IV is a private equity fund managed by Black Diamond.

**ANSWER:**     Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 20 and therefore denies them.

21.     Defendant Black Diamond Commercial Finance, L.L.C. ("BDCF") is a Delaware limited liability company with a place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830. BDCF is an affiliate of Black Diamond.

**ANSWER:**     Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 21 and therefore denies them.

22.     Defendant Sam Farahnak is an individual and a Managing Director of Black Diamond, with a place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830. Farahnak spear-headed Black Diamond's acquisition of Debtors in 2016 and was a member of Bayou Holdings' Board of Directors from April 2016 until September 30, 2019.

**ANSWER:**     Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 22 and therefore denies them, except admits that Sam Farahnak was a member of Bayou Holdings' Board of Directors.

23.     Defendant Phil Raygorodetsky is an individual and a Managing Director of Black Diamond, with a place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830. Raygorodetsky was a member of Bayou Holdings' Board of Directors and Chairman from April 2016 until September 30, 2019.

**ANSWER:**     Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 23 and therefore denies them, except admits that Phil Raygorodetsky was a member of Bayou Holdings' Board of Directors

24.     Defendant Rob Archambault is an individual with an address of 145 Standish Street, Duxbury, MA 02332. Archambault was a member of Bayou Holdings' Board of Directors from September 2016 through the Petition Date.

**ANSWER:**     Defendant admits that Rob Archambault was a member of the Bayou Holdings' Board of Directors but is without knowledge or information sufficient to form a belief as to the truth of the alleged address, and thus that allegation is denied.

25. Defendant Terry Taft is an individual with an address of 4633 Riverview Drive, Hoover, AL 35244. Taft was a member of Bayou Holdings' Board of Directors from September 2016 through the Petition Date.

**ANSWER:** Defendant admits the allegations in Paragraph 25 but clarifies that his address is now 841 Creekside Lane, Bowling Green, KY 42103.

26. Defendant Bob Unfried is an individual with an address of 2041 Incrociato, New Braunfels, TX 78132. Unfried was a member of Bayou Holdings' Board of Directors from May 2016 through the Petition Date. Defendants Farahnak, Raygorodetsky, Archambault, Taft and Unfried are referred to herein, collectively, as the "Director Defendants."

**ANSWER:** Defendant admits that Bob Unfried was a member of the Bayou Holdings' Board of Directors but is without knowledge or information sufficient to form a belief as to the truth of the alleged address, and thus that allegation is denied.

## IV. FACTS

### Black Diamond's Acquisition of the Debtors

27. Bayou Steel Corporation was founded in 1979. At its headquarters in LaPlace, Louisiana, the company operated a mini-mill with electric arc furnace steelmaking, continuous billet casting, and a medium section rolling mill. The company also operated a bar product rolling mill in Harriman, Tennessee, as well as distribution depots in Tulsa, Oklahoma, Chicago, Illinois, and Pittsburgh, Pennsylvania.

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in the first sentence of Paragraph 27 and therefore denies them. Defendant admits the remainder of the allegations in Paragraph 27.

28. Typical steelmaking production flow included processing scrap at the LaPlace headquarters, which was then sent to steel making operations and then to rolling mills where it was converted into rolled products, which were then sold from the LaPlace or Harriman facilities or shipped to distribution depots. Finished goods were sent to customers via truck, rail, barge, or internationally via ocean vessel.

**ANSWER:** Defendant admits the allegations in Paragraph 28.

29. In January 2003, Bayou Steel Corporation and its subsidiaries filed for Chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas. The company emerged from bankruptcy in February 2004, pursuant to a plan of reorganization.

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 29 and therefore denies them.

30. In May 2006, Black Diamond acquired Bayou Steel and its subsidiaries for approximately $184 million.

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 30 and therefore denies them.

31. A couple years later, in July 2008, Black Diamond sold the company to ArcelorMittal, one of the world's largest steel producers, for $475 million. Post-closing, Bayou Steel operations were renamed ArcelorMittal LaPlace.

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 31 and therefore denies them, except admits that Black Diamond previously sold the Debtors' business to ArcelorMittal.

32. Around June 2015, ArcelorMittal put its United States long steel assets on the market, which included: (i) ArcelorMittal LaPlace, (ii) a facility in Steelton, Pennsylvania (formerly part of Bethlehem Steel), and (iii) a facility in Vinton, Texas (formerly known as Border Steel).

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 32 and therefore denies them.

33. On June 19, 2015, Farahnak emailed Steve Deckoff-Black Diamond's founder and managing principal-and Les Meier-a Black Diamond principal-reporting: "Arcelor is selling the old Bayou assets and a few other plants ($750m/35m rev/EBITDA). They have not done well with them and are looking to get out. It is a limited process and we are the only sponsor getting a look. I've attached the teaser and will send across the [Confidential Information Memorandum] once we get it. First round bids will be due in early July."

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 33 and therefore denies them.

34. Black Diamond's first-round bid was $190 million, based on $33 million estimated 2015 EBITDA. This bid was for the LaPlace-headquartered operations (which also included the Harriman facility and the three depots), the Steelton facility, and the Vinton facility.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 34 and therefore denies them.

35.    On July 21, 2015, Farahnak emailed Deckoff and Meier, reporting: "We are through to the next round on Arcelor mills and will start digging in to more detailed company information and financials over the next few weeks. We can sit down and go through it once we have done some more work. The bottom end of our current value range is $190m (5.4x)."

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 35 and therefore denies them.

36.    Black Diamond's goal was to repeat its lucrative turnaround and re-sale of Bayou Steel, as a July 23, 2015 email exchange between Farahnak and Eddie Lehner (President and CEO of Ryerson, a metal processor and distributor based in Chicago) confirmed: "Black Diamond completed a gem of a deal when they sold Bayou in 2008 to Mittal for $475m before the crash. In 2002 you could not have sold Bayou for $75m." (Lehner); "Yes Bayou was a home run and with steel having a tough time in 2015 we're hoping to get in at a good time again." (Farahnak).

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 36 and therefore denies them.

37.    The former Bayou Steel assets had not performed well when owned by ArcelorMittal. On July 27, 2015, Raygorodetsky commented to one of his Black Diamond colleagues that "Sam [Farahnak] told me that this underperformed for arcelor be arcelor fucked it up (mis managed). Arcelor doesn't strike [me] as a company that fucks things up but I may be wrong." A September 2015 presentation prepared by Black Diamond also characterized the mills as "undermanaged."

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 37 and therefore denies them.

38.    To assist with due diligence, Black Diamond hired Alton Davis as a consultant. Davis-an experienced steel industry executive-had served as Bayou Steel's Vice President of Plant Operations during Black Diamond's prior ownership and Chief Operating Officer of ArcelorMittal's Long Carbon North America unit before retiring in 2013.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 38 and therefore denies them.

39.    Davis highlighted operational problems: "finished product inventory [was] low compared to when Bayou owned the facilities;" and "loss of sales due to possible lack of inventory

at the right locations." His October 16, 2015 email identified improving performance at the LaPlace rolling mill and "gain[ing] market share and increase[ing] sales" as pivotal.

**ANSWER:**   Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 39 and therefore denies them.

40.   On September 12, 2015, Farahnak updated Deckoff and Meier: "first round bid was $190m (based on $33m 2015EBITDA-provided in CIM)" and that they "plann[ed] to bid $100m for second round this week and request exclusivity (based on $20m 2015E EBITDA and $130m NWC--our volume, price, margin assumptions, their stand alone cost assumptions)." Due to poor performance in QI 15, Farahnak expected an actual purchase price "closer to $70m," based on $15 million estimated 2015 EBITDA. According to Farahnak, "Q 1 '15 was a period of rapidly dropping scrap prices leading to high cost inventory being sold at low prices and significant negative EBITDA."

**ANSWER:**   Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 40 and therefore denies them.

41.   Black Diamond's lower second round of bid of $100 million reflected the significant decline in ArcelorMittal's operations during 2015, as compared with management's projections of 2015 EBITDA. ArcelorMittal's management projected $33 million EBITDA for 2015 versus actual first quarter results of significant negative EBITDA, thereby causing Black Diamond to reduce its bid by $90 million, or 47%.

**ANSWER:**   Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 41 and therefore denies them.

42.   In February 2016, an article published on AMM.com reported ArcelorMittal's having recorded impairment charges of $200 million during the fourth quarter of 2015 related to the intended sale of the LaPlace, Vinton, and Steelton mills, the planned sale of which came as the company's losses surged.

**ANSWER:**   Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 42 and therefore denies them.

43.   The executive summary contained in Black Diamond's Control Investment Committee Transaction Review dated March 23, 2016 stated "ArcelorMittal at its core is a flat roll company and has been unable to successfully operate long mill products." The presentation also provided historical performance and future projections for the LaPlace and Vinton mills:

LaPlace                Vinton

| | | |
|---|---|---|
| 2015 EBITDA | ($6.1MM) | $0.5MM |
| LTM January 2016 | ($6.1MM) | $0.1MM |

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 43 and therefore denies them.

44.    According to Raygorodetsky, the business had been "mismanaged" by ArcelorMittal and product prices had been discounted to quickly generate cash, at the expense of margin and profits.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 44 and therefore denies them.

45.    ArcelorMittal and Black Diamond reached an agreement in March 2016, as Farahnak confirmed in a March 16, 2016 email: "We have formally shaken hands on a [LaPlace] and [Vinton] deal with [ArcelorMittal] and will be announcing the deal as soon as Monday with a closing scheduled for the end of the month." The deal included the LaPlace-headquartered operations and the Vinton, Texas facility. Though it initially was to include the Steelton, Pennsylvania facility, ArcelorMittal kept that facility.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 45 and therefore denies them.

46.    The acquisition ("Acquisition") terms are set forth in a Sale and Purchase Agreement dated as of March 23, 2016, between ArcelorMittal USA LLC and ArecelorMittal Bayou Acquisition LLC, as Sellers, and BD Long Products, LLC, as Buyer. BD Long Products, LLC was formed on December 22, 2015 for purposes of the acquisition, with Fund IV as its sole member and Black Diamond as its manager. After closing, BD Long Products, LLC's name was changed to Bayou Steel BD Holdings, L.L.C. *(i.e.,* Debtor Bayou Holdings).

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 46 and therefore denies them.

47.    As adjusted, the final purchase price was approximately $90.2-allocated $64.7 million to LaPlace, and $25.5 million to Vinton-and the transaction closed on April 4, 2016.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 47 and therefore denies them.

48.     The Acquisition was funded by a combination of equity and debt.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 48 and therefore denies them.

49.     Black Diamond, through Fund IV, made an initial member contribution of $59.6 million, and owned 100% of Debtor Bayou Holdings, which in turn owned 100% of Debtors Bayou Investment and BD LaPlace.

**ANSWER:**    Defendant admits that Bayou Holdings owned 100% of the equity issued by Bayou Investment but denies that Bayou Holdings directly owned 100% of the equity issued by BD LaPlace. Defendant lacks knowledge or information sufficient to respond to the remaining allegations in Paragraph 49 and therefore denies them.

50.     The balance of the purchase price was funded through a revolving loan with Bank of America, N.A. ("BoA") and SunTrust Robinson Humphrey, Inc. ("SunTrust"), the terms of which are set forth in a Loan and Security Agreement dated as of April 4, 2016 (the "Revolving Loan").

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 50 and therefore denies them.

51.     The Revolving Loan permitted borrowings in the aggregate not to exceed $75 million-with availability determined by a prescribed borrowing base of inventory and accounts receivable-secured by liens on substantially all of Debtors' assets. BD LaPlace is the Borrower under the Revolving Loan, and Bayou Holdings and Bayou Investment are Guarantors.

**ANSWER:**    The allegations in Paragraph 51 refer to the contents of loan documents, which speak for themselves. Defendant denies any allegations in Paragraph 51 that are inconsistent therewith.

52.     Under the loan documents, availability below a "trigger" imposed cash management and increased reporting obligations and below $10 million constituted a default.

**ANSWER:**    The allegations in Paragraph 52 refer to the contents of loan documents, which speak for themselves.  Defendant denies any allegations in Paragraph 52 that are inconsistent therewith.

53.    Black Diamond had the right to appoint all members of Bayou Holdings' Board of Directors, and it did so.

**ANSWER:**    Defendant admits the allegations in Paragraph 53 on information and belief.

54.    Appointed in April 2016, the first two directors, Farahnak and Raygorodetsky, were Black Diamond managing directors. Raygorodetsky was appointed Chairman.

**ANSWER:**    Defendant admits the allegations in Paragraph 54 on information and belief.

55.    Thereafter, Black Diamond appointed three more directors: (i) Bob Unfried, a former steel industry executive, appointed in May 2016; (ii) Rob Archambault, a private equity operating executive, appointed in September 2016; and (iii) Terry Taft, a former metals industry executive, appointed in September 2016.

**ANSWER:**    Defendant admits the allegations in Paragraph 55.

56.    Black Diamond also controlled the recruitment and hiring of Debtors' executives. While executives' employment agreements were with Debtor BD LaPlace, final decisions concerning compensation and other terms of employment were typically made by Farahnak or other individuals associated with Black Diamond.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 52 and therefore denies them.

57.    Alton Davis was hired as Debtors' President and Chief Operating Officer, and Rob Simon as Debtors' Chief Executive Officer. Debtors also had a series of interim Chief Financial Officers until March 2017 when Tom Gilboy was hired in that role on a permanent basis.

**ANSWER:**    Defendant admits the allegations in Paragraph 57.

58.    Black Diamond played an active role in the Company's management and decision-making. Representatives of Black Diamond (including but not limited to Black Diamond-affiliated Board members and various associate-level employees of Black Diamond, such as Daniel Ozen and Gregory Schunk) maintained regular contact with Debtors' executives and other personnel regarding Debtors' financial performance, liquidity, sales, operational issues, and other matters. Ozen, a Senior Associate with Black Diamond, also served as Debtors' interim CFO. Representatives of Black Diamond also maintained regular contact with BoA regarding the Debtors' credit facility, financials, liquidity needs, and related matters.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 58, except to admit that representatives of Black Diamond were actively involved in the financial aspects of the business.

59.     In their decision making, the Director Defendants routinely favored the interests of Black Diamond over those of the Debtors (and the Debtors' creditors).

**ANSWER:**     Defendant denies the allegations in Paragraph 59.

### Crippled by Undercapitalization and Chronic Liquidity Problems, Debtors, Acting at Black Diamond's Direction, Nevertheless Issue a $30 Million Distribution To Fund IV

60.     Commencing upon Black Diamond's Acquisition in April 2016, and continuing to the Petition Date, Debtors were substantially undercapitalized and operated at a loss.

**ANSWER:**     Defendant denies that the Debtors were substantially undercapitalized from April 2016 through the Petition Date.  Defendant lacks knowledge or information sufficient to respond to the remaining allegations in Paragraph 60 and therefore denies them.

61.     Debtors recorded an operating loss of $16.4 million for 2016. The LaPlace operations reported negative EBITDA of $13.6 million for 2016, including negative EBITDA in each month of 2016.

**ANSWER:**     The allegations in the *first*[2] Paragraph 61 refer to the contents of financial records, which are documents that speak for themselves.  Defendant denies any allegations in the *first* Paragraph 61 that are inconsistent therewith.

62.     A series of post-Acquisition communications confirms Debtors' undercapitalization and persistent liquidity deficits.

For example:

(i)     A June 13, 2016 email from Farahnak to Paul Meyers (Debtors' interim CFO) states, "Do we think we will have to draw the revolver over the next few weeks? This week['s] cash is the lowest we've seen it." Meyers responded "Yes, we will likely draw next week or the week after." Meyers further explained that the poor cash situation was "not a surprise" and that the company had been sustaining itself by "moving cash between entities and pushing payments when able."

(ii)     A July 13, 2016 email from Farahnak to Kevin Torres (Debtors' Vice President of Recycling & Scrap Procurement) directs him to "push out payment on scrap purchases or pull back purchases in general" in order to "help out our cash position significantly" because "[ w]e are going to be tight going through Q3."

---

[2]     [As seen below, Plaintiff's Complaint inadvertently re-numbers its allegations, restarting at Paragraph 61. Defendant's Answer follows this numbering sequence.]

(iii)     A July 27, 2016 email chain among Ozen, Farahnak and Raygorodetsky reports that Debtors' management was in "hand to hand combat mode" and "busy making sure the lights stay on [and] the cash account stays above zero."

(iv)     An August 18, 2016 daily shipments report reflected significant negative variances of over 15% in shipments for the month to date prompting Raygorodetsky's alarming comment to Alton Davis: "looking at shipments below - I am growing pessimistic we hit 27kt in august, although I hope I am wrong!"

(v)     An October 15, 2016 email from Bob Unfried to Farahnak laments, "When I saw the Sept financials I almost threw up."

(vi)     An October 23, 2016 status report from Davis to Farahnak provides:

> Here I sit at the Laplace plant of the Bayou Steel Group in a facility that is shut down for one week with 5 cars in the parking lot (everyone else is on layoff). This is due to lack of business. It is a terrible shame to be in this situation. We have plant assets that are idle, inventory assets that are consuming huge amounts of cash, and a majority of our people assets are on one week layoff (after having worked with reduced pay since July). In addition we are burning cash and certainly not increasing the value of this investment.

> I believe that everyone from owners, board members, executives, other managers, and hourly employees feel a high degree of frustration, concern, anxiety, anger, fear, and who knows what other kinds of emotions that are not good.

(vii)     A November 14, 2016 13-week cash forecast prepared by Debtor management and forwarded by Ozen to Farahnak reports, "Razor thin liquidity." Later the same day, Ozen informs, "There is an impromptu call that is taking place with BSG management to discuss an urgent decision coming up in regards to our declining borrowing base and if we should be drawing some liquidity in advance of this."

(viii)     The Debtors were unable to pay for desperately needed modernization. For example, on November 15, 2016, Farahnak emailed Raygorodetsky and Ozen concerning the Debtors' need for certain e-commerce software solutions to improve customer service, saying "It looks like ecommerce is going to require $2m investment which will need to come from BD as equity or a loan given liquidity position at Bayou."

**ANSWER:**     Defendant lacks knowledge or information sufficient to respond to the allegations in *first* Paragraph 62 as to (i) communications not sent to or from Defendant or (ii) materials not provided to the Defendant. With respect to allegations in *first* Paragraph 62 as to communications sent to or from Defendant and materials provided to the Defendant, those are

documents that speak for themselves, and Defendant denies any allegations in *first* Paragraph 62 that are inconsistent therewith.  Defendant denies the remaining allegations in *first* Paragraph 62.

61.     Unlike the LaPlace operations-which burned cash and lost millions of dollars- the Vinton, Texas operation was cashflow positive.

**ANSWER:**     The allegations in the *second* Paragraph 61 refer to the contents of financial records, which are documents that speak for themselves. Defendant denies any allegations in the *second* Paragraph 61 that are inconsistent therewith.

62.     Accordingly, post-Acquisition, Black Diamond pursued a sale of the Vinton business-an effort which succeeded with the December 20, 2016 sale of BD Vinton LLC to Kyoei Steel for $49 million (the "Vinton Sale").

**ANSWER:**     Defendant lacks knowledge or information sufficient to respond to the allegation in the *second* Paragraph 62 that ties sale efforts to the allegations in prior Paragraphs, except Defendant admits that a sale of the Vinton business was explored in late 2016 and the sale consummated in December 2016.

63.     The Debtors recognized a gain of $12.8 million from the Vinton Sale, utilizing the proceeds to reduce the Revolving Loan balance from $55.3 million to $6.4 million.

**ANSWER:**     The allegations in Paragraph 63 refer to the contents of financial records, which are documents that speak for themselves.  Defendant denies any allegations in Paragraph 63 that are inconsistent therewith.  Defendant denies any allegation to the extent it implies an intended use of the Vinton Sale proceeds as a permanent reduction of the Revolving Loan balance.

64.     For a short time, the Vinton Sale de-leveraged Debtors' balance sheet, and significantly improved liquidity.

**ANSWER:**     Defendant admits that the result of applying the Vinton Sale proceeds to the Revolving Loan decreased outstanding debt and increased availability under the Revolving Loan.

65.     Rather than using the improved liquidity to rescue the business and make the capital investments necessary for the business to succeed, Black Diamond preferred itself-compelling Debtors to make a $30 million distribution to Black Diamond-controlled Fund IV on March 17, 2017.

**ANSWER:**    Defendant denies the allegations in Paragraph 65.

66.    A series of internal Black Diamond communications confirms that Black Diamond planned to withdraw every penny that it could get away with, knowing full well that it would leave the Debtors, including BD LaPlace, undercapitalized and in the same precarious financial condition that existed before the Vinton Sale.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 66 and therefore denies them.

67.    For example:

(i)    A November 30, 2016 email chain from Farahnak suggests: "Maybe we propose to increase availability to 15m (pay down 14m) and take the rest (36m) out. See if BofA will waive the other dividend restrictions"

(ii)    In January 2017, Farahnak discussed the proposed distribution with Terry McKinney of BoA. McKinney expressed concern about "the effect on cash flow for Bayou Steel".

(iii)    On January 26, 2017, Farahnak emailed Michael Soileau, Debtors' Vice President of Finance, requesting projections that supported taking out as much money as possible, "Can you put together a package that shows us drawing the maximum amount possible in Feb without going under 15m of availability in 2017?"

(iv)    The following week, Soileau sent a cash flow projection and explained: "We can draw $32,850,000 in February. February is actually the lowest point of the year for our availability because inventory and AR are at a low point in February. This is contingent upon the budget being met - if we miss the sales goal and therefore do not build as much inventory as in the budget then our availability will be lower. We certainly would like to have a little contingency in case things don't go as planned." Farahnak replied asking for revisions to the projection, including lowering the availability block in the projection to $10 million rather than $15 million.

(v)    On February 7, 2017 Farahnak reported to Raygorodetsky that "BofA is directionally good with a $33m dividend." Farahnak further explained that he had asked BoA to agree to remove the $15 million "trigger" from the loan, and leave only the $10 million minimum availability requirement.

(vi)    On February 9, 2017, Raygorodetsky commented to Farahnak: "[W]hile I like the fact that we are basically taking all of the money out that we got for [V]inton net of paying off [V]inton collateral backed borrowings - are we leaving enough liquidity in for [K]evin [Torres] to capitalize on any scrap dislocation opportunities I don't think he would need more than 2 mil extra at a time but it may be worth confirming." Farahnak, however, remained unconcerned: "Yes I agree with looking at liquidity if they miss budget. I imagine they still stay well above the 10m block because we wouldn't build inventory if volumes looked that far off which is a big use of cash during the year."

(vii)    While planning the Distribution, Farahnak and Rayogorodetsky were well aware that Debtors were liquidity-challenged. For example, just two weeks before the Distribution was made, Rayogorodetsky told Simon that 3.5% salary increases for employees who had not received any increase in several years had to wait, because "we need to start making money first."

(viii)    Rather than creating a realistic budget for Debtors' 2017 operations, Farahnak and Rayogorodetsky white-washed Debtors' operational and financial struggles. On March 8, 2017, Rayogorodetsky emailed Soileau and Kevin Castellanos (Associate at Black Diamond) expressing frustration that Debtors' management had been unable to reverse engineer a budget reflecting an acceptable EBITDA forecast for 2017, reporting to Soileau, "[w]e had an internal sit down on this already and indicated 12 mil budget EBITDA number to folks here [at Black Diamond] - so now we would need to come up with a plan/budget to get this back up as to $12 [million] as we can to avoid heavy pain and 1000s of additional questions."

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 67 and therefore denies them.

68.    On March 16, 2017, Debtors, BoA, and SunTrust executed the First Amendment to Loan and Security Agreement dated as of March 16, 2017 (the "First Amendment"), which, *inter alia,* amended the Revolving Loan to permit the payment of a distribution in the amount of $30 million (the "Distribution").

**ANSWER:**    The allegations in Paragraph 68 refer to the contents of documents, which speak for themselves.  Defendant denies any allegations in Paragraph 68 that are inconsistent therewith.

69.    The Distribution was paid by BD LaPlace to Fund IV the following day, on March 17, 2017.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 69 and therefore denies them.

70.    The wire confirmation from Bank of America Merrill Lynch shows that on March 17, 2017 $30,000,000.00 was wired from the "BD LaPlace A/P Account" to a JP Morgan Chase account belonging to Fund IV. Per the wire confirmation, the wire was initiated in the system by Soileau at 12:56 PM on March 17, 2017 and "Approved" by Bill Pax, the Debtors' Financial Planning & Analysis Manager, a few minutes later at 1:05 PM.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 70 and therefore denies them.

71.     The wire was facilitated by the Debtors' finance team at the direction of the Black Diamond-affiliated Directors. But those Directors ignored concerns over the liquidity impact of the Distribution and did not consult management in any meaningful way as to the detrimental impact the Distribution would have on the Debtors' operations and ability to pay debts as they became due.

**ANSWER:**     Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 71 and therefore denies them.

72.     Black Diamond (Farahnak and Raygordetsky, in particular) arranged the Distribution and the First Amendment without input from Debtors' CEO. On March 16, 2011-*after* the First Amendment had been executed and BoA had green-lighted the transfer-Farahnak forwarded the executed documents to Simon, noting: "Rob, we are ready to return $30m of BD capital. Let me know today if any concerns." Simon replied: "Not sure I have much say so[] on this but I would like a better understanding of what our position will be on our revolver after this withdrawal. How much access to cash will be available as we will more than likely need to draw from the revolver starting in approximately 30 to 45 days for a period of about 90 days..."

**ANSWER:**     Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 72 and therefore denies them.

73.     After inquiring as to Debtors' cash position, Simon expressed concern to Farahnak: "Sam my understanding from Mike is we currently have $47M of availability which will be $17 after the transfer. This is subject to a $10M min, and a $12M trigger which leaves us with $5M of availability. Given AR and inventories in January have been $3M. We are projected to draw from the revolver $3M in the next two to three months. This seems extremely close. Am I missing something? Running a business with $5M of availability seems very limited..."

**ANSWER:**     Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 73 and therefore denies them.

74.     Later the same day (March 16, 2017), Soileau sent an email to Farahnak and Simon expressing similar liquidity concerns - specifically, that "liquidity gets tight April - July," that "if we don't achieve the [sales] volumes and have to reduce production we don't have a lot of wiggle room and inventories (especially scrap) don't always move as smoothly as in a budget," and that if scrap costs increased significantly they may run into other issues under the Revolving Loan.

**ANSWER:**     Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 74 and therefore denies them.

75.     The liquidity concerns expressed by Simon and Soileau were not heeded and, as set forth above, BD LaPlace wired the Distribution to Fund IV the following day.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 75 and therefore denies them.

76.    In an August 28, 2017 email to Farahnak, Tom Gilboy (Debtors' then-CFO) wrote that, as he and Soileau recalled, "to the extent that there was any discussion of trailing fixed charge coverages . . . in connection with the [Distribution]," those issues were "put aside" and the Distribution was instead "supported ...more on future coverage (based on the budget)"-even though, as noted above, that budget was knowingly unrealistic, having been engineered to support Black Diamond's agenda.

**ANSWER:**    Defendant denies the allegations in Paragraph 76 to the extent it alleges that Defendant knew that any budget Defendant reviewed was "knowingly unrealistic" or otherwise not prepared in good faith. Defendant lacks knowledge or information sufficient to respond to the remaining allegations in Paragraph 76 and therefore denies them.

77.    The Distribution stripped the Debtors, including BD LaPlace, of much-needed capital to benefit Black Diamond and Fund IV at the expense of the Debtors and their creditors.

**ANSWER:**    Defendant denies the allegations in Paragraph 77.

78.    Farahnak and Raygorodetsky-who were both well aware of the Debtors' liquidity struggles at the time-elevated the interests of Black Diamond and Fund IV over those of the Debtors.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 78 and therefore denies them.

79.    As for the other Director Defendants-Taft, Unfried, and Archambault-the records available to the Trustee reflect no involvement or participation on their part in the decision to authorize the Distribution and no inquiry as to the impact the Distribution would have on the Debtors.

**ANSWER:**    Defendant lacks knowledge or information as to what records are available to the Trustee and, thus, lacks knowledge or information sufficient to respond to the allegations in Paragraph 79 and therefore denies them.

80.    The Board did not execute any resolutions or written consents approving the First Amendment or the Distribution.

**ANSWER:**   Defendant lacks knowledge or information sufficient to respond to the

allegations in Paragraph 80 and therefore denies them.

81.    The Distribution was issued when the Debtors, including BD LaPlace were
operating at a loss and were insolvent--or the Distribution rendered Debtors, including BD LaPlace
insolvent and without adequate capital to conduct business and pay debts as they became due.

**ANSWER:**   Defendant denies the allegations in Paragraph 81.

82.    A company's financial condition and solvency are commonly determined by
reference to an income-based approach, which measures a company's ability to generate positive
cash flows from operations and earnings.

**ANSWER:**   Defendant lacks knowledge or information sufficient to respond to the

allegations in Paragraph 82 and therefore denies them.

83.    From Black Diamond's Acquisition of Debtors in 2016, through Debtors'
bankruptcy filings in 2019, Debtors failed to generate positive cash flows from operations-rather,
Debtors consistently reported significant negative cash flows as confirmed by the following
information contained in their audited financial statements:

|  | **2016** | **2017** | **2018** |
|---|---|---|---|
| Cash Flow from Operations (000) | ($13,174) | ($9,873) | ($2,915) |
| Cash Flow from Investing[3] (000) | ($2,943) | ($5,935) | ($5,869) |
| Cumulative Negative Cash Flow (000) | ($16,117) | ($15,808) | ($8,784) |

**ANSWER:**   The allegations in Paragraph 83 refer to the contents of financial records,

which are documents that speak for themselves.  Defendant denies any allegations in Paragraph

83 that are inconsistent therewith.

84.    Debtors' significant negative cash flows evidenced their inability to operate
profitably and thus their insolvency.

**ANSWER:**   Defendant denies the allegations in Paragraph 84.

---

[3]      Reflects purchases of property, plant and equipment (i.e., capital expenditures).

85.     Debtors' also failed to generate any significant earnings during this period and primarily reported negative EBITDA as reflected in their internal financial statements as follows:

|  | **2016** | **2017** | **2018** | **YID AUG. 2019** |
|---|---|---|---|---|
| EBITDA (000) | ($13,679) | ($8,999) | $1,435 | ($21,839) |

**ANSWER:**    The allegations in Paragraph 85 refer to the contents of financial records, which are documents that speak for themselves.  Defendant denies any allegations in Paragraph 85 that are inconsistent therewith.

86.     Companies are often valued using a multiple of EBITDA to formulate enterprise value. Debtors' poor earnings history implies a negative enterprise value thus also yielding a negative equity value throughout the period from the Distribution through the Petition Date. Debtors' relatively small positive EBITDA for 2018 was woefully inadequate to increase enterprise value and yield positive equity.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 86 and therefore denies them.

87.     As a result, Debtors' liabilities exceeded Debtors' assets rendering them insolvent from the date of the Distribution and thereafter.

**ANSWER:**    Defendant denies the allegations in Paragraph 87.

88.     Debtors' operating losses and capital expenditures were funded by debt financing, principally through the Revolving Loan and the BD Loan, which grew year-over-year until the Debtors' bankruptcy filings, as reflected below:

|  | **2016** | **2017** | **2018** | **Petition Date** |
|---|---|---|---|---|
| Total Debt Financing (000) | $3,813 | $46,879 | $61,437 | $78,824 |
| Total Liabilities (000) | $41,960 | $88,621 | $109,659 | $145,287 |

**ANSWER:** The allegations in Paragraph 88 refer to the contents of financial records, which are documents that speak for themselves. Defendant denies any allegations in Paragraph 88 that are inconsistent therewith.

89. Debtors' insolvency deepened from ongoing operating losses, as they were unable to generate positive cash flows during the entirety of Black Diamond's ownership.

**ANSWER:** Defendant denies the allegations in Paragraph 89.

90. To the extent Black Diamond's/management's projections presented a rosier picture, they are unreliable, having been reverse engineered to a predetermined result for Black Diamond's internal purposes.

**ANSWER:** Defendant denies the allegations in Paragraph 90.

91. The Distribution was made on account of Fund IV and/or Black Diamond's equity interests in the Debtors, not on account of any debt or services rendered.

**ANSWER:** Defendant admits the Distribution was an equity distribution.

92. Accordingly, the Distribution conferred no value on the Debtors.

**ANSWER:** Defendant denies the allegations in Paragraph 92.

### Debtors' Financial Condition and Operating Performance
### Further Deteriorate Following the Distribution

93. The increased financial leverage and limited borrowing availability on the Revolving Loan-caused by having funded the Distribution while reducing the facility from $75 million to $60 million-left Debtors, including BD LaPlace, with unreasonably small capital to operate the business.

**ANSWER:** The allegations in Paragraph 93 state a legal conclusion to which no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 93.

94. Debtors' reported availability on the Revolving Loan decreased from $35.3 million prior to the Distribution to $7.2 million after-a decline of $28.1 million or 80%-and worsened thereafter as Debtors continued to lose money.

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 94 and therefore denies them.

95.    As the chart below and the information set forth in EXHIBIT A attached hereto demonstrate, Debtors' Revolving Loan availability cratered immediately after payment of the Distribution and never recovered:

[GRAPHIC/CHART FROM COMPLAINT OMMITTED]

**ANSWER:**    Upon information and belief, Defendant denies the accuracy of the chart in Paragraph 95 and the information set forth in Exhibit A, as it appears to net out the required $10MM minimum availability under the Bank of America loan documents (as referred to in Paragraph 52 of the Complaint).  Defendant lacks knowledge or information sufficient to respond to the remaining allegations in Paragraph 95 and therefore denies them.

96.    Debtors funded the Distribution by increasing borrowings under the Revolving Loan-thereby increasing the balance under the Revolving Loan from $3.8 million to $33.9 million and reducing Debtors' available capital.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 96 and therefore denies them.

97.    Debtors' financial leverage increased dramatically upon and as a result of the Distribution.

**ANSWER:**    Defendant admits that the advancement of a revolving loan to fund the Distribution by definition increases the financial leverage of the Debtors.  Defendant lacks knowledge or information sufficient to respond to the remaining allegations in Paragraph 97 and therefore denies them.

98.    Debtors' financial leverage was negatively impacted by poor operating performance which reduced the value of members' equity.

**ANSWER:**    Defendant admits that the Debtors' financial leverage would be negatively impacted during times when the Debtors experienced performance challenges.  Defendant does not know whether the reference to "members' equity" is intended as the term would appear on a balance sheet or the enterprise value of the business and, thus, Defendant lacks knowledge or

information sufficient to respond to the remaining allegations in Paragraph 98 and therefore denies them.

99. Prior to the Distribution, Debtors reported operating losses of $16.4 million for the year ended December 31, 2016, and $2.2 million for the two months ended February 28, 2017.

**ANSWER:** The allegations in Paragraph 99 refer to the contents of financial records, which are documents that speak for themselves. Defendant denies any allegations in Paragraph 99 that are inconsistent therewith.

100. Debtors' operating losses continued after the Distribution, through Debtors' bankruptcy filing on October 1, 2019.

**ANSWER:** The allegations in Paragraph 100 refer to the contents of financial records, which are documents that speak for themselves. Defendant denies any allegations in Paragraph 100 that are inconsistent therewith.

101. As admitted by the Debtors in a first-day filing, "the Company has suffered under its debt load, which eventually led to severe liquidity issues, and eventually default under the [Revolving Loan] Documents." *(See* Declaration of Alton Davis, Main Bankruptcy Docket, D.I. 14).

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the allegations of paragraph 101, except refer to the declaration for a complete and accurate statement of its contents.

102. Accordingly, the Distribution significantly increased the Debtors' financial leverage and severely limited borrowing capabilities and available capital necessary to operate the business.

**ANSWER:** Defendant admits that the advancement of a revolving loan to fund the Distribution by definition increases the financial leverage of the Debtors and reduces borrowing availability. Defendant lacks knowledge or information sufficient to respond to the remaining allegations in Paragraph 102 and therefore denies them.

103. Debtors' cash position similarly deteriorated as a result of the Distribution.

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 103 and therefore denies them.

104. Simply stated, pre-Distribution liquidity concerns voiced by Simon, Soileau, and others manifested themselves in short order.

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 104 and therefore denies them.

105. On April 12, 2017-less than a month after the Distribution and only 12 days after approving a 2017 budget (which was based on the unrealistic and unattainable goal of $12 million positive EBITDA)-Farahnak and Raygorodetsky had an email discussion with Simon concerning the Debtors' customer accounts, shipping volumes, and lack of profitability. Farahnak wrote that they needed to discuss further discounting some key accounts, that he was "laser focused" on increasing shipments, and that he was "tired of reporting to Steve [Deckoff] that we are negative Ebitda." Simon responded: "Keep in mind that we also had a serious discussion while you guys were here about not discounting too much in order to maximize EBITDA from a margin perspective. I think a thorough review of some key accounts is warranted too but I also am of the opinion that as our inventory position improves, our volumes will improve accordingly." Unhappy with this response, Raygorodetsky replied: "Hey rob - do u have a plan to get to positive EBITDA? Is it more volume or cost cuts? Or both? How do we get volume? How do you plan on meeting the budget? Looking forward to hearing from you as the leader and the management team you are leading."

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 105 and therefore denies them.

106. In an April 26, 2017, Simon highlighted Debtors' operational shortcomings in an email to Farahnak and Raygorodetsky, highlighting that inventory would be "greatly devalue[d]" due to product discounting and that "[the Debtors'] product is viewed as inferior in quality, appearance and service."

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 106 and therefore denies them.

107. Simon further complained that he was not being given authority as CEO to implement needed changes to operations or even to personnel. As evidenced by Simon's complaints, the Black Diamond-affiliated directors inserted themselves into daily operations, constantly pestering the Debtors' management and limiting their ability to implement necessary changes or focus on daily operations.

**ANSWER:**    Defendant admits that Simon would make such complaints, but Defendant lacks knowledge or information sufficient to respond to any allegation that the Black Diamond-affiliated directors' involvement limited management's ability to implement necessary changes or focus on daily operations.

108.    Debtors' poor performance continued into May 2017 and beyond. Numerous communications and other documents in the Trustee's possession demonstrate Debtors' insufficient liquidity, under capitalization and worsening financial performance in the period following the Distribution.

For example:

(i)    A May 10, 2017 email from Raygorodetsky to Simon, "Can u remind us of plan to cover budget shortfall for may?," to which Simon responded, "the goal is to make May positive in the EBITDA line. We are trying to hit the budget number for shipments really hard right now! Hitting budget EBITA of $1+ million is out of reach at this point given the metal margin";

(ii)    A June 30, 2017 email from Unfried to Gilboy commenting that "looks like another very poor financial performance" and asking for "breakdown of why selling price tumbled so much";

(iii)    A July 18, 2017 forecast reporting actual cumulative negative EBITDA of $1.2 million for the first six months of 2017 (a miss of $3.8 million from the original budgeted EBITDA forecast) and forecasted cumulative negative EBITDA of $1.9 million for the second half of 2017, as well as underperformance for the first six months of 2017 in all major performance metrics, including shipping volume, average sales price, margin, and other costs;

(iv)    A July 18, 2017 email from Farahnak to Andersen Tax, commenting "we will have significant 2017 loss";

(v)    A July 29, 2017 email chain between Raygorodetsky, Simon, and Farahnak about the company's "need to start making money," "lack of cash availability," and attempts "to show break even right now, the next step is to show a profit.";

(vi)    Another July 29, 2017 email chain between Raygorodetsky and Simon lamenting that "the company is losing money at a rapid clip" and had been "missing budget by a mile";

(vii)    September 18, 2017 emails between Simon, Raygorodetsky, and others discussing cost-cutting measures due to "severity of our situation";

(viii)    Emails throughout September 2017 between Farahnak, Raygorodetsky, Simon, and Gilboy expressing concerns about cash management, the possibility of falling below the $10 million availability block (which would trigger an event of default on the Revolving Loan), and negative EBITDA;

(ix)    A September 28, 2017 email from Gilboy to Raygorodetsky and others concerning errors in the borrowing base calculation and commenting that "By the end of Aug we were in such a crisis (still are) we started liquidating more [inventory]";

(x)    A September 29, 2017 email from Raygorodetsky to Unfried, Taft, and Archambault stating, "I am sad to communicate this to all of you but the latest feast which we have not vetted yet is showing a much bigger loss for bayou for 2017. We are looking at ebitda of -7 mil [... ] I have received an approval from our boss to go cut costs in a manner that reflects a very tough situation. The company is also likely to require funding which we will support. Don't know yet when and how much.";

(xi)    An October 27, 2017 email from Farahnak about projections, "[W]e'll need to show [BoA] something that proves September isn't as bad as it looks on surface," to which Raygorodetsky replied "And we as an owner need it ourselves frankly";

(xii)    An October 28, 2017 email from Gilboy concerning adjustments to projections, commenting "to the extent that 'normalize' Sept to take account of unusually high expenses, that would mean that earlier months would 'normalize' to be more bad";

(xiii)    An October 31, 2017 email from Unfried to Farahnak and Rayogoretsky, "I have been studying last month's financial package for a while now....depressing and disgusting. The $5,000 EBITDA/$13,000 net income loss for 9 months is beyond belief.";

(xiv)    Q3 2017 Board Discussion Materials noting "Business results have been **very poor** with TYO October EBITDA of ($6,253K) and tight cash availability" (emphasis in original) and showing negative cash flows and negative net income;

(xv)    A November 2, 2017 email from Simon to Raygorodetsky and Farahnak, "Current projections show us falling below the $1OM threshold on our revolver as early as the first week of December, with conditions worsening quite significantly by late January, (net availability as low as $4M).";  and

(xvi)    A December 22, 2017 email from Les Meier to Steve Deckoff noting "significant Bayou cash burn."

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 108 as to (i) communications not sent to or from Defendant or (ii) materials not provided to the Defendant.  With respect to allegations in Paragraph 108 as to communications sent to or from Defendant and materials provided to the Defendant, those are documents that speak for themselves, and Defendant denies any allegations in Paragraph 108 that are inconsistent therewith.  Defendant admits that the Debtors' operational performance generally

did not meet expectations from May 2017 until the Petition Date.  Defendant denies all remaining

allegations in Paragraph 108.

109.    In an August 25, 2017 email to Farahnak attaching a 13-week availability forecast,
Gilboy explained:

> This is the "bank" availability. In other words, this is our best estimate of what the
> bank will have in their system, and takes into account the benefit we get from
> "float" on checks issued.
>
> As you can see, there are a few weeks where we dip below $10 million of net
> availability for the bank. This is a serious concern.
>
> Let me assure you that the trade is getting pushed hard. There is not much left there,
> without having critical vendors starting to cut us off....

Gilboy also explained that having to file borrowing base certificates with BoA on a weekly basis-a
heightened reporting requirement that had kicked in after the Debtors fell below the availability
"trigger" provided in the Revolving Loan-caused volatility in the borrowing base when receivables
were paid late. Gilboy concluded, "The purpose of this email is to highlight that I believe we are
cutting this too tight."

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the

allegations in Paragraph 109 and therefore denies them.

110.    Debtors' post-Distribution losses accelerated throughout 2017, triggered severe
cost cutting measures, and eventually a declared default under the Revolving Loan.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the

allegations in Paragraph 110 and therefore denies them.

111.    Debtors cut employee salaries and benefits in October 2017. As notes from an
October 25, 2017 meeting among Alton Davis, Kristen Barney and union representatives confirm:
(i) Debtors' Board and executive leadership had taken pay cuts; (ii) salaried jobs had been reduced;
(iii) changes had been made to employee's medical and other benefits; (iv) 40l(k) match had been
discontinued (along with other cost-cutting measures); (v) Debtors' "[p]roblem is [it's] losing
money"; and, (vi) that "[p]rojection for the rest of the year will end up -[$]8m so all coming months
are projected to be negative and so will Jan[uary] unless something changes in cost and selling
price."

**ANSWER:**    Defendant admits the allegations in the first sentence of Paragraph 111. The

remaining allegations in Paragraph 111 refer to the contents of written notes, which are documents

that speak for themselves, and Defendant denies any allegations in Paragraph 111 that are inconsistent therewith.

112.    Debtors recorded an operating loss of $18.7 million for 2017.

**ANSWER:**    The allegations in Paragraph 112 refer to the contents of financial records, which are documents that speak for themselves.  Defendant denies any allegations in Paragraph 112 that are inconsistent therewith.

113.    By the end of 2017, the balance under the Revolving Loan had grown to over $38 million.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 113 and therefore denies them.

## The BD Term Loan

114.    In late 2017, as Debtors were running out of cash, Black Diamond explored injecting cash into the business.

**ANSWER:**    Defendant admits that Black Diamond was considering providing a loan to the business in late 2017 but denies any other the allegations in Paragraph 114.

115.    On October 19, 2017, Black Diamond's legal counsel emailed Terrance McKinney at BoA, reporting that, "BD is planning to provide additional capital to BD Laplace in the form of a subordinated loan and BD would like the subordinated loan to be secured by a second lien," and seeking BoA's consent to the subordinated loan (as required by the Revolving Loan documents).

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 115 and therefore denies them.

116.    While Black Diamond and BoA negotiated a subordinate loan structure, Debtors' liquidity problem exacerbated. On November 16, 2017, Gilboy advised Farahnak that Debtors' 13-week cash forecast showed a $7 million deficit below the $10 million threshold that applied under the Revolving Loan, due to low sales and expenditures related to a planned shutdown in December and rebates that would hit in January. Farahnak responded, "We are not going to get through process with [BoA] until end of December to put in the $5m. We need the team to find a way to make it deeper in to the month without tripping the availability block. We also need to find a way to make it through January with $5m. Neither of these are optional."

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 116 and therefore denies them.

117.    On December 21, 2017, Debtors entered into a Subordinated Loan and Security Agreement with Fund IV and BDCF (the "BD Term Loan"), which provided, initially, for a $15 million subordinated term loan, from which the Debtors would draw in increments (the first of which was $5 million, on the date of the agreement).

**ANSWER:**    Defendant admits that the Debtors and certain Black Diamond entities entered into loan documents in December 2017.  Defendant lacks knowledge or information sufficient to respond to the remaining allegations in Paragraph 117 and therefore denies them.

118.    The Subordinated Loan and Security Agreement identifies Debtor BD LaPlace as "Borrower," Debtor Bayou Holdings as "Parent," Debtor Bayou Investment as a "Guarantor," Fund IV as a "Lender," and BDCF as "Agent." The agreement was executed by Farahnak on behalf of each Debtor, Deckoff on behalf of Fund IV, and Hugo Gravenhorst on behalf of BDCF.

**ANSWER:**    The allegations in Paragraph 118 refer to the contents of documents, which speak for themselves.  Defendant denies any allegations in Paragraph 118 that are inconsistent therewith.

119.    Section 7 of the Subordinated Loan and Security Agreement grants to the "Secured Parties" (defined to mean the Agent and the Lenders under the agreement-i.e., BDCF and Fund IV) a continuing security interest and lien upon substantially all of the property of each of the Obligors (defined to include BD LaPlace, Bayou Investment, and "any other Person that is liable for payment of any Obligations or that has granted a Lien on its assets in favor of Agent to secure any Obligations"). Debtors' grant of these security interests is referred to herein as the "BD Lien Grant."

**ANSWER:**    The allegations in Paragraph 119 refer to the contents of documents, which speak for themselves.  Defendant denies any allegations in Paragraph 119 that are inconsistent therewith.

120.    The Maturity Date of the BD Term Loan was April 5, 2022.

**ANSWER:**    The allegations in Paragraph 120 refer to the contents of documents, which speak for themselves.  Defendant denies any allegations in Paragraph 120 that are inconsistent therewith.

121.    The BD Term Loan was subordinated to the BoA Revolving Loan. BoA (as agent for the lenders under the Revolving Loan) and BDCF entered into a Subordination and Intercreditor Agreement, dated December 21, 2017, reflecting the parties' agreement to subordinate the BD Term Loan to the Revolving Loan. BoA and SunTrust also executed a Limited Consent Letter (dated same) consenting to Debtors' incurrence of the subordinated debt and to the related liens securing the subordinated debt.

**ANSWER:**    The allegations in Paragraph 121 refer to the contents of documents, which speak for themselves.  Defendant denies any allegations in Paragraph 121 that are inconsistent therewith.

122.    Contemporaneously with the execution of the Subordinated Loan and Security Agreement and the Subordination and Intercreditor Agreement, Bayou Holdings and Bayou Investment also executed a Guaranty dated December 21, 2017 (the "Guaranty") in favor of BDCF (as Agent) and the secured parties under the BD Term Loan. The Guaranty defines Bayou Holdings as the "Parent Guarantor" and Bayou Investment as a "Guarantor," and provides that they each "irrevocably and unconditionally guarantie[d], jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, the due and punctual payment when due (whether at the stated maturity, by required prepayment, by acceleration or otherwise) and performance by the Borrowers [*i.e.,* BD LaPlace] of all Obligations [under the BD Term Loan]." Farahnak executed the Guaranty on behalf of Bayou Holdings and Bayou Investment.

**ANSWER:**    The allegations in Paragraph 122 refer to the contents of documents, which speak for themselves.  Defendant denies any allegations in Paragraph 122 that are inconsistent therewith.

123.    The BD Term Loan was amended on January 4, 2019 to increase the maximum term loan commitment from $15 million to $30 million. In connection with the First Amendment to the BD Term Loan, a substitute term loan note was prepared, which reflected that $17.5 million had been borrowed under the loan as of January 4, 2019 (made up of $14 million that had been drawn during 2017 and 2018, and an additional $3.5 million drawn on the date of the First Amendment).

**ANSWER:**    The allegations in Paragraph 123 refer to the contents of documents, which speak for themselves.  Defendant denies any allegations in Paragraph 123 that are inconsistent therewith.

124.    The BD Term Loan was amended again on May 5, 2019, to increase the amount available for borrowing-from $30 million to $40 million. As of that date (and as reflected in a second substitute term loan note) Debtors had borrowed $30.5 million under the BD Term Loan.

**ANSWER:**   The allegations in Paragraph 124 refer to the contents of documents, which speak for themselves.  Defendant denies any allegations in Paragraph 124 that are inconsistent therewith.

125.   A Third Amendment to the BD Term Loan was executed August 30, 2019, amending Schedule 1.1 of the loan agreement to "reflect[] the aggregate principal amount of Term Loans borrowed as of the date hereof," which amended Schedule 1.1 states was $40 million.

**ANSWER:**   The allegations in Paragraph 125 refer to the contents of documents, which speak for themselves.  Defendant denies any allegations in Paragraph 125 that are inconsistent therewith.

126.   According to Notices of Borrowing prepared by Debtors and quarterly Notices sent by BDCF to Debtors, draws were made on the BD Term Loan as follows:

| Date | Amount |
|------|--------|
| 12/21/2017 | $5,000,000 |
| 5/2/2018 | $5,000,000 |
| 12/26/2018 | $4,000,000 |
| 1/4/2019 | $3,500,000 |
| 4/4/2019 | $7,500,000 |
| 4/30/2019 | $5,000,000 |
| 8/30/2019 | $1,000,000 |
| 9/6/2019 | $2,000,000 |
| TOTAL | $33,000,000 |

**ANSWER:**   The allegations in Paragraph 126 refer to the contents of written notices, which are documents that speak for themselves.  Defendant denies any allegations in Paragraph 126 that are inconsistent therewith.

127.   Upon information and belief, each draw was approved by Farahnak on behalf of Debtors and by Deckoff on behalf of the Black Diamond Entities.

**ANSWER:**   Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 127 and therefore denies them.

128.   The BD Term Loan was subject to a 12% interest rate. As reflected on quarterly Notices sent by BDCF to Debtors, the interest was paid-in-kind (PIK) interest which accrued quarterly and was then added to the principal amount. Between the draws being made on the loan and the compounding PIK interest, the outstanding balance owed on the BD Term Loan grew as follows:

| Date | Outstanding Principal |
|------|----------------------|
| 12/31/2017 | $5,016,666.67 |
| 3/31/2018 | $5,167,166.67 |
| 6/30/2018 | $10,422,237.39 |
| 9/30/2018 | $10,741,852.67 |
| 12/31/2018 | $15,077,936.15 |
| 3/31/2019 | $19,130,607.57 |
| 6/30/2019 | $32,530,069.33 |
| 9/30/2019 | $36,553,991.46 |

**ANSWER:**   To the extent the allegations in Paragraph 128 refer to the contents of loan documents or written notices, those are documents that speak for themselves.  Defendant lacks knowledge or information sufficient to respond to the remaining allegations in Paragraph 128 and therefore denies them.

129.    Despite the growing balance, neither the loan agreements nor the quarterly Notices prepared by BDCF required Debtors to make any payments on the loan in advance of the maturity date.

**ANSWER:**    The allegations in Paragraph 129 refer to the contents of loan agreements or notices, which are documents that speak for themselves.  Defendant denies any allegations in Paragraph 129 that are inconsistent therewith.

130.    Debtors did not repay any portion of the BD Term Loan.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 130 and therefore denies them.

131.    By causing the Debtors to grant security interests on substantially all of their property, the Black Diamond Entities used the BD Term Loan to elevate themselves to secured creditor status before Debtors' bankruptcy.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 131 and therefore denies them.

132.    BDCF and Fund IV have filed proofs of claim in Debtors' bankruptcy in the amount of $36,553,991.46 and assert security interests in substantially all of Debtors' property.

**ANSWER:**    The claims registered maintained in connection with the main bankruptcy case and the proofs of claim filed therein are matters of the public record, which speaks for itself. Defendant denies any allegations in Paragraph 132 that are inconsistent therewith.

133.    The Black Diamond Entities were insiders, and through Bayou Holdings' Board, dominated and controlled many of Debtors' management decisions, in particular its financial decisions (including the decision to make the Distribution and to enter into the BD Term Loan). The BD Term Loan was not made at arm's length and was made at a time when the Debtors were insolvent and inadequately capitalized.

**ANSWER:**    Defendant denies the allegations in Paragraph 133.

134.    Given Debtors' poor financial condition, the Black Diamond Entities knew when it made the BD Term Loan (and caused the Debtors to make the BD Lien Grant) that the Debtors had no ability to repay even the initial loan amount, much less the increased borrowings provided for in the amended loan documents.

**ANSWER:** Defendant denies the allegation that the Debtors had no ability to repay the BD Term Loan. Defendant lacks knowledge or information sufficient to respond to the remaining allegations in Paragraph 134 and therefore denies them.

### The Debtors' Descent Into Bankruptcy

135. Despite the cash infusions made in connection with the BD Term Loan (which simultaneously increased the Debtors' indebtedness well beyond any amount they could hope to repay and encumbered substantially all of their assets), Debtors' financial and operational difficulties continued.

**ANSWER:** Defendant admits that the Debtors' financial and operational difficulties continued after the making of the BD Term Loan. Defendant denies that the BD Term Loan "increased the Debtors' indebtedness well beyond any amount they could hope to repay." Defendant lacks knowledge or information sufficient to respond to the remaining allegations in Paragraph 135 and therefore denies them.

136. Simon, the Debtors' CEO, had been fired in November 2017. Debtors did not hire a new CEO until almost a year and half later, in May 2019. After Simon's firing, Director Unfried took on a more active role with the Debtors' finance and operations teams, functioning as interim CEO.

**ANSWER:** Defendant admits the allegations in the first sentence of Paragraph 136. Defendant admits that Bob Unfried took on a more active role in the business immediately after Simon's termination but denies that Mr. Unfried was functioning as interim CEO. Defendant clarifies that Alton Davis was in charge of the business immediately after Simon's termination and Defendant's role was to support Alton Davis.

137. Like those in 2017, emails throughout 2018 consistently acknowledged poor financial results, operational problems, and liquidity crises. For example:

(i) A February 28, 2018 email update from Unfried to Farahnak and Raygorodetsky explaining that cash flow was "still highest priority on a daily basis" and that BoA had concerns related to "suppressed availability" and lack of "positive EBITDA and cash flow";

(ii)    A March 27, 2018 email from Gregory Schunk to Unfried, Farahnak, Raygorodetsky, and the executive leadership team discussing how "February was another poor month at an adjusted EBITDA of -$812k";

(iii)    A March 28, 2018 email from Gilboy to Unfried, Farahnak, Raygorodetsky, and the executive leadership team concerning the 14-week availability forecast reported, "We have many vendors that are seriously past due, materially past their 'stretch' terms. We are beginning to have a broad pullback of vendors, particularly in scrap.";

(iv)    An April 6, 2018 email from Unfried to Farahnak noted Debtors' "cash flow tap dance" and encouraged another cash infusion;

(v)    A December 31, 2018 memorandum to Black Diamond's files prepared by Raygorodetsky describing that "second half of 2018" had been characterized by "operational performance issues;" and,

(vi)    A January 16, 2019 email from Raygorodetsky describing December 2018 as a "[v]ery disappointing month."

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 137 as to (i) communications not sent to or from Defendant or (ii) materials not provided to the Defendant.  With respect to allegations in Paragraph 137 as to communications sent to or from Defendant and materials provided to the Defendant, those are documents that speak for themselves, and Defendant denies any allegations in Paragraph 137 that are inconsistent therewith.

138.    Tensions between the Directors and Debtors' leadership team continued to impact Debtors' operations, as an April 15, 2018 email from Dan Lay (who had been hired as Vice President of Sales & Marketing in June 2017) to Raygorodetsky highlights:

> **Look I came into this situation with some seriously wrong information about the solvency of Bayou but I'm here working to turn it around. Quite honestly I was lied to about where BSG stood financially when I agreed to come onboard.**
>
> I am 100% engaged and strive to make money. I don't get to retire after this. I know we are still not making money.
>
> So, question all you want. That's your right. You own the place. But don't think this is easy. It's not. When the only focus seemed to be volume I was focused on price too. It's the hardest part of this job.

I'm not sure I have the trust of you guys even after almost 10 months. I guess the gong show that's [the finance team] stains my credibility. If you think someone else knows better than me then search them out. I can tell you I've got a handle on this market. I won't get my forecast right every month but in total I'll be pretty spot on for this year.

I'd take the money you put into [Bob Unfried's] salary and turn it into inventory. That would help! (That's a joke. Sort of.)

(emphasis added).

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 138 and therefore denies them.

139.    Undeterred, Black Diamond persisted in setting unachievable goals and micromanaging Debtors' reporting and forecasting.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 139 and therefore denies them.

140.    On March 21, 2019, Lay emailed Schunk: "[I]f there is some magical number you need me to get to then just say and we can stop the back and forth. The market sucks and I've now given you three scenarios to work with (original, pessimistic and optimistic). I've got nothing else. You want bridges to numbers that aren't within reach given our position right now and the market."

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 140 and therefore denies them.

141.    Debtors' financial difficulties eroded availability under the Revolving Loan and caused disputes with BoA-exacerbated by Debtors having miscalculated the borrowing base in violation of the Revolving Loan agreement.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 141 and therefore denies them.

142.    In fact, Debtors' Revolving Loan availability was *worse* than reflected in its financial projections because ineligible items had been included in the borrowing base.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 142 and therefore denies them.

143.    In a March 6, 2018 email, Gilboy had explained to Farahnak and Schunk that the Debtors may have been including items in the borrowing base which, under the Revolving Loan, were improper:

> There is Language in the credit agreement that would exclude from the BB the reserves for slow moving. [... ]

> That is ordinary and customary language. This issue has not been raised in any of our field exams, or valuations done by Level 3. We do have such a reserve on our Balance Sheet today of $424 k (we raised that reserve in Dec 2017.)

> Not having eyes on this issue (that it has never been factored out of our BB) is what tripped me up when we were looking at the disposition of old secondary materials in the summer.

> So maybe it is an esoteric question of steel being "Obsolete" which steel never is technically, or a "recoverable value" question. In any case, digging thru this document more, this is an "open" exposure for us.

> In addition, there is language that arguably would lead us to taking an offset for our Lower of Cost or Market reserve [... ]

> Our current LCM reserve is $335 k. Likewise, this issue has never been raised in Field Exams or valuations.

> We should discuss (not email) before I decide what to do re electrodes

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the

allegations in Paragraph 143 and therefore denies them.

144.    On March 30, 2018, Schunk emailed Gilboy:

> I've been doing some digging and it seems that the budget is overstating the amount of availability in the revolver. I'm also not sure I understand the timing of how this is set up in the "availability calc." Tab - i.e. column C is pulling AR and revolver balance for January but also inventory for January and I would have expected a lag there (I've made this change in the attached). We were also including electrodes in the borrowing base for Jan/Feb.>>

> The reason for the overstatement is a bust in the BS detail tab for AR ending balance, the first few months don't appear to be following the formula so that overstates the ending AR by ~$1M and the "collections from the beginning AR" are larger than the beginning AR. Those two things would offset but based on January results we seem to be collecting current month invoices as well because ending January balance is ~$3M higher than actual. Changing the collections formula so that I end on the January and February ending AR balances does start to have us running into availability issues in March.

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 144 and therefore denies them.

145. On April 5, 2018, Farahnak asked Terrence McKinney at BoA whether they could include electrodes in the borrowing base. McKinney said no: "Electrodes are a manufacturing supply - not inventory for the borrowing base. The bank doesn't allow electrodes as eligible even for profitable clients. This doesn't have anything to do with the company's financial performance." McKinney further explained, "The decrease in availability was caused by the company's poor operating results and negative cash flow. Black Diamond should contribute capital to replenish liquidity. The bank's position hasn't changed about this either." Farahnak replied that Black Diamond was "planning to contribute capital," and asked McKinney what amount the bank would "need to see from us to increase the size of the [Revolving Loan] line." McKinney replied, "Probably will need to see Bayou Steel generating positive cash flow for a few months. Not just positive EBITDA."

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 145 and therefore denies them.

146. Exclusion of the electrodes did not resolve the problems with the Debtors' borrowing base calculations. As referenced in Gilboy's March 6, 2018, there was also a problem concerning the LCM (Lower of Cost or Market) Reserve. Despite having been alerted to the issue by March 2018, the problem had not been corrected by summer of 2019.

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 146 and therefore denies them.

147. On August 20, 2019, Farahnak and McKinney discussed an inventory audit performed by Sector3 Appraisals, Inc. (who had been hired by BoA), the results of which reduced available borrowings. As McKinney explained:

> The inventory advance rates have always been determined by the appraisals. The appraisal results are a function of the current market conditions, which are commonly known. The company was forewarned about this a long while ago, when the appraisal was originally engaged, and based on initial feedback from the appraiser. Frankly, the appraiser had thought the results would be worse. Also, the company was not reporting the inventory values appropriately at the lower of cost or market, so the borrowing base has been overstated. Moreover, the company doesn't have enough liquidity because of operating losses and negative cash flow have been ongoing and significant.

**ANSWER:** Defendant lacks knowledge or information sufficient to respond to the allegations in Paragraph 147 and therefore denies them.

148.    The next day, on August 21, 2019, Kevin Kirkland (Debtors' VP of Finance) emailed Mike Williams (Debtors' new CEO, hired in May 2019) and others reporting that the results of the inventory audit were "worse than we had expected" and that, between the audit results and the changes concerning the LCM Reserve, Debtors' borrowing base had been negatively impacted by approximately $5 million. Kirkland also reported:

> I had a conversation with Terry McKinney of BOA this afternoon regarding the situation and he indicated that BOA was holding firm on the calculations to include the LCM reserve. I told him our position has been since the inception to not include the LCM reserve and he indicated this was just an oversight on their part and were insisting it be included going forward. It is in the agreement as he indicated, however, it has been audited numerous times and acknowledged to not be included in our calculations which is the practice we followed in the cash flow model we prepared. We will prepare another cash flow model in the morning with the changes BOA has given us.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the

allegations in Paragraph 148 and therefore denies them.

149.    The BoA-required adjustments caused Debtors to fall below the $10 million availability threshold under the Revolving Loan, triggering a default and permitting BoA to pursue default remedies.

**ANSWER:**    Defendant admits that Bank of America called a default under the loan

documents during this time period and exercised some remedies under the loan documents.

Defendant lacks knowledge or information sufficient to respond to the remaining allegations in

Paragraph 149 and therefore denies them.

150.    Throughout August 2019, Farahnak and McKinney were emailing back and forth concerning the Debtors' desperate need for capital, with McKinney demanding to know when Black Diamond would be funding more subordinated debt to keep the Debtors afloat.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the

allegations in Paragraph 150 and therefore denies them.

151.    Debtors' operational and financial performance were dismal, liquidity was a persistent problem, and millions of dollars in subordinated debt from Black Diamond, as well as concessions from BoA, were necessary for Debtors to operate at the most basic level. Indeed, on the morning of August 29, 2019, McKinney emailed Farahnak that "Based on preliminary information so far [that day], Bayou Steel does not have enough loan availability, even to fund payroll this morning, without creating a default with the minimum availability covenant. And aside

from additional funding request to pay critical vendors. Expecting that you do understand the circumstances this will create."

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the

allegations in Paragraph 151 and therefore denies them.

152.    On September 12, 2019, McKinney emailed Kirkland, Lisa Savoie (Debtors' Manager of Financial Reporting), Williams, and Farahnak about a $2 million discrepancy in cash reporting (between the borrowing base and amount in the collection account):

> Bank of America and SunTrust were compelled to approve loan advances to BD LaPlace up to $900,000 for today. Loan operations dept has been notified.

> Please be advised that the diversion of cash collections is a serious violation of the loan agreement, and especially in light of the existing default, and pending forbearance negotiations.

> Be advised further, the company should retain that cash in trust, and deposit in the collection account today, as is required by the loan agreement. The company should not use that cash for any other purpose.

> The collateral coverage for the revolver has deteriorated even further, as a result of the actions yesterday and today by BD LaPlace and Black Diamond. All future loan advance requests from the bank will be under serious scrutiny.

> Please advise when Black Diamond will be funding additional sub debt to the company. It seems that tomorrow will likely be a necessity.

> Pending further investigations by the bank and legal counsel.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the

allegations in Paragraph 152 and therefore denies them.

153.    The same day, BoA brought in CR3 Partners LLC as an outside consultant for the Debtors, to assist with cash management, modeling, and managing Debtors' relationship with the banks. BoA also issued a Default Notice that day, due to Debtors' failure to maintain availability of $10 million or more.

**ANSWER:**    Defendant lacks knowledge or information sufficient to respond to the

allegations in Paragraph 153 and therefore denies them.

154.    A few weeks later, on October 1, 2019, Debtors filed their bankruptcy petitions.

**ANSWER:**    Defendant admits the allegations in Paragraph 154.

## V.    THE CLAIMS

### FIRST CLAIM - AVOIDANCE OF TRANSFER – DISTRIBUTION
#### Pursuant to 6 Del. C. § 1304(a)(l), and 11 U.S.C. § 544
#### (Against Fund IV and Black Diamond)

155.    Paragraphs 1 through 154 above are incorporated herein by reference, as if restated in their entirety.

**ANSWER:**    The First Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

156.    As set forth in detail above, the Trustee seeks to avoid and recover the Distribution paid in March 2017.

**ANSWER:**    The First Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

157.    The Distribution payment is avoidable as a "transfer" within the meaning of 6 Del. C. § 1301(12) and 11 U.S.C. § 101(54).

**ANSWER:**    The First Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

158.    At all times material hereto, Debtors had at least one general unsecured creditor holding an allowed claim who, but for Debtors' bankruptcy filings, would have standing to bring claims to avoid and recover the Distribution, including but not limited to general unsecured creditors which have filed proofs of claim in the Debtors' bankruptcy cases, as reflected in the Claims Register.

**ANSWER:**    The First Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

159.    Accordingly, actual fraudulent transfers as to these predicate creditors are avoidable pursuant to 11 U.S.C. § 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 130 l, *et seq.*

**ANSWER:**    The First Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

160.     The Distribution was made with actual intent to hinder, delay, and/or defraud the Debtors' creditors, including but not limited to insofar as the Distribution was intended to enrich Fund IV and Black Diamond at the expense of and without regard for the Debtors or their creditors.

**ANSWER:**     The First Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

161.     The Distribution was paid to an insider of the Debtors.

**ANSWER:**     The First Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

162.     The Debtors did not receive reasonably equivalent value in exchange for paying the Distribution.

**ANSWER:**     The First Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

163.     At the time the Distribution was paid, Debtors were insolvent (or were rendered insolvent shortly after and as a result of paying the Distribution), had unreasonably small capital, and/or had incurred or intended to incur debts beyond their ability to pay as such debts matured.

**ANSWER:**     The First Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

164.     The goal of the Distribution was to strip out as much of the Debtors' available capital as possible, for Fund IV and Black Diamond's benefit.

**ANSWER:**     The First Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

165.     Accordingly, the Distribution is avoidable as an actual fraudulent transfer pursuant to 6 Del. C. § 1304(a)(l) and Section 544 of the Bankruptcy Code.

**ANSWER:**     The First Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

## SECOND CLAIM - AVOIDANCE OF TRANSFER – DISTRIBUTION
### Pursuant to 6 Del. C. §§ 1304(a)(2) & 1305(a), and 11 U.S.C. § 544
### (Against Fund IV and Black Diamond)

166.    Paragraphs 1 through 165 above are incorporated herein by reference, as if restated in their entirety.

**ANSWER:**    The Second Claim in the Complaint is not asserted against Defendant, and

therefore no response is required.

167.    As set forth in detail above, the Trustee seeks to avoid and recover the Distribution paid in March 2017, which constitutes an avoidable "transfer" within the meaning of 6 Del. C. § 1301(12) and 11 U.S.C. § 101(54).

**ANSWER:**    The Second Claim in the Complaint is not asserted against Defendant, and

therefore no response is required.

168.    At all times material hereto, Debtors had at least one general unsecured creditor holding an allowed claim who, but for Debtors' bankruptcy filings, would have standing to bring claims to avoid and recover the Distribution, including but not limited to general unsecured creditors which have filed proofs of claim in the Debtors' bankruptcy cases, as reflected in the Claims Register.

**ANSWER:**    The Second Claim in the Complaint is not asserted against Defendant, and

therefore no response is required.

169.    Accordingly, constructive fraudulent transfers as to these predicate creditors are avoidable pursuant to 11 U.S.C. § 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301, *et seq.*

**ANSWER:**    The Second Claim in the Complaint is not asserted against Defendant, and

therefore no response is required.

170.    As set forth more particularly above, at the time the Distribution was paid the Debtors were insolvent (or were rendered insolvent shortly after and as a result of paying the Distribution), had unreasonably small capital, and/or had incurred or intended to incur debts beyond their ability to pay as such debts matured.

**ANSWER:**    The Second Claim in the Complaint is not asserted against Defendant, and

therefore no response is required.

171.    The Debtors did not receive reasonably equivalent value in exchange for paying the Distribution.

**ANSWER:**    The Second Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

172.    Accordingly, the Distribution is avoidable as a constructively fraudulent transfer pursuant to 6 Del. C. §§ 1304(a)(2) and 1305(a), and Section 544 of the Bankruptcy Code.

**ANSWER:**    The Second Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

**THIRD CLAIM - RECOVERY OF TRANSFER UNDER 11 U.S.C. § 550**
**(Against Fund IV and Black Diamond)**

173.    Paragraphs 1 through 172 above are incorporated herein by reference, as if restated in their entirety.

**ANSWER:**    The Third Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

174.    As more particularly set forth above, the Trustee is entitled to avoid the Distribution pursuant to 11 U.S.C. § 544 and applicable state law.

**ANSWER:**    The Third Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

175.    As more particularly set forth above, the Distribution was paid to Fund IV, for the benefit of Fund IV and Black Diamond. Accordingly, Fund IV was the initial transferee of the transfer and Black Diamond was an entity for whose benefit the transfer was made, or, alternatively, the immediate or mediate transferee of such initial transferee.

**ANSWER:**    The Third Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

176.    Accordingly, the Trustee is entitled to recover the Distribution or its value pursuant to Section 550 of the Bankruptcy Code.

**ANSWER:**    The Third Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

### FOURTH CLAIM - AVOIDANCE OF TRANSFER - BD LIEN GRANT
**Pursuant to 11 U.S.C § 548(a)(l)(A)**
**(Against Fund IV and BDCF)**

177.    [The Fourth Claim was dismissed and is not replead.]

**ANSWER:**    The Fourth Claim in the Complaint was dismissed, and therefore no response is required.

### FIFTH CLAIM - AVOIDANCE OF TRANSFER - BD LIEN GRANT
**Pursuant to 11 U.S.C § 548(a)(l)(B)**
**(Against Fund IV and BDCF)**

178.    [The Fifth Claim was dismissed and is not replead.]

**ANSWER:**    The Fifth Claim in the Complaint was dismissed, and therefore no response is required.

### SIXTH CLAIM - AVOIDANCE OF TRANSFER - BD LIEN GRANT
**Pursuant to 6 Del. C. § 1304(a)(l), and 11 U.S.C. § 544**
**(Against Fund IV and BDCF)**

179.    [The Sixth Claim was dismissed and is not replead.]

**ANSWER:**    The Sixth Claim in the Complaint was dismissed, and therefore no response is required.

### SEVENTH CLAIM - AVOIDANCE OF TRANSFER - BD LIEN GRANT
**Pursuant to 6 Del. C. §§ 1304(a)(2) & 1305(a), and 11 U.S.C. § 544**
**(Against Fund IV and BDCF)**

180.    [The Seventh Claim was dismissed and is not replead.]

**ANSWER:**    The Seventh Claim in the Complaint was dismissed, and therefore no response is required.

### EIGHTH CLAIM - UNJUST ENRICHMENT
**(Against the Black Diamond Entities)**

181.    [The Eighth Claim was dismissed and is not replead.]

**ANSWER:**    The Eighth Claim in the Complaint was dismissed, and therefore no response is required.

## NINTH CLAIM - BREACH OF FIDUCIARY DUTY
### (Against the Director Defendants)

182.    Paragraphs 1 through 181 above are incorporated herein by reference, as if restated in their entirety.

**ANSWER:**    Defendant's responses above are incorporated herein by reference, as if restated in their entirety.

183.    As members of Bayou Holdings' Board of Directors, the Director Defendants owed fiduciary duties of loyalty and care to Bayou Holdings.

**ANSWER:**    The allegations in Paragraph 183 state a legal conclusion to which no response is required.

184.    As the sole manager of Debtors' Bayou Investment and BD LaPlace, Debtor Bayou Holdings owed fiduciary duties of loyalty and care to Bayou Investment and BD LaPlace.

**ANSWER:**    The allegations in Paragraph 184 state a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 184.

185.    The duty of loyalty obligated the Director Defendants to commit themselves to the business of Bayou Holdings and not themselves or other entities with which they were affiliated.

**ANSWER:**    The allegations in Paragraph 185 state a legal conclusion to which no response is required.

186.    The duty of loyalty obligated Bayou Holdings to commit itself to the business of Bayou Investment and BD LaPlace and not itself or other entities with which it was affiliated.

**ANSWER:**    The allegations in Paragraph 186 state a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 186.

187.    The duty of loyalty is breached, *inter alia:* (a) when a fiduciary fails to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his/her responsibilities; (b) when a fiduciary "abdicates" his fiduciary responsibilities; (c) when a fiduciary acts in bad faith; and/or (d) when a fiduciary engages in self-dealing.

**ANSWER:**   The allegations in Paragraph 187 state a legal conclusion to which no response is required.

188.   The duty of care is breached, *inter alia:* (a) when a fiduciary engages in an irrational decision-making process; and (b) when the conduct of a fiduciary rises to the level of gross negligence.

**ANSWER:**   The allegations in Paragraph 185 state a legal conclusion to which no response is required.

189.   The Director Defendants breached their fiduciary duties to Bayou Holdings by, inter alia:

(a)   Causing the Distribution to be made using borrowings from the Revolving Loan, which was guaranteed by Bayou Holdings and caused Debtor BD LaPlace and the other Debtors to become insolvent.

(b)   Elevating the interests of the Black Diamond Entities over those of BD LaPlace and the other debtors in connection with the Distribution and the BD Term Loan and BD Lien Grant.

(c)   Failing to be fully informed and/or to take actions to prevent the payment of the Distribution, the BD Term Loan and the BD Lien Grant and resulting harm to Debtor BD LaPlace and the other debtors; and/or

(d)   Structuring the cash infusions made under the BD Term Loan as debt rather than equity investments, encumbering substantially all of the Debtors' assets, and, in connection therewith, causing Bayou Holdings to guaranty the payment and performance of the BD Term Loan, which none of the Debtors could ever hope to repay.

**ANSWER:**   Defendant denies the allegations in Paragraph 189.

190.   Bayou Holdings breached its fiduciary duties to BD LaPlace and Bayou Investment by, *inter alia:* causing and/or permitting BD LaPlace to borrow funds from the Revolving Loan (for which Bayou Investment and Bayou Holdings were guarantors) in order to pay the Distribution, which rendered all of the Debtors insolvent, constituted a fraudulent transfer, and prioritized the Black Diamond Entities' interests.

**ANSWER:**   Defendant denies the allegations in Paragraph 190.

191.   The conduct of the Director Defendants, as alleged herein, was intentional, reckless, or grossly negligent.

**ANSWER:**   Defendant denies the allegations in Paragraph 191.

192.    At all times relevant hereto, the Director Defendants prioritized the interests of the Black Diamond Entities over those of Debtor BD LaPlace, the non-insider creditors of that insolvent entity, and Debtor Bayou Holdings for which they served as directors.

**ANSWER:**    Defendant denies the allegations in Paragraph 192.

193.    As a result of the various breaches of fiduciary duty described above, Debtors have suffered damages in an amount to be determined at trial.

**ANSWER:**    Defendant denies the allegations in Paragraph 193.

## TENTH CLAIM - AIDING & ABETTING BREACH OF FIDUCIARY DUTY
### (Against the Black Diamond Entities)

194.    Paragraphs 1 through 193 above are incorporated herein by reference, as if restated in their entirety.

**ANSWER:**    Defendant's responses above are incorporated herein by reference, as if restated in their entirety.

195.    The Director Defendants owed fiduciary duties to Bayou Holdings and breached those duties in connection with the Distribution, the BD Term Loan, and the BD Lien Grant.

**ANSWER:**    Defendant denies the allegations in Paragraph 195.

196.    Debtor Bayou Holdings-as the sole Manager of Debtors BD LaPlace and Bayou Investment, with full power and authority over all aspects of their business and affairs-owed fiduciary duties to BD LaPlace and Bayou Investment and breached those duties in connection with the Distribution, the BD Term Loan, and the BD Lien Grant.

**ANSWER:**    Defendant denies the allegations in Paragraph 196.

197.    The Black Diamond Entities knowingly participated in the breaches of the Director Defendants and of Bayou Holdings set forth above , as demonstrated by: (i) their role as the entities through which the Director Defendants carried out their plan to enrich Black Diamond and Fund IV at the Debtors' expense via the Distribution, and to encumber Debtors' assets for their own benefit in connection with the BD Term Loan and BD Lien Grant; (ii) the improper benefits the Black Diamond Entities received as a result of the Distribution; and (iii) Farahnak and Raygorodetsky's abuse and neglect in their roles as Directors of Bayou Holdings for the benefit of the Black Diamond Entities.

**ANSWER:**    Defendant denies the allegations in Paragraph 197.

198.    As a result of the Director Defendants' and Bayou Holdings' breaches of fiduciary duty and the Black Diamond Entities' knowing participation therein, Debtors have suffered damages.

**ANSWER:**   Defendant denies the allegations in Paragraph 198.

## ELEVENTH CLAIM - CORPORATE WASTE
### (Against the Director Defendants)

199.   [The Eleventh Claim was dismissed and is not replead.]

**ANSWER:**   The Eleventh Claim in the Complaint was dismissed, and therefore no response is required.

## TWELFTH CLAIM - EQUITABLE SUBORDINATION
### Pursuant to 11 U.S.C. § 510
### (Against Fund IV and BDCF)

200.   Paragraphs 1 through 199 above are incorporated herein by reference, as if restated in their entirety.

**ANSWER:**   The Twelfth Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

201.   Fund IV and BDCF have filed claims against the Debtors. *See* Claim Nos. 59 and 62 (proofs of claim filed by BDCF); Claim Nos. 60 and 63 (proofs of claim filed by Fund IV).

**ANSWER:**   The Twelfth Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

202.   As set forth in detail above, the Director Defendants and the Black Diamond Entities, including Fund IV and BDCF, engaged and/or knowingly participated in inequitable conduct with respect to the Debtors, including: (i) causing BD LaPlace to make the Distribution to enrich the Black Diamond Entities, to the detriment of the Debtors, and (ii) intentionally causing the Debtors to enter into secured loan agreements which the Debtors could never hope to repay and which had the effect of elevating the Black Diamond Entities to secured creditors in advance of Debtors' bankruptcy filing.

**ANSWER:**   The Twelfth Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

203.   As a result of this inequitable conduct, non-insider creditors have been injured and Fund IV and BDCF have obtained an unfair advantage over those creditors.

**ANSWER:**   The Twelfth Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

204.    Given the willful, unfair, bad faith, and/or inequitable conduct described herein, Claim Nos. 59, 60, 62, and 63 filed by Fund IV and BDCF should be equitably subordinated below the rights of all other innocent creditors of the Debtors, pursuant to Section 510(c) of the Bankruptcy Code.

**ANSWER:**    The Twelfth Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

### THIRTEENTH CLAIM - SURCHARGE PURSUANT TO 11 U.S.C. § 506(c)
### (In The Alternative)

205.    Paragraphs 1 through 204 above are incorporated herein by reference, as if restated in their entirety.

**ANSWER:**    The Thirteenth Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

206.    Should the Court hold that one or more of the Black Diamond Entities holds a valid lien on Debtors' property-which the Trustee disputes-the Trustee seeks to recover the costs and expenses incurred by the estate to preserve and maximize the value of that property.

**ANSWER:**    The Thirteenth Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

207.    Section 506(c) of the Bankruptcy Code provides, in relevant part:

The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim ....

11 U.S.C. § 506(c).

**ANSWER:**    The Thirteenth Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

208.    Prior to the Conversion Date, Debtors incurred more than $1.1 million in fees and expenses (including, but not limited to, estate professional fees) to preserve and maximize the value of Debtors' estates, including in connection with the sale of Debtors' assets to Liberty BSG Holdings Inc.

**ANSWER:**    The Thirteenth Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

209.    Since the Conversion Date, the Trustee and his professionals have undertaken a variety of efforts (and incurred related costs and expenses, in an amount which has yet to be fully quantified) to preserve, maintain, recover, collect and dispose of the assets of Debtors' estates, including, but not limited to, the following:

(i)     Preservation of Debtors' Documents: The Trustee has incurred professional time and related expenses in connection with identifying, preserving and gaining access to Debtors' books and records from various third parties.

(ii)    Collection of Accounts Receivable: The Trustee has incurred professional time and related expenses associated with pursuing collection of Debtors' accounts receivable balances. As a result of the Trustee's efforts to date, Debtors' estates have recovered in excess of $3 million.

(iii)   Turnover of Estate Funds: The Trustee has incurred professional time and related expenses associated with analyzing and pursuing the turnover of funds held in various escrow accounts, Debtors' prior cash management system, and various cash collateralizing letters of credit in excess of $23 million.

210.    The Trustee may recover from Debtors' secured creditors the costs and expenses associated with the above-referenced efforts to preserve and maximize the underlying collateral pursuant to 11 U.S.C. § 506(c).

**ANSWER:**    The Thirteenth Claim in the Complaint is not asserted against Defendant,

and therefore no response is required.

211.    To the extent the Black Diamond Entities hold liens on Debtors' assets, the above-referenced costs and expenses were reasonable and necessary for the preservation of the alleged collateral and, therefore, provided a direct benefit to the Black Diamond Entities as secured creditors.

**ANSWER:**    The Thirteenth Claim in the Complaint is not asserted against Defendant,

and therefore no response is required.

212.    The Black Diamond Entities were aware of the estate's efforts and expenditure of resources in this regard because they directly or impliedly consented to them in connection with certain pre-conversion agreements and/or had actual or constructive knowledge of them (including insofar as they received notice of all bankruptcy case filings, which included Rule 9019 settlement motions and interim professional fee applications).

**ANSWER:**    The Thirteenth Claim in the Complaint is not asserted against Defendant,

and therefore no response is required.

213.    Based on the above facts, the Trustee is entitled to charge the above-referenced costs and expenses, which benefited the Black Diamond Entities and were reasonable and

necessary to preserve and maximize Debtors' assets, against the Black Diamond Entities' alleged collateral.

**ANSWER:**   The Thirteenth Claim in the Complaint is not asserted against Defendant, and therefore no response is required.

## <u>AFFIRMATIVE DEFENSES</u>

Without assuming the burden of proof where such burden is otherwise on Plaintiff as a matter of applicable substantive or procedural law, Defendant asserts the following affirmative defenses:

### *First Defense*

Plaintiff does not state a claim upon which relief can be granted.

### *Second Defense*

Plaintiff's claims fail, in whole or in part, because Plaintiff cannot satisfy his burden of proof as to Defendant.

### *Third Defense*

Plaintiff's claims fail, in whole or in part, because the conduct alleged is protected by the application of the business judgment rule.

### *Fourth Defense*

Plaintiff's claims fail, in whole or in part, because the conduct alleged is protected by the application of the relevant documents.

### *Fifth Defense*

If the entire fairness standard applies, Plaintiff's claims are barred, in whole or in part, because the conduct and acts about which Plaintiff complains satisfy that standard.

### *Sixth Defense*

Plaintiff's claims are barred, in whole or in part, because he cannot demonstrate any breach of fiduciary duty by Defendant.

### Seventh Defense

Plaintiff's claims are barred, in whole or in part, because he cannot demonstrate knowing participation in any breach of fiduciary duty by Defendant.

### Eighth Defense

Plaintiff's claims are barred, in whole or in part, by the doctrine of reliance pursuant to 6 *Del. C.* § 18-406. Plaintiff is fully protected due to his reliance, in good faith, upon the records of the limited liability company and the information, opinions, reports or statements presented by any manager, member, office or employee of the Debtors and the information, opinions, reports or statements presented by other persons as to matters the Plaintiff reasonably believed were within such other person's professional or expert competence, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Debtors, or the value and amount of assets or reserves or contracts, agreements or other undertakings that would be sufficient to pay claims and obligations of the Debtors (or any one of them) or to make reasonable provision to pay such claims and obligations, or any other facts pertinent to the existence and amount of assets from which distributions to members or creditors might properly be paid.

### Ninth Defense

If Plaintiff's fraudulent transfer claims as to the Distribution fail, his claims against Defendant fail because Plaintiff cannot demonstrate any breach of fiduciary duty.

### Tenth Defense

Plaintiff's claims fail, in whole or in part, because Defendant did not receive any personal enrichment from the wrongs alleged in the Complaint.

### Eleventh Defense

The Trustee's claim for Breach of Fiduciary Duty is not supportable because the Debtors were wholly owned entities that were not insolvent at the time of the Distribution.

### Twelfth Defense

Defendant is protected from personal liability under Section 3.9 of the limited liability company agreement of BD Holdings.

### Thirteenth Defense

The Trustee lacks standing to bring some or all of its claims.

### Fourteenth Defense

Plaintiff is not entitled to recover the entirety of the damages sought against Defendant because Plaintiff has a duty to mitigate damages and/or reconcile filed proofs of claim against the appropriate debtor estate.

### Fifteenth Defense

Plaintiff's claims are barred by the statute of limitations.

### Sixteenth Defense

Plaintiff is not entitled to recover attorney's fees or costs and fees of litigation.

### Seventeenth Defense

The costs, damages, and penalties the Plaintiff seeks to recover are unreasonable, excessive, arbitrary, and capricious.

### Eighteenth Defense

Plaintiff's claims are barred by the equitable doctrines of waiver, laches, acquiescence, ratification, estoppel, unclean hands, and/or all other equitable defenses.

### *Nineteenth Defense*

Recovery, if any, on some or all of the Plaintiff's claims should be barred, reduced, impressed with a lien, or otherwise adjusted in the interests of equity.

### *Twentieth Defense*

Defendant is entitled to offset and/or recoup any judgment in favor of the Plaintiff from Defendant's claim against the Debtors for indemnification, pursuant to section 553 of the Bankruptcy Code, and applicable state laws, and/or pursuant to the doctrine of defensive recoupment under applicable Federal and state law.

### *Twenty-First Defense*

Defendant adopts by reference any applicable defense pleaded by any other defendant not expressly set forth herein.

### ADDITIONAL AFFIRMATIVE DEFENSES

Defendant hereby reserves and asserts all affirmative defenses available under any applicable state law.  Defendant presently has insufficient knowledge or information upon which to form a belief as to whether he may have other, as yet unstated, affirmative defenses available. Therefore, Defendant reserves the right to assert additional affirmative defenses in the event that discovery indicates that they would be appropriate.

### PRAYER FOR RELIEF

WHEREFORE, Defendant respectfully requests that the Court enter an order:

a.  Denying all relief requested in the Complaint;

b.  Entering judgment against Plaintiff and in favor of Defendant;

c.  Dismissing the Complaint with prejudice;

d.  Awarding Defendant his costs and disbursements, including reasonable expert and attorneys' fees, incurred in this action; and

e.      Granting Defendant such other and further relief as the Court deems just and appropriate.

## STATEMENT UNDER DEL. BANKR. L.R. 7012-1

Defendant does not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

*/s/ Jennifer R. Hoover*
Jennifer R. Hoover (No. 5111)
1313 North Market Street, Suite 1201
Wilmington, Delaware 19801
Telephone: 302.442.7010
Email: jhoover@beneschlaw.com

-and-

Sven T. Nylen (*admitted pro hac vice*)
Jacob H. Marshall (admitted *pro hac vice*)
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone:  312.624.6388
Email: snylen@beneschlaw.com
             jmarshall@beneschlaw.com

*Counsel for Defendants Rob Archambault, Terry Taft and Bob Unfried*

May 24, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2023, I caused the foregoing to be filed with the Clerk of

Court using the CM/ECF system, which will then send a notification of such filing to the following:

FOX ROTHSCHILD LLP
Seth A. Niederman (DE No. 4588)
919 N. Market Street, Suite 300
Wilmington, DE  19801-3062
Tel.: (302) 654-7444
Fax: (302) 656-8920
E-mail: sniederman@foxrothschild.com

KRAMER LEVIN NAFTALIS & FRANKEL LLP
William J. Trunk (admitted *pro hac vice*)
Jack A. Herman (admitted *pro hac vice*)
2000 K Street NW, 4th Floor
Washington, DC 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
E-mail: wtrunk@kramerlevin.com
        jherman@kramerlevin.com

ZAIGER LLC
Jeffrey H. Zaiger (admitted *pro hac vice*)
Judd A. Linden (admitted *pro hac vice*)
2187 Atlantic Street, 9th Floor
Stamford, CT 06902
Tel: (917) 572-7701
E-mail: jzaiger@zaigerllc.com
        jlinden@zaigerllc.com

PACHULSKI STANG ZIEHL & JONES LLP
Bradford J. Sandler
Colin R. Robinson
Peter J. Keane
919 North Market Street, 17th Floor
P O Box 8705
Wilmington, DE 19899
Tel: 302-652-4100
Fax: 302-652-4400
E-mail: bsandler@pszjlaw.com
        crobinson@pszjlaw.com
        pkeane@pszjlaw.com

KAUFMAN, COREN & RESS, P.C.
Steven M. Coren, Esq.
Benjamin M. Mather, Esq.
Janice I. Daul Felix, Esq.
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: 215-735-8700
Fax: 215-735-5170
E-mail: scoren@kcr-law.com
        bmather@kcr-law.com
        jfelix@kcr-law.com

*/s/ Jennifer R. Hoover*
Jennifer R. Hoover (No. 5111)

*Counsel for Defendants Rob Archambault, Terry Taft and Bob Unfried*